**EXHIBIT B**

Fulton County Superior Court
***EFILED***JT
Date: 12/10/2019 2:20 PM
Cathelene Robinson, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| JAMESON TAYLOR ANDERSON; DEAN ANDERSON; and ROGER MALDONADO | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | _____ 2019CV330376 |
| | ) | |
| USI ADVANTAGE CORP. and USI INSURANCE SERVICES, LLC | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' BRIEF SUPPORTING MOTION FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

COME NOW Plaintiffs Jameson Taylor Anderson ("Taylor Anderson"); Dean Anderson

("Dean Anderson"); and Roger Maldonado ("Maldonado") (collectively, the "Plaintiffs") by and

through undersigned counsel, and respectfully files this Brief Supporting their Motion for

Declaratory Judgment and Permanent Injunction.  As grounds therefore, Plaintiffs state as follows:

### I.    INTRODUCTION

Plaintiffs seek immediate injunctive relief against Defendants USI Advantage Corp ("USI

Advantage") and USI Insurance Services, LLC ("USI") (collectively the "USI entities" or

"Defendants").  This lawsuit arises in the context of a former employment relationship between

Plaintiffs and USI and seeks a declaratory judgment relating to certain restrictive covenants

contained within Taylor Anderson's "Employment Agreement" ("TA Employment Agreement"),

Taylor Anderson's "Restricted Stock Award Agreement" (the "Stock Agreement"), Dean

Anderson's "Employment Agreement" ("DA Employment Agreement"), and Maldonado's

"Confidentiality, Non-Solicitation & Non-Interference Agreement" ("Maldonado's

Confidentiality Agreement").

These several agreements purport to contain restrictive covenants which place severe restrictions on Plaintiffs post-employment activities. The Stock Agreement also contains an unenforceable New York choice-of-law and forum selection provision. As explained below, the relevant covenants contained in these agreements violate the Georgia Restrictive Covenant Act, O.C.G.A. § 13-8-50 *et. seq.* (the "RCA") and are unenforceable.

Plaintiffs recently resigned from USI due to an anticipated significant reorganization and staff reduction which would prevent them from adequately servicing clients' insurance needs. Because of restrictive covenants contained the agreements, their ability to obtain new employment and provide for themselves their family is now in serious jeopardy. Therefore, considering the circumstances and the patent facial unenforceability of the relevant covenants, Plaintiffs respectfully request that the Court grant their request for an emergency hearing and immediate injunctive relief as set forth in their Verified Complaint.[1]

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs' Employment with USI

USI is an insurance brokerage firm engaging in the provision of various types of commercial insurance. (Verified Comp. ¶ 16). USI Insurance employs more than 7,000 professionals and operates approximately 200 offices serving every state in the United States. (*Id.* ¶ 17).

Plaintiffs began working for USI in or about 2017 when USI acquired their former employer, Wells Fargo Insurance Services, Inc. ("WFIS"). (*Id.* ¶ 18). USI's acquisition of WFIS resulted in a combined entity that effectively doubled the client base of WFIS. (*Id.* ¶ 19).

---

[1] Plaintiffs incorporate their Verified Complaint as if fully set forth herein. A verified complaint serves as both pleading and evidence and can be used as evidence to support the entry of injunctive relief. *BEA Systems, Inc. v. Webmethods, Inc.*, 265 Ga. App. 503, 504 (2006).

Throughout their employment at USI, Plaintiffs have worked in the USI office located in Atlanta, Fulton County, Georgia. (*Id.* ¶ 20).

Taylor Anderson has worked as a client executive advising government, defense, aerospace and other commercial entities on how to identify risks, develop risk management strategies, structure insurance programs, and obtain insurance coverage appropriate to their needs. (*Id.* ¶ 21). His insurance business is focused on the aviation sector. (*Id.* ¶ 22).

Taylor Anderson's clients include entities which work with agencies of the United States government engaged in secret and sensitive activities related to national security and defense. Certain clients have sponsored Taylor Anderson to obtain security clearance from the government which allows him to provide these insurance services. (*Id.* ¶ 23). If Taylor Anderson were unable to provide insurance products and services to these clients, it could undermine, delay, or thwart missions which cannot be launched unless and until insurance coverage has been confirmed. (*Id.* ¶ 24).

The process of obtaining the required security clearance takes approximately a year, if clearance can be obtained at all. (*Id.* ¶ 25). USI is not authorized to provide, and thus cannot provide, the insurance services that Taylor Anderson provides to the certain clients whose insurance needs require security clearance. (*Id.* ¶ 26). No other individual employed with USI possesses security clearance sufficient to allow USI to provide the insurance products and services that Taylor Anderson provides to the government related clients. Thus, USI cannot retain and service these clients now that Taylor Anderson is no longer employed with USI. (*Id.* ¶ 27).

Dean Anderson worked for USI as the National Aviation Practice Leader. (*Id.* ¶ 28). At the time of his resignation, Dean Anderson had approximately ten Aviation Insurance/Risk professionals working in the National Aviation Practice. (*Id.* ¶ 31). During his time as Practice

3

Leader, Dean Anderson developed great respect for his team members and valued their contributions to ensuring that all client needs were met. (*Id.* ¶ 30).

The National Aviation Practice provided aviation insurance for clients in the a wide range of sectors including Municipal, Government and Private Airports, Ground Service Operations, Maintenance/Repair/Modification Companies, Products Manufacturers, Department of Defense, Aerospace Service Firms, Workers Compensation, Defense Base Act Insurance, Unmanned Aerial Vehicles (UAV's), Corporate Aviation/Aircraft Management Companies, Regional, National and International Air Carriers as well as Individual Aircraft Owners. (*Id.* ¶ 29).

Prior to and during his employment with USI, Maldonado worked as a Practice Leader in the National Aviation Practice. (*Id.* ¶ 32). Maldonado was responsible for developing new and existing customers relationships on a national level. (*Id.* ¶ 33).

**B.     The Restrictive Covenant Agreements**

   **1.     Taylor Anderson Employment Agreement ("TA Employment Agreement")**

When WFIS was acquired by the USI entities, Taylor Anderson was required to execute an "Employment Agreement," which contained very broad restrictive covenants, as a condition of his employment with WFIS and to remain employed with USI following its purchase. (*Id.* ¶ 34). (a copy of the TA Employment Agreement is attached here as Exhibit A). The TA Employment Agreement purports to place severe restrictions on Taylor Anderson's post-employment activities. Section 7 of the Employment Agreement is titled "Covenants" and contains, in relevant part, the following restrictive covenants: "Non-Solicitation of Clients and Active Prospective Clients" (Section 7.5), "Non-Competition With Respect to Client Accounts and Active Prospective Clients" (Section 7.6), "Non-Interference With Employees" (Section 7.7) and Notice of Termination (8.2).

The "Non-Solicitation" provision states:

***Non-Solicitation of Clients and Active Prospective Clients.***  In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a)   During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b)   During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

The "Non-Competition" provision states:

***Non-Competition With Respect to Client Accounts and Active Prospective Clients.***
In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer will refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Geographic Area. "Carrying on any business in competition with the Company" shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Producer had a role in the sale, marketing, distribution, or

5

development in the last two (2) years of Producer's employment hereunder, or about which Producer acquired Confidential Information. For purposes of this Section 7.6, the term "Geographic Area" shall include any territory within a one hundred (100) mile radius of any Company facility in which Producer maintained an office during the last twelve (12) months of Producer's employment hereunder, including any counties in the Geographic Area in which Producer conducted business or where Client Accounts or Active Prospective Clients with whom Producer had material contact in the two (2) years prior to termination of Producer's employment hereunder are present. It is expressly agreed that this Section 7.6 is not intended to restrict or prohibit the ownership by Producer of stock or other securities of a publicly-held corporation in which Producer (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

The "Non-Interference With Employees" provision states:

***Non-Interference With Employees.*** In consideration of Producer's employment with the Company, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement herewith; in each case with respect to any employee of the Company with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company.

The Notice of Termination restrictive covenant states:

***Termination by Producer.*** Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

### 2.     Taylor Anderson's Stock Agreement ("Stock Agreement")

Taylor Anderson and USI Advantage also entered into the Stock Agreement effective on

May 8, 2019 ("Stock Agreement"). (A copy of the Stock Agreement is attached here as Exhibit

B). The Stock Agreement conditionally granted certain restricted stock to Taylor Anderson and

was drafted by USI Advantage. (Verified Comp. ¶ 41). Taylor Anderson's stock grants under the

Stock Agreement did not vest prior to Anderson's separation from employment with USI. Under the terms of the Stock Agreement, the equity grant would not "vest," defined as becoming nonforfeitable in case of termination, unless and until Anderson remained continually employed by USI, or a related entity, through May 19, 2023. (Id. ¶ 42).

However, The Stock Agreement purports to place several restrictions on Anderson's post-employment activities. Specifically, Paragraph 11 of the Stock Agreement incorporates an Appendix A which contains, in relevant part, the following two restrictive covenants: "Non-Solicitation" and "No Hiring."

The "Non Solicitation" covenant states:

> **Non-Solicitation.** Except in the normal course of business on behalf of the Company or any of its Affiliates, the Participant will not, directly or indirectly, (x) solicit, sell, provide or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any person, corporation, firm or other entity whose account constituted a Client Account of a USI Company, at any time within the 24 months preceding the earlier of the date of such act or the date of termination of the Participant's employment with the Company and its subsidiaries, or (y) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of a USI Company, determined as of the earlier of the date of such act or the effective date of termination of the Participant's employment with the Company and its subsidiaries. The restrictions contained in this Paragraph (a) shall apply throughout the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years after the effective date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

The "No Hiring" covenant states:

> **No Hiring.** The Participant will not, directly than 5% of the voting capital stock of such corporation or (y) participate in any management or advisory capacity. The restrictions contained in this Paragraph (b) shall apply during the Participant's employment with the or indirectly, solicit the employment, consulting or other services of any other employee or independent producer of any USI Company or otherwise induce any of such employees to leave any USI Company's employment or to breach an employment or independent producer agreement therewith. The restrictions contained in this Paragraph ( c) shall apply during the Participant's employment with the Company and its

subsidiaries and thereafter until two (2) years following the date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

In the Stock Agreement, "USI Company" is defined to include USI Advantage and all of its subsidiaries, affiliates, associates, successors, and assigns.

### 3.    Dean Anderson Employment Agreement ("DA Employment Agreement")

When WFIS was acquired by the USI entities, Dean Anderson was required to execute an "Employment Agreement," which contained very broad restrictive covenants, as a condition of his employment with WFIS and to remain employed with USI following its purchase. (Verified Comp. ¶ 49). The DA Employment Agreement became effective on the date of the closing of the transaction pursuant to which USI purchased WFIS. (A copy of the DA Employment Agreement is attached here as Exhibit C).

The DA Employment Agreement purports to place severe restrictions on Dean Anderson's post-employment activities. Specifically, the DA Employment Agreement contains restrictive covenants in Section 7 titled "Covenants" and Section 8 titled "Termination." Specifically, it contains, in relevant part, the following restrictive covenants: "Non-Competition" (Section 7.5); "Non-Competition of Client Accounts" (Section 7.6), "Non-Solicitation of Clients and Active Prospective Clients" (Section 7.7), "Non-Interference With Employees" (Section 7.7), and Notice of Termination (8.2).

The "Non-Competition" covenant states:

> ***Non-Competition.*** In consideration of Executive's employment hereunder, and for other good and valuable consideration, Executive agrees, during the Term and for six (6) months after Executive is no longer employed hereunder, for any reason, Executive shall not, directly or indirectly, compete with the Company within the Restricted Geographic Area by: (a) acting in Executive's same or similar capacity, which Executive acted for the Company, on behalf of any Competitive Business; (b) performing Executive's same or similar functions, which Executive performed for the Company, on behalf of any Competitive Business; or (c) otherwise taking, facilitating

8

or encouraging any action to evade or attempt to evade the intent of this Section. *"Restricted Geographic Area"* means each of the following separate and divisible geographic areas: (a) the state in which Executive maintained his/her principal office for the Company during the last twelve (12) months of Executive's employment hereunder; (b) a one hundred (100) mile radius from any Company facility in which Executive maintained an office during the last twelve (12) months of Executive's employment hereunder; (c) any territory to which Executive has been assigned during the last twelve (12) months of Executive's employment hereunder; and (d) any area in the United States where the Company has conducted USI Business during the last twelve (12) months of Executive's employment hereunder. Notwithstanding the foregoing, in the event that (i) Executive terminates Executive's employment hereunder pursuant to Section 8.2 (Termination by Executive) within twelve (12) months following the Effective Date (a **"Voluntary Termination Event")** and (ii) the Company does not, within fifteen (15) business days of the Company's receipt of Executive's notice of termination (the **"Election Period"),** notify Executive of the Company's election to enforce this Section 7.5 (Non-Competition), then, following the later of (1) the effective date of such Voluntary Termination Event or (2) the end of the Election Period, this Section 7.5 (Non-Competition) shall be void and of no further force or effect. For the avoidance of doubt, any such election shall be made at the Company's sole discretion and in the event the Company elects, within the Election Period, to enforce this Section 7.5 (Non-Competition) (such election, the **"Non-Compete Election"),** then this Section 7.5 (Non-Competition) shall remain fully enforceable against Executive and Executive shall be entitled to the payments set forth in Section 8.3(e). Also, for the avoidance of doubt, the covenants set forth in this Section 7.5 shall remain in force for any termination hereunder, except as expressly stated in this Section 7.5.

The "Non-Competition of Client Accounts" covenant states:

*Non-Competition of Client Accounts.* During the Term and for (2) years after Executive is no longer employed hereunder, for any reason, Executive shall refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Restricted Geographic Area. **"Carrying on any business in competition with the Company"** shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Executive had a role in the sale, marketing, distribution, or development in the last two (2) years of Executive's employment with the Company or about which Executive acquired Confidential Information. It is expressly agreed that this Section 7.6 is not intended to restrict or prohibit the ownership by Executive of stock or other securities of a publicly-held corporation in which Executive (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

9

The "Non-Solicitation of Clients and Active Prospective Clients" restrictive covenant

states:

**Non-Solicitation of Clients and Active Prospective Clients.** In consideration of Executive's employment hereunder, and for other good and valuable consideration, Executive agrees that:

(a) During the Term and for two (2) years after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Executive managed or regularly serviced and/or about which Executive obtained Confidential Information on behalf of the Company within the last two (2) years of Executive's employment hereunder.

(b) During the Term and for six (6) months after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Executive solicited and/or about which Executive obtained Confidential information on behalf of the Company within the last six (6) months of Executive's employment hereunder.

The "Non-Interference with Employees" restrictive covenant states:

**Non-Interference With Employees.** In consideration of Executive's employment with the Company, and for other good and valuable consideration, Executive agrees, during the Term and for two (2) years after Executive is no longer employed hereunder, for any reason, Executive shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Executive worked or obtained knowledge about as a result of Executive's employment with the Company.

10

The Notice of Termination restrictive covenant states:

> ***Termination by Executive.*** Executive may terminate Executive's employment
> hereunder by giving at least sixty (60) days written notice to the Company. The
> termination of employment shall be effective on the date specified in such notice;
> provided, however, at any time following receipt of such notice, the Company may:
> (a) accept Executive's termination of employment hereunder effective on such earlier
> date specified by the Company; and/or (b) require Executive to cease performing any
> services hereunder until the termination of employment.

### 4.    Maldonado's Confidentiality, Non-Solicitation & Non-Interference Agreement ("Maldonado's Confidentiality Agreement")

When WFIS was acquired by the USI entities, Maldonado was required to execute the

Maldonado Confidentiality Agreement, which contained very broad restrictive covenants, as a

condition of his employment with WFIS and to remain employed with USI following its purchase.

(Verified Comp. ¶ 57).  Maldonado's Confidentiality Agreement became effective on the date of

the closing of the transaction pursuant to which USI purchased WFIS.  (A copy of Maldonado's

Confidentiality Agreement is attached here as Exhibit D).

Maldonado's Confidentiality Agreement purports to place severe restrictions on

Maldonado's post-employment activities. Maldonado's Confidentiality Agreement contains

restrictive covenants in Section 4 titled "Covenants."  Specifically, it contains, in relevant part, the

following restrictive covenants: "Non-Solicitation of Clients and Active Prospective Clients"

(Section 4.5), "Non-Competition with Respect to Client Accounts and Active Prospective Clients"

(Section 4.6), and Non-Interference with Employees (Section 4.7).

The "Non-Solicitation of Clients and Active Prospective Clients" covenant states:

> ***Non-Solicitation of Clients and Active Prospective Clients.*** In consideration of
> Employee's employment with the Company, and for other good and valuable
> consideration, Employee agrees that:
>
> (a) During Employee's employment with the Company and for two (2) years after
> Employee is no longer employed with the Company, for any reason, Employee

shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

The "Non-Competition With Respect to Client Accounts and Active Prospective Clients"

covenant states:

> ***Non-Competition With Respect to Client Accounts and Active Prospective Clients.***
> In consideration of Employee's employment hereunder, and for other good and valuable consideration, Employee agrees that, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee will refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Geographic Area. **"Carrying on any business in competition with the Company"** shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Employee had a role in the sale, marketing, distribution, or development in the last two (2) years of Employee's employment with the Company, or about which Employee acquired Confidential Information. For purposes of this Section 4.6, the term **"Geographic Area"** shall include any territory within a one hundred (100) mile radius of any Company facility in which Employee maintained an office during the last twelve (12)

months of Employee's employment hereunder, including any counties in the Geographic Area in which Employee conducted business or where Client Accounts or Active Prospective Clients with whom Employee had material contact in the two (2) years prior to termination of Employee's employment with the Company are present. It is expressly agreed that this Section 4.6 is not intended to restrict or prohibit the ownership by Employee of stock or other securities of a publicly-held corporation in which Employee (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (bl does not participate in any management or advisory capacity.

The "Non-Interference with Employees" restrictive covenant states:

*Non-Interference With Employees.* In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company.

## C.    Plaintiffs' Separation from Employment with USI

During Plaintiffs' Employment, USI maintained a national aviation insurance group. Dean Anderson and Maldonado were leaders in the group and Taylor Anderson worked closely with the group to provide specialized aviation services to clients across the country. (Verified Comp. ¶ 63).

During the summer and fall of 2019, USI indicated that it would be significantly reducing and altering the National Aviation Practice's size and nature, leaving it largely dismantled. Under the proposed changes, clients' aviation insurance needs would largely be handled locally by individual USI offices around the country instead of as currently by the national aviation insurance group. (Id. ¶ 64). As part of the possible reorganization, USI intended to make significant staff reductions, eliminating long-term and valued employees. (Id. ¶ 65).

13

In the days prior to Plaintiffs' resignations and in response to several departures by personnel in the national aviation insurance group to other brokers, USI suddenly indicated to Dean Anderson that it might not dismantle the National Aviation Practice. USI indicated, instead, that it might just reorganize the practice in some ways without significant layoffs of employees. USI's lack of a coherent and definite plan for the National Aviation Practice continued to undermine the Plaintiffs' confidence and trust in USI. One day the plan was to eliminate the national group; another day the plan was just diminishing the size of the group; then yet another day, once personnel were departing due to the plans to diminish the group, the plan suddenly shifted to retain the group in a reorganization, but without any details of when, how, or what kind of reorganization it would be. (Id. ¶ 68).

Due to these issues, Plaintiffs resigned their employment with USI on December 9, 2019. (Id. ¶ 69). Plaintiffs subsequently became affiliated with the Southeastern Series of Lockton Companies, LLC. (Id. ¶ 70).

Now that Plaintiffs have resigned their employment with USI, they are fearful and uncertain that USI and/or USI Advantage may attempt to enforce or pursue legal claims related to one or more of the unlawful restrictive covenants contained in the agreements detailed above. (Id. ¶ 71).

Enforcement of these illegal covenants would impose unlawful restrictions on Plaintiffs' ability to engage in commerce, trade, enjoy the fruits of their labors, and to earn a livelihood and provide for their family's well-being. (Id. ¶ 72). Plaintiffs are fearful and uncertain regarding their legal rights to solicit business opportunities and to accept business opportunities with regard to current and former clients of the USI entities and their related companies. (Id. ¶ 73). Plaintiffs are also fearful and uncertain regarding their ability to assist or participate in the hiring of USI

entity employees who may desire to separate from USI and obtain new employment with another company.  (Id. ¶ 74).

## II.    ARGUMENT AND CITATION OF AUTHORITY

As shown more fully below, injunctive relief enjoining the USI entities and any associated person or entity acting on their behalf from taking any action to enforce the unlawful restrictive covenants set forth in the TA Employment Agreement, the Stock Agreement, DA Employment Agreement, or Maldonado's Confidentially Agreement is appropriate.  Unless this Court enjoins Defendants, Plaintiffs will suffer irreparable harm in being subjected to illegal covenants in violation of the public policy of the state of Georgia, and in the form of losing their ability to provide necessary insurance products and services to clients who rely upon them to provide such products and services.  These restrictions will dramatically hinder the Defendants' general ability to engage in their chosen profession to support themselves and their families.

### A.    Forum Selection/Choice of Law Provision

#### 1.    Georgia does not enforce forum selection and choice of law provisions if they contravene Georgia public policy.

The forum selection and choice of law provision contained in the Stock Agreement is unenforceable because it contravenes Georgia public policy.  Georgia courts will not enforce a contractual provision that contravenes its public policy.  See *Davis v. Oasis Legal Fin. Operating Co., LLC*, 936 F.3d 1174 (11th Cir. 2019) (invalidating forum selection clause used by out-of-state lenders to avoid litigation in Georgia courts as contravening Georgia public policy).  Indeed, "[n]o principle of jurisprudence is better settled than this." *Glass v. Childs*, 9 Ga. App. 520, (Ga. App. 1911).  Georgia courts historically and uniformly refuse to enforce foreign choice of law provisions when application of the chosen law contravenes Georgia's public policy on restrictive

covenants. *Convergys Corp. v. Keener*, 276 Ga. 808 (2003). "On this principle, the cases are legion." *Id.* at 810.[2]

Applying this principle, Georgia law is clear that if upholding a forum selection clause would likely result in a foreign court applying a foreign law (here New York law) and enforcing restrictive covenants that are unenforceable under Georgia law, then the forum selection clause violates Georgia public policy and is invalid. *Carson v. Obor Holding Co., LLC*, 318 Ga. App. 645 (2012); *see also Holsinger v. Fortress Investment Group, LLC and Hybrid GP Holdings LL*, Case No. 2019CV315101 (Fulton County Superior Court March 20, 2019) (finding a New York forum selection and choice-of-law provision unenforceable as it was contrary to Georgia's public policy in a restrictive covenant case);[3] *Lapolla Indus. v. Hess*, 325 Ga. App. 256, 266-67 (2013) (physical precedent only) ("Because it is likely that a Texas court applying Texas law would enforce covenants in this case that are unenforceable under applicable Georgia law and public policy, the trial court did not err by refusing to enforce the forum selection and choice of law clauses"); *Bunker Hill Int'l, Ltd. v. Nationsbuilder Ins. Servs., Inc.*, 309 Ga. App. 503, 507 (2011) ("It follows that the agreement's forum-selection provision is void because its application would likely result in the enforcement by an Illinois court of at least one covenant in violation of Georgia public policy").

---

[2]    *See e.g. Barnes Group, Inc. v. Harper*, 653 F.2d 175,178 (5th Cir. 1981) (applying Georgia law over Ohio law); *Becham v. Synthes (U.S.A.)*, No. 5:11-CV-73 (MTT), 2011 U.S. Dist. LEXIS 103841, at *2 (M.D. Ga. Sep. 14, 2011) (applying Georgia law over Pennsylvania law) *aff'd*, 482 F. App'x. 387; *Boone v. Corestaff Support Services, Inc.*, 2011 WL 3418382, at *3-4 (applying Georgia law over Texas law); *Nasco*, 239 Ga. at 676 (applying Georgia law over Tennessee law); *Enron Capital & Trade Resources Corp. v. Pokalsky*, 227 Ga. App. 727, 729 (1997) (applying Georgia law over Texas law); *Marketing and Research Counselors, Inc. v. Booth*, 601 F. Supp. 615, 616 (N.D. Ga. 1985) (applying Georgia law over Texas law); *Wind Logistics Prof'l v. Universal Truckload, Inc.*, No. 1:16-cv-00068, 2019 U.S. Dist. LEXIS 161720, at *22 (N.D. Ga. Sep. 23, 2019) (applying Georgia law over Michigan law).
[3] A copy of this recent decision is attached here as Exhibit E.

Thus, "if a party can show both that a restrictive covenant violates Georgia public policy and that a court in the selected forum likely would find the restrictive covenant enforceable, a compelling reason exists to avoid the contractual forum selection clause." *Carson*, 318 Ga. App. at 648. In *Carson*, the Georgia Court of Appeals concluded:

> were Carson required to challenge the restrictive covenants at issue in a Florida court, applying Florida law, the covenants would almost certainly be upheld, despite the fact that they violate applicable Georgia law. Thus, enforcement of the forum selection clause would likely result in a violation of Georgia's then-existing public policy against certain agreements in partial restraint of trade.

*Id.* at 654. The same analysis applies here.

### 2.    A New York Court would likely apply New York law to the relevant covenants.

A New York Court would likely apply New York law to evaluate the enforceability of the covenants contained in the Stock Agreement since the Stock Agreement includes both a New York forum selection and New York choice-of-law provision. See *Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984) ("[u]nder New York law, great deference is to be given a contract's designation of the law that is to govern disputes arising from the contract"). New York state and federal courts routinely honor contractual choice of law provisions in the context of restrictive covenant cases as long as the jurisdiction whose law is to be applied has sufficient contacts to the dispute, and no fraud nor violation of fundamental public policy of the state of New York would result. *See State-Wide Capital Corp. v. Superior Bank FSB*, 98 Civ. 0817 (MJL)(KTD), 1999 U.S. Dist. LEXIS 6159, at *8 (S.D.N.Y. Apr. 28, 1999) (recognizing in covenant case "contracting parties' right to agree to choice of law"); *Hackett v. Millbank, Tweed, Hadley & McCloy,* 86 N.Y.2d 146 (1995) (court enforcing New York choice of law provision in covenant case).

To have bear a reasonable relationship to the dispute, the forum state selected in the contract must simply have sufficient contacts with the transaction. *Marsh USA Inc. v. Hamby*, 2010

NY Slip Op 51320(U), ¶ 3, 28 Misc. 3d 1214(A), 1214A, 958 N.Y.S.2d 61, 61 (Sup. Ct.) (finding sufficient contacts env though "defendants are residents of California, the alleged injuries occurred there, substantially all of the documentary evidence and potential witnesses are there" because employer was based in New York); *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)  ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.")

According to its website, USI is headquartered in Valhalla, New York.[4]   USI's headquarters coupled with New York's tendency to honor contractual choice of law provisions in restrictive covenant cases, indicates that a New York court interpreting the relevant covenants in this case would apply New York law.

### 3.    A New York Court would likely enforce one or more of the covenants in the Stock Agreement.

As detailed below, the relevant covenants contained in the Stock Agreement are unenforceable under Georgia law.  However, under New York law, these covenants would likely be enforced.  New York Courts regularly enforce customer non-solicitation provisions that prevent the acceptance of unsolicited business in direct contravention of Georgia law.  *Compare Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377, 297 S.E.2d 473, 475 (1982) (holding non-solicitation provision unenforceable because by prohibiting acceptance, it "prohibit[ed] more than the active solicitation or diversion of clients") and *Fine v. Commc'ns Trends, Inc.*, 305 Ga. App. 298, 306-07, 699 S.E.2d 623, 632 (2010) (holding non-solicitation provision unenforceable

---

[4]        https://www.usi.com/

because it prevented former employee "from merely accepting business without solicitation") *with Uniform Rental Div., Inc. v. Moreno,* 441 N.Y.S.2d 448 (N.Y. App. Div. 1981); *Bates Chevrolet Corp. v. Haven Chevrolet, Inc.,* 213 N.Y.S.2d 577 (N.Y. App. Div. 1961) (injunction issued to prevent former employee from "accepting business" from employer's customers in violation of employment covenant); *Ecolab, Inc. v. KP. Laundry Mach., Inc.,* 656 F. Supp. 894, 897 (S.D.N.Y. 1987) (preliminary injunction entered after finding that former employee violated covenant by accepting unsolicited orders).

Indeed, in *USI Ins. Serv., LLC v. Miner,* 801 F. Supp. 2d 175, 186 (S.D.N.Y. 2011), a USI Insurance prevailed on a nearly identical non-solicitation provision that did not allow a former employee to "solicit, sell, service, manage, provide, or **accept any request to provide."** The court expressly held that a 24-month prohibition on **"**accepting business from former clients who voluntarily and without any solicitation choose to continue to do business with [former employee]" was not overbroad under New York law. *Id* at 188.

Additionally, unlike Georgia, New York regularly enforce broad non-recruitment of employee provisions which contain no geographic imitation or limitation to co-workers with whom the former employee had a relationship. *Compare Becham v. Synthes USA*, 482 F. App'x 387, 393 (11th Cir. 2012) ("[T]he nonsolicitation-of-employees covenant fails because it lacks any territorial limitation.") and *Hulcher Servs. V. R.J. Corman R.R. Co. L.L.C.*, 247 Ga. App. 486, 492, 543 S.E.2d 461, 467 (2000) (finding covenant not to solicit customers or employees unreasonable when former employee "had no contact with customers or employees outside his work area sufficient to establish a relationship") *with Evolution Mkts., Inc. v. Penny*, 2009 NY Slip Op 51019(U), ¶ 26, 23 Misc. 3d 1131(A), 889 N.Y.S.2d 882 (Sup. Ct.) (enforcing a no-hire provision that contained no geographical limitation or relationship requirement) and *OTG Mgmt., LLC v.*

19

*Konstantinidis*, 2013 NY Slip Op 23187, ¶ 1, 40 Misc. 3d 617, 618, 967 N.Y.S.2d 823, 824 (Sup.

Ct.) (enforcing non-recruitment provision with no relationship requirement).  Indeed, in *Minor*

USI Insurance prevailed on a very similarly worded non-recruitment hire provision under New

York Law. 801 F. Supp. 2d 175, 187 (S.D.N.Y. 2011).

Accordingly, the New York forum selection and choice-of-law provision in the

Agreements should not be applied because it contravenes Georgia public policy.

**B.      Standard for Injunctive Relief**

Georgia courts routinely grant interlocutory injunctions when restrictive covenants are

unenforceable. *See Enron Capital & Trade Resources Corp. v. Pokalsky*, 227 Ga. App. 727 (1997)

(affirming grant of interlocutory injunction in declaratory judgment action when restrictive

covenants were unenforceable); *Hostetler v. Answerthink, Inc.*, 267 Ga. App. 325, 329 (2004)

("The final judgment in a declaratory judgment action, finding the restrictive covenants void and

unenforceable, should also have injunctive relief.").

"An interlocutory injunction may be issued to maintain the status quo if after balancing the

relative equities of the parties, it appears the equities favor the party seeking the injunction.  The

trial court's exercise of its discretion will not be disturbed by an appellate court unless a manifest

abuse of that discretion is shown or unless there was no evidence on which to base the ruling."

*Nguyen v. Tran*, 287 Ga. App. 888 (2007) (citing *Bernocchi v. Forcucci*, 279 Ga. 460, 461 (2005).)

The Declaratory Judgment Act expressly provides that "[t]he court **in order to maintain the**

**status quo pending the adjudication of the questions** or to preserve equitable rights, may grant

injunction and other interlocutory extraordinary relief in substantially the manner and under the

same rules applicable in equity cases." O.C.G.A. § 9-4-3 (emphasis added).

"Georgia courts and [the Eleventh Circuit] have not hesitated to find irreparable harm in

cases involving covenants not to compete." *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005) (citations omitted).

In determining whether injunctive relief is appropriate, the Court must consider the following:

> (1)    whether there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial;
>
> (2)    whether there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted;
>
> (3)    whether the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; and
>
> (4)    whether granting the injunction will not disserve the public interest.

*Holton v. Physician Oncology Servs., LP*, 292 Ga. 864, 866-67 (2013) (citing *SRB Investment Servs., LLP v. Branch Banking & Trust Co.*, 289 Ga. 1, 5 (2011)). Here, each of these factors support granting injunctive relief to Mr. McCollister. This Brief address each in turn, beginning with the merits.

**C.    There is a substantial likelihood Plaintiffs will Prevail on the Merits**

> **1.    The Covenants in the TA Employment Agreement are Unenforceable.**
>
> > **a.    The Non-Solicitation Covenant is Unenforceable**

The TA Employment Agreement's Non-solicitation of customers covenant does not comply with O.C.G.A. § 13-8-53 because its scope is too broad. A customer non-solicitation covenant can only restrict affirmative actions by a former employee and cannot prevent the acceptance of unsolicited business. *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377, 297 S.E.2d 473, 475 (1982); *Fine v. Commc'ns Trends, Inc.*, 305 Ga. App. 298, 306-07, 699 S.E.2d 623, 632 (2010) (holding non-solicitation provision unenforceable because it prevented former employee "from merely accepting business without solicitation"); *Orkin Exterminating Co. v.*

*Walker*, 251 Ga. 536, 539, 307 S.E.2d 914, 917 (1983) (holding broad prohibition on "servicing" unreasonable as it also prohibited mere acceptance).

Here, the non-solicitation covenant explicitly prohibits Taylor Anderson form "sign[ing] a broker of record letter with any Client Account [or Active Prospective Client] to provide services in competition with the Company." This prohibition applies equally to solicited and unsolicited business and thus is unenforceable. Taylor Anderson would be prohibited from servicing clients and prospective clients who independently and unrelatedly severed their relationship with USI and sought him out. USI has no legitimate business interest in these clients. Thus, the breadth of the Employment Agreement's non-solicitation of customers covenant renders it unenforceable.

Additionally, the Non-Solicitation covenant is also unenforceable because it is too vague and uncertain. Client Account and Active Prospective Account are both defined with reference to the "Company" (WFIS) and not USI. Similarly, the provision prohibits actions adverse to the "Company" (WFIS) and not USI. As a result, Taylor Anderson is uncertain if the prohibitions apply only to clients he had contact with as a WFIS employee or only to clients he had contact with as an USI employee or both. Non-solicitation covenants which are too vague and indefinite are invalid. See *Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, *8 (finding non-solicit unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components, Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, *26 (invalidating non-solicitation covenant because its terms were " ill-defined, ambiguous and wide-ranging"); *Matthew Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D. Ga. Sep. 9, 2013) (same).

    b.    **The Non-Competition Covenant is Unenforceable**

A covenant not to compete is enforceable if it is reasonable in time, geographic limit, and scope of prohibited activities. O.C.G.A. §13-8-53(a). "The plain language of O.C.G.A. § 13-8-53 requires a territorial restriction for a non-competition clause." *CCmulti, LLC v. Carle*, 2017 Ga. Super. LEXIS 588, *8 (finding a non-compete clause that lacked any geographical area but instead prohibited a subset of customers unenforceable).

The TA Employee Agreement's Non-Competition covenant at 7.6 has no territorial restriction. The provision states Taylor Anderson "will refrain from carrying on any business in competition with the Company, directly or indirectly **with respect to any Client Account or Active Prospective Client in the Geographic Area**." Client Account and Active Prospective Client are defined in the contract as being any person or entity that was serviced or solicited to be serviced by the Company.

Thus, the non-competition covenant prohibits Taylor Anderson from servicing any of the WFIS clients located within a 100-mile radius of WFIS's Fulton county office, regardless of where Anderson is located or whether he had any material contact with the client. In essence, the geographic scope exists only to define the client group, not to define the non-compete territory. For example, if Taylor Anderson started work for a competing business in Siberia, this provision would prohibit him from servicing a WFIS client's Siberian activity if that client also had a presence within 100 miles of WFIS's office. Since the covenant has no geographic limitation, it is does not comply with O.C.G.A. §13-8-53(a) and is unenforceable.

The Non-Compete covenant at Section 7.6 of the TA Employment Agreement also is invalid and unenforceable because the territory used to define the prohibited clients and prospects purports to include entire counties, and thus all clients and prospects within the entire county, if Taylor Anderson had even one client in that county. The covenant is unreasonable to prohibit

Taylor Anderson from doing any work with clients and prospects if they happen to reside in a county in which Taylor Anderson had contact with another client or prospect.

The Non-Compete covenant is also unenforceable because it is too vague and ambiguous. Client Account and Active Prospective Account are both defined with reference to the "Company" (WFIS) and not USI. Similarly, the provision prohibits actions adverse to the "Company" (WFIS) and not USI. As a result, Taylor Anderson is uncertain if the prohibitions apply only to clients he had contact with as a WFIS employee or only to clients he had contact with as an USI employee or both. Non-Solicitation covenants which are too vague, ambiguous, or indefinite are invalid. *See Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, *8 (finding non-solicit unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components, Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, *26 (invalidating non-solicitation covenant because its terms were "ill-defined, ambiguous and wide-ranging"); *Matthew Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D. Ga. Sep. 9, 2013) (same).

### c.   The Non-Interference with Employees Covenant is Unenforceable

Georgia law is clear that a non-interference/recruitment which contain "blanket prohibition" against hiring former employer's employees is an "unreasonable restraint on competition under Georgia law." *Wetherington v. Ameripath, Inc.*, 566 Fed. App'x. 850 (11th Cir. 2014); *Cox v. Altus Healthcare & Hospice, Inc.*, 308 Ga. App. 28, 32 706 S.E.2d 660 (2011) (holding such covenants do not "withstand the reasonableness test ").

Here, the Non-Interference covenant prohibits Taylor Anderson from "solicit[ing] the employment, consulting other services of, or hir[ing], any other employee of the Company." Such

24

a covenant is illegal and unenforceable because it prohibits Taylor Anderson from merely hiring any WFIS employee.

### d.     The Notice of Termination Provision is Unenforceable

Georgia law is clear that an employer cannot obtain injunctive relief to enforce a Notice of Termination provision. *Capricorn Sys. v. Pednekar*, 248 Ga. App. 424, 425, 546 S.E.2d 554, 557 (2001) (holding that notice termination provisions were **only** enforceable through "special damages [and]... nominal damages."). Additionally, the Notice of Termination provision is a restrictive covenant pursuant to O.C.G.A. § 13-8-51(15) as it designed to protect business relationships. However, the Notice of Termination provision contains no territorial restriction effectively prohibiting Taylor Anderson from working for any other company anywhere. Therefore, the Notice of Termination provision is is in violation of O.C.G.A. § 13-8-53 and cannot be enforced. *See also CCmulti, LLC v. Carle*, 2017 Ga. Super. LEXIS 588, *8 (finding a non-compete clause that lacked any geographical area unenforceable).

### 2.     The Covenants in the Stock Agreement are Unenforceable

#### a.     The Non-Solicitation of Customers Covenant in the Stock Agreement is Unenforceable

The Stock Agreement's Non-solicitation of customers covenant does not comply with O.C.G.A. § 13-8-53 because its scope is too broad. The covenant purports to prohibit the solicitation of clients of any "USI Company." USI Company is defined as "any of the [USI Advantage], its subsidiaries (including USI Holdings Corporation), its "affiliates" and "associates" (as defined in Rule 12b-2 of the regulations promulgated under the Exchange Act, without regard to whether any party is a "registrant" under such Act), and any of their successors or assigns."

USI Holdings Corporation's last publicly available 10K report which listed its subsidiaries in the required Exhibit 21.1 identified eighty-three (83) subsidiaries.[5] (A copy of Exhibit 21.1 is attached here as Exhibit F). Thus, the covenant purports to bar solicitation of any client of any USI entity, including entities for whom Taylor Anderson never worked and may not be aware. This restriction is strikingly overbroad and not enforceable under Georgia law.

The covenant also purports to prohibit Taylor Anderson from soliciting Client Accounts with whom he never worked. This prohibition is unreasonable and not in compliance with O.C.G.A. § 13-8-53(b) which limits customers covered by a non-solicitation agreement to those "whom the employee had material contact during his or her employment." *See also W. R. Grace & Co., Dearborn Div. v. Mouyal*, 262 Ga. 464, 467-68, 422 S.E.2d 529, 533 (1992) (customer non-solicitation provision must contain geographic restriction or be limited to those customers with whom employee had contact); *Carson v. Obor Holding Co., LLC*, 318 Ga. App. 645, 650, 734 S.E.2d 477, 482 (2012) ("Georgia law is clear that unless the non-solicit covenant pertains only to those clients with whom the employee had a business relationship during the term of the agreement, the nonsolicit covenant must contain a territorial restriction").

Moreover, covenant is also overbroad because under Georgia common law, customer non-solicitation covenants can only restrict affirmative action by a former employee and cannot prevent the acceptance of unsolicited business. *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377, 297 S.E.2d 473, 475 (1982); *Fine v. Commc'ns Trends, Inc.*, 305 Ga. App. 298, 306-07, 699 S.E.2d 623, 632 (2010) (holding non-solicitation provision unenforceable because it prevented former employee "from merely accepting business without solicitation"). Here, in addition to prohibiting

---

[5]      USI Holdings was bought by a private equity firm in 2006 and as a result is no longer required to publicly disclose its subsidiaries or affiliated companies.

affirmative acts of solicitation, the covenant also states Taylor Anderson cannot "provide or accept any request to provide…" competitive products. Therefore, the non-solicitation is unenforceable.

Finally, the covenant is invalid and unenforceable on because it prohibits solicitation of a "Client Account" of a USI Company and the term "Client Account" is defined to include any entity that was a client at unspecified point in time, even if such entity is no longer a client of a USI Company. *See Gill v. Poe & Brown of Ga.*, 241 Ga. App. 580, 583, (1999) (finding non-solicit covenant which applied to clients who had previously "severed their relationship" with the employer unreasonable); *Smith Adcock & Co. v. Rosenbohm*, 238 Ga. App. 281, 284-285 (518 S.E.2d 708) (1999) (finding similar covenant, applying to all "former company clients," was "an unreasonable partial restraint of trade").

   **b.     The No Hiring Covenant in the Stock Agreement is Unenforceable**

The No Hiring covenant is unenforceable because it is neither limited to a geographic territory nor limited to only co-workers with whom Taylor Anderson previously had a relationship. *Capricorn Sys., Inc. v. Pednekar*, 248 Ga. App. 424, 427 (2001) ("[S]uch restrictive covenant had no definite geographic area limitations as to competition, solicitation of clients, or recruiting of employees, which also renders the covenant unenforceable for being overbroad."); *Becham v. Synthes USA*, 482 F. App'x 387, 393 (11th Cir. 2012) ("[T]he non solicitation-of-employees covenant fails because it lacks any territorial limitation."); *Hulcher Servs. v. R.J. Corman R.R. Co. L.L.C.*, 247 Ga. App. 486, 492, 543 S.E.2d 461, 467 (2000) (finding covenant not to solicit customers or employees unreasonable when former employee "had no contact with customers or employees outside his work area sufficient to establish a relationship"); *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005) ("[T]he employee non-solicitation provision, which sets no geographical or relationship restriction, but rather prohibits . . . soliciting any . . .

employee, regardless of place or prior relationship . . .. The Georgia courts have refused to enforce such provisions."); *Wetherington v. Ameripath, Inc.*, 566 F. App'x 850, 852 (11th Cir. 2014) (covenant impermissibly barred former employee from hiring even such former employees with whom he had no relationship during his employment with the former employer); *ALW Mktg. Corp. v. Drunasky*, 1991 U.S. Dist. LEXIS 20326, at *18 (N.D. Ga. Dec. 30, 1991) (non-recruitment covenant in Georgia must contain a territorial restriction to be enforceable and is overbroad because it "covers not only general agents of the employer but also covers the administrative staff, which presumably includes even clerical and janitorial employees").

Here, the no-hire covenant is almost unlimited. It has no territorial limitation meaning that Taylor Anderson is prohibited from recruiting any "USI Company" employees worldwide. It also contains no restriction on the nature of the job a USI Company employee may be recruited for, such that Taylor Anderson would be prohibited from recruiting a USI Company janitor to be a salesman. Finally, the no hire covenant does not require that Taylor Anderson have had a relationship with the USI Company employee such that Taylor Anderson would be prohibited from recruiting any USI Company, including those he has never met and those who work for USI Companies with which he is unfamiliar. Given the extraordinary breadth of the no hire covenant, it is unenforceable under Georgia law.

### 3.   The Covenants in the DA Employment Agreement are Unenforceable.

#### a.   The Non-Competition Covenants are Unenforceable

The DA Employment Agreement's Non-competition covenants do not comply with O.C.G.A. § 13-8-53 because the geographic territory is not limited to the geographic area actually involved in his work and is too broad. Georgia has long recognized that the territorial restrictions in a non-compete should be confined to the geographic areas in which the employee worked for or

represented the employer. *Wiley v. Royal Cup, Inc.*, 258 Ga. 357, 370 S.E.2d 744 (1988); *See also CCmulti, LLC v. Carle*, 2017 Ga. Super. LEXIS 588, *8 (finding a non-compete clause that lacked any geographical area but instead prohibited a subset of customers unenforceable). Indeed, O.C.G.A. § 13-8-53(c)(1) continues this trend identifying a reasonable territory as "the geographic areas actually involved within a reasonable period of time prior to resignation."

Here however, the DA Employment Agreement purports to prohibit Dean Anderson from working anywhere "in the United States where the Company has conducted USI Business during the last twelve (12) months of the Executive's employment hereunder" (Section 7.5(d)) or "from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client" effectively nationwide (Section 7.6). Given that Dean Anderson never worked in an office at USI other than the Atlanta office and was never assigned a territory by USI during his employment, this nation-wide territorial restriction is overly broad and unreasonable. O.C.G.A. § 13-8-53(c).

The Non-Compete covenants are also unenforceable because they are too vague and ambiguous. Client Account and Active Prospective Account are both defined with reference to the "Company" (WFIS) and not USI. Similarly, the provision prohibits actions adverse to the "Company" (WFIS) and not USI. As a result, Dean Anderson is uncertain if the prohibitions apply only to clients he had contact with as a WFIS employee or only to clients he had contact with as an USI employee or both. Additionally, the covenants purport to apply to all clients and prospects in a territory, regardless of whether Dean Anderson ever had any contact with the client or prospect. There is no way for Dean Anderson to know whether or not he would be in violation of the covenants since it applied to clients/prospects with whom he never had contact and thus would not know if they are WFIS or USI clients.

29

Non-Solicitation covenants which are too vague, ambiguous, or indefinite are invalid.  See

*Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, *8 (finding non-solicit

unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components,*

*Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, *26 (invalidating non-

solicitation covenant because its terms were "ill-defined, ambiguous and wide-ranging"); *Matthew*

*Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D.

Ga. Sep. 9, 2013) (same).

Finally, the Non-Compete covenant at Section 7.5 of the DA Employment Agreement is

invalid and unreasonable on the grounds that is not a reasonable restriction on Dean Anderson's

employment in light of the fact that he was never assigned to the territories of either the state of

Georgia or 100 miles from his Atlanta office.  Further, the covenant is unreasonably redundant in

light of the restrictions purportedly imposed by the covenant at Section 7.6.

### b.    The Non-Solicitation Covenant is unenforceable

The DA Employment Agreement's Non-solicitation of customers covenant does not

comply with O.C.G.A. § 13-8-53 because its scope is too broad.  A customer non-solicitation

covenant can only restrict affirmative actions by a former employee and cannot prevent the

acceptance of unsolicited business.  *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377,

297 S.E.2d 473, 475 (1982); *Fine v. Commc'ns Trends, Inc.*, 305 Ga. App. 298, 306-07, 699

S.E.2d 623, 632 (2010) (holding non-solicitation provision unenforceable because it prevented

former employee "from merely accepting business without solicitation"); *Orkin Exterminating*

*Co. v. Walker*, 251 Ga. 536, 539, 307 S.E.2d 914, 917 (1983) (holding broad prohibition on

"servicing" unreasonable as it also prohibited mere acceptance).  .

Here, the non-solicitation covenant explicitly prohibits Dean Anderson from "sign[ing] a broker of record letter with any Client Account [or Active Prospective Client] to provide services in competition with the Company." This prohibition applies equally to solicited and unsolicited business and thus is unenforceable. Dean Anderson would be prohibited from servicing clients and prospective clients who independently and unrelatedly severed their relationship with USI and sought him out. USI has no legitimate business interest in these clients. Thus, the breadth of the DA Employment Agreement's non-solicitation of customers covenant renders it unenforceable.

Additionally, the Non-Solicitation covenant is also unenforceable because it is too vague and uncertain. Client Account and Active Prospective Account are both defined with reference to the "Company" (WFIS) and not USI. Similarly, the provision prohibits actions adverse to the "Company" (WFIS) and not USI. As a result, Dean Anderson is uncertain if the prohibitions apply only to clients he had contact with as a WFIS employee or only to clients he had contact with as an USI employee or both. Non-solicitation covenants which are too vague and indefinite are invalid. See *Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, *8 (finding non-solicit unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components, Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, *26 (invalidating non-solicitation covenant because its terms were " ill-defined, ambiguous and wide-ranging"); *Matthew Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D. Ga. Sep. 9, 2013) (same).

### c.  The Non-Interference with Employees Covenant is Unenforceable

Georgia law is clear that a non-interference/recruitment which contain "blanket prohibition" against hiring former employer's employees is an "unreasonable restraint on

competition under Georgia law." *Wetherington v. Ameripath, Inc.*, 566 Fed. App'x. 850 (11th Cir. 2014); *Cox v. Altus Healthcare & Hospice, Inc.*, 308 Ga. App. 28, 32 706 S.E.2d 660 (2011) (holding such covenants do not "withstand the reasonableness test ").

Here, the Non-Interference covenant prohibits Dean Anderson from "solicit[ing] the employment, consulting other services of, or hir[ing], any other employee of the Company." Such a covenant is illegal and unenforceable because it prohibits Dean Anderson from merely hiring any WFIS employee.

This covenant is also too vague and ambiguous because it is unclear if the prohibitions apply only to employees who were previously WFIS employees, apply to no one because there are no longer WFIS employees or apply to all USI employees. *See Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, at *8 (finding non-solicit unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components, Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, at *26 (invalidating non-solicitation covenant because its terms were "ill-defined, ambiguous and wide-ranging"); *Matthew Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D. Ga. Sep. 9, 2013).

### d.    The Notice of Termination Provision is Unenforceable

Georgia law is also clear that an employer cannot obtain injunctive relief to enforce a Notice of Termination provision. *Capricorn Sys. v. Pednekar*, 248 Ga. App. 424, 425, 546 S.E.2d 554, 557 (2001) (holding that notice termination provisions were **only** enforceable through "special damages [and]… nominal damages."). Additionally, the Notice of Termination provision is a restrictive covenant pursuant to O.C.G.A. § 13-8-51(15) as it is designed to protect business relationships. However, the Notice of Termination provision contains no territorial restriction effectively prohibiting Dean Anderson from working for any other company

32

anywhere. Therefore, the Notice of Termination provision is in violation of O.C.G.A. § 13-8-53

and cannot be enforced. *See also CCmulti, LLC v. Carle*, 2017 Ga. Super. LEXIS 588, *8

(finding a non-compete clause that lacked any geographical area unenforceable).

### 4. The Covenants in Maldonado's Confidentiality Agreement are Unenforceable.

#### a. The Non-Solicitation Covenant is Unenforceable

Maldonado's Confidentiality Agreement's Non-solicitation of customers covenant does

not comply with O.C.G.A. § 13-8-53 because its scope is too broad. A customer non-solicitation

covenant can only restrict affirmative actions by a former employee and cannot prevent the

acceptance of unsolicited business. *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377,

297 S.E.2d 473, 475 (1982); *Fine v. Commc'ns Trends, Inc.*, 305 Ga. App. 298, 306-07, 699 S.E.2d

623, 632 (2010) (holding non-solicitation provision unenforceable because it prevented former

employee "from merely accepting business without solicitation"); *Orkin Exterminating Co. v.

Walker*, 251 Ga. 536, 539, 307 S.E.2d 914, 917 (1983) (holding broad prohibition on "servicing"

unreasonable as it also prohibited mere acceptance).

Here, the non-solicitation covenant explicitly prohibits Maldonado from "sign[ing] a

broker of record letter with any Client Account [or Active Prospective Client] to provide services

in competition with the Company." This prohibition applies equally to solicited and unsolicited

business and thus is unenforceable. Maldonado would be prohibited from servicing clients and

prospective clients who independently and unrelatedly severed their relationship with USI and

sought him out. USI has no legitimate business interest in these clients. Thus, the breadth of the

DA Employment Agreement's non-solicitation of customers covenant renders it unenforceable.

Additionally, the Non-Solicitation covenant is also unenforceable because it is too vague

and uncertain. Client Account and Active Prospective Account are both defined with reference to

the "Company" (WFIS) and not USI.  Similarly, the provision prohibits actions adverse to the "Company" (WFIS) and not USI.  As a result, Maldonado is uncertain if the prohibitions apply only to clients he had contact with as a WFIS employee or only to clients he had contact with as an USI employee or both.  Non-solicitation covenants which are too vague and indefinite are invalid.  See *Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, *8 (finding non-solicit unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components, Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, *26 (invalidating non-solicitation covenant because its terms were " ill-defined, ambiguous and wide-ranging"); *Matthew Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D. Ga. Sep. 9, 2013) (same).

b.  <strong>The Non-Competition Covenants are Unenforceable</strong>

A covenant not to compete is enforceable if it is reasonable in time, geographic limit, and scope of prohibited activities.  O.C.G.A. §13-8-53(a).  "The plain language of O.C.G.A. § 13-8-53 requires a territorial restriction for a non-competition clause." *CCmulti, LLC v. Carle*, 2017 Ga. Super. LEXIS 588, *8 (finding a non-compete clause that lacked any geographical area but instead prohibited a subset of customers unenforceable).

Maldonado's Confidentiality Agreement's Non-Competition covenant has no territorial restriction.  The provision states Maldonado "will refrain from carrying on any business in competition with the Company, directly or indirectly **with respect to any Client Account or Active Prospective Client in the Geographic Area**."  Client Account and Active Prospective Client are defined in the contract as being any person or entity that was serviced or solicited to be serviced by the Company.

Thus, the non-competition covenant prohibits Maldonado from servicing any of the WFIS clients located within a 100-mile radius of WFIS's Fulton county office, regardless of where Maldonado is located or whether he had any material contact with the client. In essence, the geographic scope exists only to define the client group, not to define the non-compete territory. For example, if Maldonado started work for a competing business in Siberia, this provision would prohibit him from servicing a WFIS client's Siberian activity if that client also had a presence within 100 miles of WFIS's office. Since the covenant has no geographic limitation, it is does not comply with O.C.G.A. §13-8-53(a) and is unenforceable.

The Non-Compete covenant at Section 4.6 of the TA Employment Agreement also is invalid and unenforceable because the territory used to define the prohibited clients and prospects purports to include entire counties, and thus all clients and prospects within the entire county, if Maldonado had even one client in that county. The covenant is unreasonable to prohibit Maldonado from doing any work with clients and prospects if they happen to reside in a county in which Maldonado had contact with another client or prospect.

The Non-Compete covenant is also unenforceable because it is too vague and ambiguous. Client Account and Active Prospective Account are both defined with reference to the "Company" (WFIS) and not USI. Similarly, the provision prohibits actions adverse to the "Company" (WFIS) and not USI. As a result, Maldonado is uncertain if the prohibitions apply only to clients he had contact with as a WFIS employee or only to clients he had contact with as an USI employee or both. Non-Solicitation covenants which are too vague, ambiguous, or indefinite are invalid. *See Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, *8 (finding non-solicit unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components, Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, *26 (invalidating non-

solicitation covenant because its terms were "ill-defined, ambiguous and wide-ranging"); *Matthew Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D. Ga. Sep. 9, 2013) (same).

### c.   The Non-Interference with Employees Covenant is Unenforceable

Georgia law is clear that a non-interference/recruitment which contain "blanket prohibition" against hiring former employer's employees is an "unreasonable restraint on competition under Georgia law." *Wetherington v. Ameripath, Inc.*, 566 Fed. App'x. 850 (11th Cir. 2014); *Cox v. Altus Healthcare & Hospice, Inc.,* 308 Ga. App. 28, 32 706 S.E.2d 660 (2011) (holding such covenants do not "withstand the reasonableness test ").

Here, the Non-Interference covenant prohibits Maldonado from "solicit[ing] the employment, consulting other services of, or hir[ing], any other employee of the Company." Such a covenant is illegal and unenforceable because it prohibits Maldonado from merely hiring any WFIS employee.

This covenant is also too vague and ambiguous because it is unclear if the prohibitions apply only to employees who were previously WFIS employees, apply to no one because there are no longer WFIS employees or apply to all USI employees.  *See Jack Boutwell, C.P.A., P.C. v. Stone-Benton*, 2013 Ga. Super. LEXIS 441, at *8 (finding non-solicit unenforceable because it was "overbroad, vague, and ambiguous"); *World Micro Components, Inc. v. Crestwood Tech. Grp. Corp.*, 2014 Ga. Super. LEXIS 2520, at *26 (invalidating non-solicitation covenant because its terms were "ill-defined, ambiguous and wide-ranging"); *Matthew Focht Enters. v. Lepore*, No. 1:12-cv-04479-WSD, 2013 U.S. Dist. LEXIS 127894, at *15 (N.D. Ga. Sep. 9, 2013).

### 5.   The Covenants Cannot be Salvaged by Judicial Modification

Under the RCA, a court "may modify" a void or unenforceable covenant to make it comply with Georgia law. O.C.G.A. §§ 13-8-53(d) and 13-8-54(b). However, "[t]hough courts may strike unreasonable restrictions, and may narrow over-broad territorial designations, courts may not completely reform and rewrite contracts by supplying new and material terms from whole cloth." *Lifebrite Labs., LLC v. Cooksey*, No. 1:15-CV-4309-TWT, 2016 U.S. Dist. LEXIS 181823, at *19 (N.D. Ga. Dec. 9, 2016); See also *Hamrick v. Kelley*, 260 Ga. 307, 308 (1990), ("The 'blue pencil' marks, but it does not write. It may limit an area, thus making it reasonable, but it may not rewrite a contract void for vagueness, making it definite by designating a new, clearly demarcated area").

As set forth above, the restrictive covenants contained in Plaintiffs' several agreements are extraordinarily broad. Moreover, the nature of the defects in the covenants make it impossible for a court to reasonably limit the provision by only striking offending portions. In order to make these covenants comply with the RCA, a court would have to "supply[] new and material terms from whole cloth." *Lifebrite Labs., LLC v. Cooksey*, No. 1:15-CV-4309-TWT, 2016 U.S. Dist. LEXIS 181823, at *19 (N.D. Ga. Dec. 9, 2016). Therefore, this court should exercise its discretion and not modify any of the unreasonable covenants.

**D.      Without an Injunction, Plaintiffs Will Suffer Irreparable Harm**

Absent injunctive relief, Plaintiffs will suffer irreparable harm. Plaintiffs are the primary source of income for their family and without the requested relief their ability to make a living in their chose profession will be severely harmed. Moreover, they would lose all of their customer relationship. The damage would be real and immediate, not hypothetical. Plaintiffs would suffer irreparable harm "which cannot be undone through monetary remedies, in the form of unenforceable restrictions on his access to customers . . . . These injuries are in the form of lost opportunities, which are difficult, if not impossible, to quantify." *MacGinnitie*, 420 F.3d at 1240.

Indeed, Plaintiffs' current situation is akin to the Plaintiff in *Enron Capital & Trade Resources Corp. v. Pokalsky*, 227 Ga. App. 727 (1999).   There, a former employee initiated a declaratory judgment action against his former employer regarding unlawful covenants against competition.   At the commencement of the action, the trial court "issued a temporary restraining order against Enron, prohibiting Enron from seeking to enforce the non-competition obligations, acting to preclude Pokalsky and [his new employer] from engaging in an employment relationship, and benefiting from the enforcement of those provisions" in Georgia or any other territory.   *Id.* at 728.   The Georgia Court of Appeals affirmed, finding the trial court's decision "proper." *Id.* at 729-730.   *See also Hostetler v. Answerthink, Inc.*, 267 Ga. App. 325, 330 (2004) (holding temporary or interlocutory injunction with extra-territorial effect enforceable).

**D.      The Threatened Injury to Plaintiffs Outweighs any Harm to Defendants**

The only "harm" Defendants would suffer if an injunction is granted is their inability to illegally restrict competition with Plaintiffs.   In short, Plaintiffs seek only to prevent Defendants from doing what they have no right to do – take action to enforce the unenforceable covenants.

**E.      An Injunction Would Serve the Public Interest**

A long line of Georgia case law makes clear that the public has a strong interest in being protected from unreasonable restrictive covenants.   Accordingly, the public interest would be served best by preventing the Defendants from attempting to enforce the unreasonable covenants in this case.

## III.      REQUEST FOR EMERGERNCY HEARING

In light of the exigent circumstances described herein, Plaintiffs respectfully request the Court set an Emergency Hearing on this matter.   Absent such relief, it is a distinct possibility that Plaintiffs will suffer harm to their ability to financially provide for their family.

## IV.   CONCLUSIONS

Due to the unenforceability under Georgia law of the relevant restrictive covenants, there is a substantial likelihood that Plaintiffs will prevail on the merits of their claim for declaratory relief.  Plaintiffs thus respectfully requests that the Court:

(a)     That the Court immediately hear his request for temporary injunctive relief and advance the trial on the merits of this action and consolidate such trial with an interlocutory injunction hearing pursuant to O.C.G.A. Sec. 9-11-65(a)(2);

(b)     That the Court temporarily and permanently enjoin the defendants, and any associated person or entity acting on their behalf, from attempting or threatening, in any way, and in any forum or jurisdiction:

        (i)     to enforce the unenforceable restrictive covenants against Plaintiff;

        (ii)     to seek to recover damages or other remedies based upon any alleged violation of the restrictive covenants; and,

        (iii)     to take any action to preclude or disrupt Anderson's employment or new business venture;

(c)     That the Court grant Plaintiffs' requested declaratory relief; and,

(d)     That the Court award Plaintiff any further relief it deems just and proper.

Respectfully submitted this 9th day of December 2019.

*/s/Warren R. Hall, Jr.*
Warren R. Hall, Jr.
Georgia Bar No. 319405
whall@hgrslaw.com
Wayne M. Cartwright
Georgia Bar No. 257328
wcartwright@hgrslaw.com

Hall, Gilligan,
Roberts & Shanlever, LLP
3340 Peachtree Road – Suite 1900

Atlanta, Georgia 30326
T: 404-442-8776
F: 404-537-5555

*Counsel for Plaintiffs*

# EXHIBIT A

*Execution Version*

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("**Agreement**"), effective as of the Effective Date (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**"), and Jameson Taylor Anderson ("**Producer**"). The Company and Producer are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Producer, the Company desires to employ Producer on the terms and conditions herein and Producer is willing to accept employment on such terms and conditions; and

WHEREAS, Producer's covenants herein are a material inducement for the Company to enter into this Agreement; and

WHEREAS, Producer acknowledges and agrees that by virtue of employment with the Company, Producer will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, Producer hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Producer is not otherwise entitled and constitutes material and sufficient consideration to induce Producer to enter into this Agreement; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Producer:

(a)  had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will continue to develop, or will develop close and direct relationships with such customers and suppliers; and

(c) has developed, will continue to develop and/or will develop, as applicable, close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d) has benefitted, will continue to benefit and/or will benefit, as applicable, from the Company's investment of time, money and trust in Producer and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e) has made use of, and will continue to make use of, Producer's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Producer acknowledges are special, unique or extraordinary; and

WHEREAS, Producer acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Producer's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1. **DEFINITIONS.** Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) **"Active Prospective Client"** means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

(b) **"Cause"** shall mean (i) commission by Producer of a willful and material act of dishonesty in the course of Producer's duties hereunder; (ii) conviction of Producer by a court of competent jurisdiction of a crime constituting a felony or conviction in respect of any act involving fraud, dishonesty or moral turpitude; (iii) Producer's performance under the influence of illegal drugs or the abuse of legal drugs, or continued habitual intoxication, during working hours, after the Company shall have provided notice to Producer and given Producer 30 days within which to commence rehabilitation with respect thereto, and Producer shall have failed to commence such rehabilitation or continued to perform under the influence after such rehabilitation; (iv) frequent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause, in the event such condition shall not have been cured; (v) Producer's personal, willful and continuing misconduct or gross negligence that is injurious to the Company's reputation or business; (vi) refusal to perform duties and responsibilities described in this Agreement (or as they may be assigned from time to time), or to carry out reasonable and lawful directives of the Regional CEO or such Regional CEO's designee, including with respect to execution of any material policy; in each case which, if capable of being cured, shall not have been cured within 60 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause; or (vii) material non-compliance with the terms of this Agreement.

(c) **"Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(d) **"Coded to Producer"** means all policies and other business coded to Producer, as determined in good faith by the Company based on standards generally used in the insurance industry. In the event of a dispute it shall be the Company's sole and absolute discretion to determine the coding attributable to Producer.

(e) **"Competitive Business"** means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of

a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(f)   **"Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which Producer has acquired Confidential Information.

(g)   **"Confidential Information"** means at any date, any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to:   (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(h)   **"Effective Date"** means the Closing date.

(i)   **"Goodwill"** means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts,

business transactions, Confidential Information, or other efforts to develop lasting relationships.

(j) **"Net Commissions and Fees"** means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to Producer, less payments to external service providers such as, but not limited to vendors and value-added service providers, and/or to other USI Companies, and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided for by local USI practice. "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

(k) **"New"** means any policy lines of coverage for a new client or any new policy lines of coverage for an existing client written by the Company or the other USI Companies, as the case may be. New will not encompass any client for which similar coverage was "In-Force" in the previous twelve (12) months and such business will be considered Renewal business. For policies with a coverage period of more than twelve (12) months, New shall be determined by the Company in accordance with the Company's policies in effect at such time.

(l) **"Person"** means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(m) **"Predecessor"** means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(n) **"Producer's Book of Business"** means the annual Net Commissions and Fees received by the Company on Client Accounts Coded to Producer.

(o) **"Renewal"** means the second and any subsequent year of any New coverage. For policies with a coverage period of more than twelve (12) months, Renewal shall be determined by the Company in accordance with the Company's policies in effect at such time.

(p) **"USI Business"** means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(q) **"USI Companies"** or **"USI Company"** means USI Advantage Corp., a Delaware corporation ("USI"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether

any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

## 2. POSITION, RESPONSIBILITIES AND TERM

2.1 **Position and Responsibilities.** On the terms and conditions in this Agreement, and conditioned upon the Closing, the Company shall employ Producer as a producer for the Company. Producer shall perform all services and duties customarily attendant to such position, including the goals outlined in any applicable Producer expectation form as amended from time to time, and such other services and duties commensurate with such position as prescribed from time to time by Producer's Regional Chief Executive Officer or his/her designee (hereinafter, the **"Regional CEO"**). Nothing in this Agreement shall confer upon Producer any right to continued employment hereunder or interfere with the Company's right to change the terms and conditions of Producer's employment hereunder.

2.2 **Insurance Licenses.** Producer shall obtain and retain the proper licenses for all lines of insurance solicited and serviced by Producer. Notwithstanding anything to the contrary in this Agreement, Producer acknowledges Producer is not entitled to any commissions for sales or servicing of policies within a line of insurance if Producer is not properly licensed for such line of insurance.

2.3 **No Conflicts of Interest.** During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4 **Duty of Loyalty.** Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

2.5 **Term.** This Agreement, including Producer's employment hereunder, shall commence on the Effective Date and continue until terminated pursuant to Section 8 (the **"Term"**).

## 3. COMPENSATION AND BENEFITS

3.1 **Draw.** The Company agrees to pay Producer commissions, calculated pursuant to Section 3.2, and a recoverable draw against such future commissions in an amount determined by the Company based on Producer's Book of Business (**"Draw"**); provided, however, that the Company may adjust Producer's Draw upward or downward in its discretion to fairly reflect the commissions Producer will likely earn based on Producer's Book of Business. The Draw shall be offset by commissions earned by Producer

pursuant to this Agreement.  The Draw will be payable in equal installments by the Company (or another USI Company designated by the Company) according to its normal payroll practices.

3.2  *Calculation of Commissions*.   The Company agrees to pay Producer commissions calculated in accordance with the following policies:

(a)  Forty percent (40%) of annual Net Commissions and Fees received by the Company on Client Accounts for New policies (and thirty percent (30%) on New surety products), subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.  For the avoidance of doubt, Producer shall not be paid commissions for New policies on accounts below the account minimums set forth in Section 3.2(e) below.

(b)  Twenty-five percent (25%) of annual Net Commissions and Fees received by the Company on Client Accounts for Renewal policies (and thirty percent (30%) on Renewals of surety products and zero percent (0%) on Renewals of personal lines policies), subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.  For the avoidance of doubt, Producer shall not be paid commissions for (i) Renewal policies on personal lines policies or (ii) accounts that fall below the account minimums set forth in Section 3.2(e) below.

(c)  An amount determined on a case by case basis by the Company for Client Accounts where a substantial portion of fee based revenue is attributable in whole or part to Producer's efforts as an originating/selling or servicing producer.

(d)  An amount determined by the Company's policies then in effect on Client Accounts, including cross-sold business and transferred business, for which Producer is not both the sole originating/selling producer and the sole servicing producer.

(e)  No commission will be paid on Client Accounts Coded to Producer that generate annual Net Commissions and Fees of less than Ten Thousand Dollars ($10,000) on commercial property and casualty, or Ten Thousand Dollars ($10,000) on employee benefits.  There shall be no account minimum on surety products.

(f)  Producer's commissions shall be reduced by payments to co-brokers, sub-brokers, and sub-producers (including commissions and fees), referral fees, and return commissions, so that the Company's total payments to all Persons from the Net Commissions and Fees do not exceed any applicable maximum commission percentages under Company policy as amended from time to time.

(g) Producer's commissions shall be reduced by, and Producer shall have an ongoing duty to return to the Company, any commissions previously paid to Producer on premiums or fees subsequently refunded or not collected by the Company. Producer shall be subject to any Company policies regarding charges to and/or deductions from commissions in effect at the time such commissions are determined. Producer shall also be subject to any Company policies, as amended from time to time, regarding bad debts and write-offs from clients that require reimbursement from Producer.

(h) Producer's commissions shall not be considered earned until all charges and/or deductions have been made pursuant to this Agreement and the Company's compensation policies. In addition, such commissions only become earned by Producer if: (i) the business transaction is completed during Producer's employment hereunder; and (ii) Producer is still employed hereunder on the date the Company receives such commissions.

3.3 **Payment of Commissions.** The Company shall calculate, no less often than quarterly, commissions earned by Producer and received by the Company. Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance. Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after each quarter. If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall may be offset against installments of Producer's Retention Payment under Section 4 and/or installments of Producer's Draw for subsequent quarters and Producer's Draw for the subsequent quarter may be reduced commensurate with current earned commission levels to minimize the risk of a shortfall in the new period.

3.4 **Commissions Upon Termination.** Producer acknowledges that Producer shall not be eligible to earn or receive any commissions received by the Company after Producer is no longer employed hereunder because Producer will no longer be performing the essential duties of Producer's position which form the basis for such compensation. Accordingly, if Producer's employment hereunder is terminated for any reason, including death, the Company shall calculate commissions earned by Producer and received by the Company prior to Producer's termination. Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance. Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after the effective date of Producer's termination. No further commissions shall be due or payable after such payment. If Producer's Draw and any other applicable offsets for such period exceed Producer's

earned commissions, such shortfall shall be due and payable to the Company within sixty (60) days after the effective date of Producer's termination.

3.5  *Right to Modify.* The Company may modify the policies and terms in Section 3 by giving at least thirty (30) days written notice to Producer, provided, however, that the Company may not modify the commission percentages set forth in Section 3.2(a) and 3.2(b) prior to the end of the Measurement Period without Producer's consent. For the avoidance of doubt, the Company may modify any commission percentages following the end of the Measurement Period. Producer's continued employment hereunder following any change shall be considered sufficient consideration for, and acceptance of, such change.

3.6  *Tax Withholding.* The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.7  *Benefits.* Producer shall be entitled to benefits, other than paid time off, on the same terms generally provided to similar employees of the Company. Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for producers of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.8  *Paid Time Off.* Producer shall not accrue or be entitled to any paid time off ("PTO") under this Agreement or the Company's PTO policy.

4.  **RETENTION BONUS PAYMENT.** Producer shall be eligible for a special retention bonus payment (the "Retention Payment").

4.1  *Amount.* The amount of the Retention Payment shall be equal to ninety percent (90%) of the average annual Net Commissions and Fees received by the Company (subject to the exceptions set forth at the end of this Section 4.1) in each case, for Client Accounts assigned and Coded to Producer as the sole originating/selling and sole servicing employee during each of (a) the period beginning on the first anniversary of the Effective Date and ending one (1) day prior to the second anniversary of the Effective Date, (b) the period beginning on the second anniversary of the Effective Date and ending one (1) day prior to the third anniversary of the Effective Date and (c) the period beginning on the third anniversary of the Effective Date and ending one (1) day prior to the fourth anniversary of the Effective Date (collectively, the "**Measurement Period**"). By way of example, if the Effective Date is December 1, 2017, and Net Commissions and Fees in Producer's book of business (subject to the exceptions set forth at the end of this Section 4.1) are $900,000 for the year beginning December 1, 2018 and ending November 30, 2019 $1,000,000 for the year beginning December 1, 2019 and ending

November 30, 2020, and $1,100,000 for the year beginning December 1, 2020 and ending November 30, 2021, the amount of the Retention Payment would be $900,000 (the average of $900,000, $1,000,000 and $1,100,000 equals $1,000,000, multiplied by ninety percent (90%) equals thereto). When calculating the Net Commissions and Fees received by the Company, the following Net Commissions and Fees shall be excluded and not counted toward the Retention Payment (i) Client Accounts transferred to Producer by the Company or a USI Company, (ii) life insurance, other heaped commission life and health insurance products, and any heaped commission property and casualty insurance products, (iii) Net Commissions and Fees for Client Accounts that do not meet the account minimums required to receive commissions as set forth in this Agreement, any amendment thereto or any modification pursuant to Section 3.5, and (iv) large, non-recurring, and unusual commissions and fees, each as reasonably determined by the Company.

4.2   *Timing and Eligibility.* The Company shall pay Producer fifty percent (50%) of the Retention Payment within forty-five (45) days following the end of the Measurement Period, and the remaining fifty percent (50%) of the Retention Payment shall be paid to Producer on the payroll date immediately following the first anniversary of the payment of the first installment.  Continuing on with the example in Section 4.1 above, the first installment of $450,000 would be paid within forty-five (45) days after November 30, 2021, and the remaining installment of $450,000 would be paid on the payroll date immediately following the one (1) year anniversary of the date of payment of the first installment.  If Producer's employment with the Company terminates or Producer is not actively employed on the dates the installment payments under this Section 4.2 are due, Producer shall not earn or be paid such installment.  Notwithstanding the foregoing, if Producer is employed by the Company as of the last day of the Measurement Period and the Company thereafter terminates Producer's employment without Cause, or Producer's employment terminates by reason of death or disability, or if Producer becomes employed by a successor or assign of the Company, then Producer or Producer's estate shall nevertheless be eligible to receive any installment payment Producer would otherwise be eligible to receive, in accordance with the timetable set forth in this Section 4.2.  For the avoidance of doubt, if (i) the Company terminates Producer's employment with Cause before or after the Measurement Period, (ii) Producer resigns or terminates employment for reasons other than death or disability after the Measurement Period, or (iii) Producer is not actively employed with the Company for any reason before the end of the Measurement Period, then in each case, Producer shall not earn or be paid any installment of the Retention Payment that Producer has not already been paid.  Each installment of the Retention Payment is subject to offset as set forth in Section 3.3.

5. **EXPENSES.** During the Term, the Company shall reimburse Producer, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses

reasonably and properly incurred by Producer in connection with the performance of Producer's duties hereunder and the conduct of the business of the Company.

6. **COMPANY PROPERTY.** Producer acknowledges and agrees all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Producer has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Producer's employment.   Producer further acknowledges and agrees that Producer has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

7. **COVENANTS**

7.1 *Confidential Information.*  The Company agrees to provide Producer with Confidential Information to assist Producer in the course and scope of Producer's duties.  Producer acknowledges that the Company's agreement to provide this Confidential Information to Producer is in consideration for, and ancillary to, Producer's agreement to the other terms in this Agreement.

7.2 *Confidentiality During and Following Term.*  During the Term and for five (5) years after Producer is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except:  (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).  Nothing in this Agreement shall prohibit Producer from disclosing data or information which has been independently developed and disclosed by others or which has otherwise entered the public domain through lawful means.

7.3 *Defend Trade Secrets Act Required Notice.*  Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Producer acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:  (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**WELLS FARGO INSURANCE SERVICES USA, INC.**    **EXECUTIVE**

By: _____    By: _____

      Ernest J. Newborn, II                          Robert Dean Anderson
      Secretary

# EXHIBIT D

## CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT

This CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT ("**Agreement**"), effective as of the **Effective Date** (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**") and Roger Maldonado ("**Employee**"). The Company and Employee are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Employee, the Company desires to employ Employee on the terms and conditions herein and Employee is willing to accept employment on such terms and conditions; and

WHEREAS, Employee's covenants herein are a material inducement for the Company to enter into an at-will employment relationship with Employee pursuant to this Agreement; and

WHEREAS, Employee hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Employee is not otherwise entitled and constitutes material and sufficient consideration to induce Employee to enter into this Agreement; and

WHEREAS, Employee acknowledges and agrees that by virtue of employment with the Company, Employee will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Employee:

  (a)  had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will develop, and/or will continue to develop close and direct relationships with such customers and suppliers; and

(c) has developed, will continue to develop and/or will develop, as applicable close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d) has benefitted, will benefit, and/or will continue to benefit, as applicable, from the Company's investment of time, money and trust in Employee and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e) has made use of, and will continue to make use, of Employee's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Employee acknowledges are special, unique or extraordinary; and

WHEREAS, Employee acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the Employee's employment with the Company, and the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1. **DEFINITIONS.** Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) **"Active Prospective Client"** means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Employee's employment with the Company.

(b) **"Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(c) **"Competitive Business"** means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(d) **"Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Employee or the Company has sold, marketed, distributed or developed in the last two (2) years of Employee's employment with the Company, or about which Employee has acquired Confidential Information.

(e) **"Confidential Information"** means at any date, any information of the Company, any Predecessor and/or a USI Company to which Employee has access, that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi)

the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(f)  "**Effective Date**" means the Closing date.

(g)  "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts to develop lasting relationships.

(h)  "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(i)  "**Predecessor**" means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(j)  "**USI Business**" means the businesses provided by the Company or the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(k)  "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware corporation ("**USI**"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2.  **RETENTION BONUS PAYMENT.**  Employee shall be eligible for a special retention bonus payment (the "**Retention Payment**").

2.1  *Retention Payment.*  The Company shall pay Employee $39,560.00, payable in two (2) equal installments of $19,780.00 on the payroll immediately following each of the following dates: (i) the first anniversary of the Effective Date and (ii) the second anniversary of the Effective Date.

2.2 *Eligibility for Retention Payment.* Notwithstanding the foregoing, if Employee's employment with the Company terminates or Employee is not actively employed, for any reason, on the dates any installment payments under Section 2.1 are due, Employee shall not earn or be paid such installment.

3. **COMPANY PROPERTY.** Employee acknowledges and agrees that all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Employee has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Employee's employment. Employee further acknowledges and agrees that Employee has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

4. **COVENANTS**

4.1 *Confidential Information.* The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms in this Agreement.

4.2 *Confidentiality During and Following Employment.* During Employee's employment with the Company and for five (5) years after Employee is no longer employed with the Company, for any reason, Employee will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Employee shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure). Nothing in this Agreement shall prohibit Employee from disclosing data or information which has been independently developed and disclosed by others or which has otherwise entered the public domain through lawful means.

4.3 *Defend Trade Secrets Act Required Notice.* Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or

investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

4.4 **Assignment and Ownership of Intellectual Property**.  Employee acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law.  To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Employee is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Employee hereby irrevocably transfers and assigns to the Company all rights, title and interest Employee may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Employee may have or acquire therein.   "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Employee in whole or in part during Employee's employment with the Company:  (a) using Employee's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Employee's work for the Company.

4.5 **Non-Solicitation of Clients and Active Prospective Clients**.  In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-

renewal of any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

4.6 **Non-Competition With Respect to Client Accounts and Active Prospective Clients.** In consideration of Employee's employment hereunder, and for other good and valuable consideration, Employee agrees that, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee will refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Geographic Area. **"Carrying on any business in competition with the Company"** shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Employee had a role in the sale, marketing, distribution, or development in the last two (2) years of Employee's employment with the Company, or about which Employee acquired Confidential Information. For purposes of this Section 4.6, the term **"Geographic Area"** shall include any territory within a one hundred (100) mile radius of any Company facility in which Employee maintained an office during the last twelve (12) months of Employee's employment hereunder, including any counties in the Geographic Area in which Employee conducted business or where Client Accounts or Active Prospective Clients with whom Employee had material contact in the two (2) years prior to termination of Employee's employment with the Company are present. It is expressly agreed that this Section 4.6 is not intended to restrict or prohibit the ownership by Employee of stock or other securities of a publicly-held corporation in which Employee (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

4.7 **Non-Interference With Employees.** In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company.

4.8 **Purpose of Restrictions.** The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Employee agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

4.9 **Modification.** If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

4.10 **Independent Enforcement.** Each of the covenants in this Agreement shall be construed as an agreement independent of (a) any other agreements or (b) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 4 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 4 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Employee.

5. **REMEDIES.** Employee acknowledges: (a) the services to be rendered by Employee are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Employee's breach of Section 4 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation.

Accordingly, Employee agrees, if Employee violates Section 4 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Employee agrees to waive any requirement for the Company to post a bond.

6. **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES**

6.1 *Disclosure of Agreements; No Conflict.* Employee represents and warrants that Employee has supplied to the Company all agreements between Employee and any Person, other than the Company, that employed or otherwise retained Employee within the past five (5) years. Employee further represents and warrants that Employee's execution of this Agreement and performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Employee is bound.

6.2 *No Confidential Information.* Employee represents and warrants that Employee has not taken any confidential information from any Person that employed or otherwise retained Employee, that Employee has no such confidential information in Employee's possession or control, and that Employee will not use any such confidential information in the performance of Employee's duties for the Company.

6.3 *No Copyright Materials.* Employee represents and warrants that Employee has not taken any copyrighted materials from any Person that employed or otherwise retained Employee, that Employee has no such copyrighted materials in Employee's possession or control, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company.

6.4 *No Restrictive Purchase Agreements.* Except with regard to any employment agreements with the Company, Employee represents and warrants that Employee is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Employee from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

6.5 *Clients of Former Employers or Entities.* Employee represents and warrants that, during any period of time in which such Employee was subject to any restrictions prohibiting Employee from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, Employee has not made any contact with any clients of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning Employee's business relationship with the Company or concerning a prospective business relationship with such client in violation of such

restrictive covenant. Employee further represents and warrants that Employee will not, without prior express direction of the Regional Chief Executive Officer (the "**Regional CEO**"), solicit any clients of any Person that employed or otherwise retained Employee, within the past five (5) years in violation of such restrictive covenant.

6.6   *Employees of Former Employers or Entities.*  Employee represents and warrants that Employee has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning a prospective employment relationship with the Company.

6.7   *No Ownership Rights to Client Accounts.*   Employee represents and warrants that Employee has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

7.   **AT-WILL EMPLOYMENT.** Employee understands and agrees that Employee's employment with the Company is at-will and that nothing in this Agreement shall be construed or considered to affect the nature of such at-will employment.

8.   **ADDITIONAL TERMS**

8.1   *Amendment.*  Except as set forth in Sections 4.9, 8.5, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

8.2   *Assignment.*  Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

8.3   *Entire Agreement.*  This Agreement constitutes the entire agreement between the Parties with respect to the matters specifically referred to herein. Employee affirms that, in entering into this Agreement, Employee is not relying upon any oral or written promise or statement made by anyone at any time on behalf of the Company.

8.4   *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.

8.5   **Severability.**   The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable.  In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable.  If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

8.6   **Waivers.**   No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.  Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**WELLS FARGO INSURANCE SERVICES USA, INC.**       **EMPLOYEE**

By: _____              By: _____

    Name: Ernest J. Newborn, II                          Roger Maldonado
    Title: Secretary

# EXHIBIT E

Fulton County Superior Court
***EFILED***QW
Date: 3/20/2019 2:01 PM
Cathelene Robinson, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

------------------------------------------------------------------X

JOEL HOLSINGER

                              Plaintiff,                    Civil Case No. 2019CV315101

-against-
                                                           JURY TRIAL DEMANDED

FORTRESS INVESTMENT GROUP LLC and
HYBRID GP HOLDINGS LLC,

                              Defendants.

------------------------------------------------------------------X

## ORDER GRANTING PLAINTIFF'S MOTION FOR INTERLOCUTORY INJUNCTION

This matter comes to the Court on Plaintiff Joel Holsinger's motion for an interlocutory

injunction to enjoin defendants Fortress Investment Group LLC (together with all of its parents,

subsidiaries, and affiliates, "Fortress") and Hybrid GP Holdings LLC ("Hybrid") from enforcing

or threatening or attempting to enforce the restrictive covenants arising from his employment

with Fortress. The Court has considered the memoranda and affidavits submitted by the parties,

and argument of counsel. Holsinger's motion is **GRANTED** to the extent set forth below.

### Findings of Fact and Conclusions of Law

(1)     Mr. Holsinger lives and works in Georgia and has done so for many years.

Complaint ¶¶ 11–12. In 2008, he became an employee of Fortress. Affidavit of Joel Holsinger

filed January 16, 2019 ("Holsinger Aff.") ¶ 3. Fortress is an asset management firm that

provides expertise across a wide range of investment strategies on behalf of institutional clients

and private investors worldwide. *Id.* ¶ 4. Fortress has an Atlanta office, from which Holsinger

worked throughout his tenure with Fortress. *Id.* ¶ 5.

(2)     When first hired by Fortress in 2008, Holsinger signed an employment agreement

under which he became a managing director and manager of Fortress's Atlanta office. *Id.* ¶ 6.

1750417.1

(3)     On January 15, 2010, Holsinger entered a new employment agreement with

Fortress (the "Employment Agreement"), which superseded his earlier agreement. *Id.* ¶ 7 &

Exh. 1. Under the Employment Agreement, Holsinger continued to manage Fortress's Atlanta

office until he resigned in March of 2018. *Id.*

(4)     Holsinger's Employment Agreement includes a series of restrictive covenants.

First, the Agreement contains a one-year post-termination non-compete clause (the "Non-

Compete Clause"):

> You further agree that if you resign your employment or are terminated for Cause
> (as defined below), for twelve (12) months following the effective date of your
> termination of employment, you shall not engage in any activity which calls for
> the application of the same or similar specialized knowledge or skills as those
> utilized by you in your employment with Fortress, or otherwise directly or
> indirectly provide consultative services to, own, manage, operate, join, control, be
> employed by, participate in, or be connected with, any business, individual,
> partner, firm, corporation, or other entity that directly or indirectly competes with
> any Fortress business or Fortress managed fund for which you have performed
> services or sourced transactions during the course of the last two (2) years of your
> employment with Fortress, or any other fund of Fortress or any of its affiliates
> from or in respect of which you received an incentive allocation or payment . . .
> during your employment with Fortress.

*Id.* Exh. 1 ("Employment Agreement") at 13–14.

(5)     Second, the Employment Agreement restricts post-termination solicitation or

hiring of current and former employees of Fortress and its affiliates (the "Non-Recruitment

Clause"):

> [Y]ou shall not, directly or indirectly . . . during your employment . . . hereunder
> and for eighteen (18) months after the effective date of termination of your
> employment for any reason, either (x) solicit or encourage to leave the
> employment of Fortress or its affiliates, any employee thereof (or knowingly
> assist any other person in so soliciting, encouraging, enticing or inducing), or hire
> any person who has left the employment of Fortress or its affiliates during the
> immediately preceding one-year period without the prior written consent of
> Fortress, or (y) disrupt, damage, impair or interfere with business (including
> investment activities, and fund raising efforts) of Fortress by raiding Fortress
> employees.

*Id.* at 14.

(6)     Third, the Employment Agreement also restricts post-termination solicitation of investors, business partners, borrowers, or financial sponsors (the "Non-Solicitation Clause"):

> [D]uring the period you are employed . . . and for eighteen (18) months after the effective date of termination of your employment for any reason, you shall not, whether for your own account or for the account of any other person, firm, corporation or other business organization, directly, or indirectly by assisting others, (x) solicit or attempt to solicit any business from any of the investors, business partners, borrowers, or financial sponsors, with whom you had material contact during the last two (2) years of your employment with Fortress, for the purpose of providing services or products that are competitive with those you provided on behalf of Fortress, or (y) intentionally interfere with the relationship of Fortress or any of its affiliates or funds, or endeavor to entice away from Fortress or any affiliates or funds, any investor in Fortress or any of its affiliates or funds. As used in the previous sentence, "material contact" means dealt with, supervised or coordinated dealings with, did work related to, obtained confidential information concerning, or had resultant earnings on.

*Id.*

(7)     The Employment Agreement defines the restrictions quoted above as the "Protective Covenants" and includes a provision (the "Tolling Clause") stating that:

> The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which . . . you are . . . in violation of any of such Protective Covenants, and all such restrictions shall automatically be extended by the period of the your [sic] violation of any such restrictions.

*Id.* at 16.

(8)     Finally, the Employment Agreement indicates that Holsinger was granted interests in Hybrid as part of his compensation for his employment activities on behalf of Fortress. *Id.* at 10; Holsinger Aff. ¶¶ 14–15.

(9)     Hybrid's limited liability agreement contains a "Duty of Loyalty" provision (the "Duty of Loyalty Clause") that, in relevant part, imposes on Holsinger and other Hybrid members a "duty and obligation . . . to refrain from competing with any member of the Credit

1750417.1

3

Funds Group in the conduct of its business before the dissolution of [Hybrid]." *Id.* Exh. 2

("Hybrid Agreement") at 5 & Art. 4.2(e). The "Credit Funds Group" covers not only Fortress,

but also any investment funds or entities associated directly or indirectly with Fortress and a host

of affiliates. *Id.* at 4.

(10)     This Duty of Loyalty Clause does not end with the termination of one's

employment with Fortress, but purportedly applies until the dissolution of Hybrid, which can

occur only with the consent of the Managing Member, *i.e.*, Fortress. *Id.* at 5 & Art. 8.1(b).

Moreover, a Member, such as Holsinger, cannot voluntarily resign or withdraw from Hybrid

prior to dissolution unless the Managing Member (again, Fortress) allows it. *Id.* Art. 9.2(a).

(11)     Holsinger's Employment Agreement expressly incorporates this Duty of Loyalty

Clause. Employment Agreement at 10 ("[A]ll restrictions and covenants contained in the

Hybrid Documents (including, without limitation, the "Duty of Loyalty" as defined therein) are

hereby incorporated by reference into this [Employment] Agreement"). Further, the

Employment Agreement defines "Protective Covenants" to include any provisions listed in the

"Protective Covenants" section *or* "otherwise incorporated into" the Agreement. *Id.* at 15.

(12)     Holsinger submitted his resignation from Fortress as of March 9, 2018. Holsinger

Aff. ¶ 22. At that time, his vested Hybrid interests were valued at approximately $30 million.

*Id.* ¶ 20. After resigning from Fortress, Holsinger met with several potential partners across a

variety of firms, including an asset management firm named Ares Operations LLC ("Ares").

(13)     On June 7, 2018, Fortress's General Counsel sent a letter to Ares demanding Ares

"to institute a litigation hold immediately" "in anticipation of potential litigation." Holsinger

Aff. Exh. 4. In support of this demand, Fortress stated that it had "reason to believe that"

Holsinger had breached certain "obligations to Fortress," including "a contractual obligation not to solicit Fortress employees," and that Ares was "facilitating Mr. Holsinger's breaches." *Id.*

(14)    Thereafter, Fortress escalated its threats to sue Ares if Ares hired Holsinger. *Id.* Exhs. 5 & 6. In a letter dated November 26, 2018, Fortress's General Counsel stated that Fortress had reason to believe that Holsinger had "solicited certain former Fortress employees" in violation of "his obligations to Fortress"; that Ares had "facilitated" those violations; and that "Fortress will hold Ares responsible for aiding and abetting any" of Holsinger's purported violations. *Id.* Exh. 5.

(15)    Fortress followed with another letter to Ares on December 17, 2018. Unlike the two previous letters, this one was sent from Fortress's outside counsel. *See id.* Exh. 6. Fortress's outside counsel highlighted Fortress's "concerns that Mr. Holsinger has breached his own obligations to Fortress under various protective covenants, particularly an obligation not to solicit Fortress employees to leave Fortress," and alleged that Ares had "aided and abetted such breaches." *Id.* at 1–2. This December 17, 2018 letter concludes by announcing that Fortress was "of the view that the case against Ares is a compelling one, *and that Ares will compound its exposure even further if it consummates the hiring of Mr. Holsinger.*" *Id.* at 3 (emphasis added). "Fortress will do whatever is necessary" to "ensure that both Ares and Mr. Holsinger comply with their legal obligations." *Id.*

(16)    Eighteen days later, Holsinger filed suit in this Court to obtain, among other relief, a declaration that the restrictive covenants detailed above are invalid and unenforceable and injunctive relief precluding the enforcement or threatened enforcement of these covenants.

(17)    On January 16, 2019, Holsinger filed this motion for interlocutory injunction, seeking to preliminarily enjoin defendants from enforcing or attempting or threatening to enforce

any of the restrictive covenants in the Employment Agreement.  *See* Brief in Support of Plaintiff's Motion for an Interlocutory Injunction ("Plaintiff's Opening Br.").

(18)     On February 5, 2019, Fortress filed an "Emergency Motion to Compel Return of Information Under Confidentiality Agreement and for Forensic Imaging of Holsinger's Devices."  In that motion, Fortress invoked a Confidentiality Agreement that, by Fortress's admission, "is expressly incorporated into the" Employment Agreement.  Reply Brief in Support of Defendant Fortress Investment Group's Emergency Motion at 4.

(19)     On February 12, 2019, the Court denied Fortress's emergency motion, finding that "there is no emergency and further, that what is being sought by Fortress is not related to the issue being taken up in the hearing for interlocutory injunction."  Order on Emergency Motion.

(20)     On February 19, 2019, defendants filed their Memorandum in Opposition to Plaintiff's Motion for an Interlocutory Injunction ("Defendants' Opp.").  Mere moments before filing their memorandum, defendants sent Holsinger notice that they were invoking the Duty of Loyalty Clause to repurchase—for just under $5,000—$30 million of Holsinger's vested Hybrid interests based on his alleged violations of the Duty of Loyalty Clause.  *See* Defendants' Opp. at 3 (stating that "Hybrid's Managing Member exercised its discretionary right to repurchase all of Holsinger's Points, effective today"); Complaint ¶ 44 (stating that "when Holsinger's resignation from the Company was effective, his vested promote interests were valued at approximately $30 million").

(21)     On February 25, 2019, Holsinger filed a Reply Brief in Support of Plaintiff's Motion for Interlocutory Injunction.  The Court held a hearing on his motion on February 27, 2019.

(22)   *The factors relevant to interlocutory injunction.*  In deciding whether to issue an interlocutory injunction, a trial court should consider whether: (1) the moving party has a substantial likelihood of success on the merits; (2) there is a substantial threat that the moving party will suffer irreparable harm if the injunction is not granted; (3) the threatened injury to the moving party outweighs the potential harm that the injunction may do to the party being enjoined; and (4) granting the interlocutory injunction will not disserve the public interest. *SRB Inv. Servs., LLLP v. Branch Banking & Trust Co.*, 289 Ga. 1, 5 (2011) (quoting *Bishop v. Patton*, 288 Ga. 600, 604 (2011)). This "is a balancing test, [and] it [i]s not incumbent on [the moving party] to prove all four factors to obtain [an] interlocutory injunction." *City of Waycross v. Pierce Cty. Bd. of Comm'rs*, 300 Ga. 109, 111 (2016).

(23)   *Holsinger raises a facial challenge to the restrictive covenants in the Employment Agreement.*  "Whether or not a covenant against competition in an employment contract is reasonable is a question of law appropriately answered based upon the wording of the covenant." *Koger Props., Inc. v. Adams-Cates Co.*, 247 Ga. 68, 69 (1981).  Although facts might occasionally "be necessary to show that a questionable restriction, though not void on its face, is in fact, reasonable," Holsinger asserts that each of the restrictive covenants in the Employment Agreement is "void on its face." *Id.*  Thus, because the parties do not dispute the text of the restrictive covenants in the Employment Agreement, the Court needs no additional facts to determine whether Holsinger is likely to succeed on the merits of his claim that all of those covenants are facially unenforceable.

(24)   *Georgia does not allow "blue-penciling" or severing overbroad restrictive covenants in employment agreements entered before May 11, 2011.*  Although the Georgia legislature passed a new restrictive covenants statute, contracts that were entered into before May

11, 2011—like the Employment Agreement—must be analyzed under "the law of restrictive

covenants as it existed before" that date. *Bunker Hill Int'l, Ltd. v. Nationsbuilder Ins. Servs.,*

*Inc.,* 309 Ga. App. 503, 505 n.1 (2011); *Holton v. Physician Oncology Servs., LP,* 292 Ga. 864,

870 n.4 (2013); *Vulcan Steel Structures, Inc. v. McCarty,* 329 Ga. App. 220, 221 (2014).

(25)    Before May 11, 2011, Georgia "d[id] not follow the 'blue-pencil' doctrine of

severability in construing employment contracts." *Dent Wizard Int'l. Corp. v. Brown,* 272 Ga.

App. 553, 557 (2005). Consequently, under pre-May 11, 2011 Georgia public policy, so long as

"one restrictive covenant in [an employment] agreement is unenforceable, they are all

unenforceable." *Id.*

(26)    Importantly, this is true even if an employment agreement includes a severability

clause. *CMGRP, Inc. v. Gallant,* 343 Ga. App. 91, 101–02 (2017) ("'[T]here can be no 'blue

pencil theory' of severability of covenants not to compete *even where there is a severability*

*clause.*'") (emphasis in original) (quoting *Lane Co. v. Taylor,* 174 Ga. App. 356, 358 (1985)).

Thus, defendants' emphasis on the severability clause in the Employment Agreement is

misplaced.

(27)    Defendants cite *Holland Insurance Group v. Senior Life Insurance Co.,* 329 Ga.

App. 834, 837 (2014), which states that "'[v]oid restrictive covenants, which cannot be blue-

penciled out of the contract, do not void *the entire contract* when the contract contains a

severability clause.'" (citation omitted and emphasis added). However, that language is not

talking about severing one restrictive covenant and enforcing others; it is talking about enforcing

the remaining substantive contract provisions that do not restrict competition. In *Burson v.*

*Milton Hall Surgical Associates, LLC,* 343 Ga. App. 159 (2017), for example, the Court cited

*Holland* to explain that the "contracts contain severability clauses and therefore the provisions

1750417.1

8

*other than the restrictive covenants* are not automatically rendered void." *Id.* at 165 (emphasis added).

(28)     The Georgia Supreme Court decided against allowing blue-penciling or severing of restrictive covenants because the vast majority of overbroad restrictive covenants are never challenged, and are instead adhered to, because of the "'*in terrorem* effect'" that they have on "'employees who respect their contractual obligations'" and on "'competitors who fear legal complications if they employ a covenantor.'" *Richard P. Rita Personnel Servs. Int'l, Inc. v. Kot*, 229 Ga. 314, 317 (1972) (quoting Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 682–83 (1960)).  Therefore, allowing those few overbroad covenants that *are* challenged to "'be pared down and enforced when the facts of a particular case are not unreasonable'" would exacerbate the imbalance of power between employers and employees, and chill competition.  *Id.*

(29)     Just as the Court cannot sever or revise restrictive covenants from a pre-May 11, 2011 employment agreement, an employer cannot effectively accomplish the same thing by promising, in response to an injunction motion, not to enforce the particular covenants that have been shown to be invalid.  That would circumvent the letter and rationale for Georgia's prohibition on blue-penciling by allowing an employer to overreach in an agreement and then back off only when challenged.  It would be no different than allowing an employer to invoke a severability clause to jettison overbroad covenants and preserve what remains, which Georgia law does not allow.  *Gallant*, 343 Ga. App. at 101–02; *Lane*, 174 Ga. App. at 358.  In other words,

> [T]he policies underlying Georgia's refusal to blue-pencil over-broad employment contracts apply equally to employers' attempts to do so on their own.  As the district court notes, if employers were allowed to blue-pencil their agreements, they "could load up [non-competition agreements] with oppressively overreaching

9

terms and intimidate all but the litigation-hardy employees, then post-hoc excise offending provisions to avoid requested judicial invalidation."

*Palmer & Cay, Inc. v. Marsh & McLennan Companies, Inc.*, 404 F.3d 1297, 1307 (11th Cir. 2005) (quoting district court opinion). So, while defendants can waive their contract rights, they cannot, by doing so, salvage other restrictive covenants in the same employment agreement.

(30)    *The Tolling Clause invalidates the Non-Compete, Non-Solicitation and Non-Recruitment Clauses.* The Tolling Clause, which declares that the "temporal duration" of all restrictive covenants are tolled "during any period in which [Holsinger] is in violation of any of" those covenants, Employment Agreement at 16, violates Georgia law because it "potentially extends the duration of" all of the restrictive covenants "without limit." *ALW Mktg. Corp. v. McKinney*, 205 Ga. App. 184, 188 (1992); *see also Crump Ins. Servs. v. All Risks, Ltd.*, 315 Ga. App. 490, 492 (2012); *Gynecologic Oncology, P.C. v. Weiser*, 212 Ga. App. 858, 859 (1994); *Boone v. Corestaff Support Servs., Inc.*, 805 F. Supp. 2d 1362, 1370 (N.D. Ga. 2011).

(31)    Under Georgia's pre-May 11, 2011 public policy against "blue-penciling," because the Tolling Clause is invalid, *all* the restrictive covenants in the Employment Agreement are unenforceable. *Dent Wizard*, 272 Ga. App. at 557; *Weiser*, 212 Ga. App. at 859. Notably, the Court of Appeals in *ALW Marketing* applied this rule to invalidate both customer non-solicitation and employee non-recruitment covenants, based on a tolling provision like the one here. 205 Ga. App. at 188. Additionally, each of the other restrictive covenants in the Employment Agreement is unenforceable under pre-May 11, 2011 Georgia law for a variety of other reasons, set forth below.

(32)    Defendants cannot avoid this outcome by stating, post-termination, that they will not rely on the Tolling Clause to extend the duration of any covenant. Defendants can elect not to enforce the Tolling Clause, just as a party can elect to refrain from enforcing any contract

right, but they cannot salvage the remainder of the restrictive covenants by doing so. To hold otherwise would be to allow defendants to engage in the very blue-penciling and severance forbidden by the applicable Georgia law. If express agreement to a severability clause does not allow an employer to preserve some restrictive covenants if others are overbroad, *Gallant*, 343 Ga. App. at 101–02, then an employer's unilateral offer to forgo the overbroad covenants cannot accomplish the same thing. "[T]he policies underlying Georgia's refusal to blue-pencil over-broad employment contracts apply equally to employers' attempts to do so on their own." *Palmer & Cay*, 404 F.3d at 1307.

(33) *The twelve-month Non-Compete Clause is unenforceable.* Even leaving aside the Tolling Clause, the Non-Compete Clause is invalid because it (1) lacks any territorial limitation, *see, e.g., Coleman v. Retina Consultants, P.C.*, 286 Ga. 317, 320 (2009); *Colonial Life & Accident Ins. Co. v. Byrd*, 227 Ga. 198, 199–200 (1971); *Cold Chain Techs., Inc. v. IGH Holdings, Inc.*, 2015 WL 12778346, at *4 (N.D. Ga. Aug. 5, 2014); (2) "effectively prohibits [Holsinger] from working for a competitor in any capacity," *Lapolla Indus., Inc. v. Hess*, 325 Ga. App. 256, 264 (2013); *see also Carson v. Obor Holding Co., LLC*, 318 Ga. App. 645, 652 (2012); *Howard Schultz & Assocs. of the Se., Inc. v. Borniec*, 239 Ga. 181, 184 (1977); and (3) forbids Holsinger from using the same or similar knowledge or skills that he used during his employment with Fortress, regardless of whether he uses them to compete with Fortress, *see Habif, Arogeti & Wynne, P.C. v. Baggett*, 231 Ga. App. 289, 294 (1998).

(34) Moreover, under Georgia's blanket ban on blue-penciling, the invalidity of this Non-Compete Clause in turn renders the Non-Solicitation and Duty of Loyalty Clauses unenforceable. *Dent Wizard*, 272 Ga. App. at 557. Defendants cannot now waive the Non-Compete Clause in an effort to save the remaining provisions because that would circumvent

Georgia's rule against blue-penciling and effectively allow severance. *Palmer & Cay*, 404 F.3d at 1307; *see Gallant*, 343 Ga. App. at 101–02.

(35) *The eighteen-month Non-Recruitment Clause is invalid.* Even leaving aside the Tolling Clause, the employee Non-Recruitment Clause is unenforceable because it has neither (1) a geographic restriction, *Lowe Elec. Supply Co. v. Rexel, Inc.*, 2014 WL 5585857, at *8 (M.D. Ga. Nov. 3, 2014); *Capricorn Sys., Inc. v. Pednekar*, 248 Ga. App. 424, 427 (2001); or (2) a valid limitation on the scope of prohibited activities, *see Club Props., Inc. v. Atlanta Offices-Perimeter, Inc.*, 180 Ga. App. 352, 355 (1986); *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005) (citing *Hulcher Servs., Inc. v. R.J. Corman R.R. Co., LLC*, 247 Ga. App. 486 (2000)).

(36) Defendants' reliance on *Gallant* is unavailing because the Non-Recruitment Clause here goes well beyond protecting defendants' contractual relationships with other employees. It prohibits even the unsolicited hiring of *former* employees who had already terminated their relationship with the defendants with no inducement by Holsinger. Under the plain language of this provision, Holsinger could not hire the lowest level custodial or clerical worker who had left Fortress's employment within the last year, even if Holsinger had never before met the employee and played no role in that employee's departure or subsequent application for employment. Moreover, defendants cannot salvage this overbroad clause by disclaiming their intent to invoke it in circumstances like that; that would amount to blue-penciling. Covenants are judged on their face, as noted above, not in light of what an employer says it would or would not do once in litigation.

(37) *The eighteen-month Non-Solicitation Clause is invalid.* The Non-Solicitation Clause cannot stand because of the Tolling Clause and because it appears in the same agreement

as the unenforceable Non-Compete Clause. In addition, it fails due to the combination of its lack of territorial limitation and its overbroad "material contact" definition. Specifically, that definition precludes Holsinger from soliciting business from any entity involved in any deal on which he "had resultant earnings"—even if those earnings were entirely passive and he never had any meaningful interaction with that entity. Employment Agreement at 14. Consequently, the Non-Solicitation Clause "violates Georgia law" because it "forbids" Holsinger from soliciting business from any of Fortress's investors, business partners, borrowers, or financial sponsors, "regardless of whether [Holsinger] actually served" them. *Carson*, 318 Ga. App. at 650.

(38)    Contrary to defendants' arguments, this overbreadth may be resolved at the injunction stage. The enforceability of a restrictive covenant is determined on the face of the contract, *see, e.g.*, *Uni-Worth Enters. v. Wilson*, 244 Ga. 636, 640–41 (1979), and there is nothing on the face of this contract that requires Holsinger to have had any material contact with a particular investor, business partner, borrower, or financial sponsor in order to receive earnings on a deal. In fact, "'material contact' means dealt with, supervised or coordinated dealings with, did work related to, obtained confidential information concerning, *or* had resultant earnings on." Employment Agreement at 14 (emphasis added). Because of the "or," this clause explicitly applies if Holsinger received earnings, but did *not* deal with, supervise, coordinate dealings with, do work related to, or receive information regarding any given contact. Otherwise, that phrase would add nothing to the prior items on the list, making it mere surplusage.

(39)    Finally, under Georgia's strong public policy against blue-penciling, the invalidity of the Non-Solicitation Clause in turn renders the Non-Compete and Duty of Loyalty Clauses unenforceable, and vice-versa. *Dent Wizard*, 272 Ga. App. at 557.

(40)    *The Duty of Loyalty Clause is overbroad and invalid.*  As noted above, the Duty of Loyalty Clause is incorporated as a "Protective Covenant" in the Employment Agreement. And, even if it had not been so labeled, the Clause is clearly a restrictive covenant in substance because it imposes the "duty and obligation . . . to refrain from competing with any member of the Credit Funds Group in the conduct of its business before the dissolution of [Hybrid]." Hybrid Agreement at 5 & Art. 4.2(e).  Substance, not labels, control.  *See Atlanta Bread Co. Int'l, Inc. v. Lupton-Smith*, 285 Ga. 587, 589 (2009) (treating a so-called "loyalty provision" as a restrictive covenant: "Such restraints, *no matter the nomenclature assigned to them*, are disfavored in this state as a matter of public policy.") (emphasis added).

(41)    The Duty of Loyalty Clause prohibits Holsinger from competing in any way with Fortress and a host of other funds and entities until and unless Fortress dissolves Hybrid or allows Holsinger to withdraw as a Hybrid Member, and therefore amounts to a potentially perpetual ban on competition of any sort, in any place.  Hybrid Agreement at 5 & Art. 9.2(a). Such a ban is not remotely enforceable under Georgia law.  *Carson*, 318 Ga. App. at 645–52; *see Atlanta Bread Co.*, 285 Ga. at 591; *Early v. MiMedx Grp., Inc.*, 330 Ga. App. 652, 661 (2015).

(42)    Allowing enforcement of the Duty of Loyalty Clause would establish law enabling any employer to enforce a complete and potentially perpetual ban on post-termination competition simply by (1) placing a blanket covenant not to compete in an LLC agreement, rather than an employment agreement; (2) requiring its employee to become a member of the LLC in order to receive some element of his/her compensation; and (3) including a provision in the LLC agreement preventing the employee from ever resigning his/her membership, even upon termination of employment.  That would violate Georgia public policy.

(43)   Further, according to defendants, the Duty of Loyalty Clause also prohibits Holsinger from recruiting and hiring defendants' employees. *See* Defendants' Opp. at 3, 5–7. Yet it has no time limit.  Consequently, the Duty of Loyalty Clause is also an invalid non-recruitment provision because it amounts to an indefinite and potentially perpetual ban on hiring defendants' employees. *Gallant*, 343 Ga. App. at 95 (stating that "employee non-recruitment provisions must be . . . reasonably limited in time").  And, under Georgia's ban on blue-penciling, the incorporation of the Duty of Loyalty Clause into the Employment Agreement renders *all* the other restrictive covenants in the Agreement, including the Non-Recruitment Clause, unenforceable. *Dent Wizard*, 272 Ga. App. at 557.

(44)   *Holsinger's motion for interlocutory injunction is not moot.*  Most obviously, defendants have not disclaimed enforcement of the Non-Solicitation and Non-Recruitment Clauses, which run from June 7, 2018 for eighteen months *plus* whatever period would be tacked on by the Tolling Clause.  On the contrary, defendants (1) argue that "these remaining Protective Covenants are enforceable under Georgia law and are necessary to protect Fortress' legitimate business interests," Defendants' Opp. at 21; and (2) have counterclaimed to enforce these Clauses through damages plus "such other additional relief as this Court deems just and proper." Fortress Answer and Counterclaim ¶¶ 12, 83–88; *id.* at 31 §§ (a) & (g).

(45)   Second, Holsinger's request to enjoin the Non-Compete Clause is not moot. Although the Clause nominally expires on March 9, 2019, the Tolling Clause extends that covenant beyond its specified period for the duration of any violation of *any* covenant in the Employment Agreement.  And, regardless of expiration, the invalidity of that clause remains

squarely at issue because it causes the Non-Solicitation Clause and Duty of Loyalty Clauses also to be invalid, even if they were not independently unenforceable.[1]

(46)    Third, "[i]t does not matter that the Defendants have stated that they will not seek to enforce the" Non-Compete Clause. *Moorad v. Affordable Interior Sys., LLC*, 2012 WL 162289, at *5 (N.D. Ga. Jan. 18, 2012). That is because the Clause "still exists and facially restrains trade," and "without some binding agreement," Holsinger "will essentially sit in limbo, awaiting the Defendants' decision to change their mind." *Id.*

(47)    For similar reasons, "[i]t does not matter that the Defendants have stated that they will not seek to enforce the" Tolling Clause. *Id.* Notwithstanding defendants' belated disclaimer, the Tolling Clause still "facially restrains trade," and it still invalidates *all* of the restrictive covenants in the Employment Agreement. *Id.* Consequently, the enforceability of the Tolling Clause is not moot, even if defendants do not intend to enforce it. Its mere presence in the agreement is fatal to the Non-Compete, Non-Solicitation and Non-Recruitment Clauses. *See, e.g., ALW Marketing*, 205 Ga. App. at 188.

(48)    Finally, defendants' invocation of the Duty of Loyalty Clause to repurchase $30 million of Holsinger's vested interests and terminate his Hybrid membership does not moot the issue of whether that Clause is enforceable. As discussed above, the Employment Agreement expressly incorporates the Duty of Loyalty Clause, and the inclusion of that fatally overbroad restrictive covenant invalidates all the other restrictive covenants in the Agreement, including the Non-Recruitment Clause. So its validity remains squarely at issue for purposes of assessing the remaining covenants, even if it has no further effect on its own.

---

[1] This case is different than *Holton v. Physician Oncology Services, LP*, 292 Ga. 864 (2013), which held that an injunction *enforcing* a one-year covenant was moot after the covenant expired. Here the invalidity of the Non-Compete would be relevant even if it had already expired because it renders other non-expired covenants unenforceable.

(49)   Relatedly, the Court will not wait—as defendants urge—until final judgment or for some new "emergency" before enjoining enforcement of the restrictive covenants in the Employment Agreement. So long as those contract provisions are in place, they risk deterring prospective employers from hiring Holsinger, and they deter and prevent Holsinger from freely soliciting employees, investors, business partners, borrowers, or financial sponsors for new transactions. Deferring ruling on the enforceability of provisions is effectively to uphold them, by maintaining this uncertainty and deterrence. Indeed, as recently as December 2018, defendants explicitly threatened a prospective employer of Holsinger with aiding and abetting liability for his alleged covenant violations if it hires him. And, at the hearing, defendants conspicuously did not commit to the Court that they would not pursue *damages* against Holsinger or his employer if he takes a competing job, just as they have threatened.[2]

(50)   *The New York Forum and Choice of Law Clauses are unenforceable.* The enforceability of the New York choice-of-law and forum-selection clauses in the Employment Agreement is procedural, and thus the Court must apply Georgia law to determine their validity. *Carson*, 318 Ga. App. at 647–48; *see also Brinson v. Martin*, 220 Ga. App. 638, 638 (1996).

(51)   As an initial matter, Fortress waived its right to invoke the New York forum-selection clause. Forum-selection clauses "'are essentially no more than contractual provisions, and as such may be waived.'" *AIM DMN One, LLC v. Frank Gates Serv. Co.*, 325 Ga. App. 440, 443 (2013) (quoting *Euler-Siac S.P.A. v. Drama Marble Co.*, 274 Ga. App. 252, 254 (2005)).

---

[2] *See, e.g., Barlag v. Answerthink, Inc.*, 2006 WL 8432292, at *4 (N.D. Ga. Apr. 13, 2006) (rejecting argument that employee "has failed to demonstrate irreparable injury because . . . Answerthink has not sought to enforce the covenants in Georgia, and [the employee must] show that he is threatened with the loss of his career as a condition precedent to demonstrating irreparable injury. Answerthink's claims are unpersuasive. First, Answerthink's failure to initiate any legal action against Mr. Barlag hardly forecloses Answerthink from doing so in the future.").

Fortress waived any contract right to litigate in New York by taking actions "inconsistent with" the New York forum-selection clause. *McCormick-Morgan, Inc. v. Whitehead Elec. Co.*, 179 Ga. App. 10, 13 (1986). Specifically, Fortress's first move in this case was to file an "emergency" motion to ask this Court to enforce one of its alleged rights under the Employment Agreement. That is not consistent with Fortress's agreement, under the New York forum-selection clause, to litigate "any claims or dispute arising out of" the Employment Agreement in New York. Employment Agreement at 15. Defendants cannot test the waters by invoking the jurisdiction of this Court and then try to change venues after receiving an unfavorable ruling.

(52) . In any event, the New York choice-of-law and forum-selection clauses are unenforceable. "A forum-selection or choice-of-law provision may also be invalid, however, where the clause contravenes a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision." *Bunker Hill*, 309 Ga. App. at 506 (internal quotation marks omitted)); *see also Nasco, Inc. v. Gimbert*, 239 Ga. 675, 676 (1977). "[A] compelling reason exists to avoid [a] contractual forum selection clause" if a party "show[s] both that a restrictive covenant violates Georgia public policy and that a court in the selected forum likely would find the restrictive covenant enforceable." *Carson*, 318 Ga. App. at 648.[3] Here, the choice-of-law and forum-selection clauses in the Employment Agreement are unenforceable because a New York court would "likely" apply New York law "in a manner contrary to [the] applicable Georgia public policy" against restraint of trade. *Lapolla*, 325 Ga. App. at 266. This is true for at least three reasons.

---

[3] Defendants cite *Iero v. Mohawk Finishing Products, Inc.*, 243 Ga. App. 670, 671 (2000), but that case discusses the burden on a party seeking to invalidate a forum clause on the ground that the foreign forum is "so inconvenient that he will, for all practical purposes, be deprived of his day in court." That is not the public policy challenge plaintiff raises here.

(53)    First, New York enforces tolling provisions like the one in the Employment Agreement, which are facially invalid under Georgia law. *Compare Delta Enters. Corp. v. Cohen*, 940 N.Y.S.2d 43, 44 (N.Y. App. Div. 2012), *with ALW Mktg.*, 205 Ga. App. at 188. In *Delta Enterprises*, the contract provided "for the tolling of the various restrictive periods 'during any period in which Employee is in violation' of the restrictive covenants, and . . . that 'all restrictions shall automatically be extended by the period Employee was in violation of any such restrictions.'" 940 N.Y.S.2d at 44. The New York appellate court *reversed* the trial court's refusal to enforce this provision in its injunction—a provision that would be unenforceable as a matter of law in Georgia. That difference alone would be sufficient to preclude the application of New York law. *See, e.g., Boone*, 805 F. Supp. 2d at 1370 ("[T]he tolling provision of the Non–Compete is unenforceable in Georgia and would likely be enforced in a Delaware court. Because the application of Delaware law to the Non–Compete is violative of Georgia's public policy, the Court will apply Georgia law.").

(54)    Second, New York courts applying New York law have upheld non-compete provisions with unlimited territorial scope where "an employer's business is conducted worldwide to a global customer base." *Reed Elsevier Inc. v. Transunion Holding Co.*, 2014 WL 97317, at *7 (S.D.N.Y. Jan. 9, 2014); *see also Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 181 (S.D.N.Y. 2006); *Bus. Intelligence Servs. v. Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984). In contrast, as described above, many of the restrictive covenants in this case are invalid under Georgia law precisely because of their unlimited territorial scope. *See Coleman*, 286 Ga. at 320; *Lowe Elec. Supply Co.*, 2014 WL 5585857, at *8; *Atlanta Bread Co.*, 285 Ga. at 591.

(55)    Third, under New York law, courts "have the 'power to sever and grant partial enforcement of an overbroad employee restrictive covenant.'" *Ashland Mgmt. Inc. v. Altair*

*Inves. NA, LLC*, 869 N.Y.S.2d 465, 472 (N.Y. App. Div. 2008) (quoting *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1226 (N.Y. 1999)); *see also Compton v. IBM Corp.*, 2007 WL 9702340, at *2 (N.D. Ga. Dec. 4, 2007) ("The application of New York law to the restrictive covenants at issue would allow for the 'blue penciling' of a restrictive covenant to enforce only its reasonable limitations.").

(56)   In contrast, as explained above, Georgia applies a "strong public policy" against blue-penciling to contracts entered before May 11, 2011. *Bunker Hill*, 309 Ga. App. at 506; *see Dent Wizard*, 272 Ga. App. at 556–57; *Lifebrite Labs., LLC v. Cooksey*, 2016 WL 7840217, at *7 (N.D. Ga. Dec. 9, 2016). Consequently, because a New York court applying New York law would blue-pencil the 2010 Employment Agreement by severing any overbroad covenants, enforcing the choice-of-law and forum-selection clauses in that Agreement would "contravene[]" Georgia's "strong public policy" against blue-penciling. *Bunker Hill*, 309 Ga. App. at 507. As a result, those clauses are invalid and unenforceable. A number of cases have invalidated choice-of-law and forum-selection clauses based precisely on this difference in blue-penciling policy, and at least one of those cases voided a clause selecting New York law. *See, e.g., Compton*, 2007 WL 9702340, at *2; *Lapolla*, 325 Ga. App. at 266–67; *Dothan Aviation Corp. v. Miller*, 620 F.2d 504, 507 (5th Cir. 1980).

(57)   It makes no difference that New York law permits, but does not require, courts to exercise their blue-penciling powers. On the contrary, courts in Georgia have invalidated choice-of-law clauses on the basis that mere *allowance* of blue-penciling is sufficient to bring a foreign jurisdiction's law "in direct contravention" with Georgia's strong public policy against blue-penciling. *Compton*, 2007 WL 9702340, at *2; *see also Dothan Aviation*, 620 F.2d at 506–07; *Cold Chain Techs.*, 2015 WL 12778346, at *4. Moreover, New York's highest court has

*reversed* trial court and intermediate appellate court decisions refusing to sever or reform overbroad provisions. *See BDO Seidman*, 712 N.E.2d at 1226–27.

(58)    Further, the permissive nature of New York's blue-penciling policy does not change the fact that the difference between that policy and Georgia's blanket rejection of blue-penciling is still "likely" to have concrete consequences for this case. *Lapolla*, 325 Ga. App. at 266. In Georgia, as explained above, no part of the Non-Solicitation Clause is enforceable. In contrast, under New York law, most, if not the entirety, of the Non-Solicitation Clause would likely be enforced as a result of New York's allowance of blue-penciling. *See, e.g., TBA Global, LLC v. Proscenium Events, LLC*, 980 N.Y.S.2d 459, 460–61 (N.Y. App. Div. 2014) (enforcing similar post-employment non-solicitation clauses); *Spinal Dimensions, Inc. v. Chepenik*, 2007 WL 2296503, at **12–15 (N.Y. Sup. Ct. Aug. 9, 2017) (adding new material limitations into non-solicitation covenant to allow partial enforcement). In sum, even though New York's blue-penciling policy is not mandatory, a New York court would still "likely" (1) exercise its power to sever the Non-Compete and Tolling Clauses (assuming that they are invalid under New York law); and (2) enforce most, if not the entirety, of the Non-Solicitation Clause. *Lapolla*, 325 Ga. App. at 266. Consequently, the New York forum-selection clause is not enforceable.

(59)    The Court also finds that a New York court would likely honor the New York choice-of-law provision in the Employment Agreement, and would therefore apply New York law to analyze the enforceability of the restrictive covenants in that Agreement. As defendants point out, "New York follows the 'substantial relationship' test" of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) to analyze the enforceability of contractual choice-of-law provisions. Defendants' Opp. at 18 n.12. On that point, the Employment Agreement states:

> You will be an employee of FIG LLC at its offices in Atlanta, Georgia. You understand and agree, however, that Fortress's business is worldwide and

> *Fortress's principal place of business and its headquarters are in New York, New*
> *York.* In performing your functions as a Managing Director of Fortress, *you will*
> *be required to be in frequent contact with Fortress's New York offices and to*
> *make regular and frequent trips to New York to, among other things, attend*
> *meetings at Fortress's offices.*

Employment Agreement at 1 (emphases added). In light of this, the Court finds that a New York

court would likely conclude that (1) New York has a "substantial relationship" to the

Employment Agreement; and (2) New York's "interest" in this dispute is not "materially" less

than Georgia's. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2). This is not a case like

*TGG Ultimate Holdings, Inc. v. Hollett*, 224 F. Supp. 3d 275, 282–83 (S.D.N.Y. 2016), cited by

defendants, where the employer "has failed to demonstrate the existence of any contacts of this

action with New York other than the choice-of-law provision itself."

    (60)   *The Court will not deny injunctive relief based on "unclean hands."* The Court

further finds that defendants' unclean hands defense does not justify refusing to enjoin

prospective enforcement of the restrictive covenants in the Employment Agreement. In this

context, the unclean hands defense would require behavior that directly affects the prospective

enforceability of the contract clauses that Holsinger attacks and defendants seek to preserve.[4]

Here, even if Holsinger violated his duties under a Confidentiality Agreement or solicited

employees to leave while he was still employed, that would not render post-termination restraints

on solicitation and recruitment enforceable going forward, if those restraints violate Georgia law

and policy. *Boone*, 805 F. Supp. 2d at 1372. Those allegations of wrongdoing would instead be

---

[4] *See, e.g., Zaglin v. Atlanta Army Navy Store, Inc.*, 275 Ga. App. 855, 858–59 (2005)
(rejecting unclean hands defense where "[Zaglin] alleges that Carl has hidden, converted, or
meddled with the assets of the estate and with her right of access to certain estate properties and
documents. These allegations relate to Mrs. Zaglin's claims for an accounting, for fraud, and for
conversion of other property belonging to her husband's estate. But *none can conceivably affect
the simple sale-on-death clauses of the agreements*, which specifically identify the relevant real
property, the agreed price for the sale, and the manner in which the sale will be consummated."
(emphasis added)).

the basis for some independent claim against Holsinger, *see id.*, which defendants have now asserted by counterclaim.

(61)   In so holding, the Court is mindful that Georgia's public policy against overbroad restraints on trade is, in no small part, intended to protect the *public* interest in competition, not merely the individual parties.  Overbroad "restrictive covenants . . . are against Georgia public policy *because of their negative effect on competition.*"  *MacGinnitie*, 420 F.3d at 1243 (emphasis added).

(62)   Ultimately, defendants have cited no case where a court has concluded that restrictive covenants violated Georgia public policy, but should remain in force because the employee committed some wrong of the sort alleged here.  To the contrary, courts have rejected those arguments in the only decisions cited on this point by either party.  *Boone*, 805 F. Supp. 2d at 1372 (even assuming that employee breached fiduciary and contract duties, that would not justify denial of injunctive relief under "unclean hands").

(63)   In particular, it would change nothing if Holsinger had violated the Non-Recruitment Clause.  Because that Clause is facially invalid, a past violation could not justify its continued enforcement.  Indeed, an alleged past violation of an unenforceable covenant cannot give rise even to a claim for damages.  *See Weiser*, 212 Ga. App. at 858.  Holsinger cannot have unclean hands for violating an unenforceable covenant.

(64)   *The relevant factors favor injunctive relief.*  Based on the foregoing, the Court finds that Holsinger has demonstrated a substantial likelihood of success on the merits. Defendants have not cited any case where a Georgia court has declined an interlocutory injunction once an employee demonstrates a substantial likelihood that restrictive covenants are unenforceable, as Holsinger has done here.  Further, although "it is not incumbent on [Holsinger]

1750417.1

23

to prove all four factors to obtain [an] interlocutory injunction," *City of Waycross*, 300 Ga. at 111, the Court also finds that Holsinger has satisfied all of those factors as well.

(65)    First, Holsinger has shown that absent an interlocutory injunction, he will suffer irreparable harm "in the form of unenforceable restrictions" on not only his "access to customers [and] employees," but more essentially on his ability to pursue economic opportunities that require his specialized set of skills. *MacGinnitie*, 420 F.3d at 1242. Because Holsinger's "injuries [would be] in the form of lost opportunities," the amount of harm he would suffer is "difficult, if not impossible, to quantify." *Id.*; *see also Moorad*, 2012 WL 162289, at *5 ("[B]ecause covenants not to compete affect opportunities which are difficult to quantify, courts routinely hold that irreparable harm exists."). Consequently, any injuries sustained by Holsinger would be "irreparable" because they "cannot be undone through monetary remedies." *MacGinnitie*, 420 F.3d at 1242. Indeed, under Georgia law, being restrained from competition by an unlawful restrictive covenant is in and of itself an irreparable injury warranting injunctive relief. *See id.* at 1241–43; *Barlag*, 2006 WL 8432292, at *4.

(66)    Second, these threatened injuries to Holsinger outweigh any possible harm to defendants. The "[l]oss of business due to free and fair competition is not a harm; violation of legal rules designed to promote such competition is a harm." *MacGinnitie*, 420 F.3d at 1243. Thus, offering "opportunities . . . [in] often-overlooked markets" and providing "better terms" to potential investors, as defendants say Holsinger might do, is not a cognizable harm—competitors are entitled and encouraged to do that, absent some enforceable, narrowly-tailored contractual restriction. Defendants' Opp. at 21. On the other hand, absent an interlocutory injunction, Holsinger "face[s] the irreparable harm of lost opportunities," *Ross v. Torrey Point Grp., LLC*, 2012 WL 12883524, at *4 (N.D. Ga. Feb. 24, 2012), as a result of "restrictive covenants [that]

are against applicable Georgia public policy because of their negative effect on valid competition." *Lowe Elec. Supply Co.*, 2014 WL 5585857 at *10. Defendants have shown no harm that they will suffer except as a result of competition. Moreover, they have already invoked the Duty of Loyalty Clause to retain some $30 million in vested interests that they otherwise would have paid Holsinger, further diminishing the prospect they would suffer some uncompensated harm from being unable to also enforce their unenforceable covenants in equity.

(67)     Third, and finally, "granting the interlocutory injunction will not disserve the public interest." *Bishop*, 288 Ga. at 604. To the contrary, "[c]ourts have repeatedly held that the public interest is served by allowing former employees to compete with their former employers." *Ross*, 2012 WL 12883524, at *4 (citing *MacGinnitie*, 420 F.3d at 1243). More importantly, because the restrictive covenants in this case "are invalid, the public cannot possibly be disserved by an injunction barring their enforcement." *Hix v. Aon Risk Servs. South, Inc.*, 2011 WL 5870059, at *10 (N.D. Ga. Nov. 22, 2011).

Thus, **IT IS HEREBY ORDERED** that, until further Order of this Court, defendants, together with their officers, agents, servants, employees and attorneys, and other persons in active concert or participation with them who receive notice of the order by personal service or otherwise, shall not directly or indirectly:

1.     Seek or threaten to enforce, through lawsuit or otherwise, whether by injunction, declaratory relief, damages, or any other remedy, and whether against Joel Holsinger or any other person or entity, any restrictive covenant contained in or incorporated into the Employment Agreement; or

2.     Take any action to prevent or enjoin Holsinger from (a) accepting employment with any entity; (b) accepting or soliciting business from any of Fortress's investors, business

1750417.1

25

partners, borrowers, or financial sponsors; or (c) hiring or recruiting any of Fortress's current or

former employees.  This prohibition includes, without limitation, bringing a lawsuit or otherwise

threatening to impose damages or any other form of liability upon Holsinger or any other person

or entity, including an entity employing Holsinger.

SO ORDERED this 20TH day of March, 2019.

The Honorable Henry M. Newkirk
Superior Court of Fulton County

Prepared by:

Frank M. Lowrey IV
Ga. Bar No. 410310
Jeffrey W. Chen
Ga. Bar No. 640207
BONDURANT MIXSON & ELMORE LLP
One Atlantic Center
1201 West Peachtree Street NW, Suite 3900
Atlanta, GA  30309
Tel: (404) 881-4100
Fax: (404) 881-4111
lowrey@bmelaw.com
chen@bmelaw.com

John J. Malley (admitted pro hac vice)
SPOLZINO SMITH BUSS & JACOBS LLP
81 Main Street, Suite 306
White Plains, NY  10601
Tel: (914) 476-0600
Fax: (914) 499-3910
jmalley@ssbjlaw.com

Attorneys for Plaintiff

1750417.1

26

# EXHIBIT F

11/13/2019

EXHIBIT 21.1

<u>SUBSIDIARIES OF USI HOLDINGS CORPORATION</u>

| Name of Entity | State of Incorporation |
|---|---|
| USI Services Corporation | Delaware |
| Sammis, Smith & Brush, Inc. | New York |
| USI Insurance Brokers, Inc. | Massachusetts |
| Bertholon-Rowland, Inc. | Pennsylvania |
| Signature Premium Finance, Inc. | Pennsylvania |
| Dexter-Bertholon Rowland, Inc. | Pennsylvania |
| Bertholon Rowland, Inc. | New Jersey |
| Colburn Insurance Agency | Ohio |
| USI Gulf Coast, Inc. | Louisiana |
| USI Northeast, Inc. | New York |
| Riverside Insurance Associates, Inc. | Connecticut |
| USI Insurance Services of Northern California, Inc. | California |
| Humanex, Inc. – Insurance Services | California |
| Henderson & Phillips, Incorporated | Virginia |
| USI of Georgia, Inc. | Georgia |
| Colonial Premium Finance Company | Virginia |
| Campbell, Galt & Newlands, Inc. | Oregon |
| Kibble & Prentice Holding Company | Washington |
| USI Insurance Services of New England, Inc. | New Hampshire |
| USI Insurance Services of Rhode Island, Inc. | Rhode Island |
| Inex Alternative Programs, Inc. | New Hampshire |
| USI Insurance Services of Florida, Inc. | Florida |
| CICORP – USI, Inc. | Florida |
| USI MidAtlantic, Inc. | Pennsylvania |
| USI Insurance Services Corporation of Illinois, Inc. | Illinois |
| Progressive Plan Administrators, Inc. | New York |
| USI Retirement Services, Inc. | New York |
| Emerson, Reid & Company, Inc. | New York |
| My Benefit Advisor, LLC | New York |
| USI Consulting Group, Inc. | Connecticut |
| USI Consulting Group of Massachusetts, Inc. | Massachusetts |
| USI Advisors, Inc. | Connecticut |
| USI Consulting Group of New York, Inc. | New York |
| Benefit Strategies of Maine, Inc. | New Hampshire |
| The Capital Planning Group, Inc. | Georgia |
| USI Midwest, Inc. | Ohio |
| USI of Southern California Insurance Services, Inc. | California |
| Max Behm & Associates, Inc. | California |
| United California Insurance Agency | California |
| El Camino Insurance Agency | California |
| USI Securities, Inc. | Delaware |
| USI of Illinois, Inc. | Delaware |

| Name of Entity | State of Incorporation |
|---|---|
| WRIMS Corp. | Pennsylvania |
| Insurance Risk Managers, Inc. | Texas |
| ANCO Corporation | Texas |
| MD Premium Finance Corporation | Texas |
| Western Claims Services, Inc. | Texas |
| Regional Insurance Management Services, Inc. | Texas |
| ANCO Management Corporation | Texas |
| ANCO Life & Benefits Services, Inc. | Texas |
| Strategic Benefit Planning Corporation | Texas |
| Anco Insurance Services of Houston, Inc. | Texas |
| Commercial Insurance Concepts, Inc. | Texas |
| Inter/National Rental Insurance Services, Inc. | California |
| Inter/National Rental Insurance, Inc. | Texas |
| Kisco Partners, Inc. | New York |
| Custom Benefit Programs, Inc. | New Jersey |
| Future Planning Associates, Inc. | New York |
| Tandem Benefits | California |
| BMI Insurance Services, Inc. | California |
| U.S.I. Insurance Services of Massachusetts, Inc. | Massachusetts |
| Netcare Services, Inc. | Massachusetts |
| Bertholon-Rowland Corp. | New York |
| American Insurance Administrators, Inc. | Ohio |
| B-R Insurance Brokers, Inc. | Florida |
| B-R Corp. of North Carolina | North Carolina |
| BR Insurance Services Corp. | California |
| DWP/USI of Southern California Insurance Agency, Inc. | Delaware |
| Dodge, Warren & Peters Financial Services, Inc. | California |
| Summit Global Partners of Oklahoma, Inc. | Oklahoma |
| Summit Global Partners, Inc. | Delaware |
| SGP of Bermuda Ltd. | Bermuda |
| Summit Global Partners (Texas) Holdings, Inc. | Delaware |
| Meridian Credit Services, Inc. | Delaware |
| SGP Benefits of Texas, Inc. | Texas |
| Summit Global Partners of Texas, Inc. | Texas |
| Vista Insurance Partners, Inc. | Texas |
| Vista Wholesale Insurance Partners, Inc. | Texas |
| Vista Insurance Agency of Oklahoma, Inc. | Oklahoma |
| Summit Global Partners Holdings, Inc. | Delaware |
| Vista Insurance Partners of Illinois, Inc. | Illinois |
| USI Southwest, Inc. | New Mexico |
| Summit Global Partners of Memphis, Inc. | Tennessee |

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

7.4   ***Assignment and Ownership of Intellectual Property***.   Producer acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law.  To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Producer is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Producer hereby irrevocably transfers and assigns to the Company all rights, title and interest Producer may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Producer may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Producer in whole or in part during the Term:   (a) using Producer's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Producer's work for the Company.

7.5   ***Non-Solicitation of Clients and Active Prospective Clients***.   In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

7.6 **Non-Competition With Respect to Client Accounts and Active Prospective Clients.** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer will refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Geographic Area. "Carrying on any business in competition with the Company" shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Producer had a role in the sale, marketing, distribution, or development in the last two (2) years of Producer's employment hereunder, or about which Producer acquired Confidential Information. For purposes of this Section 7.6, the term "Geographic Area" shall include any territory within a one hundred (100) mile radius of any Company facility in which Producer maintained an office during the last twelve (12) months of Producer's employment hereunder, including any counties in the Geographic Area in which Producer conducted business or where Client Accounts or Active Prospective Clients with whom Producer had material contact in the two (2) years prior to termination of Producer's employment hereunder are present. It is expressly agreed that this Section 7.6 is not intended to restrict or prohibit the ownership by Producer of stock or other securities of a publicly-held corporation in which Producer (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

7.7 **Non-Interference With Employees.** In consideration of Producer's employment with the Company, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave

the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company.

7.8   **Purpose of Restrictions.**  The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Producer's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill.  Producer agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

7.9   **Modification.**  If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations.  If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced.  The Company may unilaterally limit the scope of these covenants.

7.10  **Independent Enforcement.**  Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Producer against the Company or any USI Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Producer or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 7 of this Agreement.  The Company shall not be barred from enforcing any of the covenants in Section 7 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Producer.

## 8.  TERMINATION

8.1   **Termination by the Company.**  The Company may terminate Producer's employment hereunder by giving written notice to Producer.  The termination of employment shall be effective on the date specified in such notice.

8.2   **Termination by Producer.**  Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company.  The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may:  (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

8.3 ***Payments Upon Termination.***  If Producer's employment hereunder is terminated pursuant to Section 8, the Company shall:  (a) reimburse Producer for any expenses properly incurred through the date of termination pursuant to Section 5; and (b) pay Producer any earned and payable commissions through the date of termination (in excess of Producer's Draw and any other applicable offsets) pursuant to Section 3.4.

8.4 ***Miscellaneous Termination Provisions.***  Upon termination of Producer's employment hereunder, Producer hereby irrevocably promises to:

(a) Immediately return to the Company any and all property of any of the USI Companies in Producer's possession or control, including electronic devices and equipment, corporate credit cards and building keys, including any and all such property acquired as a result of employment with any Predecessor.

(b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information, including any and all such materials acquired as a result of employment with any Predecessor.

(c) Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

(d) For two (2) years after Producer is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 7 of this Agreement prior to taking any position with such new employer.

(e) Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

9. **REMEDIES.**  Producer acknowledges:  (a) the services to be rendered by Producer are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Producer's breach of Section 7 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Producer agrees, if Producer violates Section 7 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.  Producer agrees to waive any requirement for the Company to post a bond.

## 10. PRODUCER'S REPRESENTATIONS AND WARRANTIES

10.1 **Disclosure of Agreements; No Conflict.**   Producer represents and warrants that Producer has supplied to the Company all agreements between Producer and any Person, other than the Company, that employed or otherwise retained Producer within the past five (5) years.   Producer further represents and warrants that Producer's execution of this Agreement and performance of the duties contemplated hereunder do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Producer is bound.

10.2 **No Confidential Information.**  Producer represents and warrants that Producer has not taken any confidential information from any Person that employed or otherwise retained Producer, that Producer has no such confidential information in Producer's possession or control, and that Producer will not use any such confidential information in the performance of Producer's duties hereunder.

10.3 **No Copyright Materials.**  Producer represents and warrants that Producer has not taken any copyrighted materials from any Person that employed or otherwise retained Producer, that Producer has no such copyrighted materials in Producer's possession or control, and that Producer will not use any such copyrighted materials in the performance of Producer's duties hereunder.

10.4 **No Restrictive Purchase Agreements.**   Except with regard to any employment agreements with the Company, Producer represents and warrants that Producer is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Producer from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

10.5 **Clients of Former Employers or Entities.**   Producer represents and warrants to the Company that, during any period of time in which such Producer was subject to any restrictions prohibiting Producer from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, that Producer has not made any contact with any clients of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning Producer's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant.  Producer further represents and warrants that Producer will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Producer, within the past five (5) years in violation of such restrictive covenant.

10.6 **Employees of Former Employers or Entities.**  Producer represents and warrants that Producer has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or

otherwise retained Producer, within the past five (5) years, concerning a prospective employment relationship with the Company.

10.7 *No Ownership Rights to Client Accounts*.  Producer represents and warrants to the Company that Producer has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

11. **ENTIRE AGREEMENT**.  No agreements or representations, oral or otherwise, express or implied, have been made with respect to Producer's employment hereunder except as set forth in this Agreement.  This Agreement supersedes and preempts any prior oral or written understandings, agreements or representations by or between Producer and the Company or any Predecessor, including without limitation, any previous employment or other similar agreement between the Producer and the Company or any Predecessor, which may have related to the subject matter hereof in any way.

12. **AMENDMENT**.  Except as set forth in Sections 3.5, 7.9, 14, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

13. **GOVERNING LAW**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.

14. **SEVERABILITY**.  The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable.  In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable.  If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

15. **WAIVERS**.  No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.  Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

16. **ASSIGNMENT**.  Producer may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company.  Producer's obligations under this Agreement inure to the Company, its successors and assigns.  The Company may, at any time and without Producer's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor.  Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**WELLS FARGO INSURANCE SERVICES USA, INC.**         **PRODUCER**

By: _____         By: _____

      Ernest J. Newborn, II               Jameson Taylor Anderson
      Secretary

# EXHIBIT B



## Equity Grants

| Date of Statement | Participant ID | Name | Address | Exchange & Ticker | Share Price @ 01-Apr-2019 | Alternative Currency | Statement Filter |
|---|---|---|---|---|---|---|---|
| 22-Aug-2019 | 301516 | Jameson Anderson | 2770 Valvedere Drive NE Atlanta GA 30319 USA | PRV | USD 13.50 | USD | Outstanding |

## Restricted & Performance Awards

| Grant Number | Grant Date | Grant Type | Awarded | Exercisable | Unvested | Canceled | Outstanding | Current Value of Outstanding | Plan Name |
|---|---|---|---|---|---|---|---|---|---|
| RSU_621 | 08-May-2019 | RSU | 4,000.0000 | 0.0000 | 4,000.0000 | 0.0000 | 4,000.0000 | USD 54,000.00 | Equity Incentive Plan |
| Total | | | 4,000.0000 | 0.0000 | 4,000.0000 | 0.0000 | 4,000.0000 | USD 54,000.00 | |

The current values displayed in this statement are based on the Fair Market Value (FMV) of Company Stock as noted in the Detail section above. The values represented on this screen are for illustration purposes only and there is no guarantee that you will receive this value at the time of exercise.

While every effort has been made to ensure the accuracy of the information in this statement in the event of any conflict between the information contained in this statement and applicable plan rules the applicable plan document in conjunction with the award agreement will govern.

If you have any questions please complete the "Contact Us" form above.

## RESTRICTED STOCK AWARD AGREEMENT

### (Peak Equity Program)

THIS AGREEMENT (this "Agreement") is made effective as of the 8th day of May, 2019 (hereinafter called the "Date of Grant"), between USI Advantage Corp., a Delaware corporation (hereinafter called the "Company"), and Jameson Anderson (hereinafter called the "Participant").

### R E C I T A L S:

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its shareholders to grant the restricted stock award provided for herein to the Participant the terms set forth herein. Capitalized terms not defined herein shall have the meanings set forth in the Stockholders Agreement.

NOW THEREFORE, the terms and conditions of this Agreement are as follows:

1. _Grant of the Restricted Shares_.  Subject to the terms and conditions set forth in this Agreement, the Company hereby grants to the Participant a restricted stock award  (the "Restricted Stock Award") consisting of 4,000 shares of common stock of the Company (the "Restricted Shares").  The Restricted Shares shall vest and become nonforfeitable in accordance with Section 2 hereof.

2. _Vesting_.

(a)   _Vesting Generally._  Subject to the Participant's continued employment with the Company and its subsidiaries and the other terms hereof, the Restricted Shares shall vest and become nonforfeitable with respect to 100% of the Restricted Shares initially granted on the fifth (5th) anniversary of May 19, 2018 (the "Vesting Date").

(b)   _Effect of Termination of Employment Other Than by Reason of Death, Disability or Qualified Retirement._  Notwithstanding anything herein to the contrary, if the Participant's employment with the Company and its subsidiaries terminates or is terminated by the Company and its subsidiaries for any reason prior to the Vesting Date, other than by reason of the Participant's death, Disability or Qualified Retirement (as defined in Paragraph (d) below), the Restricted Shares shall be forfeited by the Participant without consideration.

(c)   _Effect of Death or Disability._  If the Participant's employment with the Company and its subsidiaries terminates or is terminated due to the Participant's death or Disability, then (i) the Restricted Stock Award shall vest as of the date of such termination of employment with respect to 20% of the Restricted Shares covered by the Restricted Stock Award for each full twelve-month period that has elapsed since May 19, 2018 and (ii) the Restricted Shares that do not become vested pursuant to the preceding clause (i) shall be forfeited by the Participant without consideration.

(d)   _Effect of Qualified Retirement._   If the Participant's employment with the Company and its subsidiaries terminates by reason of the Participant's Qualified Retirement, as determined by the Board of Directors of the Company (the "Board") or the committee to which the Board delegates its powers (the "Committee"), the Restricted Shares shall not be automatically

forfeited upon termination of employment but shall continue to be eligible to vest on the Vesting Date; provided, however, that if the Committee makes a determination, in its sole discretion, that prior to the Vesting Date the Participant (A) is "carrying on any business," or has carried on any business, directly or indirectly, in the insurance industry or any "USI Business", except with the express consent of the Committee, or (B) is in breach of or has breached any other restrictive covenants or other agreements with the Company or its subsidiaries, the Restricted Shares shall not vest and shall be forfeited by the Participant without consideration. For purposes of this Agreement, "Qualified Retirement" means a resignation of employment, with the advance consent of the Committee, at any time after the Participant reaches 60 or such other age as determined by the Committee in its sole discretion. Following a Qualified Retirement, the Restricted Shares shall be subject to the call provisions described in Section 12 hereof.

       3.    Rights as a Stockholder. The Participant shall be the record owner of the Restricted Shares until or unless such Restricted Shares are forfeited or canceled pursuant to Section 2 or Section 11 hereof, and as record owner shall be entitled to all rights of a common stockholder of the Company, including, without limitation, voting rights with respect to the Restricted Shares; provided that (i) any cash or in-kind dividends paid with respect to the Restricted Shares which have not previously vested shall be withheld by the Company and shall be paid to the Participant only when, and if, such Restricted Shares shall become fully vested pursuant to Section 2 and (ii) the Restricted Shares shall be subject to the limitations on transfer and encumbrance set forth in Section 2 and will be subject to the terms of the Management Stockholders' Agreement dated May 16, 2017, as in effect from time to time (the "Stockholders Agreement"). As a condition to the receipt of this Restricted Stock Agreement, the Participant shall deliver to the Company a joinder to the Stockholders Agreement.

       4.    No Right to Continued Employment. The granting of the Restricted Shares evidenced by this Agreement shall impose no obligation on the Company or any subsidiary or Affiliate to continue the Employment of the Participant and shall not lessen or affect the Company's or any of its subsidiary's or Affiliate's right to terminate the employment of such Participant.

       5.    Transferability. Notwithstanding anything in the Stockholders Agreement to the contrary, the Restricted Shares may not, at any time prior to becoming vested pursuant to Section 2, be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Affiliate; provided that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

2

6. <u>Certain Tax Matters</u>.

(a) The Participant may be required to pay to the Company or any subsidiary or Affiliate, and the Company and its subsidiaries and Affiliates shall have the right and are hereby authorized to withhold, any applicable withholding taxes in respect of the Restricted Shares, their grant or vesting, or lapse of risk of forfeiture, or any payment or transfer under or with respect to the Restricted Shares and to take such action as may be necessary in the opinion of the Committee to satisfy all obligations for the payment of such withholding taxes.

(b) The Participant is hereby advised to confer promptly with a professional tax advisor to consider whether the Participant should make a so-called "83(b) election" pursuant to Section 83(b) of the Code with respect to the Restricted Shares. Any such 83(b) election, to be effective, must be made in accordance with applicable regulations and within thirty (30) days following the Date of Grant. The Participant shall provide the Company with a copy of any 83(b) election prior to filing, and shall provide the Company with evidence of the timely filing of such 83(b) election. The Company has made no recommendation to the Participant with respect to the advisability of making such an election. IT IS THE PARTICIPANT'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S OR ITS SUBSIDIARIES' OR AFFILIATES', TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF THE PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON THE GRANTEE'S BEHALF.

(c) The award or vesting (or lapse of risk of forfeiture) of the Restricted Shares, and the payment of dividends with respect to such Restricted Shares, may give rise to "wages" subject to withholding. The Participant's rights hereunder are subject to the Participant's promptly paying to the Company in cash (or by such other means as may be acceptable to the Committee, in its discretion) all taxes required to be withheld in connection with such award, vesting, lapse of risk of forfeiture or payment. THE PARTICIPANT (AND NOT THE COMPANY OR ITS SUBSIDIARIES OR AFFILIATES) SHALL BE RESPONSIBLE FOR ANY TAX LIABILITY THAT MAY ARISE AS A RESULT OF THE GRANT, VESTING, LAPSE OF RISK OF FORFEITURE OR ANY PAYMENT IN RESPECT OF THE RESTRICTED SHARES, OR ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7. <u>Securities Laws</u>. Upon the vesting of any Restricted Shares, the Participant will make or enter into such written representations, warranties and agreements as the Committee may reasonably request in order to comply with applicable securities laws or with this Agreement.

8. <u>Notices</u>. Any notice necessary under this Agreement shall be addressed to the Company in care of its Secretary at the principal executive office of the Company and to the Participant at the address appearing in the personnel records of the Company for the Participant or to either party at such other address as either party hereto may hereafter designate in writing to the other. Any such notice shall be deemed effective upon receipt thereof by the addressee.

9. <u>Choice of Law</u>. **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAWS; <u>PROVIDED, THAT,</u>**

**NOTWITHSTANDING THE FOREGOING, SECTION 11 AND <u>APPENDIX A</u> SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. ALL DISPUTES RELATING TO THIS AGREEMENT MUST BE SUBMITTED TO A STATE OR FEDERAL COURT IN THE COUNTY OF WESTCHESTER, IN THE STATE OF NEW YORK, AND PARTICIPANT SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.**

10.    <u>Restricted Stock Award Subject to the Stockholders Agreement</u>. The Restricted Stock Award and the Restricted Shares granted hereunder are subject to the Stockholders Agreement (and by executing the joinder to the Stockholders Agreement, the Participant agrees to the terms set forth herein). The terms and provisions of the Stockholders Agreement, as may be amended from time to time, are hereby incorporated herein by reference. In the event of a conflict between any term or provision contained herein and any term or provision of the Stockholders Agreement, the applicable terms and provisions of the Stockholders Agreement will govern and prevail.

11.    <u>Restrictive Covenants</u>. If, at any time prior to the vesting of the Restricted Shares, the Participant engages in any of the activities prohibited by <u>Appendix A</u> during the applicable period specified therein ("<u>Restricted Activities</u>"), then all of the Participant's rights with respect to any of the Restricted Shares that have not then vested shall immediately terminate. In the event the Participant engages in any Restricted Activities following vesting of the Restricted Shares, the delivery of the Shares by the Company upon such vesting may be rescinded by the Company at any time during the applicable restricted period, and the Participant shall pay to the Company the amount of any gain realized or payment received as a result of any vesting of the Restricted Shares. Such repayment by the Participant shall be in such manner and on such terms and conditions as may be required by the Company, and the Company shall be entitled to set off against the amount of any such gain any amount owed to the Participant by the Company. For purposes hereof, gain realized or payment received as a result of any vesting shall be defined as the dollar amount of the aggregate Fair Market Value (within the meaning of the Stockholders Agreement) of the Restricted Shares on the date such Restricted Shares vested. If any provision of this Section 11 or <u>Appendix A</u> is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction, such provision shall be construed or deemed amended to the extent necessary in such jurisdiction to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Restricted Stock Award, such provision shall be stricken and the remainder of the Restricted Stock Award shall remain in full force and effect. For the avoidance of doubt, the Company agrees that the provisions of <u>Appendix A</u> are not intended to and do not replace, amend, modify or supersede any similar covenants contained in the Participant's employment agreement, if any, with the Company or its subsidiaries.

12.    <u>Call Rights</u>.

(a)    *General*. The Participant agrees that, except as otherwise set forth in the Participant's employment agreement, subscription or rollover agreement, or other similar agreement, the Company and the Sponsor Group, collectively, will each have a call right (the "<u>Call Right</u>") on the Restricted Shares held by the Participant after either a Termination or a

4

Restricted Activities Violation (the "Callable Equity") upon the terms and subject to the conditions as set forth in this Section 12.

(b)  *Call Right of the Company.*  Upon either a Termination or a Restricted Activities Violation, the Company may exercise the Call Right with respect to all or any portion of the Callable Equity by one or more written notices (each, a "Call Right Notice") delivered to the Participant at any time during the period commencing on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restricted Activities Violation, as applicable (the date such notice is given by the Company, the "Call Exercise Date"), and ending one year following the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Covenant Violation, as applicable. Upon the giving of a Call Right Notice, the Company will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the Call Right Notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d).

(c)  *Call Right of the Sponsor Group.*  If the Company fails to exercise the Call Right, then the Sponsor Group (or any Affiliate of the Sponsor Group as such right may be assigned to by the Sponsor Group) may exercise the Call Right within thirty (30) days after the expiration of the aforesaid one year period by giving one (1) or more written notices (each, a "Sponsor Group Call Right Notice") to the Participant that the Sponsor Group (or Affiliate thereof) is exercising the Call Right (the date such notice is given, the "Sponsor Group Call Exercise Date"). Upon the giving of a Sponsor Group Call Right Notice, the Sponsor Group will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the aforesaid notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d). Notwithstanding anything herein to the contrary, in no event shall the Company or the Sponsor Group (or any Affiliate of the Sponsor Group) be entitled to deliver any Call Right Notice or Sponsor Group Call Right Notice, as applicable, with respect to any Restricted Shares unless and until such Restricted Shares have been issued, vested as of the Vesting Date, and outstanding for at least six (6) months and the applicable period for delivering the Call Notice shall be extended to the fifth (5th) Business Day after the end of such six (6)-month period.

(d)  *Consideration for the Exercise of a Call Right.*

(i)  In the case of either (x) a Termination for Cause or (y) a Restrictive Activities Violation, with respect to any Restricted Shares, the consideration will be equal to the lesser of (I) the Cost of such Restricted Shares and (II) the Fair Market Value of such Restricted Shares on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Activities Violation, as applicable.

(ii)  In the case of a Termination for any reason other than for Cause, the consideration will be equal to the Fair Market Value of such Restricted Shares on the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable.

(e)  *Company Sale.*  Notwithstanding the foregoing, if a Change in Control occurs within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as

5

applicable, or if the Company enters into a definitive agreement with respect to a Change in Control within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable, that is consummated, the Company shall pay to the Participant an aggregate amount equal to the additional amount the Participant would have received in respect of the Restricted Shares that were purchased by the Company or the Sponsor Group (or its Affiliate) pursuant to the exercise of such Call Right had such Participant continued to hold such Restricted Shares upon the consummation of such Change in Control; provided, however, that such additional amount shall not be payable following a Termination for Cause, a Restricted Activities Violation or a voluntary resignation (other than a bona fide, planned-for retirement, as determined by the Board in its sole discretion).

(f) *Definitions*. Capitalized terms used in this Section 12 but not otherwise defined in this Agreement shall have the meaning set forth in the Stockholders Agreement.

(g) *Third-Party Beneficiaries*. The Participant and the Company acknowledge and agree that the Sponsor Group are express third-party beneficiaries of this Section 12.

(h) *Transfer*. Participant agrees that he or she will not transfer any Restricted Shares to any person or entity on or after the Vesting Date in accordance with Section 2 of the Stockholders Agreement unless and until the proposed transferee shall have acknowledged and agreed that the transferee and the shares transferred are subject to this Section 12.

13. Acknowledgement. The Participant acknowledges and agrees that this Restricted Stock Award is in full and complete satisfaction of the Participant's rights under the Peak Equity Program.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

USI ADVANTAGE CORP.

By: _____

Agreed and acknowledged as
of the date first above written:

Jameson Anderson

May 16 , 2019

7

## APPENDIX A

This Appendix A to the Restricted Stock Award Agreement attached hereto and made a part hereof. By accepting the grant and as a condition to the vesting of the Restricted Shares, the Participant agrees as follows:

*(a)* **Non-Solicitation.** Except in the normal course of business on behalf of the Company or any of its Affiliates, the Participant will not, directly or indirectly, (x) solicit, sell, provide or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any person, corporation, firm or other entity whose account constituted a Client Account of a USI Company, at any time within the 24 months preceding the earlier of the date of such act or the date of termination of the Participant's employment with the Company and its subsidiaries, or (y) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of a USI Company, determined as of the earlier of the date of such act or the effective date of termination of the Participant's employment with the Company and its subsidiaries. The restrictions contained in this Paragraph (a) shall apply throughout the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years after the effective date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

*(b)* **Non-Competition.** The Participant will refrain from carrying on any business, directly or indirectly, which provides any USI Business, except in the normal course of business on behalf of any USI Company. For all purposes of this Agreement, the term "carrying on any business" shall mean to act as a sole proprietor, partner, member of a limited liability company, stockholder, officer, director, employee, manager, trustee, agent, advisor, joint venturer, or consultant of, with or to, any business, or otherwise to own, manage, operate, control or participate in the ownership, management, operation or control of, or engage in, any business. It is expressly agreed that the foregoing is not intended to restrict or prohibit the ownership by the Participant of stock or other securities of a publicly-held corporation in which the Participant does not (x) possess beneficial ownership of more than 5% of the voting capital stock of such corporation or (y) participate in any management or advisory capacity. The restrictions contained in this Paragraph (b) shall apply during the Participant's employment with the Company and its Affiliates.

*(c)* **No Hiring.** The Participant will not, directly or indirectly, solicit the employment, consulting or other services of any other employee or independent producer of any USI Company or otherwise induce any of such employees to leave any USI Company's employment or to breach an employment or independent producer agreement therewith. The restrictions contained in this Paragraph (c) shall apply during the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years following the date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

*(d)* **Non-Disparagement.** Subject to obligations under applicable laws and regulations, in the event of a termination of the Participant's employment with the Company and its subsidiaries, neither the Participant nor any of the USI Companies or their senior officers or

directors shall publicly make any statements or comments that disparage the reputation of the Participant, or any of the USI Companies or their senior officers or directors.

*(e)*     ***Equitable Relief.***  The services to be rendered by the Participant are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this Appendix A are of crucial importance to the Company and its Affiliates and that any damage caused by the breach of the provisions of this Appendix A would result in irreparable harm to the business of the Company and its Affiliates for which money damages alone would not be adequate compensation. Accordingly, if the Participant violates the provisions of this Appendix A, the Company and its Affiliates shall, in addition to any other rights or remedies available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.

*(f)*     ***Definitions.***  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them:

(1)     **"Active Prospective Acquisition"** means any business or enterprise engaged in providing USI Business (i) with which a specified Person (or any of its agents) had engaged in negotiations (whether or not successfully) within the 24 months preceding a specified date, regarding the acquisition of, sale of assets by, or merger or joint venture with, such business or enterprise or (ii) which had been identified by a specified Person (or any of its agents) in the business records of such specified Person within the 24 months preceding a specified date, and actively considered as a candidate, for possible acquisition, merger, sale of assets or joint venture.

(2)     **"Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third-party administration claims processing or underwriting is performed by such specified Person for such carrier or other entity) who or which is serviced, as of a specified date, by a specified Person in connection with such specified Person's business, regardless of whether such services are provided by, or through the licenses of, such specified Person or any shareholder, employee or agent of such specified Person.

(3)     **"USI Business"** means the businesses provided by any of the USI Companies (including, without limitation, the providing of: (i) insurance agency and brokerage, and related insurance services, including, without limitation, risk management and loss control, cost containment, analysis of loss exposures and designs, catastrophic case management, loss reserves and rate reviews, performance of cash flow studies, administration of risk funding and transfer techniques, captive company formation, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, management of insurance programs (including programs with respect to membership associations and congregations), third-party administration, actuarial and administrative services for pension and health plans, compensation programs and employee communications; (ii) managed care consulting services and related legal assistance; (iii) human resource and employee compensation consulting services and related legal assistance; and (iv) any insurance or financial services relating to any of the foregoing).

(4)    **"Person"** means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or another entity.

(5)    **"USI Company"** means any of the Company, its subsidiaries (including USI Holdings Corporation), its "affiliates" and "associates" (as defined in Rule 12b-2 of the regulations promulgated under the Exchange Act, without regard to whether any party is a "registrant" under such Act), and any of their successors or assigns.

# EXHIBIT C

**Execution Copy**

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (**"Agreement"**), effective as of the Effective Date (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the **"Company"**), and Robert Dean Anderson (**"Executive"**).  The Company and Executive are referred to hereinafter each individually as a **"Party"** and collectively as the **"Parties"**.

### RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the **"Purchase Agreement"**) by and between USI Insurance Services LLC, a Delaware limited liability company (**"USI LLC"**) and Wells Fargo & Company, a Delaware corporation (**"Seller"**), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation (**"ACO"**); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the **"Closing"**), and provided this Agreement is accepted in full by Executive, the Company desires to employ Executive on the terms and conditions herein and Executive is willing to accept employment on such terms and conditions; and

WHEREAS, Executive's covenants herein are a material inducement for the Company to enter into this Agreement; and

WHEREAS, Executive acknowledges and agrees that by virtue of employment with the Company, Executive will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, Executive hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Executive is not otherwise entitled and constitutes material and sufficient consideration to induce Executive to enter into this Agreement; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Executive:

    (a)    had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and

(b)   had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will continue to develop, or will develop close and direct relationships with such customers and suppliers; and

(c)   has developed, will continue to develop and/or will develop, as applicable, close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d)   has benefitted, will continue to benefit and/or will benefit, as applicable, from the Company's investment of time, money and trust in Executive and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e)   has made use of, and will continue to make use of, Executive's significant skills, training and experience; and

(f)   for these and other reasons, will render services to the Company that Executive acknowledges are special, unique or extraordinary; and

WHEREAS, Executive acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Executive's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1.   **DEFINITIONS.**   Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a)   **"Active Prospective Client"** means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Executive's employment hereunder.

2

(b)  **"Cause"** shall mean (i) commission by Executive of a willful and material act of dishonesty in the course of Executive's duties hereunder; (ii) conviction of Executive by a court of competent jurisdiction of a crime constituting a felony or conviction in respect of any act involving fraud, dishonesty or moral turpitude; (iii) Executive's performance under the influence of illegal drugs or the abuse of legal drugs, or continued habitual intoxication, during working hours, after the Company shall have provided notice to Executive and given Executive 30 days within which to commence rehabilitation with respect thereto, and Executive shall have failed to commence such rehabilitation or continued to perform under the influence after such rehabilitation; (iv) frequent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after the Company shall have advised Executive of its intention to terminate Executive's employment for Cause, in the event such condition shall not have been cured; (v) Executive's personal, willful and continuing misconduct or gross negligence that is injurious to the Company's reputation or business; (vi) refusal to perform duties and responsibilities described in this Agreement (or as they may be assigned from time to time), or to carry out reasonable and lawful directives of the Regional CEO or such Regional CEO's designee, including with respect to execution of any material policy; in each case which, if capable of being cured, shall not have been cured within 60 days after the Company shall have advised Executive of its intention to terminate Executive's employment for Cause; or (vii) material non-compliance with the terms of this Agreement.

(c)  **"Client Account"** means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(d)  **"Competitive Business"** means any Person engaged in the production, distribution, marketing or sale of a Competitive Product.  Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(e)  **"Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Executive or the Company has sold, marketed, distributed or developed in the last two (2) years of Executive's employment with the Company, or about which Executive has acquired Confidential Information.

3

(f) **"Confidential Information"** means at any date, any information of the Company, any Predecessor and/or a USI Company to which Executive has access, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(g) **"Effective Date"** means the Closing date.

(h) **"Goodwill"** means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts to develop lasting relationships.

(i) **"Person"** means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(j) **"Predecessor"** means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(k) **"USI Business"** means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(l) **"USI Companies"** or **"USI Company"** means USI Advantage Corp., a Delaware corporation (**"USI"**), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

## 2. RESPONSIBILITIES AND TERM

2.1. **Responsibilities**. The Company shall employ Executive on the terms and conditions in this Agreement, and conditioned upon the Closing. Executive shall perform all services and duties commensurate with such position as prescribed from time to time by Executive's Regional Chief Executive Officer or his/her designee (hereinafter, the **"Regional CEO"**). Nothing in this Agreement shall confer upon Executive any right to continued employment hereunder or interfere with the Company's right to change the terms and conditions of Executive's employment hereunder.

2.2. **No Conflicts of Interest**. During Executive's employment hereunder, Executive agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Executive's employment with the Company. Executive agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.3. **Duty of Loyalty**. Executive acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

2.4. **Term**. This Agreement, including Executive's employment hereunder, shall commence on the Effective Date and continue until terminated pursuant to Section 8 (the **"Term"**).

## 3. COMPENSATION AND BENEFITS

3.1. **Base Salary**. To the extent Executive remains employed by the Company hereunder, the Company agrees to pay Executive, and Executive agrees to accept, a base salary in the annual amount of Three Hundred Thousand Dollars ($300,000) (**"Base Salary"**); provided, however, the Company may adjust Executive's Base Salary upward in its discretion and/or pursuant to Company polices as amended from time to time. The Base Salary will be payable in equal installments in accordance with the Company's normal payroll practices.

3.2. **Performance Bonus**. Executive shall be eligible from time to time to receive a bonus under the USI Management Incentive Plan (the **"USI Plan"**), as may be amended from time to time (the **"Performance Bonus"**). Executive's "target" award opportunity shall be thirty-five percent (35%) of Executive's Base Salary; provided, however, the Company may adjust such "target" percentage in its discretion; except that the Company shall not adjust

5

such "target" percentage before the end of the performance year ended 2018. Any Performance Bonus hereunder shall be determined by the Chief Executive Officer of USI LLC, subject to the terms, conditions and approvals required by USI LLC's policies and procedures then in effect. Each Performance Bonus, if any, shall be paid to Executive no later than ninety (90) days following the end of the performance year; provided, however, that Executive shall not earn or receive any bonus herein unless Executive is still actively employed hereunder on the respective bonus payment date.

3.3. **Tax Withholding**. The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.4. **Benefits**. Executive shall be entitled to benefits on the same terms generally provided to similar employees of the Company. Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for executives of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.5. **Paid Time Off**. Executive shall be entitled to paid time off (consisting of vacation, sick days and personal days ("**PTO**")) in the amount provided in general to similarly situated employees of the Company, which shall be accrued and taken in accordance with the Company's PTO policy, as amended from time to time.

3.6. **Option Grant**. Following the Closing, Executive shall be eligible for a grant of stock options in USI, subject to Executive purchasing a minimum amount of common stock (the "**Co-Invest**") of USI. The terms and details of the Co-Invest and option grant will be included in separate offering materials and agreements, which will be delivered to Executive following the Closing.

4. **RETENTION BONUS PAYMENT**. Executive shall be eligible for a special retention bonus payment (the "**Retention Payment**").

4.1. **Amount**. Executive shall be eligible to receive a Retention Payment in an amount of up to fifty percent (50%) of Executive's Base Salary as of the Effective Date. The Retention Payment shall be calculated based on the retention, thirty (30) days after the Effective Date, of the employees managed by Executive (excluding all Sales Executives and employees with administrative roles (i.e. receptionists and secretaries)) (such employees, "**Executive's Staff**") as of the signing date of the Purchase Agreement (the "**Signing Date**"). In the event that 100% of Executive's Staff (a) executes new employment agreements in the form delivered to such Executive's Staff by the Company in connection with the Closing within thirty (30) days after the Effective Date and (b) remains employed by the Company thirty (30) days after the Effective Date, then Executive shall receive 50% of Executive's Base Salary as of the Effective Date subject to the timing and eligibility provisions in Section 4.2 below. However, in the event that an employee(s) of Executive's Staff (i) does *not* execute the aforementioned employment agreement or (ii) does *not*

6

remain employed by the Company thirty (30) days after the Effective Date (such employee(s) described in (i) and (ii), collectively, the "**Non-Retained Staff**"), then the Retention Payment percentage above shall be reduced pursuant to the following formula: FIRST, calculate the number of Non-Retained Staff and divide that number by the aggregate number of Executive's Staff as of the Signing Date; SECOND, take the percentage derived from the FIRST step and multiply that by 50% (the Retention Payment percentage cap); THIRD, subtract the percentage derived from the SECOND step from 50% to determine the final Retention Payment percentage.  By way of example, if, on the Signing Date, Executive's Staff consisted of ten (10) employees and thirty (30) days after the Effective Date nine (9) employees of Executive's Staff met the criteria in sub-clauses (a) and (b) of this Section, and one (1) employee of Executive's Staff did not (and thus, became Non-Retained Staff), then Executive would be eligible to receive a Retention Payment of forty-five percent (45%) of Executive's Base Salary as of the Effective Date (FIRST, 1 divided by 10 = 10%; SECOND, 10% multiplied by 50% = 5%; THIRD, 50% minus 5% = 45%).

4.2.  *Timing and Eligibility*.  The Company shall pay Executive fifty percent (50%) of the Retention Payment within forty-five (45) days following the fourth anniversary of the Effective Date, and the remaining fifty percent (50%) of the Retention Payment shall be paid within forty-five (45) days following the fifth anniversary of the Effective Date. Notwithstanding the foregoing, if Executive's employment with the Company terminates or Executive is not actively employed for any reason on the dates the installment payments under this Section are due, Executive shall not earn or be paid such installment.

5.  **EXPENSES**. During the Term, the Company shall reimburse Executive, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses reasonably and properly incurred by Executive in connection with the performance of Executive's duties hereunder and the conduct of the business of the Company, upon submission to the Company (or its designee) of appropriate documentation therefor.

6.  **COMPANY PROPERTY.** Executive acknowledges and agrees all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Executive has access to and/or receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Executive's employment.  Executive further acknowledges and agrees that Executive has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.  Executive shall neither copy for him/herself Confidential Information, nor send Confidential Information to him/herself, unless done so in accordance with the provisions of Section 2.3.

7.  **COVENANTS**

7.1.  *Confidential Information*.  The Company agrees to provide Executive with Confidential Information to assist Executive in the course and scope of Executive's duties.  Executive

7

acknowledges that the Company's agreement to provide this Confidential Information to Executive is in consideration for, and ancillary to, Executive's agreement to the other terms in this Agreement.

7.2. ***Confidentiality During and Following Term.*** During the Term and for five (5) years after Executive is no longer employed hereunder, for any reason, Executive will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Executive shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure). Executive will also use reasonable efforts to prevent any prohibited use or disclosure by any other Person. Nothing in this Agreement shall prohibit Executive from disclosing data or information which has been independently developed and disclosed by others or which has otherwise entered the public domain through lawful means.

7.3. ***Defend Trade Secrets Act Required Notice.*** Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Executive acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

7.4. ***Assignment and Ownership of Intellectual Property.*** Executive acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Executive is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Executive hereby irrevocably transfers and assigns to the Company all rights, title and interest Executive may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Executive may have or acquire therein. **"Intellectual Property"**

8

means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Executive in whole or in part during the Term: (a) using Executive's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Executive's work for the Company.

7.5.    ***Non-Competition.*** In consideration of Executive's employment hereunder, and for other good and valuable consideration, Executive agrees, during the Term and for six (6) months after Executive is no longer employed hereunder, for any reason, Executive shall not, directly or indirectly, compete with the Company within the Restricted Geographic Area by: (a) acting in Executive's same or similar capacity, which Executive acted for the Company, on behalf of any Competitive Business; (b) performing Executive's same or similar functions, which Executive performed for the Company, on behalf of any Competitive Business; or (c) otherwise taking, facilitating or encouraging any action to evade or attempt to evade the intent of this Section.  ***"Restricted Geographic Area"*** means each of the following separate and divisible geographic areas:  (a) the state in which Executive maintained his/her principal office for the Company during the last twelve (12) months of Executive's employment hereunder; (b) a one hundred (100) mile radius from any Company facility in which Executive maintained an office during the last twelve (12) months of Executive's employment hereunder; (c) any territory to which Executive has been assigned during the last twelve (12) months of Executive's employment hereunder; and (d) any area in the United States where the Company has conducted USI Business during the last twelve (12) months of Executive's employment hereunder.  Notwithstanding the foregoing, in the event that (i) Executive terminates Executive's employment hereunder pursuant to Section 8.2 (Termination by Executive) within twelve (12) months following the Effective Date (a **"Voluntary Termination Event"**) and (ii) the Company does not, within fifteen (15) business days of the Company's receipt of Executive's notice of termination (the **"Election Period"**), notify Executive of the Company's election to enforce this Section 7.5 (Non-Competition), then, following the later of (1) the effective date of such Voluntary Termination Event or (2) the end of the Election Period, this Section 7.5 (Non-Competition) shall be void and of no further force or effect.  For the avoidance of doubt, any such election shall be made at the Company's sole discretion and in the event the Company elects, within the Election Period, to enforce this Section 7.5 (Non-Competition) (such election, the **"Non-Compete Election"**), then this Section 7.5 (Non-Competition) shall remain fully enforceable against Executive and Executive shall be entitled to the payments set forth in Section 8.3(e).  Also, for the avoidance of doubt, the covenants set forth in this Section 7.5 shall remain in force for any termination hereunder, except as expressly stated in this Section 7.5.

7.6.    ***Non-Competition of Client Accounts***.  During the Term and for (2) years after Executive is no longer employed hereunder, for any reason, Executive shall refrain from carrying on

9

any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Restricted Geographic Area. "**Carrying on any business in competition with the Company**" shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Executive had a role in the sale, marketing, distribution, or development in the last two (2) years of Executive's employment with the Company or about which Executive acquired Confidential Information. It is expressly agreed that this Section 7.6 is not intended to restrict or prohibit the ownership by Executive of stock or other securities of a publicly-held corporation in which Executive (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

7.7. *Non-Solicitation of Clients and Active Prospective Clients.* In consideration of Executive's employment hereunder, and for other good and valuable consideration, Executive agrees that:

(a) During the Term and for two (2) years after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Executive managed or regularly serviced and/or about which Executive obtained Confidential Information on behalf of the Company within the last two (2) years of Executive's employment hereunder.

(b) During the Term and for six (6) months after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Executive solicited and/or about which Executive obtained Confidential Information on behalf of the Company within the last six (6) months of Executive's employment hereunder.

7.8.  **Non-Interference With Employees.**  In consideration of Executive's employment with the Company, and for other good and valuable consideration, Executive agrees, during the Term and for two (2) years after Executive is no longer employed hereunder, for any reason, Executive shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Executive worked or obtained knowledge about as a result of Executive's employment with the Company.

7.9.  **Purpose of Restrictions**.  The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Executive's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill.  Executive agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

7.10.  **Modification**.  If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations.  If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced.  The Company may unilaterally limit the scope of these covenants.

7.11.  **Independent Enforcement**.  Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Executive against the Company or any USI Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Executive or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 7 of this Agreement.  The Company shall not be barred from enforcing any of the covenants in Section 7 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Executive.

8.  **TERMINATION**

8.1.  **Termination by the Company**.  The Company may terminate Executive's employment hereunder by giving written notice to Executive.  The termination of employment shall be effective on the date specified in such notice.

8.2.  **Termination by Executive**.  Executive may terminate Executive's employment hereunder by giving at least sixty (60) days written notice to the Company.  The termination of employment shall be effective on the date specified in such notice; provided, however, at

any time following receipt of such notice, the Company may:  (a) accept Executive's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Executive to cease performing any services hereunder until the termination of employment.

8.3.  ***Payments Upon Termination***.   If Executive's employment hereunder is terminated pursuant to Section 8, the Company shall:

(a)   reimburse Executive for any expenses properly incurred through the date of termination pursuant to Section 5;

(b)   pay Executive any earned but unpaid Base Salary through the date of termination pursuant to Section 3.1;

(c)   if such termination is by the Company without Cause within twelve (12) months following the Effective Date and provided Executive is in compliance with Executive's obligations in Section 7, pay severance pay to Executive in equal monthly installments in an aggregate amount equal to the greater of (A) six (6) months of salary at Executive's then current annual Base Salary; or (B) such greater amount as Executive would have received under the terms of the Wells Fargo & Company Salary Continuation Plan, as amended and effective April 1, 2017;

(d)   if such termination is by the Company without Cause within twelve (12) months following the Effective Date and provided Executive is in compliance with Executive's obligations in Section 7, continue Executive's medical, dental and vision coverages in effect as of the date of termination (provided Executive remains eligible to participate in such plans and continues paying Executive's share of the premiums for such plans) or reimburse Executive for the Company's share of premiums had Executive continued such coverages (such benefits (together with all restrictions set forth hereunder), **"Executive's Medical Benefits"**), in either case until the earlier of the last day of the month in which the severance payment is paid in full or Executive commences coverage under another employer's healthcare plan; and

26 YEARS  ✳

(e)   if such termination is (i) a Voluntary Termination Event followed by a Non-Compete Election or (ii) by the Company without Cause following the first anniversary of the Effective Date and, in each case, provided Executive is in compliance with Executive's obligations in Section 7, pay severance pay to Executive in installments over six (6) months in an aggregate amount equivalent to six (6) months of salary at Executive's then current annual Base Salary and continue Executive's Medical Benefits until the earlier of the last day of the month in which the severance payment is paid in full or Executive commences coverage under another employer's healthcare plan.

8.4.   Executive understands and agrees that the payments and benefits in Section 8.3 for a Voluntary Termination Event followed by a Non-Compete Election or a termination by the Company without Cause shall be contingent upon Executive executing and not revoking

·a separation agreement and release of all claims against the Company and its related entities and persons, in form and content satisfactory to the Company. Without limiting any other remedies available to the Company, all payments and benefits in Section 8.3 for a Voluntary Termination Event followed by a Non-Compete Election or a termination by the Company without Cause shall immediately terminate upon the Company's good faith determination that Executive has failed to comply with Executive's obligations in Section 7 of this Agreement.

8.5. **Miscellaneous Termination Provisions**. Upon termination of Executive's employment hereunder, Executive hereby irrevocably promises to:

(a) Immediately return to the Company any and all property of any of the USI Companies in Executive's possession or control, including electronic devices and equipment, corporate credit cards, and building keys, including any and all such property acquired as a result of employment with any Predecessor.

(b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Executive's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information, including any and all such materials acquired as a result of employment with any Predecessor.

(c) Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

(d) For two (2) years after Executive is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 7 of this Agreement prior to taking any position with such new employer.

(e) Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

9. **REMEDIES**. Executive acknowledges: (a) the services to be rendered by Executive are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Executive's breach of Section 7 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Executive agrees, if Executive violates Section 7 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Executive agrees to waive any requirement for the Company to post a bond.

10.   **EXECUTIVE'S REPRESENTATIONS AND WARRANTIES**

10.1.   ***Disclosure of Agreements; No Conflict***.  Executive represents and warrants that Executive has supplied to the Company all agreements between Executive and any Person, other than the Company, that employed or otherwise retained Executive within the past five (5) years.  Executive further represents and warrants that Executive's execution of this Agreement and performance of the duties contemplated hereunder do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Executive is bound.

10.2.   ***No Confidential Information***.  Executive represents and warrants that Executive has not taken any confidential information from any Person that employed or otherwise retained Executive, that Executive has no such confidential information in Executive's possession or control, and that Executive will not use any such confidential information in the performance of Executive's duties hereunder.

10.3.   ***No Copyright Materials***.  Executive represents and warrants that Executive has not taken any copyrighted materials from any Person that employed or otherwise retained Executive, that Executive has no such copyrighted materials in Executive's possession or control,  and  that  Executive  will  not  use  any  such  copyrighted  materials  in  the performance of Executive's duties hereunder.

10.4.   ***No Restrictive Purchase Agreements***.  Except with regard to any employment agreements with the Company, Executive represents and warrants that Executive is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Executive from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

10.5.   ***Clients of Former Employers or Entities***.  Executive represents and warrants to the Company that, during any period of time in which such Executive was subject to any restrictions prohibiting Executive from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, that Executive has not made any contact with any clients of any Person that employed or otherwise retained Executive, within the past five (5) years, concerning Executive's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant.  Executive further represents and warrants that Executive will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Executive, within the past five (5) years in violation of such restrictive covenant.

10.6.   ***Employees of Former Employers or Entities***.  Executive represents and warrants that Executive has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained

Executive, within the past five (5) years, concerning a prospective employment relationship with the Company.

10.7. **No Ownership Rights to Client Accounts**.  Executive represents and warrants to the Company that Executive has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

11. **ENTIRE AGREEMENT**.  No agreements or representations, oral or otherwise, express or implied, have been made with respect to Executive's employment hereunder except as set forth in this Agreement.  This Agreement supersedes and preempts any prior oral or written understandings, agreements or representations by or between Executive and the Company or any Predecessor, including without limitation, any previous employment or other similar agreement between Executive and the Company or any Predecessor, which may have related to the subject matter hereof in any way.

12. **AMENDMENT**.  Except as set forth in Sections 7.10, 14, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

13. **GOVERNING LAW**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.

14. **SEVERABILITY**.  The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable.  In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable.  If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

15. **WAIVERS**.  No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.  Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

16. **ASSIGNMENT**.  Executive may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company. Executive's obligations under this Agreement inure to the Company, its successors and assigns.  The Company may, at any time and without Executive's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor.  Any such successor or assign is expressly authorized to enforce the terms of this Agreement.