## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JAMESON TAYLOR )
ANDERSON; DEAN ANDERSON; )
and ROGER MALDONADO )
      )
     Plaintiffs, )
      ) CIVIL ACTION NO.
v. ) 19-CV-05582-SCJ
      )
USI ADVANTAGE CORP. and )
USI INSURANCE SERVICES LLC, )
      )
     Defendants. )
_____)

## ORDER GRANTING USI INSURANCE SERVICES LLC'S MOTION FOR PRELIMINARY INJUNCTION

This case is before the Court on Defendant USI Insurance Services LLC's ("USI") Emergency Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction [Doc. 7] and USI's Supplement to its Motion for TRO and Preliminary Injunction [Doc. 70] (collectively, the "Motion"). The Court conducted an evidentiary hearing on the Motion on December 20, 2019. The Court previously granted in part and denied in part USI's Motion for a TRO, but did not rule at that time on USI's Motion for Preliminary Injunction. [Doc. 31 (the "TRO Order").] The Court conducted an evidentiary hearing on USI's Motion for

Preliminary Injunction on February 26, 2020. After having reviewed the submissions by both USI and Plaintiffs Jameson Taylor Anderson ("Taylor Anderson"), Robert Dean Anderson ("Dean Anderson"), and Roger Maldonado (collectively, "Plaintiffs") and the record evidence (inclusive of post-hearing filings that the Court has exercised its discretion to consider over Plaintiffs' objection), and after having heard argument from all parties to the Motion, the Court hereby **GRANTS** USI's Motion for Preliminary Injunction.

<u>First</u>, the Court **GRANTS** USI's motion for a preliminary injunction enforcing Section 7.5 of Dean Anderson's Employment Agreement [Doc. 7-2, pp. 29-44] (the "DA Agreement").

Section 7.5 of the DA Agreement prohibits Dean Anderson from, "directly or indirectly, compet[ing] with the Company [USI] within the Restricted Geographic Area [as defined in the DA Agreement] by: (a) acting in Executive's [as defined in the DA Agreement] same or similar capacity, which Executive acted for the Company, on behalf of any Competitive Business [as defined in the DA Agreement]; (b) performing Executive's same or similar functions, which Executive performed for the Company, on behalf of any Competitive Business [as defined in the DA Agreement]; or (c) otherwise taking, facilitating or encouraging any action to evade or attempt to evade the intent of this Section[.]" [DA Agreement, § 7.5, Doc. 7-2, p. 37.] The "Restricted Geographic Area" is defined

to include, in relevant part, any area in the United States where USI has conducted business during the last twelve months of Dean Anderson's employment or, alternatively, any territory to which Dean Anderson has been assigned during the last twelve months of his employment with USI.  [*Id.*]

In the Court's previous Order granting in part USI's Motion for a TRO, the Court found that USI has demonstrated a substantial likelihood of success on the merits of its claim that Dean Anderson has breached Section 7.5 of the DA Agreement and that the other criteria for injunctive relief are satisfied.  [TRO Order, Doc. 31, pp. 2-3.]  The evidence presented shows that Dean Anderson attempted to resign from his employment with USI on December 9, 2019 without providing any notice, as he was required to give under the DA Agreement. [Declaration of Robert Allen ("First Allen Decl."), ¶ 36, Doc. 7-1, pp. 13-14; DA Agreement, § 8.2, Doc. 7-1 p. 39.]  Dean Anderson began immediately working for the Southeast Series of Lockton Companies, LLC ("Lockton"), a direct competitor of USI, in a similar capacity to his employment for USI, and began competing with USI for USI's clients within the "Restricted Geographic Area" specified in Section 7.5 of the DA Agreement.  Since Dean Anderson's attempted resignation from USI, USI has received at least 19 Broker of Record ("BOR") Letters indicating a transfer of a client's insurance brokerage relationship from USI

to Lockton.  [Declaration of Robert Allen ("Third Allen Decl."), ¶ 18, Doc. 70-1, p. 7.]

The Court previously enforced Section 7.5 of the DA Agreement, but did not at that time enjoin Dean Anderson from working for Lockton in Charlotte, North Carolina.  [TRO Order, Doc. 31, p. 3.]  However, since the entry of the TRO Order, USI has submitted evidence showing that Dean Anderson continues to compete with USI on a nationwide basis despite the fact that the TRO enjoined Mr. Anderson from working in a competitive capacity to USI, except did not enjoin Dean Anderson from working for Lockton only in Charlotte, North Carolina. Since the date the TRO was entered, Lockton and Plaintiff Taylor Anderson have communicated to certain of the USI clients Dean Anderson previously worked with while employed in USI's Atlanta office that Dean Anderson is part of the team servicing the client's account at Lockton and is the national head of the aviation practice at Lockton.  [Doc. 82-1, pp. 65-78.]  Additionally, Dean Anderson has directed his work through Lockton's Georgia team, with whom he regularly communicates about Lockton business.  [Doc. 82-1, pp. 34, 47.]  Finally, USI has presented evidence that Dean Anderson has continued to engage in communications with underwriters located in Georgia.  [Doc. 82-1, pp. 166-169.]

4

Based on the foregoing evidence, there continues to be a substantial likelihood that USI will succeed on the merits of its claim against Dean Anderson for the breach of Section 7.5 of the DA Agreement, and the other criteria for injunctive relief are also satisfied.

Given that the Court previously ruled, based on Dean Anderson's particular circumstances, that he was not enjoined from working for Lockton in Charlotte, North Carolina, the Court will keep in place the injunction imposed in its prior order [Doc. 31] that enjoins Dean Anderson from violating Section 7.5 of the DA Agreement, except that Dean Anderson is not enjoined from working for Lockton in Charlotte, North Carolina.  The Court clarifies, however, that Dean Anderson's work for Lockton must be limited to work in and related to Charlotte, North Carolina.   Accordingly, Dean Anderson is prohibited from, without limitation, working with any of Lockton's employees, any clients  or prospective clients, or any underwriters situated in Georgia.

The preliminary injunction against Dean Anderson issued pursuant to this section of the Order shall run until **August 7, 2020**, which is six months after the termination of Dean Anderson's employment with USI on February 7, 2020 (60 days after Dean Anderson provided notice of his intention to terminate his employment on December 9, 2019), or until further Order of the Court.

Second, the Court **GRANTS** USI's motion for a preliminary injunction enforcing Plaintiffs' client non-compete provisions found in Section 7.6 of the DA Agreement, Section 4.6 of Roger Maldonado's employment agreement [Doc. 7-2, pp. 48-59] (the "RM Agreement", and Section 7.6 of Taylor Anderson's employment agreement [Doc. 7-2, pp. 61-79] (the "TA Agreement" (collectively, the "Client Non-Compete Provisions".

The Client Non-Compete Provisions prohibit Plaintiffs from "carrying on any business in competition with the Company [USI], directly or indirectly, with respect to any Client Account [as defined in the Client Non-Compete Provisions]

or Active Prospective Client [as defined in the Client Non-Compete Provisions] in the Restricted Geographic Area [as defined in the Client Non-Compete Provisions]." [DA Agreement, § 7.6, Doc. 7-2, p. 37; RM Agreement, § 4.6, Doc. 7-2, p. 54; TA Agreement, § 7.6, Doc. 7-2, p. 73.]

In the TRO Order, the Court found that USI was substantially likely to succeed on the merits of its claims for Plaintiffs' violations of the Client Non-Compete Provisions and that the other criteria for granting injunctive relief are satisfied. [TRO Order, Doc. 31, pp. 3-5.]

USI has presented evidence that both prior to and since attempting to resign their employment from USI, the Plaintiffs have been actively working in a capacity that is directly competitive to the business of USI, including by moving numerous client accounts from USI to Lockton. [First Allen Decl., ¶¶ 42-44, Doc. 7-2, pp. 18-19; USI's Memorandum of Law in Support of its Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Mot. Br."), Doc. 7-1, pp. 32-34.]   Because the evidence continues to show that USI is substantially likely to succeed on the merits of its claims against the Plaintiffs for their violations of the Client Non-Compete Provisions and because the other criteria for injunctive relief are satisfied, the Court **GRANTS** USI's Motion for Preliminary

Injunction with respect to all three of the Plaintiffs for the violation of each of their respective Client Non-Compete Provisions.

As to Taylor Anderson and Roger Maldonado, the Court converts its previously entered TRO into a preliminary injunction on the same terms. [TRO Order, Doc. 31, pp. 4-5.] With respect to Dean Anderson, the Court previously entered a TRO enforcing Section 7.6 of the DA Agreement that encompassed the following portions of his Restricted Geographic Area: "(a the state in which Executive maintained his/her principal office for the Company during the last twelve (12 months of Executive's employment hereunder," which is Georgia, and "(b a one hundred (100 mile radius from any Company facility in which Executive maintained an office during the last twelve (12 months of Executive's employment hereunder[.]" [TRO Order, Doc. 31, p. 4.] Given this evidence and law on reasonableness, the Court will enforce Section 7.6 of the DA Agreement as written, with the exception that the TRO's blue-penciled Restricted Geographic Area shall continue to apply to this preliminary injunction.

The preliminary injunction enforcing the Client Non-Compete Provisions shall run for a period of two years following Plaintiffs' termination of their employment from USI, which for Roger Maldonado will be **December 9, 2021**,

and for Dean Anderson and Taylor Anderson will be **February 7, 2022**, or until further Order by the Court.

<u>Third</u>, the Court **GRANTS** USI's motion for a preliminary injunction enforcing Section 7.7 of the DA Agreement, Section 4.5 of the RM Agreement, and Section 7.5 of the TA Agreement (collectively, the "Non-Solicitation Provisions").

The Non-Solicitation Provisions provide that Plaintiffs, during the term of their employment and for two years thereafter, shall not "directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account." [DA Agreement, § 7.7, <u>Doc. 7-2, p. 38</u>; RM Agreement, § 4.5, <u>Doc. 7-2, p. 53</u>; TA Agreement, § 7.5, <u>Doc. 7-2, p. 72</u>.] USI has indicated that, for purposes of this Motion for Preliminary Injunction, it is seeking to enforce only the prohibitions set forth in subsections (i), (ii), and (v) above.

USI has presented evidence that Plaintiffs accepted Lockton's employment offers on or about November 1, 2019, more than one month before their attempted resignations from USI.  [Doc. 70-2, p.45, 46-48]. On December 9, 2019, Plaintiffs sent emails to dozens of USI's clients informing them of their departures from USI.  [First Allen Decl., Ex. I-K, Doc. 7-2, p. 90-96.]  These emails were not authorized and were sent before Plaintiffs even provided notice of their attempted resignations to USI.   [*Id.*, ¶ 38, Doc. 7-2, pp. 14-15.]   After considering the arguments made by Defendants at the February 26, 2020 hearing, the Court finds that Plaintiffs' intent in sending these mass emails to clients was to encourage and induce these clients to contact Plaintiffs and to switch their insurance brokerage business to Lockton.   Many of these clients, in fact, immediately contacted Plaintiffs and did execute BOR Letters to switch their business from USI to Lockton.

Shortly after Plaintiffs sent their departure emails, they began communicating with their former USI clients.  They corresponded with and solicited these former clients by phone, text messaging, and LinkedIn.  For example, in one instance, Tyson Teeter, the President of USI client Southwind Global Aviation, Inc. ("Southwind") asked Taylor Anderson via text message: "With your hand on your heart and your word, . . . [t]his is the smartest move . . . [Southwind] could make for its insurance needs?  Yes or no,"

to which Taylor Anderson replied "Yes."    [Doc. 82-1, pp. 82-83.]    Mr. Teeter then agreed to transfer Southwind's business away from USI to Lockton. [*Id.*]

Some of Plaintiffs' acts of solicitation occurred through intermediaries such as David Brosbell, a Canadian broker involved in servicing the client's account at USI.  [USI's Supplement to its Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in Support ("Supp. Br."), Doc. 70, pp. 7-10; Third Allen Decl., ¶ 9, Ex. D, Doc. 70-1, pp. 4, 25-32.]  Brosbell had multiple phone calls with Roger Maldonado on December 10, 2019.  [Doc 88-1, p.5, 10-11.]  He also called a contact at USI client Field Aerospace, Inc. ("Field Aerospace") and "recommended they change their American broker to Lockton" and sent an email to two contacts at Field Aerospace to "fully endorse moving to Lockton."  [Doc. 70-3, p. 17; Doc. 86-3, p.2.]  The following day, December 12, 2019, Brosbell again texted his contacts at Field Aerospace and encouraged them to submit a BOR quickly.  [Doc. 70-3, p. 25.]

Brosbell has submitted a declaration indicating that he was not asked by any of the Plaintiffs to contact Field Aerospace and suggest that they change their insurance broker to Lockton.  [Doc. 86-3, p. 2.]  This evidence, however, must be viewed together with the significant evidence that Brosbell was in close communication with Roger Maldonado shortly before and after Plaintiffs gave

notice of their resignations on December 9, 2019 [Doc 88-1, p.5, 10-11], and Brosbell's admission that he was coordinating with Roger Maldonado regarding the transfer of client accounts, including Field Aerospace, to Lockton. [Doc 86-3, p.2, ¶10] Additionally, Brosbell specifically encouraged his Field Aerospace contacts to reach out to Manoj Sharma at Lockton. It would be reasonable for a factfinder to conclude that it is highly unlikely that it was a coincidence that Brosbell encouraged his Field Aerospace contacts to reach out to the same person that Plaintiffs were directing other USI clients to without having received some direction from Roger Maldonado, and neither Brosbell nor the Plaintiffs provided any alternative explanation. [Doc. 70-3, p. 17; Doc. 86-3, p.2.]

In their correspondence with USI clients, Plaintiffs facilitated, and at times encouraged, the clients' transfers of their accounts over to Lockton by directing them to contact Manoj Sharma at Lockton, who was not himself licensed to handle the clients' accounts. [Id., Doc. 70, p. 8; Doc. 70-3, pp. 5-6, 38-40; Doc. 82-1, pp. 164-165.] In one example of Plaintiffs using Sharma to circumvent the Non-Solicitation Provisions, Chris Crutchfield, a client contact at former USI client Rally Point Management, Inc. ("Rally Point") called Taylor Anderson the day he sent his resignation email. [Doc. 82-1, p. 48.] Taylor Anderson responded by saying "I am not able to discuss your account, but Manoj can." [Doc. 82-1, p. 48.]

Crutchfield subsequently texted Mike Ward, the President of Rally Point, and told him to contact Manoj Sharma about transferring their accounts because "[h]e'll be familiar with the situation and should be able to help facilitate the move."  [Doc 82-1, p. 110.]

In another example, Irena Leigh, the in-house counsel at In-Flight Crew Connections, LLC ("ICC"), texted Taylor Anderson to ask about switching ICC's brokerage account to Lockton.  Taylor Anderson replied by stating, "I will give you a call shortly."  [Doc 70-3 pp 5-6] Following Mr. Anderson's phone call with Irena Leigh and Dean Anderson's call with Jennifer Guthrie, ICC's CEO, Taylor Anderson texted Leigh and stated that all "account dialog needs to run through . . . Manoj Sharma," who was "prepared for your call."  [Doc. 70-3, p. 5.] After further phone calls, emails, and text messages, ICC submitted a BOR Letter transferring its business over to Lockton.  [Doc 7-2 p 105; Doc 82-1 pp 28-30.]

Immediately following Plaintiffs' outreach efforts to USI's clients, the clients began executing BOR Letters and at least 19 USI clients, accounting for $1,082,178 in twelve-month revenue, have transferred their accounts from USI to Lockton to date.  [Third Allen Decl., ¶¶ 18-19, Doc. 70-1, pp. 7-8.]

The Court finds that USI has presented direct evidence of solicitation of Southwind, a client Plaintiffs serviced at USI, and strong circumstantial evidence

that Plaintiffs have solicited other USI clients in violation of their contractual obligations to USI.  In response, Plaintiffs did not submit any declarations or testimony from either themselves or any client to rebut USI's evidence.

Based on the evidence discussed above, USI has met its burden of establishing a substantial likelihood of success on the merits as to its non-solicitation claims against Plaintiffs.  As this Court has previously stated:

> [T]he terms 'solicit' and 'solicitation' have not been defined by the Georgia General Assembly.  A review of Georgia's case law shows that the Georgia Court of Appeals has looked to dictionaries to define the terms as follows.
>
> Webster's Dictionary defines the term 'solicit' as "to entreat, importune . . . to endeavor to obtain by asking or pleading . . . to urge . . . ."  "The word has been otherwise defined as: 'To appeal for something; to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain; and though the word implies a serious request, it requires no particular degree of importunity, entreaty, imploration, or supplication.  To awake or incite to action by acts or conduct intended to and calculated to incite the act of giving.  The term implies personal petition and importunity addressed to a particular individual to do some particular thing.

*Wells Fargo Ins. Servs. USA v. Gupton*, No. 1:13-CV-0520-SCJ, 2013 U S  Dist  LEXIS 190019, at *9-10 (N.D. Ga. Mar. 5, 2013) (quoting *Akron Pest Control v.*

*Radar Exterminating Co.*, 216 Ga. App. 495, 497, 455 S.E.2d 601, 603 (1995)).
"[T]he Georgia appellate courts have defined the phrase forbidding solicitation directly or indirectly as unambiguous and enforceable in that **"[a]n 'indirect' solicitation occurs when the former employee undertakes 'some affirmative action on his part that could be considered a solicitation in the broadest possible sense."** *Id.* at *10 (emphasis original) (quoting *Sysco Food Servs. of Atlanta, Inc. v. Chupp*, 225 Ga. App. 584, 588, 484 S.E.2d 323, 326 (1997)).

Plaintiffs' conduct easily meets the above definition of the term solicitation. First, Plaintiffs' departure emails were a solicitation. However, even if the Court does not consider the departure emails as solicitations, Plaintiffs' other communications with clients, as outlined above and set forth in the record, constituted solicitations. *See Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 12 (1st Cir. 2013) (which party made initial contact is merely one factor among many in distinguishing solicitation from mere acceptance of business).

Plaintiffs have argued that Georgia law does not allow restricting the mere acceptance of unsolicited business [Doc. 86, pp. 7-9], but Plaintiffs' conduct went far beyond this. Here, Plaintiffs engaged in affirmative conduct and made affirmative statements to induce the switch in the clients' business from USI to Lockton. "[E]vidence of affirmative action on [Plaintiffs'] part, through contacting

[USI's] clients (for which there was an ongoing contractual and business relationship and for which [Plaintiffs] managed the relationship while at [USI]), … could be considered solicitation in the broadest possible sense." *Gupton*, 2013 U.S. Dist. LEXIS 190019 at *13.

Finally, although Plaintiffs argue that the Non-Solicitation Provisions are overbroad, the specific provisions that USI is trying to enforce are reasonable and enforceable. *See O.C.G.A. § 13-8-53(b).* Plaintiffs' arguments regarding other provisions of the contracts that USI is not seeking to enforce in this motion do not preclude the entry of this preliminary injunction. *See* O.C.G.A. §§ 13-8-53(d), 13-8-54(b); *PointNorth Ins. Grp. v. Zander*, No. 1:11-CV-3262-RWS, 2011 WL 4601028, *3 (N.D. Ga. Sept. 30, 2011) (granting preliminary injunction despite party's argument that portions of the non-solicit were overbroad because "the Court may remedy that finding by blue penciling").

USI has shown that it is substantially likely to succeed on the merits of its claims that Plaintiffs breached the Non-Solicitation Provisions within their employment agreements and the remaining criteria for injunctive relief have been

satisfied.   Consequently, the Court **GRANTS** USI's Motion for Preliminary Injunction with respect to the Non-Solicitation Provisions.

The preliminary injunction enforcing these client non-solicitation restrictions shall run for a period of two years following Plaintiffs' termination of their employment from USI, which for **Roger Maldonado** will be **December 9, 2021**, and for Dean Anderson and Taylor Anderson will be **February 7, 2022** (2 years following the conclusion of the 60-day notice period triggered by the December 9, 2019 notices), or until further Order by the Court.

Accordingly,   it   is   hereby   **ORDERED**   that:

1.   USI's Motion for Preliminary Injunction enforcing Section 7.5 of the DA Agreement is **GRANTED**.   Dean Anderson is enjoined, through **August 7, 2020**, from violating Section 7.5 of the DA Agreement, which prohibits him from, "directly or indirectly, compet[ing] with the Company [USI] within the Restricted Geographic Area [as defined in the DA Agreement] by: (a) acting in Executive's [as defined in the DA Agreement] same or similar capacity, which Executive acted for the Company, on behalf of any Competitive Business [as defined in the DA Agreement]; (b) performing Executive's same or similar functions, which Executive performed for the Company, on behalf of any Competitive Business; or

17

(c) otherwise taking, facilitating or encouraging any action to evade or attempt to evade the intent of this Section[,]" except that, based on his particular circumstances, Dean Anderson is not enjoined from working for Lockton in Charlotte, North Carolina.  The Court clarifies, however, that Dean Anderson's work for Lockton must be limited to work in and related to Charlotte, North Carolina.  Accordingly, Dean Anderson is prohibited from, without limitation, working with any of Lockton's employees, any clients or prospective clients, or any underwriters situated in Georgia.

[ADDITIONAL PAGES TO FOLLOW]

2.     USI's Motion for Preliminary Injunction enforcing Sections 7.6 of the DA Agreement, Section 7.6 of the TA Agreement, and Section 4.6 of the RM Agreement is **GRANTED**.  Dean Anderson is enjoined, through **February 7, 2022**, from violating Section 7.6 of the DA Agreement, which prohibits him from "carrying on any business in competition with the Company [USI], directly or indirectly, with respect to any Client Account [as defined in the DA Agreement] or Active Prospective Client [as defined in the DA Agreement] in the Restricted Geographic Area [as defined under the Court's blue-penciling of the DA Agreement's definition, as stated above]."   Taylor Anderson  is enjoined,  through **February 7, 2022**, from violating Section 7.6 of the TA Agreement, which prohibits him from "carrying on any business in competition with the Company [USI], directly or indirectly, with respect to any Client Account [as defined in the TA Agreement] or Active Prospective Client [as defined in the TA  Agreement]  in the Restricted Geographic Area [as defined in the TA Agreement]."  Roger Maldonado is enjoined, through **December 9, 2021**, from violating Section 4.6 of the RM Agreement, which prohibits him from "carrying on any business in competition with the Company [USI], directly or indirectly, with respect to any Client Account [as defined in the RM Agreement] or Active Prospective Client

[as defined in the RM Agreement] in the Restricted Geographic Area [as defined in the RM Agreement]."

3.      USI's Motion for Preliminary Injunction enforcing Section 7.7 of the DA Agreement, Section 7.5 of the TA Agreement, and Section 4.5 of the RM Agreement is **GRANTED**.  Dean Anderson is enjoined, through **February 7, 2022**, from violating Section 7.7 of the DA Agreement, and shall not "directly or indirectly, on behalf of any Competitive Business [as defined in the DA Agreement] in any capacity: (i) solicit or attempt to solicit services in connection with the Company [USI] to any Client Account [as defined in the DA Agreement]; (ii) divert or attempt to divert services away from the Company [USI] with respect to any Client Account [as defined in the DA Agreement]; . . . [or] (v) induce the termination, cancellation or non-renewal of any Client Account [as defined in the DA Agreement]."  Taylor Anderson is enjoined, through **February 7, 2022**, from violating Section 7.5 of the TA Agreement, and shall not "directly or indirectly, on behalf of any Competitive Business [as defined in the TA Agreement] in any capacity: (i) solicit or attempt to solicit services in competition with the Company [USI] to any Client Account [as defined in the TA Agreement]; (ii) divert or attempt to divert services away from the Company [USI] with respect to any Client Account [as defined in the TA Agreement]; . . . [or] (v) induce the termination,

20

cancellation or non-renewal of any Client Account [as defined in the TA Agreement]."  Roger Maldonado is enjoined, through **December 9, 2021**, from violating Section 4.5 of the RM Agreement, and shall not "directly or indirectly, on behalf of any Competitive Business [as defined in the RM Agreement] in any capacity: (i) solicit or attempt to solicit services in competition with the Company [USI] to any Client Account [as defined in the RM Agreement]; (ii) divert or attempt to divert services away from the Company with respect to any Client Account [as defined in the RM Agreement]; . . . [or] (v) induce the termination, cancellation or non-renewal of any Client Account [as defined in the RM Agreement]."

If any party contacts a client, prospective client, or former client of USI Insurance or Lockton for the purposes of sharing or discussing this Order, any other party shall be entitled to address the Order and its applicability, or lack thereof, to the party (or the client, prospective client, or former client).

No bond is ordered, per the waivers found in the parties' employment agreements.

**SO ORDERED THIS** 21st day of April, 2020.

s/Steve C. Jones
_____
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT COURT

1. For purposes of perfecting the record, the Court notes that post-hearing, the parties were ordered to present proposed orders to allow the Court to issue a timely ruling.  The Court has in large part adopted the order presented by Defendant USI.  The Court further perfects the record by noting that the minute sheet for the February 26, 2020 hearing incorrectly stated that Defense Counsel appeared on behalf of Defendant USI Advantage Corp. and that additional motions were heard—only the motion at Doc. No. [7] was heard at the February 26, 2020 hearing.