UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMESON TAYLOR ANDERSON,
ROBERT DEAN ANDERSON, AND
ROGER MALDONADO.,

       Plaintiffs,

  v.

USI INSURANCE SERVICES LLC,

       Defendant.

CIVIL ACTION NO.

1:19-CV-5582-SCJ

## O R D E R

Plaintiffs, three former employees (collectively, "the Former Employees") of Defendant USI Insurance Services LLC[1] ("USI"), filed this action in the Superior Court of Fulton County, Georgia seeking declaratory and injunctive relief [1-1] in relation to certain portions of their respective employment contracts with USI, as well as the forum selection and choice of law provisions in a stock purchase agreement. USI removed the action to this Court and asserted counterclaims against the Former Employees for breach of those same employment agreements, seeking injunctive relief and monetary damages [5]. The Court granted in part and denied in part a

---

[1] Plaintiffs also named as a defendant USI Advantage Corporation, but that entity was dismissed by Plaintiffs prior the close of discovery [125].

Motion for Temporary Restraining Order [12, 31] and later granted a

Preliminary Injunction in favor of USI [114]. The action comes before the

Court now on Plaintiffs' Motion for Summary Judgment as to USI's

counterclaims[2] against them [233] and USI's Motion for Summary Judgment

as to liability on certain of its counterclaims and as to Plaintiffs' claims

against it [237].

## I.    Factual Background

In 2017, USI purchased all issued and outstanding equity interests of

Wells Fargo Insurance Services USA, Inc. ("WFIS"), the corporation where

the Former Employees worked. Def.'s Stmt. Of Additional Material Facts

("DSOAMF") ¶1 (Doc. No. [264]).[3] WFIS was renamed USI Insurance

---

[2] USI, with leave of court, filed Amended Counterclaims on June 24, 2020
[134]. That is the operative pleading at issue in the Motions for Summary
Judgment.

[3] Citations that reference only one parties' Statements of Material Facts refer
to statements that are not disputed. Pursuant to the Local Rules of this
Court, each of the proponent's facts will be deemed admitted unless the
respondent "(i) directly refutes the [proponent's] fact with concise responses
supported by specific citations to evidence (including page or paragraph
number); (ii) states a valid objection to the admissibility of the [proponent's]
fact; or (iii) points out that the [proponent's] citation does not support the
[proponent's] fact or that the [proponent's] fact is not material or otherwise
has failed to comply with the provisions set out in LR 56.1 B(1)." LR 56.1B(2),
(3), NDGa. Where a factual assertion or portion thereof is properly disputed,
the Court will cite directly to evidence from the record that supports the
Court's factual recitation.

Services National, Inc. ("USIN"), then merged into USI Insurance Services LLC (Defendant in this lawsuit). *Id.* According to USI, it is the successor-in-interest to WFIS/USIN. First Allen Dec. at ¶13 [7-2].[4] Two Plaintiffs, Dean Anderson and Taylor Anderson, executed employment agreements (the "DA Agreement" and "TA Agreement" respectively) when employed by WFIS, which subsequently applied to their employment with USI. Plts.' Stmt. of Material Facts ("PSOMF") ¶2 [234]; DSOMF ¶¶28, 29 [238]. Upon closing of the purchase agreement between WFIS and USI, another Plaintiff, Roger Maldonado, accepted an at-will position as Senior Vice President in USI's National Aviation Practice Group working out of USI's office in Atlanta, Georgia. Def.'s Statement of Material Facts. ("DSOMF") ¶23 [238]. Maldonado agreed to certain terms and conditions, which are contained in a written agreement ("RM Agreement"). *Id.*

### A. Specific Terms of the Employment Agreements

All three employment agreements contain the following terms:

- "Active Prospective Client" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit

---

[4] The Court notes that Plaintiffs object to Robert Allen making this legal conclusion because he is not a lawyer. Nevertheless, Allen, in his capacity as Property & Casualty Leader in the Atlanta office of USI, offers a detailed description of how USI evolved from WFIS as set forth above. His declaration statements are sufficient for the Court to conclude that USI is the successor-in-interest to WFIS/USIN. Thus, Plaintiffs' objection is OVERRULED.

within the six (6) months preceding the termination of [Executive's/Producer's/Employee's] employment hereunder.

- "Client Account" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

- "Competitive Business" means any Person engaged in the production, distribution, marketing, or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

- "Competitive Product" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which [Executive/Producer/Employee] or the Company has sold, marketed, distributed or developed in the last two (2) years of [Executive's/Producer's/Employee's] employment with the Company, or about which [Executive/Producer/Employee] has acquired Confidential Information.

- Purpose of Restrictions. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from [Executive's/Producer's/Employee's] knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. [Executive/Producer/Employee] agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

- Modification. If a court finds that any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum

4

extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

- No Ownership Rights to Client Accounts.
  [Executive/Producer/Employee] represents and warrants to the Company that [Executive/Producer/Employee] has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.
- Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.

DSOMF ¶¶45, 46, 47, 48, 49, 50 51,52 [238].

## 1. Terms of Dean Anderson's Agreement

Dean Anderson was Senior Vice President, National Practice Leader—

Aviation for USI. DSOMF ¶4 [238]. Section 8.2 of the DA Agreement (the "DA

Notice Provision") provides:

> Termination by Executive. Executive may terminate Executive's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Executive's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Executive to cease performing any services hereunder until the termination of employment.

DSOMF ¶8 [238].

Section 2.3 of the DA Agreement provides:

> Duty of Loyalty. Executive acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully,

diligently and completely perform all duties and responsibilities
hereunder in furtherance of the business of any USI Company.

DSOMF ¶10 [238].

Section 2.2 of the DA Agreement provides:

No Conflicts of Interest. During Executive's employment
hereunder, Executive agrees not to accept other employment or
perform any activities or services that would be inconsistent with
this Agreement or would interfere with or present a conflict of
interest concerning Executive's employment with the Company.
Executive agrees to comply with all business practices and
ethical conduct requirements set forth in writing by USI and/or
the Company in employee manuals and other publications.

DSOMF ¶11 [238].

Section 7.5 of the DA Agreement (the "Non-Compete Covenant")

provides:

Non-Competition. In consideration of Executive's employment
hereunder, and for other good and valuable consideration,
Executive agrees, during the Term and for six (6) months after
Executive is no longer employed hereunder, for any reason,
Executive shall not, directly or indirectly, compete with the
Company within the Geographic Area by: (a) acting in
Executive's same or similar capacity, which Executive acted for
the Company, on behalf of any Competitive Business; (b)
performing Executive's same or similar functions, which
Executive performed for the Company, on behalf of any
Competitive Business; or (c) otherwise taking, facilitating or
encouraging any action to evade or attempt to evade the intent of
this Section; provided, however, that in the event Executive's
employment hereunder is terminated by the Company without
Cause within twelve (12) months following the Effective Date,
then the restrictions in this Section 7.5 (Non-Competition) shall
be void and of no further force or effect. "Restricted Geographic

Area" means each of the following separate and divisible geographic areas: (a) the state in which Executive maintained his/her principal office for the Company during the last twelve (12) months of Executive's employment hereunder; (b) a one hundred (100) mile radius from any Company facility in which Executive maintained an office during the last twelve (12) months of Executive's employment hereunder; (c) any territory to which Executive has been assigned during the last twelve (12) months of Executive's employment hereunder; and (d) any area in the United States where the Company has conducted USI Business during the last twelve (12) months of Executive's employment hereunder. Notwithstanding the foregoing, in the event that (i) Executive terminates Executive's employment hereunder pursuant to Section 8.2 (Termination by Executive) within twelve (12) months following the Effective Date (a "Voluntary Termination Event") and (ii) the Company does not, within fifteen (15) business days of the Company's receipt of Executive's notice of termination (the "Election Period"), notify Executive of the Company's election to enforce this Section 7.5 (Non-Competition), then, following the later of (1) the effective date of such Voluntary Termination Event or (2) the end of the Election Period, this Section 7.5 (Non-Competition) shall be void and of no further force or effect. For the avoidance of doubt, any such election shall remain fully enforceable against Executive and Executive shall be entitled to the payments set forth in Section 8.3(F). Also, for the avoidance of doubt, the covenants set forth in this Section 7.5 shall remain in force for any termination hereunder, except as expressly stated in this Section 7.5.

DSOMF ¶13 [238].

Section 7.6 of the DA Agreement (the "Client Non-Compete Covenant")

provides:

Non-Competition of Client Accounts. During the Term and for (2) years after Executive is no longer employed hereunder, for any reason, Executive shall refrain from carrying on any business in competition with the Company, directly or indirectly, with

respect to any Client Account or Active Prospective Client in the Restricted Geographic Area. "Carrying on any business in competition with the Company" shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Executive had a role in the sale, marketing, distribution, or development in the last two (2) years of Executive's employment with the Company or about which Executive acquired Confidential Information. It is expressly agreed that this Section 7.6 is not intended to restrict or prohibit the ownership by Executive of stock or other securities of a publicly-held corporation in which Executive (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

DSOMF ¶15 [238].

Section 7.7 of the DA Agreement (the "DA Non-Solicitation Covenant")

provides:

Non-Solicitation of Clients and Active Prospective Clients. In consideration of Executive's employment hereunder, and for other good and valuable consideration, Executive agrees that: (a) During the Term and for two (2) years after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Executive managed or regularly serviced and/or about which Executive obtained

Confidential Information on behalf of the Company within the last two (2) years of Executive's employment hereunder. (b) During the Term and for six (6) months after Executive is no longer employed hereunder, for any reason, Executive shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Executive solicited and/or about which Executive obtained Confidential Information on behalf of the Company within the last six (6) months of Executive's employment hereunder.

DSOMF ¶16 [238].

## 2. Terms of Roger Maldonado's Agreement

Section 4.5 of the RM Agreement (the "RM Non-Solicitation Covenant") provides:

Non-Solicitation of Clients and Active Prospective Clients. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that: (a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client

Account to provide services in competition with the Company; or
(v) induce the termination, cancellation or non-renewal of any
Client Account; in each case with respect to any Client Account
that Employee managed or regularly serviced and/or about which
Employee obtained Confidential Information on behalf of the
Company within the last two (2) years of Employee's employment
with the Company.

(b) During Employee's employment with the Company and for six
(6) months after Employee is no longer employed with the
Company, for any reason, Employee shall not, without the
Company's prior written consent, directly or indirectly, on behalf
of any Competitive Business in any capacity: (i) solicit or attempt
to solicit services in competition with the Company to any Active
Prospective Client; (ii) divert or attempt to divert services away
from the Company with respect to any Active Prospective Client;
(iii) consult for any Active Prospective Client with respect to
services in competition with the Company; or (iv) sign a broker of
record letter with any Active Prospective Client to provide
services in competition with the Company; in each case with
respect to any Active Prospective Client that Employee solicited
and/or about which Employee obtained Confidential Information
on behalf of the Company within the last six (6) months of
Employee's employment with the Company.

DSOMF ¶25 [283].

Section 4.6 of the RM Agreement (the "RM Client Non-Compete

Covenant") provides:

Non-Competition With Respect to Client Accounts and Active
Prospective Clients. In consideration of Employee's employment
hereunder, and for other good and valuable consideration,
Employee agrees that, during Employee's employment with the
Company and for two (2) years after Employee is no longer
employed with the Company, for any reason, Employee will
refrain from carrying on any business in competition with the
Company, directly or indirectly, with respect to any Client
Account or Active Prospective Client in the Geographic Area.

"Carrying on any business in competition with the Company" shall mean the sale of or providing any product or service that competes, or is reasonable anticipated to compete, in the same markets, with a product or service of the Company as to which Employee had a role in the sale, marketing, distribution, or development in the last two (2) years of Employee's employment with the Company, or about which Employee acquired Confidential Information. For purposes of this Section 4.6, the term "Geographic Area" shall include any territory within a one hundred (100) mile radius of any Company facility in which Employee maintained an office during the last twelve (12) months of Employee's employment hereunder, including any counties in the Geographic Area in which Employee conducted business or where Client Accounts or Active Prospective Clients with whom Employee had material contact in the two (2) years prior to termination of Employee's employment with the Company are present. It is expressly agreed that this Section 4.6 is not intended to restrict or prohibit the ownership by Employee of stock or other securities of a publicly-held corporation in which Employee (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

DSOMF ¶203 [238].

### 3. Terms of Taylor Anderson's Agreement

Section 8.2 of the TA Agreement (the "TA Notice Provision") provides:

Termination by Producer. Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

DSOMF ¶33 [238].

Section 2.4 of the TA Agreement provides:

Duty of Loyalty. Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

DSOMF ¶34 [238].

Section 2.3 of the TA Agreement provides:

No Conflicts of Interest. During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

DSOMF ¶35 [238].

Section 7.5 of the TA Agreement (the "TA Non-Solicitation Covenant")

provides:

Non-Solicitation of Clients and Active Prospective Clients. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert

services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

DSOMF ¶36 [238].

Section 7.6 of the TA Agreement (the "TA Client Non-Compete

Covenant") provides:

Non-Competition With Respect to Client Accounts and Active Prospective Clients. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer will refrain from carrying on any business in

13

competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Geographic Area. "Carrying on any business in competition with the Company" shall mean the sale of or providing any product or service that competes, or is reasonable anticipated to compete, in the same markets, with a product or service of the Company as to which Producer had a role in the sale, marketing, distribution, or development in the last two (2) years of Producer's employment hereunder, or about which Producer acquired Confidential Information. For purposes of this Section 7.6, the term "Geographic Area" shall include any territory within a one hundred (100) mile radius of any Company facility in which Producer maintained an office during the last twelve (12) months of Producer's employment hereunder, including any counties in the Geographic Area in which Producer conducted business or where Client Accounts or Active Prospective Clients with whom Producer had material contact in the two (2) years prior to termination of Producer's employment hereunder are present. It is expressly agreed that this Section 7.6 is not intended to restrict or prohibit the ownership by Producer of stock or other securities of a publicly-held corporation in which Producer (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity.

DSOMF ¶205.

## B. Communications between Plaintiffs and Lockton

In June 2019, Manoj Sharma, Executive Vice President and Chief Operating Officer of Southeast Series of Lockton Companies ("Lockton"), another insurance brokerage firm, contacted Taylor Anderson. DSOMF ¶56 [238]. A couple of months later, Sharma emailed Taylor Anderson an offer of employment that included an annual salary and sign-on bonus plus

indemnity in the event of litigation by USI. DSOMF ¶57 [238]. In October

2019, Sharma sent Taylor Anderson a formal offer letter, non-disclosure

agreement, and benefits summary. DSOMF ¶58 [238]. A revised offer letter

was sent three days later with modifications to the sign-on bonus. *Id.* On

November 1, 2019, Taylor Anderson accepted the offer. DSOMF ¶59 [238].

At some point before Taylor Anderson accepted the offer, he and

Maldonado had lunch with Dean Anderson and inquired whether Dean

Anderson was interested in employment with Lockton. DSOMF ¶60 [238].

Sharma called Dean Anderson at USI on October 11, 2019 and soon after

sent him a draft of terms for an employment offer. DSOMF ¶¶60, 61 [238]. As

with Taylor Anderson's offer, the offer to Dean Anderson included an annual

salary, a potential bonus structure, and an indemnity provision. DSOMF ¶61

[238]. On October 29, 2019, Sharma emailed Dean Anderson a revised term

sheet, and Dean Anderson accepted the employment offer via text message.

DSOMF ¶¶62, 63 [238]. The offer letter dated October 31, 2019 stated that

Dean Anderson would begin employment with Lockton on December 9, 2019.

DSOMF ¶64 [238].

After receiving a phone call from Sharma, Maldonado set up an in-

person meeting on September 4, 2019. DSOMF ¶65 [238]. On October 28,

2019, Sharma emailed Maldonado an offer letter, non-disclosure agreement,

15

and benefits summary. DSOMF ¶66 [238]. On November 1, 2019, Maldonado signed the offer letter while at a meeting in Lockton's offices. DSOMF ¶67 [238].

Sharma set the date for the Plaintiffs to resign from USI and begin working at Lockton as December 9, 2019. DSOMF ¶68 [238]. Taylor Anderson knew of the December 9, 2019 date as early as December 2, 2019 when he had discussions with Lockton about preparing his business cards. DSOMF ¶75 [238]. Maldonado communicated with Sharma the evening of December 8, 2019 and immediately afterward, he submitted his letter of resignation to USI on December 9, 2019. DSOMF ¶76 [238].

## C. Plaintiffs' Resignations and Departure from USI

All three Plaintiffs submitted their letters of resignation to USI, effective immediately, on December 9, 2019. DSOMF ¶78 [238]. Neither Dean Anderson nor Taylor Anderson provided sixty days' notice with their resignations. DSOMF ¶79 [238].

USI contends that Dean Anderson and Taylor Anderson remained employees of USI until February 7, 2020—60 days after the date their resignation letters were submitted. USI continued to send payroll payments to Dean Anderson and Taylor Anderson, though both testified that they did

not cash any checks from USI and returned any they received. DSOMF ¶81; D. Anderson Dep. at 222-23 [208-1]; T. Anderson Dep. at 183 [210-1].

Before submitting their resignation letters, the Former Employees sent emails to clients and others outside of USI informing recipients of their imminent departure ("Departure Emails"). DSOMF ¶¶82, 83 [238]. They reported to Lockton's Atlanta, Georgia office on December 9, 2019, the same day they submitted their resignations to USI. DSOMF ¶90 [238]. After arriving at the Lockton offices, the Former Employees updated their respective LinkedIn accounts to announce they were now affiliated with Lockton. DSOMF ¶86 [238]; Maldonado Dep. at 178 [Doc. No. 209-1]; D. Anderson Dep. at 214 [208-1]; T. Anderson Dep. at 182 [210-1]. The Former Employees listed their new job titles as follows: Dean Anderson "Senior Vice President & Aviation Practice Leader at Lockton Companies SE Series;" Roger Maldonado "Senior Vice President, Producer at Lockton Companies;" and Taylor Anderson "Senior Vice President, Defense & Aerospace at Lockton Companies." DSOMF ¶¶87, 88, 89 [238].

### D. The Former Employees' Work at Lockton

Lockton began paying the Former Employees' salaries on December 9, 2019 and has done so continuously since then. DSOMF ¶90 [238]. Except for

medical leave taken by Dean Anderson from April to August 2020, all three have worked at Lockton since that date. *Id.*

According to USI, the Former Employees have been working in capacities that are directly competitive to the business of USI. First Allen Dec. ¶42 [7-2]. USI further contends that Dean Anderson provides the same services at Lockton that he did at USI and that his two positions were "substantially similar." First Allen Dec. ¶¶15, 20, 40 [7-2]. Dean Anderson worked for Lockton in Charlotte, North Carolina. DSOMF ¶96 [238]. However, his first week of employment with Lockton, he attended orientation at the Lockton Atlanta office. D. Anderson Dep. at 138, 224 [208-1].

### E. USI Clients Moving to Lockton

On December 10, 2019, Dean Anderson had a phone conversation with Jennifer Guthrie, owner of In-Flight Crew Connections, LLC ("ICC"), a client of USI. DSOMF ¶97 [238]. Seven days later, USI received a broker of record ("BOR") letter from ICC stating that it was moving its account from USI to Lockton. DSOMF ¶¶107, 188 [238]. In January 2020, Guthrie texted Dean Anderson with a request that he review a contract; he told her that he could not conduct business in Georgia but provided her with Taylor Anderson's email address. DSOMF ¶109 [238]. At some point, Dean Anderson met with Guthrie and ICC's general counsel, Irena Leigh, in Charlotte to review

contracts. DSOMF ¶110 [238]. Furthermore, Dean Anderson continued to actively work with ICC in Charlotte. DSOMF ¶111 [238]. While at USI, Taylor Anderson was in charge of the ICC account. DSOMF ¶ 186 [238]. After leaving USI for Lockton, Taylor Anderson received a text from Leigh in response to his Departure Email. DSOMF ¶ 187 [238]. Taylor Anderson recalls an exchange with Leigh in which she asked for appropriate contacts at Lockton to discuss the ICC account. T. Anderson Dep. at 239 [210-1]. Taylor Anderson directed Leigh to run all account dialog through Sharma who, Taylor told Leigh, would be prepared for her call. DSOMF ¶187 [238].

While employed with USI, Dean Anderson worked with Floats and Fuel Cells, Inc. ("FCC"), another USI client. DSOMF ¶113 [238]. After joining Lockton, Dean Anderson communicated with FCC. DSOMF ¶114 [238]. On March 16, 2020, USI received a BOR letter from FFC stating that it was moving its account from USI to Lockton. DSOMF ¶ 115 [238].

Within the sixty-day time period provided by the Notice Provisions of the DA Agreement and TA Agreement, the following USI clients switched their business from USI to Lockton: Brightwater Capita, Arista Aviation, ICC, Rally Point Management, Tenax; Fulcrum Concepts LLC, SouthWind, Genesys, Field Aerospace, S3, Dowe Gallagher Aerospace LLC, Rampart

Aviation LLC, AirScan, US Aviation Training Solutions, Inc., and Overseas Aircraft Support, Inc. DSOMF ¶197 [238].

## II. Claims Asserted by the Parties

### A. Plaintiffs

On the day after Plaintiffs resigned their positions with USI, they filed this lawsuit in the Superior Court of Fulton County, Georgia [1-1]. In Count I, Plaintiffs request a declaratory judgment that specific restrictive covenants in their employment agreements with USI, as well as the forum selection and choice of law provisions within the Stock Purchase Agreement are void and unenforceable. In Count II, Plaintiffs seek temporary and permanent injunctions preventing USI from enforcing the restrictive covenants.

### B. Defendant

After removing this action to this Court, USI asserted counterclaims against the Former Employees [5]. The counterclaims were amended on June 24, 2020 [134]. The June 24, 2020 filing is the now the operative pleading as to USI's counterclaims. Those counterclaims are:

- Count One: Breach of the Notice Provisions by Dean Anderson and Taylor Anderson;

- Count Two: Breach of the Non-Compete Covenant by Dean Anderson;

- Count Three: Breach of the Client Non-Compete Covenants by Dean Anderson, Taylor Anderson, and Maldonado;

- Count Four: Breach of Non-Solicitation Covenants by Dean Anderson, Taylor Anderson, and Maldonado;

- Count Five: Breach of Duty of Loyalty by Dean Anderson, Taylor Anderson, and Maldonado; and

- Count Six: Breach of Fiduciary Duty by Dean Anderson, Taylor Anderson, and Maldonado.

As relief, USI seeks injunctive relief, attorneys' fees, and punitive damages.

## III. Procedural Background

After hearing evidence and oral argument on December 20, 2019 regarding USI's motion for a temporary restraining order ("TRO"), the Court granted in part and denied in part that motion [12, 31]. Another evidentiary hearing was convened on February 26, 2020 in relation to USI's motion for preliminary injunction. Following that hearing, the Court granted a preliminary injunction in favor of USI as follows: (1) enforcing Section 7.5 of the DA Agreement except as to work performed in and related to Charlotte, North Carolina; (2) enforcing the Client Non-Compete clauses of the Former Employees' Agreements; and (3) enforcing the Non-Solicitation clauses of the Former Employees' Agreements. [114].

The case moved through discovery, and the parties were given a deadline of August 13, 2021 to file dispositive motions. On that date, both sides moved for summary judgment. Plaintiffs seek summary judgment as to all the counterclaims raised against them [233]. Defendant seeks summary judgment as to liability on the following counts of the Amended Counterclaim: One, Two, Three (as to Dean Anderson), Four, Five (Dean Anderson and Taylor Anderson only), and Six (Dean Anderson and Taylor Anderson only) [237]. Within the same motion, Defendant seeks summary judgment as to Plaintiffs' claims against it [237].

## IV. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgement if the movant shows that there is no genuine dispute as to any material act and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden can be discharged either by showing an absence of evidence to support an essential element of the nonmoving party's case or by showing that the nonmoving party will be unable to prove their case at trial. *Celotex*, 477 U.S. at 325; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In determining whether the moving party has met this burden, the Court must consider the facts in the light most favorable to the nonmoving party. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id*. All reasonable doubts, however, are resolved in the favor of the nonmoving party. *Fitzpatrick*, 2 F.3d at 1115. In addition, the Court must "avoid weighing

conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

## V. Discussion

### A. USI's Counterclaims

#### 1. Notice Provisions (Count One)

USI contends it is entitled to summary judgment as to liability for claims against Dean Anderson and Taylor Anderson for breaching the sixty-day Notice Provisions in their respective employment agreements. Under Georgia law, "[a] contract provision requiring a specified prior notice of termination is reasonable to allow the employer to prepare for an orderly transition and enforceable through special damages resulting from a sudden quitting, and in the absence of special damages, nominal damages are recoverable." *Capricorn Sys., Inc. v. Pednekar*, 248 Ga. App. 424, 425, 546 S.E.2d 554, 557 (2001) (citing *Belcher v. Thomson Newspapers*, 190 Ga. App. 466, 467, 379 S.E.2d 204 (1989)).

In response to the motion for summary judgment, Plaintiffs do not dispute that Dean Anderson and Taylor Anderson breached the Notice Provisions. They simply argue that any damages are limited to actual contractual loss during the notice period and that damages are not recoverable unless they can be traced solely to the breach of contract. In their

cross motion for summary judgment, Plaintiffs contend that there is no evidence that the Andersons' breach of the Notice Provisions were the "sole" cause of any lost client or other harm. In support of this contention, they cite to differing rationales given by eight clients who transferred their business to the Former Employees at Lockton. This broad conclusion is not supported by the cited evidence, however. In fact, several of the clients state that their decision to move their business to Lockton was due to their relationship with Taylor Anderson. Wood Dep. at 99 [222], Kirlin Dep. at 41 [221], Smith Dep. at 96 [224], Jagger Dep. at 246 [223], Salmon Dep. at 56 [247-16], Sosa Dep. at 103 [231]. Thus, construing the evidence in favor of USI—as required in adjudicating Plaintiffs' motion for summary judgment—there is evidence from which a factfinder could determine that if Taylor Anderson had not breached the Notice Provision, those clients would have remained with USI at least through his sixty-day notice period. Furthermore, Plaintiffs' argument ignores the availability of nominal damages. *See Capricorn Sys., Inc.*, 248 Ga. App. at 425, 546 S.E.2d at 557.

Because it is undisputed that Dean Anderson and Taylor Anderson breached the Notice Provisions of their respective agreements and at the least, USI is entitled to nominal damages. USI's motion for summary judgment as to liability with regards to Count One of the Amended

Counterclaim is GRANTED; conversely, Plaintiffs' motion for summary as to Count One of the Amended Counterclaim is DENIED.

## 2. Non-Compete Covenant (Count Two)

USI contends it is entitled to summary judgment as to liability for the breach of the Non-Compete Covenant contained in the DA Agreement. While USI argues that the Non-Compete Covenant is enforceable as drafted (nationwide), it alternatively argues that even if the Court blue-pencils the geographic parameters of the covenant (as it did in the grant of the preliminary injunction [114]), the undisputed evidence establishes that Dean Anderson breached its terms. In response and in support of their cross motion for summary judgment on Count Two, Plaintiffs argue that the nationwide covenant is unenforceable under the Georgia Restrictive Covenant Act ("RCA"). Additionally, Plaintiffs argue that there is no evidence that Dean Anderson performed the "same or similar functions" for Lockton in Georgia.

The RCA provides that, to be enforceable, a geographic restraint must contain sufficient description such that a person bound by it can "reasonably determine the maximum reasonable scope of the restraint at the time of termination." O.C.G.A. § 13-8-53(c)(2). The DA Agreement defines "Restricted Geographic Area" as follows:

 (a) the state in which Executive maintained his/her principal office for the Company during the last twelve (12) months of Executive's employment hereunder;
(b) a one hundred (100) mile radius from any Company facility in which Executive maintained an office during the last twelve (12) months of Executive's employment hereunder;
 (c) any territory to which Executive has been assigned during the last twelve (12) months of Executive's employment hereunder; and
(d) any area in the United States where the Company has conducted USI Business during the last twelve (12) months of Executive's employment hereunder.

DSOMF ¶ 13 [238]. The only of these four provisions in dispute is subsection

(d). Plaintiffs argue that this restraint is too vague to provide fair notice to

Dean Anderson of what the maximum scope of the defined geographic area

was because he worked only in the Atlanta office and had no way to

determine everywhere that anyone at USI conducted business. In his

deposition, however, Dean Anderson testified that he was certain that USI

conducted business throughout the United States and that he himself

conducted business on USI's behalf throughout the United States. D.

Anderson Dep. at 35-36, 74 [208-1]].

For territorial restrictions, the RCA requires the Court to presume:

A geographic territory which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable, provided that:

(A) The total distance encompassed by the provisions of the covenant also is reasonable;

(B) The agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship; or

(C) Both subparagraphs (A) and (B) of this paragraph.

O.C.G.A. § 13-8-56(2). Here, Dean Anderson does not dispute that he was aware that USI performed work throughout the United States. D. Anderson Dep. at 73-74 [208-1].[5] In fact, he could not name one state in which USI did not perform work. *Id*. at 36 [208-1]. Contrary to Plaintiffs' arguments, there is nothing inherently unreasonable about a nationwide geographic restraint. This is particularly true if the employee is performing work for the employer on a nationwide basis. *See Gallagher Benefit Servs., Inc. v. Campbell*, 528 F. Supp. 3d 1326, 1341 (N.D. Ga. 2021); s*ee also Novelis Corp. v. Smith*, No. 1:16-cv-1557-ODE, 2017 WL 1745635, at *7 (N.D. Ga. Mar. 10, 2017) (granting preliminary injunction and finding non-compete that restricted

---

[5] Dean Anderson attempted to change this testimony through a statement in his Declaration. *See* D. Anderson Dec. at ¶5 [235-4] (stating that he did not know all areas in the United States where USI conducted business). However, his statement that he does not "know all areas in the United States" where USI conducted business does not alter his admission in his deposition that he was aware that USI conducted business throughout the United States.

competition on global scale reasonable due to plaintiff performing services on worldwide level)). Here, Dean Anderson stated, "I had clientele all over the country." D. Anderson Dep. at 36 [208-1]. Moreover, there is no requirement for a geographic area for a restriction that operates during the term of an employment relationship. O.C.G.A. § 13-8-56(4). As such, Plaintiffs' reasonableness challenge has no applicability to the first sixty days of Dean Anderson's employment with Lockton (*i.e.*, the sixty-day period contemplated by the Notice Provision, which this Court has determined was breached by Dean Anderson). In other words, competitive activity by Dean Anderson from December 9, 2019 through February 8, 2020, regardless of where it occurred, is sufficient to establish a breach of the Non-Compete Covenant.

Finally, Plaintiffs assert that the covenant is unreasonable because it refers to where the "Company" has conducted USI Business, and "Company" is defined as WFIS, not USI—the entity seeking to enforce the covenant. In response, USI contends it is the successor-in-interest to WFIS. While Plaintiffs object to this characterization, they do not dispute that upon closing the Stock Purchase Agreement, WFIS was renamed USI Insurance Services National, Inc., which was subsequently merged into USI Insurance Services LLC. DSOMF ¶1 [238]. This undisputed evidence is sufficient for this Court to conclude that USI is the successor-in-interest to WFIS. Georgia

law provides that a restrictive covenant is enforceable by a successor to a

contract. O.C.G.A. § 13-8-58(a). Therefore, Plaintiffs' objection to

enforceability of the non-compete covenant by USI is without merit.

This Court agrees with USI that the geographic restriction of the Non-

Compete Covenant was nationwide. Therefore, if Dean Anderson, in his role

at Lockton, acted in the same or similar capacity as his role at USI, or

performed the same or similar functions anywhere within the United States,

within six months of his resignation, USI will be entitled to summary

judgment as to liability with respect to the DA Agreement's Non-Compete

Covenant.

In responding to the Motion for Summary Judgment, Plaintiffs argue

only that Dean Anderson did not work in a same or similar capacity <u>in</u>

<u>Georgia</u>. Plaintiffs contend that all competitive work carried on by Dean

Anderson occurred in Charlotte, NC. This Court has determined, however,

that the Non-Compete Covenant applied on a nationwide basis. Therefore, it

is undisputed that Dean Anderson breached the covenant, at the very least,

through work he carried out in Charlotte.

In their cross motion for summary judgment, Plaintiffs argue that

Dean Anderson's breach of the Non-Compete Covenant did not cause any

damages. However, USI is entitled to at least nominal damages for the

breach. *See Owens v. Novae, LLC*, 357 Ga. App. 240, 246, 850 S.E.2d 457, 463 (2020), *cert. denied* (May 17, 2021). Furthermore, USI is entitled to present its evidence to the jury of what damages (such as the loss of client accounts) were proximately caused by Dean Anderson's breach of the Non-Compete Covenant. *See Gallagher Benefit Servs., Inc.*, 528 F. Supp. 3d at 1342.

Based on the foregoing, USI is entitled summary judgment as to liability on Count Two of the Amended Counterclaim.[6] Conversely, Plaintiffs' Motion for Summary Judgment as to Count Two of the Amended Counterclaim is DENIED.

### 3. Client Non-Compete Covenant (Count Three)

#### a. Dean Anderson

USI contends it is entitled to summary judgment as to liability for the breach of the Client Non-Compete Covenant contained in the DA Agreement. That provision states:

> During the Term and for (2) years after Executive is no longer employed hereunder, for any reason, Executive shall refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Restricted Geographic Area.

---

[6] Plaintiffs have pointed to evidence to establish that Dean Anderson was on medical leave from April 2020 through August 2020. Therefore, the finding of liability with respect to the Non-Compete Provision is limited to activity that occurred between December 9, 2019 and the date Dean Anderson went on medical leave.

DSOMF ¶15 [238].

In response to USI's motion, Plaintiffs contend that the Client Non-Compete Covenant is invalid because it has no geographic territory, the scope of the prohibited activity and alleged territory is unreasonable, and there is no evidence that Dean Anderson violated the covenant with respect to any clients located in Georgia.

Plaintiffs' first argument is clearly incorrect. The Client Non-Compete Covenant refers to the "Restricted Geographic Area" which is defined in the previous section as follows:

> "Restricted Geographic Area" means each of the following separate and divisible geographic areas: (a) the state in which Executive maintained his/her principal office for the Company during the last twelve (12) months of Executive's employment hereunder; (b) a one hundred (100) mile radius from any Company facility in which Executive maintained an office during the last twelve (12) months of Executive's employment hereunder; (c) any territory to which Executive has been assigned during the last twelve (12) months of Executive's employment hereunder; and (d) any area in the United States where the Company has conducted USI Business during the last twelve (12) months of Executive's employment hereunder.

DSOMF ¶ 13 [238]. Plaintiffs argue that the phrase "in the Restricted Geographic Area" refers to where the clients are located rather than where Dean Anderson may not compete. This argument is non-sensical. As the Court held in Part V.A(3) *supra*, subsection d of the definition of Restricted

Geographic Area results in a nationwide geographic area. Therefore, the plain meaning of the Client Non-Compete Covenant is that Dean Anderson agreed to refrain from carrying on any business in competition with USI involving any of USI's ongoing or prospective clients within the United States.

Plaintiffs attempt to persuade the Court that defining clients by a geographical limitation is insufficient and renders the covenant unenforceable. Relying on *Gallagher*, Plaintiffs complain that the Client Non-Compete Covenant does not provide a specific list of clients. *Gallagher*, 528 F. Supp. 3d at 1341. Contrary to Plaintiffs' argument, however, the court in *Gallagher* did not hold a client non-compete covenant <u>must</u> contain a specific list of clients. Rather, that court found that the inclusion of the specific list of clients made the client non-compete covenant there "particularly" reasonable. *Id*. Thus, the absence of a specific list of clients does not doom the Client Non-Compete Covenant in the DA Agreement.

Finally, Plaintiffs contend that there was no violation of the Client Non-Compete Covenant because no clients who transferred business to Lockton are located in Georgia. There is no basis for the narrow geographic scope urged by Plaintiffs.

Based on the foregoing, USI is entitled to summary judgment as to liability with respect to Dean Anderson's breach of the Client Non-Compete Covenant. USI asserted claims against Taylor Anderson and Maldonado regarding the Client Non-Compete Covenants in their agreements as well. However, USI did not move for summary judgment on those portions of Count Three of the Amended Counterclaim. Nevertheless, the analysis above regarding the geographic scope of the Client Non-Compete Covenants applies to those contained in the TA Agreement and the RM Agreement as well.

### b. Roger Maldonado

While USI did not move for summary judgment as to its Client Non-Compete claim against Maldonado, Plaintiffs did move for summary judgment as to this claim against Maldonado. Plts.' M. for Summ. J. at 11-15 [235]. Plaintiffs argue that Maldonado is not an employee who can be restricted by a non-compete covenant. O.C.G.A. § 13-8-53(a) provides in pertinent part:

> [E]nforcement of contracts that restrict competition after the term of employment. . . shall not be permitted against any employee who does not, in the course of his or her employment:
>
> (1) Customarily and regularly solicit for the employer customers or prospective customers; (2) Customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others; (3) Perform the following duties: (A) Have a primary duty of managing the enterprise in

which the employee is employed or of a customarily recognized department or subdivision thereof; (B) Customarily and regularly direct the work of two or more other employees; and (C) Have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (4) Perform the duties of a key employee or of a professional.

Plaintiffs point to evidence they contend establishes that Maldonado did not fall into any of these categories. *See* Plts.' Mot. for Summ. J. at 12-15 [235-1].

In response, USI argues that both Maldonado's client contact and his status as a key employee renders him subject to an enforceable non-compete covenant. USI's Resp. to Plts.' Mot. for Summ. J. at 21-24 [263]. Plaintiffs admit that Maldonado solicited clients and prospective clients and engaged in making sales or obtaining order or contracts for products or services to be performed by others. Ans. to Counter Cl. at ¶67 [139]. Thus, if there is evidence that Maldonado performed these activities customarily and regularly, Plaintiffs cannot prevail on their argument that Maldonado is not subject to the Non-Compete Covenant.

Dean Anderson testified that Maldonado generated a "couple of accounts" and worked with Taylor Anderson on [Taylor's] clients. Dean Anderson Dep. at 48 [Doc. No. 208-1]. Maldonado traveled with Taylor Anderson on more than one occasion to meet prospective clients. Maldonado

Dep. at 191-194 [Doc. No. 209-1]. Most importantly, Maldonado admits he sent his Departure Email to eighty-five USI clients and contacts with whom he had "regular contact." DSOAMF ¶67 [264]. This evidence is sufficient to create a question of fact as to whether Maldonado's customary and regular activities qualified him to enter a client non-compete covenant with USI.

As to his characterization as a "key employee," Maldonado claims there is no evidence to support it. Georgia law defines "key employee" as:

> an employee who, by reason of the employer's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of the employee's employment with the employer, has gained a high level of notoriety, fame, reputation, or public persona as the employer's representative or spokesperson or has gained a high level of influence or credibility with the employer's customers, vendors, or other business relationships or is intimately involved in the planning for or direction of the business of the employer or a defined unit of the business of the employer. Such term also means an employee in possession of selective or specialized skills, learning, or abilities or customer contacts or customer information who has obtained such skills, learning, abilities, contacts, or information by reason of having worked for the employer.

O.C.G.A. § 13-8-51 (8). USI points to Maldonado's own testimony in which he responds to an inquiry about his reputation for being knowledgeable in the insurance industry by stating, "I'd like to think so." Maldondo Dep. at 36-37 [209-1]. While Plaintiffs are correct that this testimony is not sufficient to

prove that Maldonado had such a reputation, it is certainly some evidence from which a factfinder could determine that he gained a reputation through his work at USI for credibility among USI customers.

While USI has carried it burden in responding to Plaintiffs' Motion for Summary Judgment on the issue of whether Maldonado was an employee against whom the Client Non-Compete Covenant could be enforced, USI has not responded to Plaintiffs' argument that there is no evidence of breach of the agreement by Maldonado. Rather, USI simply concludes that there is a question of fact on this issue. Resp. to Plts.' Mot. for Summ. J. at 28 [263]. Accordingly, this Court is compelled to grant summary judgment in favor of Plaintiffs on this claim.

### c. Taylor Anderson

In their motion for summary judgment, Plaintiffs argue that there is no evidence that Taylor Anderson breached the Client Non-Compete Covenant. Plts.' Mot. for Summ. J. at 18 [Doc. No. 235-1]. In response, USI concludes that there is a genuine dispute of material fact as to whether Taylor Anderson breached the Client Non-Compete Covenant contained in the TA Agreement. USI's Resp. to Plts.' Mot. for Summ. J. at 27 [263]. This conclusory assertion is insufficient to carry the burden of the non-movant once the movant points out an absence of evidence to support a required

element of a claim. Accordingly, Plaintiffs are entitled to summary judgment as to Count Three of the Amended Counterclaim against Taylor Anderson.

### 4. Non-Solicitation Covenants (Count Four)

The employment agreement of each Plaintiff[7] contained a non-solicitation covenant. The three covenants are substantively the same and provide that each employee agreed to refrain for two years after their employment ended from directly or indirectly, on behalf of any Competitive Business in any capacity:

> (i) soliciting or attempting to solicit services in competition with the Company to any Client Account;
> (ii) diverting or attempting to divert services away from the Company with respect to any Client Account;
> (iii) consulting for any Client Account with respect to services in competition with the Company;
> (iv) signing a broker of record letter with any Client Account to provide services in competition with the Company; or
> (v) inducing the termination, cancellation or non-renewal of any Client Account.

---

[7] As with the Client Non-Compete Covenant, Plaintiffs argue that Maldonado is not subject to the Non-Solicitation Covenant because he is not an employee against who such restrictive covenant can be enforced pursuant to O.C.G.A. § 13-8-53(a). For the same reasons set forth *supra,* Part V.A.3(b), the Court rejects this argument to the extent that it is used to challenge enforceability of the Non-Solicitation Covenant of the RM Agreement.

Additionally, each employee agreed that during their terms of employment and for six months following the end of their employment they would refrain from the same actions described above as to any Active Prospective Client. DSOMF ¶¶ 16, 25, 36 [238].

In its Motion for Partial Summary Judgment [237], USI argues that the following actions breached the Non-Solicitation Covenants:

- Weeks before resigning, the Former Employees notified several USI Client Accounts about their upcoming change of employment.

- During this pre-resignation period, the Former Employees notified USI Client Account Tenax that they would be moving to Lockton.

- Also prior to their resignations, Taylor Anderson and Maldonado informed David Brosbell, a Canadian broker, that they were moving to Lockton.

- On the same morning they submitted their resignations, the Former Employees sent the Departure Emails to representatives of various USI Client Accounts without authorization by USI.

- Shortly after sending the Departure Emails, the Former Employees updated their LinkedIn profiles to reflect their new positions at Lockton.

- After their Departure Emails were sent and their social media profiles were updated, the Former Employees continued frequent communications with USI's clients.

- Taylor Anderson confirmed for USI client Southwind that moving to Lockton was the smartest move it could make for its insurance needs.

- The Former Employees directed other clients to contact Manoj Sharma (of Lockton) to assist in transferring their insurance business.

- The Former Employees used third parties such as Brosbell to recommend to certain USI clients that they transfer their business to the Former Employees at Lockton.

In response to USI's Motion for Partial Summary Judgment Plaintiffs argue that their pre-resignation communications with clients are not solicitations as a matter of law because Taylor Anderson and Maldonado[8] told clients about nothing more than a future, possible, or potential change in employment. Next, Plaintiffs contend that the Departure Emails were not solicitations because they simply informed the clients of the resignations and directed the clients to contact USI for any insurance needs. Finally, Plaintiffs argue that their post-resignation actions (updating LinkedIn, referring

---

[8] Plaintiffs correctly point out that USI makes no allegations with respect to Dean Anderson's pre-resignation conduct.

clients to Sharma, and confirming to Southwind that moving to Lockton was the smartest move) were not solicitations.

Plaintiffs urge the court to deny USI's motion for partial summary judgment and grant their cross motion for summary judgment on this counterclaim by analyzing each alleged wrongdoing separately under plain definitions of the term solicitation. There are two flaws with this approach, however. First, as pointed out by USI, Plaintiffs' conduct should be viewed not only singularly but also in the aggregate. Without question, there is evidence from which a factfinder could determine that the whole process was a carefully orchestrated scheme to bring business from USI to Lockton. Next, the plain language of the Non-Solicitation Covenants encompasses more than the verb "solicit." In particular, the Former Employees agreed not to divert or attempt to divert services away from USI with respect to any Client Account or Active Potential Client. Furthermore, and they agreed not to induce or attempt to induce termination of any Client Account. DSOMF ¶¶ 16, 25, 36. Therefore, limiting review of the conduct to actions that could be termed "solicitation" is simply wrong.

With respect to Plaintiffs' Motion for Summary Judgment as to the counterclaim based on breach of the Non-Solicitation Clauses, the Court cannot conclude that there is an absence of evidence to support this

counterclaim or that each item of alleged wrongful conduct is not a breach of the terms of Non-Solicitation Covenants as a matter of law. Therefore, Plaintiffs are not entitled to summary judgment on this claim.

Turning to USI's Motion for Partial Summary Judgment—where the facts are required to be construed in favor of Plaintiffs—the Court likewise cannot conclude that each allegation of wrongdoing committed by the Former Employees, singularly or in the aggregate, breached the terms of the Non-Solicitation Covenants as a matter of law. USI quotes this Court's order granting the preliminary injunction in which the Court stated that the Former Employees sent "these mass emails to clients . . . to encourage and induce these clients to contact Plaintiffs and to switch their insurance brokerage business to Lockton. Many of these clients, in fact, immediately contacted Plaintiffs and did execute BOR Letters to switch their business from USI to Lockton." Ord. on Prelim. Inj. at 10 [Doc. No. 114]. These findings were at the preliminary stages of this case on the record of two evidentiary hearings. Given that the parties have now engaged in discovery for many months, the record has been fully developed. For example, the deposition of each of the Former Employees has been taken and unsurprisingly, they deny efforts to solicit, divert, or induce USI clients to Lockton. Because a determination of any breach of the Non-Solicitation

Covenants will turn largely on the intent of Former Employees, an evaluation of the credibility of their testimony is required. That is a job for the factfinder, not the Court.

Based on the foregoing, neither party here is entitled to summary judgment as to Count Four of USI's counterclaim.

### 5. Loyalty and Fiduciary Duty (Counts Five and Six)

#### a. Dean Anderson and Taylor Anderson

USI has moved for summary judgment as to liability with regard to its claims of breach of loyalty and fiduciary duty by Dean Anderson and Taylor Anderson. These claims pertain to duties owed during the Andersons' term of employment. As an initial matter, the parties dispute whether the term of employment ended on December 9, 2019—the date the Former Employees resigned—or whether it ended on February 7, 2020—the date the sixty-day Notice Provisions expired.

Plaintiffs cite *Savannah Coll. of Art & Design, Inc. v. Nulph*, 265 Ga. 662, 662, 460 S.E.2d 792, 793 (1995) and *Botterbusch v. Preussag Int'l Steel Corp.*, 271 Ga. App. 190, 194, 609 S.E.2d 141, 145 (2004), for the proposition that failure to give contractually required notice prior to termination of employment is a "procedural flaw in the manner in which the termination was carried out." Neither of these cases is on point and neither goes to the

critical question of whether Dean and Taylor Anderson remained within the term of their employment agreements during the sixty days after they provided notice to USI that they were departing. While Plaintiffs attempt to characterize USI's argument as claiming that the Andersons remained "employed" with USI against their will for sixty days after their resignation date, this is simply not so. Rather, USI argues that the Andersons had a contractual obligation to provide sixty days' notice before ending their employment relationship. It is undisputed that such notice by both Dean and Taylor Anderson was given on December 9, 2019. Therefore, the sixty-day period following the date notice was given was within the term of employment. To hold otherwise would nullify the Notice Provisions.[9]

Because the relevant time period for USI's breach of loyalty and fiduciary duty claims against Dean Anderson and Taylor Anderson includes December 9, 2019 through February 7, 2020, there is no factual dispute regarding those breaches. Plaintiffs admit they began working for Lockton on December 9, 2019. In addition to the actions taken by the Andersons between

---

[9] Likewise, Plaintiffs' reliance on Georgia's statutory at-will employment provisions is misplaced. In fact, the statute cited by Plaintiffs expressly states, "An indefinite hiring may be terminated at will by either party." O.C.G.A. § 34-7-1. In this case, however, Dean Anderson and Taylor Anderson were not indefinite hires; they contractually agreed to provide sixty days' notice before terminating their employment.

December 9, 2019 and February 7, 2020, USI alleges that Taylor Anderson breached his duty of loyalty to USI prior to December 9, 2019 by informing multiple USI Client Accounts of his impending departure and plan to go to Lockton. In response, Plaintiffs contend that the evidence reveals that Taylor Anderson did nothing more than discuss a future possibility of leaving USI. To the contrary, it is undisputed that Taylor Anderson called Tim Cantrell of USI's client Tenax in late November 2019 to alert Cantrell that he was looking at a change of employment. DSOMF ¶170. Another Tenax employee, Linda Jagger, emailed Cantrell on November 25, 2019 informing him that based on a recent phone conversation with Taylor Anderson, he and Maldonado would be going to work for Lockton. DSOMF ¶86.[10] Therefore, the record contains undisputed evidence that Taylor Anderson breached his contractual duty of loyalty to USI prior to beginning work for Lockton on December 9, 2019.

Finally, Plaintiffs argue that Taylor Anderson owed no fiduciary duty to USI because he lacked the authority to obligate USI, enter into contracts

---

[10] While Plaintiffs claim that Taylor Anderson denies telling Jagger this information, that is an inaccurate characterization of his testimony. Taylor Anderson stated that he did not recall telling Jagger that he and Maldonado were going to Lockton prior to giving notice to USI. T. Anderson Dep. at 221-22 [210-1].

on its behalf, or hire and fire employees. This argument ignores Section 2.4 of the TA Agreement regarding Taylor Anderson's duty of loyalty. DSOMF ¶ 34. The Georgia Supreme Court has recognized that a duty of loyalty is a fiduciary duty. *Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 587, 397 S.E.2d 699, 703 (1990). Inexplicably, Plaintiffs contend that the duty of loyalty claims merge with the fiduciary duty claims but then fail to acknowledge Taylor Anderson's contractual duty of loyalty. Of course, it is true that USI may not recover duplicative damages for the same breaching conduct, but the fact that Taylor Anderson did not have sufficient authority at USI to be a fiduciary does not obviate his contractual duty of loyalty.

In moving for partial summary judgment, USI has adduced evidence that both Dean and Taylor Anderson worked for a competitor prior to expiration of the notice period in their agreements and that Taylor Anderson, even before giving notice to USI, contacted USI clients to inform them of his anticipated move to Lockton. Additionally, USI has directed the court to evidence that it suffered harm as a result of these actions in the loss of business. DSOMF ¶ 197. Accordingly, USI is entitled the summary judgment as to liability on Counts Five and Six against Dean Anderson and Taylor

Anderson.[11]  In light of this determination, Plaintiffs' motion for summary judgment as to USI's counterclaims for breach of loyalty and fiduciary duty as to Dean Anderson and Taylor Anderson is DENIED.

### b. Maldonado

USI's motion for partial summary judgment did not encompass its claim for breach of loyalty and fiduciary duty against Maldonado. Plaintiffs, however, have moved for summary judgment as to these claims against Maldonado. Plts.' M. Summ. J. at 29 [235]. Plaintiffs argue that Maldonado did not owe loyalty or fiduciary duty to USI, and there can be no claim for breach of a non-existent duty. In response to Plaintiffs' Motion for Summary Judgment, USI fails to set forth anything in support of its contention that Maldonado owed loyalty and fiduciary duty to USI. Therefore, Plaintiffs are entitled to summary judgment as to Counts Five and Six of USI's counterclaims with respect to Maldonado only.

### B. Plaintiffs' Claims

Plaintiffs assert two claims: (1) for declaratory judgment pursuant to O.C.G.A. § 9-4-2, and (2) for injunctive relief [1-1]. Specifically, Plaintiffs ask the Court to declare void and unenforceable the Notice Provisions, Dean

---

[11] USI has not moved for summary judgment with respect to its breach of loyalty and fiduciary duty claims against Maldonado.

Anderson's six-month Non-Compete Covenant, the Client Non-Compete Covenants, the Non-Solicitation Covenants, and the Employee Non-Interference Covenants.[12] USI has moved for summary judgment on these claims against it, arguing that each of the challenged provisions is enforceable as a matter of law. As set forth above, the Court has found the Notice Provisions, Dean Anderson's Non-Compete Covenant, the Client Non-Compete Covenants, and the Non-Solicitation Covenants to be enforceable. Therefore, USI is entitled to summary judgment with respect to the declaration and injunctive claims based on these portions of the agreements.

With respect to the Employee Non-Interference Covenants, USI argues that Plaintiffs are not entitled to declaratory and injunctive relief because there is no evidence that USI is seeking to enforce these covenants or that the Former Employees risk a future violation of these covenants. Plaintiffs did not respond to this argument. This Court has routinely held that a party has

---

[12] In the Complaint, Plaintiffs allege that the New York Forum Selection and Choice of Law Provisions contained in the Stock Purchase Agreement are unenforceable. Compl. at ¶87 [1-1]. These provisions were not addressed in USI's motion for summary judgment as to Plaintiffs' claims and it is not entirely clear to the Court if these allegations were encompassed in the stipulation of dismissal of USI Advantage Corporation and the withdrawal of Plaintiffs' request for jurisdictional discovery [125]. Nevertheless, in the interest of caution, the counts seeking declaratory and injunctive relief as to these provisions will be listed as part of the remaining claims at the conclusion of this order.

an obligation to respond to an argument raised in a motion for summary judgment. *See Orquiola v. Nat'l City Mortgage Co.*, 510 F. Supp. 2d 1134, 1139 (N.D. Ga. 2007) (granting summary judgment as to plaintiff's state law claims because plaintiff did not respond to defendant's summary judgment motion on those claims); *Burnett v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004)("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."); *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997)("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims."). Accordingly, USI is entitled to summary judgment on Plaintiffs' claim for declaratory and injunctive relief as to the Employee Non-Interference Covenants.

## VI.  Conclusion

For the above-mentioned reasons, the Court rules as follows:

- USI's Motion for Leave to File Supplemental Authority Relating to Pending Motions for Summary Judgment [284] is GRANTED.

- Plaintiffs' Motion for Summary Judgment [Doc. No. 233] is GRANTED IN PART AND DENIED IN PART. Plaintiffs are entitled to summary judgment on (1) Count Three of the Amended Counterclaim as to

Maldonado and Taylor Anderson (Breach of the Client Non-Compete Covenants) and (2) Counts Five and Six of the Amended Counterclaim as to Maldonado (Breach of Loyalty and Fiduciary Duty); the motion is otherwise denied.

- USI's Motion for Summary Judgment [237] is GRANTED IN PART AND DENIED IN PART. USI is entitled to summary judgment as to liability on (1) Count One of the Amended Counterclaim (Dean Anderson and Taylor Anderson's Breach of the Notice Provisions), (2) Count Two of the Amended Counterclaim (Dean Anderson's Breach of the Non-Compete Covenant), (3) Count Three of the Amended Counterclaim as to Dean Anderson only (Breach of the Client Non-Compete Covenant), and (4) Counts Five and Six of the Amended Counterclaim as to Dean Anderson and Taylor Anderson (Breach of Loyalty and Fiduciary Duty). Likewise, USI is entitled to summary judgment on Plaintiffs' claims for declaratory and injunctive relief pertaining to the Notice Provisions, Dean Anderson's Non-Compete Covenant, the Client Non-Compete Covenants, the Non-Solicitation Covenants, and the Employee Non-Interference Covenants.

The following claims remain pending:

- Plaintiffs' claims for declaratory and injunctive relief with regard to the New York Forum Selection and Choice of Law provisions contained in the Stock Purchase Agreement;

- The amount of damages USI is entitled to on the following claims: Count One of the Amended Counterclaim (Breach of the Notice Provisions by Dean Anderson and Taylor Anderson); Count Two of the Amended Counterclaim (Breach of the Non-Compete Covenant by Dean Anderson); Count Three of the Amended Counterclaim (Breach of the Client Non-Compete Covenant by Dean Anderson); and Counts Five and Six of the Amended Counterclaim (Breach of loyalty and fiduciary duty by Dean Anderson and Taylor Anderson);[13] and

---

[13] As set forth herein, USI has shown it is entitled to summary judgment as to liability on these claims. This ruling is based on specific instances of conduct that amount to breach of specific contractual provisions. This order does not preclude USI from seeking relief on additional instances of conduct (as alleged in the Amended Counterclaim) that it contends breached the contractual provisions it is suing upon unless the Court has specifically granted summary judgment to Plaintiffs on the same conduct. However, any finding of liability on the part of Plaintiffs is limited to the specific conduct discussed in this order. In other words, USI will be required to prove all elements of its claims at trial as to any alleged breaching conduct not specifically addressed in this order.

- USI's claim for breach of the Non-Solicitation Covenants by each

    Plaintiff.

Because this order does not adjudicate all the pending claims, final judgment

will not be entered at this time. This case is REFERRED to the next available

magistrate judge, who shall be assigned this case in the ordinary manner.

With respect to the mediation process, the parties are reminded to conduct

themselves in accordance with Local Rule 16.7, NDGa. Furthermore, the

deadline for filing the proposed consolidated pretrial order is STAYED to give

the parties time to pursue settlement. The parties are ORDERED to file,

within ten days of the mediation, a joint status report informing the court of

the outcome of the mediation. If the mediation is successful, the parties'

status report shall provide a date by which the final settlement agreement

will be executed and the dismissal filed. If the mediation is unsuccessful, the

stay shall be automatically lifted, and the proposed consolidated pretrial

order shall be due within 30 days of the date of mediation.

    SO ORDERED, this 29th day of March, 2022.

HONORABLE STEVE C. JONES
United States District Judge