UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JAMESON TAYLOR ANDERSON, ROBERT DEAN ANDERSON, and ROGER MALDONADO, | <u>CONSOLIDATED CASES</u> <u>PURSUANT TO FED. R. CIV. P. 42</u> |
| Plaintiffs, | Civil Action File No. |
| v. | 1:19-cv-05582-VMC |
| USI INSURANCE SERVICES LLC, | |
| Defendant. | |
| USI INSURANCE SERVICES LLC, | Civil Action File No. |
| Plaintiff, | 1:20-cv-02490-VMC |
| v. | |
| SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC, | |
| Defendant. | |

**USI INSURANCE SERVICES LLC'S RESPONSE IN OPPOSITION TO MOTION TO STRIKE AND EXCLUDE FROM TRIAL THE REPORT AND TESTIMONY OF LORNA GUNNERSEN**

**PARKER, HUDSON, RAINER & DOBBS LLP**

Nancy H. Baughan
Georgia Bar No. 042575
Jared C. Miller
Georgia Bar No. 142219
Julie A. Wood
Georgia Bar No. 023749
Anne Horn Baroody
Georgia Bar No. 475569

303 Peachtree Street, NE
Suite 3600
Atlanta, Georgia 30308
Telephone: (404) 523-5300
Facsimile: (404) 522-8409
nbaughan@phrd.com
jmiller@phrd.com
jwood@phrd.com
abaroody@phrd.com

The motion to exclude expert testimony filed by Counterclaim Defendants Jameson Taylor Anderson, Robert Dean Anderson, and Roger Maldonado (the "Former Employees") and Defendant Southeast Series of Lockton Companies, LLC ("Lockton," and collectively with Former Employees, the "Lockton Parties") offers the Lockton Parties' own weighing of record evidence considered by USI's expert, Lorna Gunnersen ("Gunnersen"), and identifies no fundamental flaw in either methodology that Gunnersen used in rendering her opinions. The Court should deny the Lockton Parties' motion in full and should admit all the opinions and testimony that Gunnersen has offered.

USI Insurance Services LLC offers Gunnersen as a valuation expert in this case to value a book of client account assets that unquestionably moved their business immediately following the Lockton Parties' breaches of contract and other misconduct. She does not purport to offer any opinions about causation in this case, which will be established by other non-expert evidence. The Lockton Parties are wrong that a valuation expert like Gunnersen must establish causation, or must consider every hypothetical factor that might bear on that issue. But regardless, it is clear that Gunnersen did also consider the record evidence supporting causation in this case—namely, that at least 25 accounts immediately transferred their business to Lockton following what this Court has already found to be breaches of contract,

1

an event that would not happen in the ordinary course of business. The Court should not exclude Gunnersen's opinions simply because the Lockton Parties may weigh that evidence differently.

Moreover, both of Gunnersen's valuation models meet the requirements of Rule 702, *Daubert*, and Georgia law. Georgia courts authorize juries to consider all the facts and circumstances of the loss in awarding damages in restrictive covenants cases. Here, Gunnersen presents two methodologies to value the accounts at issue in order to assist the jury in assigning a dollar value to that loss. Under either approach, the parties plainly anticipated the potential loss of customer accounts when they entered into the employment agreements. Gunnersen provides sufficient data and follows a reliable methodology in both instances. The Lockton Parties' criticisms of those models can be explored on cross-examination, but do not present any fatal problem with either methodology to warrant exclusion of her opinions.

## I.   SUMMARY OF RELEVANT FACTS

This Court's prior summary judgment orders outline the facts of this case at length. (Case No. 1:19-cv-05582-VMC ("2019 Case") Doc. 286; Case No. 1:20-cv-02490-VMC ("2020 Case") Doc. 174.) In this case, USI contends that Robert Dean Anderson, Jameson Taylor Anderson, and Roger Maldonado (the "Former Employees") breached multiple contractual and other legal obligations owed to their

former employer, USI, in connection with switching employment from USI to USI's direct competitor, Lockton, and by improperly moving to Lockton a significant portion of USI's clients that the Former Employees had serviced while working for USI. Indeed, this Court has already found, as a matter of law, that the Former Employees breached certain contractual and other legal obligations they owed to USI. (2019 Case, Doc. 286, at 50-51 & n.13.) In addition, USI alleges that Lockton tortiously interfered with USI's contracts with the Former Employees by inducing the Former Employees to breach their contracts with USI.

As a result of this established and alleged conduct—set out more fully in the Court's prior orders and also in USI's Motion to Exclude the Expert Testimony of Glenn C. Sheets—at least 19 USI clients with twelve-month revenues totaling $1,080,178 transferred their brokerage relationships away from USI to Lockton within a very short period of time between December 9, 2019 and February 12, 2020. (*See* Order Granting USI's Motion for Preliminary Injunction (Doc. 114 in 2019 Case) at 13.)[1] Lockton completed its raid on USI's Aviation Group by simultaneously hiring multiple USI additional employees to support the Former Employees, effectively stealing a large portion of USI's Aviation Group and client

---

[1] As shown in the Gunnersen Report, additional accounts that the Former Employees had worked on that were not addressed at the preliminary injunction phase of this case also moved from USI to Lockton around this same time period.

business, rather than trying to purchase that business legitimately on the open market.

In support of USI's claims against the Lockton Parties, USI submitted the expert report of Lorna Gunnersen. Gunnersen's report has a singular purpose, to calculate and provide evidence of the amount of damages USI has suffered in connection with the loss of the subject client accounts. Gunnersen explained that she "performed a calculation engagement, in order to estimate the value of [the subject accounts]." (Gunnersen Report (Doc. 314-1 in 2019 Case; Doc. 203-1 in 2020 Case) at 2.) Gunnersen described her scope of work as "appl[ying] a lost profits method to calculate the value of the [subject accounts]," and states that she also performed a "calculation of fair market value of the accounts" as another means to quantify the "value of the [subject accounts]." (*Id.* At 3.) Gunnersen explained that her calculations were provided pursuant to "Statement of Standards for Valuation Services No. l" of the American Certified Public Accountants and Revenue Ruling 59-60. (*Id.* At 2). Gunnersen's two different calculations reflect alternative opinions as to the value of the client accounts that USI lost to Lockton. She opines that USI was damaged in the amount of several million dollars in losing the subject accounts.

USI does not offer Gunnersen's testimony to prove causation of its damages. Gunnersen confirmed in her deposition testimony that she has not offered any

opinions as to causation in this case. (Gunnersen Dep. (Doc. 256-2 in 2019 Case) at 54:10-13.) Instead, USI will present significant and compelling non-expert evidence, much of which is outlined in USI's prior briefing in this case, showing that the Lockton Parties directly caused USI to lose the subject account assets. Among many other things, Rob Allen, USI's 30(b)(6) corporate representative witness, has testified that, in his more than 30 years of experience, the rapid succession of client moves in this case was "extremely unusual" for USI's business and would not be seen in the ordinary course. (*See, e.g.*, Deposition of R. Allen (Doc. 218 in 2019 Case; Doc. 101 in 2020 Case), at 135-136, 138, 296-297.) Further, as established above, liability for many of USI's claims against the Lockton Parties has already been established.

## II.   ARGUMENT AND CITATION OF AUTHORITIES

### A.   Standard for Admissibility of Expert Testimony

The admissibility of expert testimony is governed by FRE 702. Rule 702 states that a witness who is qualified by knowledge, skill, experience, training, or education may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the

principles and methods to the facts of the case." (Emphasis added.)

Thus, expert testimony is admissible if: (1) the expert is qualified to testify competently on the topic at issue; (2) the methodology used by the expert is sufficiently reliable; and (3) the testimony will assist the trier of fact. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786 (1993); *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004). "The Eleventh Circuit Court of Appeals has cautioned that '[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test.'" *Forbo Flooring, Inc. v. Falcone Glob. Sols., LLC*, No. 1:19-CV-2876-MHC, 2022 WL 4596639, at *6 (N.D. Ga. Jul. 22, 2022) (quoting *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). As the Lockton Parties have argued in this case, "[t]he presumption is that expert testimony is admissible." (*See* Doc. 325 in 2019 Case and Doc. 214 in 2020 Case at 10 (citing *Cosper v. Ford Motor Co.*, No. 2:18-cv-189-RWS, 2022 WL 17908815, at *2 (N.D. Ga. Oct. 17, 2022)).)

**B.     A valuation expert like Gunnersen need not independently establish causation, which can be shown from non-expert evidence, and Gunnersen appropriately considered causation issues to the extent she was required to do so.**

USI offers Gunnersen as a valuation expert with opinions relevant to the issue of damages. The scope of her engagement was to calculate a value for the subject accounts. Gunnersen has not been offered to give opinions as to the separate issue

of causation, and she does not purport to do so. The Lockton Parties nevertheless contend that, because there are disputed issues as to the separate element of causation, that the Court should exclude Gunnersen from presenting her valuation opinions. (*See* Lockton Mem. at 9.) But they identify no authority requiring a valuation expert to establish causation when, as here, there is ample non-expert evidence establishing causation. Gunnersen appropriately considered potential factors relevant to causation, and the Lockton Parties identify no evidence in the record that they contend she ignored in her analysis.

1.  <u>A valuation expert need not independently establish causation, which can</u>
    <u>be established by other non-expert sources of evidence.</u>

First, the Lockton Parties ignore that numerous federal district courts across the country have held that an expert giving opinions relevant to ***damages*** can assume that causation is established by the record evidence. *See, e.g.*, *Orthofix, Inc. v. Gordon*, No. 1:13-cv-01463-SLD-TSH, 2016 WL 1273160, at *3 (C.D. Ill. Mar. 31, 2016) ("It is entirely appropriate for a damages expert to assume liability for the purpose of his or her opinion. To hold otherwise would be illogical."); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. für Chemische Industrie*, No. 11–cv–681 (KBF), 2015 WL 5459662, at *10 (S.D.N.Y. Sept. 16, 2015) ("[A] damages expert does not need to perform her own causation analysis to offer useful expert testimony."); *Gaedeke Holdings VII, Ltd. v. Baker*, No, No. CIV-11-649-M, 2015

WL 11570978, at *3 (W.D. Okla. Nov. 30, 2015) ("Proof of causation often comes from fact witnesses, and it is appropriate for expert witnesses to assume causation will be established and then proceed to calculate the damages.").

Undoubtedly, a claimant can establish causation through non-expert sources of evidence, and Gunnersen (as a valuation expert relevant to damages) need not independently establish causation. *See Gallagher Benefit Servs., Inc. v. Campbell*, 528 F. Supp. 3d 1326, 1342 (N.D. Ga. 2021) (finding evidence of direct causation in the factual record); *KW Plastics v. U.S. Can Co.*, 199 F.R.D. 687, 692 & n.5 (M.D. Ala. 2000) (explaining that proof of facts supporting or refuting causation "have to come from other evidentiary sources," and cannot be established by an expert as to damages). In *Gallagher*, Judge Grimberg found evidence to support a genuine dispute as to causation separate and apart from any expert testimony the plaintiff intended to present concerning the amount of the plaintiff's damages.

The Lockton Parties' own authorities confirm that Georgia courts look to the entirety of the evidentiary record to establish causation, and do not require damages experts to establish causation. *See Coffee Butler Serv., Inc. v. Sacha*, 208 Ga. App. 4 (1993). In *Coffee Butler*, the appellate court reviewed the entire summary judgment record, including expert and non-expert sources of evidence, to confirm that the plaintiff failed to elicit ***any evidence*** of causation. *See id.* at 6-7 (reviewing affidavit

testimony of multiple fact witnesses, as well as proffered opinions of plaintiff's damages expert, to conclude that evidence of causation could not be found anywhere in the record). The court neither held nor intimated that a damages expert **must** offer evidence of causation, as the Lockton Parties incorrectly contend, and in fact the case did not involve admissibility of the experts' testimony at all. *See id.* at 7 (merely noting that "neither expert had any information" relevant to causation, but not requiring that a damages expert possess such information to be admissible).

USI will present ample non-expert evidence at trial that the Lockton Parties' breaches of contract and other misconduct directly caused the subject accounts to leave USI. This Court's prior orders, particularly the two summary judgment orders and the order granting USI's motion for preliminary injunction in the 2019 Case, outline the extensive evidence of the Lockton Parties' successful, but unlawful, scheme to move USI's aviation clients over to Lockton by engaging in conduct in blatant disregard of the Former Employees' legal obligations to USI. (*See, e.g.*, 2019 Case, Doc. 286, at 41 ("Without question, there is evidence from which a factfinder could determine that the whole process was a carefully orchestrated scheme to bring business from USI to Lockton."); 2019 Case, Doc. 114, at 10 ("[T]he Court finds that Plaintiffs' intent in sending these mass emails to clients was to encourage and induce these clients to contact Plaintiffs and to switch their insurance brokerage

business to Lockton. ***Many of these clients, in fact, immediately contacted Plaintiffs and did execute BOR Letters to switch their business from USI to Lockton***.") (emphasis added); 2020 Case, Doc. 174).

That the Lockton Parties desire to present a competing theory of causation at trial is no basis to exclude Gunnersen's expert valuation opinions. Sister district courts within the Circuit have examined the interplay between non-expert sources of evidence relevant to causation and an expert's role in rendering opinions as to the valuation or dollar amount of damages. *See KW Plastics v. U.S. Can Co.*, 199 F.R.D. 687, 692 & n.5 (M.D. Ala. 2000). The *KW Plastics* court noted that a "pivotal" issue in the case would be whether the claimant "suffered damages arising from KW's possible violation of an alleged limited non-compete agreement." "Without meaning to seem overly simplistic, … a plaintiff's case is like a puzzle. Each witness provides bits and pieces of evidence that, taken as a whole, come together to form an entire finished product." *KW Plastics v. U.S. Can Co.*, 199 F.R.D. 687, 691 (M.D. Ala. 2000). Consistent with Georgia state and federal courts, the *KW Plastics* court at no point required the ***damages expert*** to establish causation. Indeed, the Lockton Parties concede that their own expert has opined that an expert is not required to analyze causation. (*See* Doc. 325 in 2019 Case and Doc. 214 in 2020 Case at 7 ("AICPA does not *require* a damages expert to analyze causation in detail in a damages

10

analysis").)

    2.  <u>Gunnersen appropriately considered evidence relevant to causation.</u>

Moreover, it is clear that Gunnersen did consider the record evidence of causation in rendering her opinions. She explained in her report that she considered that the "circumstances in this case, including the speed with which the clients submitted BOR letters to Lockton after THE FORMER EMPLOYEES submitted their notices of resignation, strongly suggest that THE FORMER EMPLOYEES' conduct caused the AVIATIONACCTS to move their business to LOCKTON." (Gunnersen Report, at 7.) Gunnersen explained multiple times in her deposition that the very short timeframe in which these accounts moved to Lockton was persuasive to her that the loss of the accounts resulted directly from the Lockton Parties' misconduct. (*See* Gunnersen Dep. at 38:5-12 (accounts were "BOR'd to Lockton within a short period of time after the former employees went to work for Lockton"); *id.* at 39:4-6 (same); *id.* at 40:16-17 (presumed causation based on timeframe involved on these facts).) Her conclusion from this evidence is supported by other non-expert testimony. Rob Allen, USI's 30(b)(6) corporate representative witness, has testified that, in his more than 30 years of experience, the rapid succession of client moves in this case was "extremely unusual" for USI's business and would ***not be seen in the ordinary course***. (*See, e.g.*, Deposition of R. Allen (Doc. 218 in 2019

Case; Doc. 101 in 2020 Case), at 135-136, 138, 296-297 (emphasis added).)

Additionally, Gunnersen considered data accepted in the insurance industry showing that client retention rates are at or above 90 percent. This data supports Gunnersen's assumption that the mass exodus of clients resulted from the Lockton Parties' misconduct, and not from normal market forces. (Gunnersen Report at 20 ("The typical retention of an average insurance agency is between 90 and 95%."); Gunnersen Dep. at 93:23-94:1.)[2] Nevertheless, Gunnersen also considered that retention could be somewhat lower when a producer leaves the firm. Her models assumed retention rates as low as 80% (which she explained was a particularly low rate under normal circumstances, absent a breach of contractual or other legal obligations). (*See* Gunnersen Dep. at 177:20-178:7.)[3] Her methodology thus accounted for variability in retention rates. The Lockton Parties may weigh all this evidence differently, and can argue so at trial. But to the extent Gunnersen was required to establish or consider causation for the loss of the accounts she was asked to value, she plainly did so in considering the above facts.

---

[2] This data is consistent with Lockton's own reported client retention rate of "at or above 96." (*See* Lockton's Response to Interrogatory No. 17 (Doc. 229-1, pp. 46-47 in 2019 Case; Doc. 112-1, pp. 46-47 in 2020 Case).)

[3] (*See also* Deposition of R. Allen (Doc. 218 in 2019 Case; Doc. 101 in 2020 Case), at 295-296 (explaining that when producers honor their contractual obligations to provide adequate notice, work through their notice periods, and assist in transitioning the business, USI normally keeps most of the business at issue).)

3.  <u>Gunnersen has not ignored any specific record evidence identified by the Lockton Parties as to other known causes of USI's damages.</u>

The Lockton Parties contend that Gunnersen failed to consider various "benign" causes for client movement, such as "service levels, competence, pricing, or personal relationships." (Lockton Mem. at 12.) These alternative causation theories amount to pure speculation, as the Lockton Parties cite no evidence of any of these factors in the record purporting to explain the reason for movement of any of the subject accounts. The Lockton Parties' speculation about other theoretical causes does not warrant exclusion of Gunnersen's valuation opinions.

Here, the Lockton Parties baldly claim that Gunnersen "ignored evidence in the record refuting the presumption of causation underlying [her] damages report." (Lockton Mem. at 13.) Not a single record citation follows that claim. The Lockton Parties cite **_no record evidence_** of any alternative causes they contend were at play in any account's decision to move their business to Lockton.

This Court has squarely rejected a similar Daubert challenge where the challenging party showed "no evidence or other support for its proposition" that other factors might have contributed to the claimant's loss. *Forbo Flooring, Inc. v. Falcone Glob. Sols., LLC*, NO. 1:19-CV-2876-MHC, 2022 WL 4596639, at *8 (N.D. Ga. Jul. 22, 2022). There, Judge Cohen explained that the challenging party's "speculations and hypotheticals that it contends [the challenged expert] should have

13

considered are not equivalent to specific evidence presented to a proffered expert but excluded from calculations." *Id.* Those are issues to be explored on cross-examination, and are no basis to exclude a valuation expert's opinion. The Lockton Parties' own authorities make clear that admissibility does not turn on whether "a lawyer or another expert can think of some other cause or some other factor that another expert did not consider." *See Wind Logistics Pro., LLC v. Univ. Truckload, Inc.*, No. 1:16-CV-00068, 2020 WL 3411037, at *5 (N.D. Ga. June 22, 2020).

The Lockton Parties fail to show that Gunnersen ignored actual evidence of known alternative causes, making this case completely distinguishable from the authorities that they rely on. In *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, for instance, the plaintiff's damages expert ignored the fact that "nearly all of the restrictive covenants [at issue] permitted *some* amount of grocery sales at Defendants' stores." 746 F.3d 1008, 1028 (11th Cir. 2014) (emphasis in original). The district court determined that the expert's proffered opinions about the impact of competition between the stores, ***generally***, thus "analyz[ed] the wrong problem" and could not help the trier of fact determine the amount of damages Winn-Dixie suffered ***in excess of*** the contractually permitted competition as a result of any breaches of the relevant covenants. *Id.*

The Lockton Parties' other authorities are equally inapposite. *Flowers*

14

*Bakeries Brands, Inc. v. Interstate Bakeries Corp.* addressed issues arising in trademark litigation (not presented here) and involved an expert who ignored ***known market factors*** impacting consumer purchasing decisions. No. 1:08–CV–2376–TWT, 2011 WL 1004657, at *2-3 (N.D. Ga. Mar. 17, 2011). Those factors included price, advertising, and quality, that admittedly impact consumer purchasing decisions. *Id.* Similarly, in *Wind Logistics Professional, LLC v. Universal Truckload, Inc.*, this Court held that an expert must consider ***known factors*** that can cause the amount of business from an ***ongoing client relationship*** to fluctuate. No. 1:16-cv-00068, 2020 WL 3411037 (N.D. Ga. June 22, 2020). *Wind Logistics* did not involve an immediate exodus of numerous client accounts. The claimant retained a business relationship with the account at issue, but claimed that the amount of business had decreased. Thus, factors relevant to the claimant's ability to service that business were plainly relevant, as they are not when accounts immediately move all their business to a competitor. This Court found, in any event, that the proffered expert had sufficiently considered causal factors and denied the motion to exclude. *Id.* at *5. Neither case requires valuation experts generally to consider all speculative or hypothetical potential causes for an event to satisfy Rule 702's admissibility standard. *Id.* at *4 ("The Court also does not hold an expert must consider and eliminate all possible causes."; expressly stating that the Court's holding did not

15

preclude experts from assuming liability where appropriate).

On this record, moreover, Gunnersen reasonably considered—and a jury could find—that none of the Lockton Parties' speculative alternative factors would lead to the *immediate exodus* of at least 25 client accounts that occurred here. Gunnersen opined, based on her experience in the insurance industry, that customer accounts generally have no significant contact with their brokers between renewal cycles, which typically occur every 12 months. (Am. Report at 8-9.) Gunnersen plainly considered how the insurance industry functions and the normal cycle of policy renewals within that industry. It would be reasonable to conclude that clients are not likely to be thinking about their broker pricing, service levels, or relationships during the quiet twelve months between renewals. Thus, as already explained above, Gunnersen reasonably assumed that the immediate and concerted exodus of so many accounts resulted directly and solely from the Lockton Parties' wrongful conduct.

**C.    Gunnersen's fair market value model presents a reasonably certain method to value damages in this case.**

The Lockton Parties contend that Gunnersen may not use a fair market value model to calculate the value of the account assets that USI lost because USI did not intend to sell the accounts as of December 2019. That position ignores settled Georgia law endorsing a flexible approach to valuing damages in restrictive covenants disputes. The Lockton Parties also fail to cite any authority holding that a

damages model based on the fair market value of assets requires a showing that the injured party actually intended to sell the asset prior to the injury—a requirement that would make no sense.

As an initial matter, "[d]amages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." O.C.G.A. § 13-6-2. Under Georgia law, "recoverable damages are simply all damages incident to the breach." *Direct Response Prods., Inc. v. Thomas*, No. 1:13–cv–1526–WSD, 2013 WL 5890473, at *3 (N.D. Ga. Nov. 1, 2013). "[D]amages recoverable for a breach of a restrictive covenant are lost profits, as well as the loss of customers, the loss of employees, and the decreased value of the business property purchased in reliance on the covenant." *Id.*; *see also Gaines v. Crompton & Knowles Corp.*, 190 Ga. App. 863, 864 (1989); *Reid v. Bryant*, 100 Ga. App. 105, 112 (1959).

Here, the damage to USI caused by the Lockton Parties' breaches of contract and wrongful conduct is the loss of at least 25 customer accounts. There can be no question that the loss of the accounts was contemplated by the Former Employees in entering into the contracts with USI, and there will be ample evidence that the loss of the accounts arose naturally and directly from the Lockton Parties' misconduct.

17

As Gunnersen will testify, moreover, "[c]ustomer accounts, … in an insurance agency, represent the assets of a firm" which "inherently have value." (Am. Report at 8.) The issue for the jury to determine is how to assign a dollar value of the subject accounts to award damages. Gunnersen has applied multiple methodologies to calculate the value of what USI unquestionably lost. First, she values the accounts by the proceeds or profits that USI could have realized from a sale of the subject accounts. Second, she values the accounts by the profits that USI would have realized on the accounts themselves had they remained at USI. Under either view, there is no question that the damage to USI—the loss of the subject accounts—was incident to the Former Employees' breaches of contract and to the Lockton Parties' concerted activities.

The Lockton Parties cite no Georgia authorities precluding the fair market valuation method that Gunnersen has applied in this case. The better view is that Georgia law would authorize such a recover in a restrictive covenants case. Georgia courts consistently take a flexible approach to valuing damages in restrictive covenants disputes. The Georgia Court of Appeals has held that, upon breach of a restrictive covenant, the "jury might consider **all the facts and circumstances tending to show the extent of the plaintiff's loss."** *Reid v. Bryant*, 100 Ga. App. 105, 112 (1959) (emphasis added). Under the facts of that case, the court found it

appropriate to consider the "decreased value of the business property" caused by the wrongful competition, ***in addition to*** lost net profits, loss of customers, and/or loss of employees. *Id.* The Court of Appeals reiterated that comprehensive and flexible approach in *Gaines v. Crompton & Knowles Corp.*, where it noted that the plaintiff had sought and proved both damages for loss of customers and loss of employees, in addition to lost net profits. 190 Ga. App. 863, 864 (1989).

Gunnersen's fair market valuation is reasonably certain and not too speculative to be recoverable. Gunnersen has opined that calculating the fair market value USI could have realized from sale of the subject accounts as of the valuation date in December 2019 is an accurate and reliable way to value the accounts that were lost at that time. (Am. Report at 16 ("I believe that the fair market value is a more appropriate representation of value of the AVIATIONACCTS" for several reasons that she enumerated); Gunnersen Dep. at 47:5-11 ("As stated in my report, we use a fair market value and that's what I believe a real world view of the damages are here.").) Gunnersen explained that the insurance industry is "highly acquisitive," with a high volume of transactions each year, and she opined that a book of business like the subject accounts "would have been extremely easy to divest" in a sale transaction such as the one she has modeled. (Am. Report at 16.) Gunnersen personally has experience through involvement in "hundreds of transactions." (*Id.*)

Gunnersen has clearly explained why a fair market value model is relevant to value the account assets that USI lost, and for that reason and others this case is distinguishable from the hypothetical purchase transaction model proposed in *Gallagher Benefit Services, Inc. v. Campbell.* Unlike Gunnersen's model, the plaintiff's expert in *Gallagher* proposed to model damages based on what Gallagher "would have to spend in the open market ***to replace the clients***" that had defected to the competitor. 528 F. Supp. 3d 1326, 1351 (N.D. Ga. 2021). This Court rejected the proposed replacement damages model because there was "no indication from [the proposed expert's] testimony that a damages model predicated on a formula employed to valuate a book of business for future acquisition is relevant to calculating the lost profits from a departing client." *Id.* at 352. By contrast, Gunnersen simply offers an opinion about the value of the assets that USI unquestionably lost, and she provides ample reasoning for her decision to employ that model to value damages here. Moreover, federal courts in similar cases involving breach of restrictive covenants in the insurance industry have authorized experts to value the lost book of business by reference to a hypothetical purchase or sale transaction. *See Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 294 (5th Cir. 2012) (applying Louisiana law) (ultimately holding that valuation expert's opinion was inadmissible for other reasons not at issue here).

Here, Gunnersen's fair market value model is sufficiently certain to recover under Georgia law. The Lockton Parties take issue with her calculation because she chose a lump-sum cash price model rather than modeling a transaction with an earn-out period. They fail to explain how or to what extent the distinction matters for purposes of assigning value to the subject accounts. A person seeking damages need only provide the jury with "sufficient data to estimate the damages to a reasonable certainty." *Forbo Flooring, Inc. v. Falcone Glob. Sols., LLC*, No. 1:19-CV-2876-MHC, 2022 WL 4596639, at *19 (N.D. Ga. July 22, 2022), reconsideration denied, No. 1:19-CV-2876-MHC, 2022 WL 17908422 (N.D. Ga. Nov. 10, 2022); Ga. Law of Damages § 7.1 (2022-2023 ed.). "The requirement of reasonable certainty does not mean … that [a plaintiff] cannot get damages unless he proves the exact amount of his harm." Restatement (First) of Contracts § 331 (1932). "Damages need not be calculable with mathematical accuracy and are often at best approximate." Restatement (Second) of Contracts § 352 (1981).

Gunnersen testified at her deposition that she typically uses a cash basis, and that in her experience earnouts are becoming less common and less significant in transactions. (Gunnersen Dep. at 122:10-16; 123:23 – 124:9.) Whether the Lockton Parties disagree and believe an earnout model should be employed here—and what impact they contend that would have on the ultimate valuation—are issues that the

Lockton Parties can explore on cross-examination. The Lockton Parties show no grounds to exclude Gunnersen's fair market value model.

## D. Georgia law plainly allows recovery of lost profits in restrictive covenants cases.

Not happy with Gunnersen's fair market value analysis, the Lockton Parties also argue that Gunnersen may not present a lost profits analysis. But they ignore long-standing Georgia authorities routinely authorizing recovery of lost profits in restrictive covenants cases. As noted above, the Georgia Court of Appeals has recognized for decades that damages for breach of restrictive covenant can be lost profits (as well as loss of customers and loss of employees). *See Gaines v. Crompton & Knowles Corp.*, 190 Ga. App. 863, 864 (1989); *Reid v. Bryant*, 100 Ga. App. 105, 112 (1959); *Annis v. Tomberlin & Shelnutt Assocs., Inc.,* 195 Ga. App. 27, 32 (1990).

The Lockton Parties are incorrect that the "collateral enterprise" rule bars or limits recovery of lost profits in this case. They appear to be relying on O.C.G.A. § 13-6-8, which provides that "*[r]emote or consequential damages*" are not recoverable unless they are "independent of any collateral enterprise entered into in contemplation of the contract." O.C.G.A. § 13-6-8 (emphasis added). The rule applicable to consequential damages does not apply here, where the loss of the subject accounts arose ***directly*** from the Lockton Parties' breaches of contract and other wrongful conduct. The lost profits that Gunnersen models in order to value the

lost accounts are not consequential damages subject to O.C.G.A. § 13-6-8.[4]

The Lockton Parties' reliance on *Hixson-Hopkins Autoplex v. Custom Coaches* is also misplaced, as it addressed a claim for consequential damages. 208 Ga. App. 820 (1993). Moreover, the claimant's damages model in that case was so outlandish that the court called it "a new form of pyramid scheme." *Id.* at 821. The claimant asserted breach of a contract to purchase vans. *Id.* at 820. It argued that the defending party's failure to pay for the vans resulted in the claimant being unable to purchase separate conversion packages for additional vans, "which once sold, would have created a profit which would have, in turn, allowed for the purchase of additional conversion packages, again creating a profit." *Id.* at 821. By contrast, Gunnersen's lost profits analysis models direct damages as a result of the Lockton Parties' conduct that routinely are awarded in restrictive covenants cases.

As noted above, there can be no question that the loss of customer accounts and related business was contemplated by the parties at the time they entered into

---

[4] Even if the "collateral enterprise" rule applied here, the Lockton Parties' argument makes no sense and would eliminate lost profits damages in most cases. The Lockton Parties contend that USI's lost profits are not independent of a collateral enterprise because clients "are free to obtain their insurance from any insurance broker they choose." (Lockton Mem. at 19.) Of course, customers *in any business* tend to be free to choose goods or services from a competitor. Were that sufficient to constitute a "collateral enterprise," no business could ever establish lost profits damages. The Lockton Parties cite no authority for their sweeping view that customer choice dooms a lost profits damages claim.

the employment agreements. It is neither here nor there what the Lockton Parties contemplated would be the methodology for *valuing* that loss. The Lockton Parties' contention that they did not contemplate "lost profits" as a measure of damages ignores the fact that all parties plainly contemplated the potential loss of accounts and business, which in fact occurred here.

Also as explained above, USI need not prove its lost profits with exact mathematical certainty. Restatement (Second) of Contracts § 352 (1981). Gunnersen unquestionably provides sufficient data to allow a jury to estimate USI's damages with reasonable certainty. *Forbo Flooring, Inc. v. Falcone Glob. Sols., LLC*, No. 1:19-CV-2876-MHC, 2022 WL 4596639, at *19 (N.D. Ga. July 22, 2022), reconsideration denied, No. 1:19-CV-2876-MHC, 2022 WL 17908422 (N.D. Ga. Nov. 10, 2022). The Lockton Parties are simply wrong that Gunnersen failed to consider the historical performance of the subject accounts. Gunnersen received and considered historical revenue earned on the subject accounts. (Am. Report at 3.) If the Lockton Parties assess the historical revenue data differently, that is a subject for cross-examination. This case is completely distinguishable from *EZ Green Associates, LLC v. Georgia-Pacific Corp.*, which concerns businesses or ventures with *no actual track record or performance history*, or a history of making very little money. 331 Ga. App. 183, 185, 187 n.14 (2015). The claimant in *EZ Green*

argued that it could rely on forecasts and projection as a benchmark for its lost profits analysis, rather than actual historical performance. *Id.* at 185. USI has data to establish the historical performance of these accounts, making *EZ Green* inapposite.

In any event, the Lockton Parties cannot avoid compensating USI for its loss simply by arguing that the methodologies to calculate that loss are complex and approximate. The Court has already found that the Former Employees breached several provisions in their employment contracts, which breaches are now established as a matter of law. The Lockton Parties show no fundamental or fatal flaw in either Gunnersen's fair market value model or lost profits model for assessing USI's damages. Any doubts as to the certainty of Gunnersen's damages model should be "resolved against the party in breach." Restatement (Second) of Contracts § 352 (1981). "A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred." *Id.* At most, the Lockton Parties identify issues that can be addressed on cross-examination. For all the reasons explained above, Gunnersen provides ample data and information to allow a jury to assess and award damages in the case for the loss of the subject accounts.

Respectfully submitted this 20th day of February 2023.

**PARKER, HUDSON, RAINER & DOBBS LLP**

/s/ Jared C. Miller
Nancy H. Baughan
Georgia Bar No. 042575
Jared C. Miller
Georgia Bar No. 142219
Julie A. Wood
Georgia Bar No. 023749
Anne Horn Baroody
Georgia Bar No. 475569
303 Peachtree Street, N.E., Suite 3600
Atlanta, Georgia 30308
Telephone:  404-523-5300
Facsimile:   404-522-8409
E-mail: nbaughan@phrd.com
        jmiller@phrd.com
        jwood@phrd.com
        abaroody@phrd.com

*Attorneys for USI Insurance Services LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with N.D. Ga. LR 7.1(D) and 5.1(C)-(D), this opposition brief has been prepared with a top margin of not less than one and one-half (1 ½) inches and a left margin of not less than one (1) inch. This opposition brief has been prepared in Times New Roman 14-point font type and is within the 25-page limit as set forth in the local rule.

This 20th day of February 2023.

**PARKER, HUDSON, RAINER & DOBBS LLP**

<u>/s/ Jared C. Miller</u>
Jared C. Miller

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing **USI** **Insurance** **Services** **LLC's** **Response** **In** **Opposition** **To** **Motion To Strike And Exclude From Trial The Report And Testimony** **of Lorna Gunnersen** upon all parties to this matter by electronically filing a copy of same with the Court's CM/ECF system, which will automatically send an electronic copy to the following counsel of record:

> Warren R. Hall, Esq.
> Elizabeth M. Newton, Esq.
> Wayne M. Cartwright, Esq.
> Kristina K. Griffin, Esq.
> Hall, Gilligan, Roberts & Shanlever, LLP
> 3340 Peachtree Road – Suite 1900
> Atlanta, Georgia 30326
> whall@hgrslaw.com
> enewton@hgrslaw.com
> wcartwright@hgrslaw.com
> kgriffin@hgrslaw.com
>
> Joseph D. Wargo, Esq.
> David M. Pernini, Esq.
> Brandon Parrish, Esq.
> Wargo, French & Singer LLP
> 999 Peachtree Street, NE, 26th Floor
> Atlanta, Georgia 30309
> jwargo@wfslaw.com
> dpernini@wwfslaw.com
> bparrish@wfslaw.com

This 20th day of February, 2023.

/s/ Jared C. Miller
Jared C. Miller