The following is the PDF of an official transcript.  Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3
   JAMESON TAYLOR ANDERSON,        )
 4 ROBERT DEAN ANDERSON, and       )
   ROGER MALDONADO,                )  CONSOLIDATED CASES
 5                                 )  PURSUANT TO FED.R.CIV.P.42
        Plaintiffs,                )
 6                                 )  Civil Action File No.
             v.                    )
 7                                 )  1:19-CV-05582-VMC
   USI INSURANCE SERVICES LLC,     )
 8                                 )
        Defendant.                 )
 9 _____  )_____
   USI INSURANCE SERVICES LLC,     )
10                                 )
        Plaintiff,                 )  Civil Action File No.
11                                 )
             v.                    )  1:20-CV-02490-VMC
12                                 )
   SOUTHEAST SERIES OF             )
13 LOCKTON COMPANIES, LLC,         )
                                   )
14      Defendant.                 )
   _____  )_____
15

16           BEFORE THE HONORABLE VICTORIA M. CALVERT
                   TRANSCRIPT OF PROCEEDINGS
17                      APRIL 26, 2023

18 _____

19
            Proceedings recorded by mechanical stenography
20          and computer-aided transcript produced by

21
                WYNETTE C. BLATHERS, RMR, CRR
22                  Official Court Reporter
                   2114 U.S. Courthouse
23                 75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303
24                      (404) 215-1547

25
```

```
 1   APPEARANCES:

 2   For USI Insurance          NANCY H. BAUGHAN
     Services:                  JARED C. MILLER
 3                              ANNE M. H. BAROODY
                                WILLIAM J. HOLLEY, II
 4                              Attorneys at Law
                                Parker, Hudson, Rainer & Dobbs LLP
 5                              303 Peachtree Street NE
                                Suite 3600
 6                              Atlanta, Georgia  30308

 7   For the Individuals        CHRISTOPHER J. BANKS
     James Taylor Anderson,     Attorney at Law
 8   Robert Dean Anderson,      Crowell & Moring, LLC
     and Roger Maldonado and    3 Embarcadero Center
 9   Southeast Series of        26th Floor
     Lockton Companies:         San Francisco, California  94111
10
     For Individuals Jameson    WAYNE M. CARTWRIGHT, II
11   Taylor Anderson, Robert    WARREN R. HALL, JR.
     Dean Anderson, and Roger   Attorneys at Law
12   Maldonado:                 Hall, Gilligan, Rogerts
                                & Shanlever LLP
13                              3340 Peachtree Road NE
                                Suite 1900
14                              Atlanta, Georgia  30326

15   For Southeast Series of    DAVID M. PERNINI
     Lockton Companies, LLC:    BRANDON PARRISH
16                              Attorneys at Law
                                Wargo, French & Singer LLP
17                              999 Peachtree Street NE
                                Suite 1120
18                              Atlanta, Georgia  30309

19

20

21

22

23

24

25
```

```
 1                    Wednesday Morning Session

 2                       April 26, 2023

 3                        10:00 a.m.

 4                         -  -  -

 5               P R O C E E D I N G S

 6         COURTROOM SECURITY OFFICER:  All rise.  United States

 7  District Court for the Northern District of Georgia, Atlanta

 8  Division, is now in session, the Honorable Judge Victoria

 9  Marie Calvert presiding.

10         THE COURT:  Good morning.  Please be seated.  I

11  apologize for my tardiness.  We are here in the case -- the

12  Case No. is 19-5582 and 20-2490.  This is the pretrial

13  conference for the trial set to start next week.  Can I have

14  appearances from counsel.

15         MS. BAUGHAN:  Good morning, your Honor.  My name is

16  Nancy Baughan.  I'm with Parker, Hudson, Rainer & Dobbs, and

17  the rest of the trial team, my partner Jared Miller, also with

18  Parker Hudson, Anne Baroody and Bill Holley.

19         THE COURT:  All right.  Good morning to all of you.

20         MR. BANKS:  Good morning, your Honor.  My name is

21  Christopher Banks, with the law firm Crowell & Moring on

22  behalf of both the individuals, Taylor Anderson, Dean

23  Anderson, Roger Maldonado, and Lockton.  And I can introduce

24  the others if -- I'd prefer that they introduce themselves if

25  that's okay.
```

1      MR. HALL:  I'm Warren Hall, and I'm counsel for the

2 individuals, the Andersons and Maldonado.

3      THE COURT:  All right.

4      MR. PERNINI:  Your Honor, I'm David Pernini from

5 Wargo, French & Singer, and I represent the Southeast Series

6 of Lockton Companies.

7      THE COURT:  All right.

8      MR. CARTWRIGHT:  Your Honor, Wayne Cartwright with

9 Hall, Gilligan, Roberts & Shanlever on behalf of Taylor, Dean,

10 and Roger.

11      MR. PARRISH:  Good morning, your Honor.  Brandon

12 Parrish with Wargo, French & Singer.  I also represent

13 Southeast Series of Lockton.

14      THE COURT:  All right.  Thank you.  Good morning to

15 everyone, and good morning to all the people in the back.

16      All right.  So there are a lot of issues to take up,

17 and I'm going to try to deal with the substantive issues

18 first, and then we can go into more of the procedural issues.

19 And if you all have a question that comes up, just please ask.

20      It seems to me -- I'm going to start with USI's

21 motion to strike Richard Robbins because that one seems to me

22 a little bit more procedural as opposed to substantive, so I

23 was hoping to get an update from the parties as to the

24 discovery that took place with respect to Mr. Robbins and the

25 deposition.

1           MR. PERNINI:  Yes, your Honor.  The deposition of

2    Mr. Robbins was taken on all topics including the affirmative

3    deposition -- affirmative opinion regarding Lockton's

4    attorney's fees.

5           THE COURT:  All right.  And will you just at least

6    give me your name again and --

7           MR. PERNINI:  Sorry.  David Pernini, your Honor, on

8    behalf of Lockton.

9           THE COURT:  The idea is by Tuesday I'll know all of

10   you, and you won't have to repeat it but thank you.

11          So in terms of USI's position, do you have the

12   documents you needed, the bills?

13          MR. MILLER:  Your Honor, Jared Miller on behalf of

14   USI.  I believe we do have the documents we need.  The biggest

15   concern, though, your Honor, is the prejudice that USI

16   suffered by the inability to retain a counter expert due to

17   the late designation.  Mr. Robbins's opinion was not tendered

18   until late February.  I believe it was February 22nd, and as

19   we've laid out in our motion, that was both after the expert

20   discovery period, the deadline in September of 2022, as well

21   as after in violation of the Court's order in January that

22   they could only retain Mr. Robbins as a rebuttal expert only.

23          So we didn't receive the opinion until late February.

24   We were able to take his deposition in March, but we are

25   unable to retain a counter expert.

 1          There is one other outstanding discovery issue, your

 2     Honor.  We need the former employees' attorney's fees

 3     invoices, which we did ask for in discovery.  They declined to

 4     produce them.  Mr. Robbins is opining on that, so there is one

 5     outstanding discovery issue.

 6          MR. PERNINI:  Your Honor, David Pernini.  That is not

 7     correct.  Mr. Robbins is not opining on the former employees'

 8     attorney's fees issues.  His opinion is solely on the

 9     attorney's fees incurred by Lockton in pursuing its

10     counterclaim.  That's the only affirmative part that he has.

11          MR. MILLER:  And to clarify, your Honor, he's not

12     opining on their fee amount.  He is relying on and referring

13     to that information as a basis for his opinion regarding the

14     attorney's fees in this case.

15          MR. PERNINI:  I think we have just a fundamental

16     disagreement, and this is the first I've heard of this, that

17     they feel like there's a discovery issue that's been

18     addressed.  It was not brought up in his deposition.

19          Mr. Robbins is testifying to -- responding to their

20     attorney's fees and finding that he believes they're

21     unreasonable.  He is also testifying regarding our fees,

22     finding unreasonable.  He does juxtapose the amount of fees

23     that we spent in our case, which they do have those.  So

24     they've had the Lockton fees since last year, but he did not

25     have access to the former attorneys -- former employees.

1  That's Mr. Hall's fees because they don't have a claim for

2  attorney's fees.  They are just solely defendants at this

3  point.

4          MR. MILLER:  And I believe that issue came up, your

5  Honor, in Mr. Robbins's deposition, so it would have been

6  after the briefing on the motion to strike.  And that's where

7  he referenced the former employees' attorney's -- former

8  employee's attorney's fees in that issue.  But the more

9  significant issue, your Honor, is what we laid out in the

10  motion to strike, the prejudice on the late timing.  Lockton

11  itself took the position that our designating an expert back

12  in September of 2022 was untimely because they didn't have

13  enough time before trial.  Your Honor denied that motion, and

14  then they were able to retain a rebuttal expert, which is the

15  only thing your Honor allowed.

16          The same rule applies, unfortunately, due to their

17  late designation about a month before trial, two months before

18  trial were unable to retain a rebuttal expert on that issue.

19          MR. PERNINI:  And, your Honor, they do have an

20  expert.  Mr. Horst is their attorney's fees expert.  He's

21  certainly capable of opining on any of the issues regarding

22  this, and we obviously would have no objection to that.

23          MR. MILLER:  It's really a timing issue, your Honor.

24          THE COURT:  All right.  Thank you.

25          MR. MILLER:  Thank you, your Honor.

```
 1              THE COURT:  Just give me a moment.
 2              (Brief Pause.)
 3              THE COURT:  So I am going to allow Mr. Robbins to
 4    testify, including offering his opinion on Lockton's -- excuse
 5    me.  I'm sorry.  Okay.  On Lockton's fees.  And I understand
 6    USI's position, but I think that given that you've had the
 7    opportunity to depose him and you will have Mr. Horst as a
 8    rebuttal, to offer rebuttal opinion as to Mr. Robbins'
 9    testimony on their fees will be enough.
10              Any concerns?
11              MR. MILLER:  No, your Honor.  We understand that
12    ruling.
13              On the issue of obtaining the former employees' fee
14    invoices, I think there's another reason I probably didn't
15    fully articulate as to why that's critical here.  Mr. Robbins
16    is offering an opinion.  This is his rebuttal opinion that the
17    attorney's fees of USI are unreasonable.  He essentially takes
18    the position they're far too high, and he has a lengthy report
19    on that.
20              He admitted in his deposition that the fees in their
21    case -- there's economies of scale, obviously, and so what
22    they provided is Lockton's fees, but they haven't provided the
23    former employees' fees.  And the relevance is understanding
24    the fees they've incurred on the other side of litigating this
25    case.  That is relevant to the reasonableness of USI's fees,
```

1    and Mr. Robbins essentially admitted such in his deposition.

2           So those are fees invoices from the former employees

3    we've been asking for for over a year.  We think they are

4    vitally relevant to showing that USI's own fees are reasonable

5    as opposed to the incomplete picture they want to paint of

6    saying here's what Lockton's fees are, compare them to USI

7    fees, but they're only giving us half of the story, your

8    Honor.

9           THE COURT:  Well, wouldn't that be something you

10   could get out on cross-examination?

11          MR. MILLER:  That is something I think we could ask

12   about on cross-examination.  Certainly it would be, we think,

13   more effective, and we'd be better prepared to handle that

14   with the documents.  And the answer on cross-examination

15   without the documents may well be I don't know exactly.

16          THE COURT:  I understand.

17          MR. PERNINI:  Your Honor, the only point I'd make is

18   Mr. Robbins has not seen those fees, so they're not part of

19   his opinion.  If you ask Mr. Robbins to give everything he

20   relied upon, he has provided that.  He does not have the fees

21   for the former employees.  That's not part of his opinion.  So

22   if they want to make an argument, that's fine, but that is not

23   something Mr. Robbins relied upon.  And I will say he is

24   correct they did ask for these in discovery.  There were

25   objections as to relevance.  There was no motion to compel.

1 That was where it is.  Now we're, you know, less than a week

2 before trial, and this is basically a motion to compel.  And

3 so we ask the Court would deny that.

4          MR. MILLER:  And the reason there was no motion to

5 compel, your Honor, is because it didn't become crystal clear

6 how vital they are until Mr. Robbins provides his expert

7 report in February 2023 and takes the position that USI's fees

8 are unreasonable and offers a very strong opinion on that.

9 And so Mr. Pernini's answer is all the more reason why

10 cross-examining Mr. Robbins on that issue would not be

11 effective.  We need the information of the documents to be

12 able to cross-examine him on that issue to be able to have a

13 fair comparison of what the fees on both sides are.

14          MR. PERNINI:  And, your Honor, without getting too

15 much into the details, the prosecution or the plaintiff's side

16 proving their case, comparing that to what it costs to defend

17 the case is not an appropriate comparison because every time

18 they send a subpoena there's an expense on the defense side.

19 Every time they take a deposition there's an expense on the

20 defense side.  It's not apples and apples.  It's apples and

21 oranges.  That's why they didn't ask for the discovery.

22 That's why Mr. Robbins didn't look at it.  That's why it's not

23 relevant to this case.

24          MR. MILLER:  There is case law in Georgia holding

25 that the defense fees are relevant to the prosecution fees.

1    If your Honor would give me one second, I can provide the

2    case.

3         MR. PERNINI:  Your Honor, this should have been

4    brought up in discovery if this was going to be an issue.

5    They have their affirmative expert report already.  We've

6    already deposed Mr. Horst.

7         MR. MILLER:  Your Honor, we did bring this up in

8    discovery.  We, in fact, cited this case.  The case is *N.D.T.,*

9    *Inc. v. Connor*, 196 Ga. App. 314.  It's a 1990 Georgia Court

10   of Appeals case.  We think that case demonstrates the

11   relevance of their fees.  We cited the case.  We brought it

12   up, but the reason we didn't file the motion to compel is the

13   importance of it.  We didn't become acutely aware of that

14   until Mr. Robbins provided his opinion in February of 2023.

15        THE COURT:  Can you just point out for me what part

16   of his report you're relying on that you're concerned about

17   with respect to this issue.

18        MR. MILLER:  The concern, your Honor, is not a

19   specific reference in his report about their fees.  The

20   concern is that his opinion that our fees are unreasonable, we

21   should have the right to rebut that with evidence showing the

22   complete fees from the other side.  It's relevant evidence for

23   the purpose of challenging his opinion.  And so the portion of

24   his report would simply be the statement that our fees are

25   unreasonable, all the statements about the reasons why, the

1   fact that they're many multiples higher than Lockton's fees.

2   And so we think that is misleading without the opportunity to

3   understand the total fees on the defense side of the case.

4        THE COURT:  But if he is -- if he was not provided

5   those fees, then his opinion is not based on it.  Then it

6   seems like that's really all you need to get out, to elicit.

7        MR. MILLER:  Your Honor, his report does reference

8   Lockton's attorney's fees and the fact they were $895,000

9   through the date of the report, and that's something he relies

10  upon to say USI's fees, which are significantly higher, are

11  unreasonable.  And so, yes, we can cross-examine him and say,

12  well, that doesn't include the fees of Hall Gilligan, the

13  former employees.  Those would be in addition; right?  We

14  can't ask that, but we can ask the follow-up question with the

15  information to show what those fees are, which I think is very

16  relevant to how he would answer the question, and it's

17  relevant to his fundamental opinion.

18       THE COURT:  All right.  Last word and then it sounds

19  like I might need to look at this a little bit more.

20       MR. PERNINI:  Certainly, your Honor.  Your Honor, the

21  case that they cited, which we had looked at before, talked

22  about whether their own expert could see both sides' fees to

23  discuss the reasonableness of it.  They didn't need it for

24  their expert.  Their expert came in and said our fees are

25  reasonable.  Our expert says guess what, I don't agree with

```
 1   you.  There's nothing unexpected about that.  He doesn't --
 2   out expert then talks about Lockton's fees but not the former
 3   employees' fees because he's not making a comparison that the
 4   former employees in defending this case have a certain amount
 5   of money.  He is not making that opinion.
 6        Their expert had all the documents they needed to
 7   make his affirmative representation regarding reasonableness.
 8   At this point to ask anyone to produce three years of
 9   litigation bills prior to trial would be a huge inconvenience.
10   We'd have to look through them for attorney-client privilege.
11   It would be very expensive.  It's not appropriate.  It wasn't
12   sought in discovery, it wasn't pushed for in discovery, and
13   our expert does not rely on it in any way, shape or form.
14        MR. MILLER:  Just one final point, your Honor, on the
15   burden issue.  An alternative given the proximity to trial
16   would just be a verified response saying here's what the fees
17   are as opposed to having to redact and produce all of the
18   invoices in a few days.  That certainly wouldn't be
19   burdensome.  But our position, your Honor, I've already
20   articulated.  It's relevant under Georgia law for the case I
21   cited, and I think it's particularly relevant here given the
22   nature of the opinion Mr. Robbins is offering.
23        THE COURT:  All right.  Let me just look at the case
24   you cited, and I will get you all a ruling later on that
25   issue.
```

1          MR. MILLER:  Thank you, your Honor.

2          THE COURT:  So let's turn to the motion to strike

3   Lorna Gunnersen.  So I am not going to strike her testimony in

4   full.  I think that the concerns that the former employees and

5   Lockton have about the causation issue are things that can be

6   elicited through cross-examination, and similarly I think the

7   same with respect to her sale of business methodology.  The

8   concerns about that can be elicited through cross-examination.

9          I wanted to hear a little bit more about the lost

10  profits analysis and specifically hear some more about what's

11  come up in some of the other filings about incidents or events

12  that happened after this December 2019 date.  And I'm also, I

13  guess, wondering in terms of the former employees and Lockton,

14  isn't her alternative lost profits analysis maybe more

15  favorable to you all, that you all don't like it.

16         MR. BANKS:  So, your Honor, those are good questions,

17  and some of the things that I also was thinking about with

18  this.  Could I be heard briefly on the fair market value?

19  Because I think it puts context on the rest as well.

20         THE COURT:  Sure.

21         MR. BANKS:  So I think, in looking at this case,

22  there are sort of two major things to be looking at.  One is

23  what are the claims that are going to be tried, and second is

24  what is the damages that they're seeking, like what do these

25  models actually try to measure because I think what you'll see

1    is that the claims and the models don't match.

2            All right.  And this is really relevant starting with

3    the fair market value model because what that model is trying

4    to value is not the value of 25 lost customers, which is what

5    they claim in their papers, but rather it is the value of a

6    business that served those 25 customers.  And as she admitted

7    in her deposition, that includes having employees, but it

8    would also include everything else that would be involved in

9    having a business; right?  And that is why her fair market

10   value number is actually higher than the lost profit number

11   because they're not measuring the same thing.

12           Normally if you're looking at the fair market value

13   of future receivables, the current fair market value is going

14   to be less because you have to risk adjust it, take into

15   account the fact that you don't know what's going to happen in

16   the future.

17           And the fact that their fair market value number is

18   significantly higher than the lost profit value number tells

19   you right off the bat they're not measuring the same thing,

20   and they don't have a claim in this case that would allow them

21   to recover what the fair market value is measuring, which,

22   again, is this value of a hypothetical business that would be

23   sold as a package including those clients, including the

24   employees, including presumably office space, IT support, IT

25   supplies, things like that.  That's what you would be buying

1    if you were buying the business, and they don't have a claim

2    for that.

3           Okay.  So now we look at the lost profit analysis.

4    There's actually one other very, very fundamental flaw in

5    their lost profit analysis, and that is that they have not

6    given -- their expert has not looked at all at the history of

7    profitability of those clients.  And as they admit in their

8    reply, the only thing she looked at was the lost revenue

9    history, and she has never looked ever at the actual costs

10   incurred by USI or its predecessor, WFIS, in serving those

11   clients.  She didn't do so because, as we showed in our

12   opposition, this was not a good business for them.

13          You saw those documents that we submitted in the

14   opposition that, you know, the numbers are terrible for us.

15   You know, there's just no way to make this look good.  This

16   was not a venture that was successful at USI for whatever

17   reason, and so she ignored their actual costs, never even

18   asked for that data, looked at historical revenues, and then

19   didn't even consider whether it was ever profitable in the

20   past.  But then to drive her future lost profits, she takes

21   industry averages that she gets from somewhere, and then on

22   her own without any real basis lowers those because she just

23   wants to and says, voila, it would have been profitable at

24   this amount but not based, again, on any historical

25   information.

1          The case law is clear that to seek loss profits they

2     have to prove a prior history of profitability, and they have

3     not done that.  She has not considered it.  She has not even

4     looked at that data.  So that's the problem with her second

5     model.

6          So I don't think either of these should be

7     admissible, the fair market value because it has nothing to do

8     with this case.  There's no claim that gets them that lost

9     business.  And then on the lost profits analysis, it is both

10    very speculative -- it's also not linked to the claims, and I

11    can talk about that.  But fundamentally they have failed to

12    look at the history of profitability.

13         It is also, I want to emphasize, not tied to the

14    claims at issue here.  If you look, for example, the claim for

15    breach of the 60-day notice provision, at summary judgment

16    what the Court found was that they could present evidence that

17    perhaps some of these clients would have stayed for the 60

18    days, and if they can show damages for that 60-day period,

19    they could seek those.  Neither of these models measures that.

20         You look at the non-compete provision that was found

21    to have been violated by Dean Anderson.  Now, remember he did

22    this after the clients moved over, and he's provided some very

23    limited services to a couple of clients.  They don't have a

24    model that measures that.  They have a model that measures

25    either the lost business associated with 25 clients or the

1   lost profits from 25 clients.  It's not disaggregated.  It's

2   not based on this non-compete violation or anything like that.

3          Then you have the non-solicitation provision.  Now,

4   the non-solicitation provision, I suppose if they could show

5   that all 25 of these clients left due to the non-solicitation

6   or breach of the non-solicitation provision, they might be

7   entitled to some lost profits on that, if they had a model

8   that measured those.  But, again, it does not link up with the

9   fair market value model.  And then the same thing on the

10  torts.  Neither of those link up with these models.

11         So that's why we don't think that this should be

12  admitted.  It would be extremely prejudicial to give the jury

13  the fair market value analysis that has nothing to do with

14  this case and then ask them to assess damages based on this

15  large lump sum that they're going to present.  And, similarly,

16  it would not be appropriate for them to receive the lost

17  profits analysis that Ms. Gunnersen has done because it does

18  not comply with Georgia law.

19         MS. BAROODY:  Your Honor, Anne Baroody on behalf of

20  USI.  Your Honor was correct that everything that counsel has

21  raised can be addressed on cross-examination with

22  Ms. Gunnersen at trial.  The big picture here is on summary

23  judgment Judge Jones has --

24         THE COURT:  Ms. Baroody?

25         MS. BAROODY:  Yes, your Honor.

1              THE COURT:  Did I say your name right?

2              MS. BAROODY:  Yes.  That's right.

3              THE COURT:  All right.  Will you either come to the

4    podium or come closer to your microphone so my court reporter

5    can hear you?

6              MS. BAROODY:  Yes, of course.

7              THE COURT:  And you don't have to come to the podium.

8              MS. BAROODY:  Is that clearer, your Honor?

9              THE COURT:  Ms. Blathers, better?  Okay.  Yes, go

10   ahead.

11             MS. BAROODY:  Your Honor, the Court was correct that

12   everything counsel raises here can be handled on

13   cross-examination with Ms. Gunnersen.  The big picture is that

14   on summary judgment Judge Jones has already found that without

15   question there is evidence from which a fact finder could

16   determine that the whole process was a carefully orchestrated

17   scheme to bring business from USI to Lockton.  And what we

18   know is that the business did go to Lockton, and the fair

19   market value model that Ms. Gunnersen applies is one way to

20   measure the value of that business that unquestionably moved

21   to Lockton.

22             Ms. Gunnersen has experience in hundreds of

23   transactions in the insurance brokerage industry she testified

24   at her deposition.  She's been involved in voluntary sales of

25   books of business that are negotiated when a competitor wants

1    to buy out a portion of an agency or a book of business.  The

2    fair market value model attempts to replicate that type of

3    voluntary sale that could have been negotiated between these

4    two competitors in December of 2019 when Lockton instead chose

5    to raid USI's business and take the clients with them.

6         So counsel can explore on cross-examination what the

7    differences are between a voluntary sale and an involuntary

8    sale, but what Ms. Gunnersen has experienced modeling and

9    valuing in the real world is the voluntary sale of a book of

10   business when a competitor chooses to purchase and negotiate

11   that transaction on the open market.

12        As to the lost profits model, Ms. Gunnersen testified

13   at her deposition she's looked at the historical revenues for

14   these accounts.  She modeled expenses to model the

15   profitability of these accounts.  She explained that's because

16   there's really no financial statement for a book of business.

17   Obviously, those are numbers that could be gotten, but there

18   are no financials for a small set of accounts rather than a

19   full agency.  But she looked at industry data standards.

20        Again, what she looked at and considered to determine

21   the profitability of these accounts can be explored on cross.

22   This is not a case where USI is seeking lost profits on a new

23   business or a venture that has no track record of revenues or

24   expenses.  This can all be modeled, and Georgia law doesn't

25   require it to be modeled with exactitude.  This is an estimate

1   of the expenses and profitability of these accounts and what

2   they would -- how they would perform over time.

3          Again, if counsel wants to ask Ms. Gunnersen

4   questions about how she arrived at her normalized expense

5   figures based on industry data and standards, counsel can

6   explore that on cross-examination.

7          THE COURT:  When you say she looked at it over time,

8   are you saying up until this December 2019 date or did she

9   look at what might happen after that date?

10          MS. BAROODY:  For the lost profits model she

11   considered historic revenue and then modeled future expenses

12   that she would expect to see on these accounts over time.

13          THE COURT:  Just expenses?

14          MS. BAROODY:  Expenses are what she modeled out into

15   the future, and then she used historical financial revenue

16   data from USI for these specific accounts.

17          THE COURT:  Okay.

18          MS. BAROODY:  The model also considers some amount of

19   attrition over time, your Honor.

20          THE COURT:  All right.  Thank you.

21          MR. BANKS:  Your Honor, could I respond?

22          THE COURT:  Yes.

23          MR. BANKS:  So I think a couple of things there.  On

24   the lost profits model, what counsel said is very, very

25   important.  Ms. Gunnersen looked at prior revenue data.  She

1   never looked at any historical cost information at all or
2   profitability information, which is what she was required to
3   have done under Georgia law.

4           Going forward she did not use the actual costs that
5   USI incurred.  As they admitted, she could have gotten data
6   and tried to model that based on real data, but instead she
7   looked at this industry data and came up with future costs.
8   She never looked at prior costs, never tried to model it,
9   never tried to look at what the past profitability was.  That
10  is why right off the bat it should be inadmissible.  And,
11  yeah, we can ask her these things on cross-examination, but we
12  should not have to because as a matter of law this damages
13  opinion should not be considered.

14          The other -- I'm sorry.  Your Honor had raised
15  another point earlier that I forgot to address, which is what
16  actually did happen because what Ms. Gunnersen did is she
17  modeled out future profits based on the last 12 months of
18  revenue that these clients had generated at USI rather than
19  what revenue they actually generated in the last three years,
20  which is, again, information she could have used, could have
21  obtained.  And it is important because, as we know, the
22  airline industry or the aviation industry was impacted by
23  Covid.  We also know that at least one of these clients was
24  bought out by someone else and ceased being a client
25  altogether within months of the departures that happened here,

1   you know, things like that.

2        There's a lot of actual things that happened the last

3   several years that Ms. Gunnersen never considered, but

4   fundamentally, like I said, I think that that opinion should

5   be excluded for the failure to look at prior profitability.

6        On fair market value, again I think what counsel said

7   is absolutely right. What Ms. Gunnersen looked at is what

8   would have happened in a transaction where two parties are

9   engaged together trying to value a business that is sold, but

10   this is not a case about the sale of a business. This is

11   about supposed solicitation of particular client accounts.

12   And so it is measuring something different, and it is

13   measuring something larger.

14        It would be extremely prejudicial for them to put up

15   this large amount that does not have a bearing on the actual

16   claims at issue and the losses that they claim they suffered.

17   And then we'd have to try to -- you know, we'd have to deal

18   with the fact they put this large number out there. That just

19   shouldn't be what we have to do when they could have done

20   something that actually measured real losses.

21        MS. BAROODY: Your Honor, briefly. Ms. Gunnersen

22   performed both of these models under standards that are

23   applicable in her industry, and counsel can cross-examine her

24   on how she arrived at these figures. But ultimately here this

25   is a challenge to the specificity exactitude of her damages

1  model, and Georgia law says that whether it's lost -- a lost

2  profits model does not have to be presented with mathematical

3  exactitude.  This is an instance where you have a party who by

4  its breach has caused damages.  How else are the damages to be

5  valued?  How else is a jury to determine the value of the

6  accounts that were unquestionably lost to USI except to have a

7  certified valuation analyst and CPA present models that are

8  accepted in her industry to help the jury determine the value

9  of those accounts?

10       This is why we have experts.  Her models can be

11  cross-examined.  The models can be cross-examined, and this

12  Court was absolutely right that this is something that should

13  not be excluded.  Both models are accepted under Georgia law,

14  and Ms. Gunnersen considered both the expenses and the revenue

15  on these accounts when she modeled out lost profits over time.

16  Thank you, your Honor.

17       THE COURT:  Before I rule on this one I think it

18  might be helpful for me to hear a little bit about Mr. Sheets

19  since they're kind of related, and I'd like to hear more about

20  what he is going to testify about beyond just saying that

21  Ms. Gunnersen did not consider causation.  Can you give me

22  some more information about that.

23       MR. PERNINI:  Your Honor, David Pernini again for

24  Lockton.  Yes, your Honor.  Mr. Sheets has 35 years experience

25  in valuing assets and testifying in this regard.  Part of his

1  testimony -- and he basically rebuts all of the testimony of

2  Ms. Gunnersen regarding valuation, specifically in regards to

3  the fair market value valuation that she provided.

4      Ms. Gunnersen's report says that she was hired to

5  provide a valuation of accounts lost to USI as a result of the

6  conduct of the former employees at Lockton, so her basis for

7  her opinion, what she was asked to do, was say I'm supposed to

8  find out what was the damage caused by the former employees.

9  And she says I think a good way to look at this is to do a

10 fair market value.  Let's pretend that we're going to sell

11 this company that has these specific accounts, and so if we

12 were selling a company that had these accounts along with all

13 the rest of it, this would be the fair market value of that.

14     What Mr. Sheets says is that's not a proper way to

15 value what happened in this case.  Now, as an expert you don't

16 just come and say these are the damages caused by someone as

17 I've calculated them and then pick a model that doesn't work

18 for the facts.  Part of your job as an expert is to make sure

19 that the model that you're providing fits with the facts of

20 this case, and that's what his opinion is regarding the fair

21 market values.  This is not the right model.

22     What happened here was not a sale of a company.  It

23 was employees left, and certain individual clients left them

24 of their own free will.  And so to view this in the

25 retrospective view of, well, let's pretend that USI was going

1   to market and sell a mini business with these specific 25

2   accounts doesn't fit, and that's what he is saying.  This is

3   not the appropriate analysis of it.

4         He also goes on to say if you're looking at the

5   appropriate analysis of it, which is, okay, certain accounts

6   came over, you have to determine whether it's the client's own

7   free will, and if it is, there's no liability.  And if it's

8   not, then you can add the numbers to that, but she doesn't

9   provide any methodology to determine how a jury could do that.

10  And he thinks as an expert you're supposed to provide the jury

11  that option, that ability.

12        There's also some issues he has regarding the

13  calculations.  She does not -- in making these calculations,

14  she does not properly look at the actual expenditures that

15  were included, as was argued by counsel, but is equally a

16  problem from a process point of view.  When you're doing an

17  analysis as an expert and as an accountant in this regard,

18  you're supposed to look at the actual expenses.  She did not.

19  She used an industry standard, and that's not an appropriate

20  use of her -- of the expert.  So that's what he has testified

21  to.  Does that make sense?

22        THE COURT:  It does.  He is not going to be providing

23  his own numbers or analysis because he's a rebuttal expert.

24  That's your position.

25        MR. PERNINI:  That is correct.  We did not have an

1    expert because from the point of view of Lockton and the

2    former employees, all of the clients that came over came of

3    their own free will, so there is no damages in this case.  So

4    there was no reason to hire him to make an analysis.

5              THE COURT:  And is he going to specifically identify

6    what factors Ms. Gunnersen should have looked at in causation

7    or is --

8              MR. PERNINI:  Only in the sense of, you know, you

9    have to look at causation to determine, and to the degree he

10   is going to say, look, you have to make sure that the numbers

11   you're providing tie into the actual claim that's being

12   presented.  Now, your Honor, it certainly is possible she

13   could say I'm just giving a value of this account, period, end

14   of discussion, but that's not what she did.  She did tie it to

15   the causation in this case.  They're arguing it's tied to the

16   causation in this case, and he's saying if you're going to do

17   that, you have to do it appropriately and she did not.

18             THE COURT:  And just so I'm clear, he is going to

19   specifically state what she did not do appropriately?

20             MR. PERNINI:  Yes.  I'd say within this he's going to

21   talk about how she did not -- well, for example, how she

22   miscalculated using industry standards rather than actual

23   numbers and how she did not look to determine whether or not

24   the numbers she's providing is tied to the actions such that

25   it actually aids the jury.

1          THE COURT:  All right.  And can you explain to me

2    some more of what he's going to say about future cause factors

3    and how that is relevant.

4          MR. PERNINI:  Your Honor, her opinion is -- she has

5    two opinions.  And they're inconsistent, and that's part of

6    what he's bringing out.  So the one opinion for the fair

7    market value he says let's just take a snapshot of

8    December 2019, and that's, as he said, for many reasons

9    entirely inappropriate in this case, not the least of which is

10   we're not talking about a valuation of the business.  We're

11   talking about accounts that moved over.  And she at that point

12   does not take into account any future actions that might

13   occur, and that, he believes, is improper.  So he's going to

14   talk about that.

15         As far as for the accounts going forward, she did not

16   look at what the actual costs were, so you have to look at

17   revenue stream for the individual accounts.  She did not look

18   at what the proper revenue stream was, and that's an

19   accounting error that she made.

20         Also, your Honor, she used a standard of a 10 percent

21   reduction each year, which is an industry standard that you

22   can use when you have a large number.  So if you have 10,000

23   accounts, you can assume that 10 percent will be lost every

24   year.  For an account of 25, which is what we're talking about

25   here, it's not appropriate to use that 10 percent.  You should

1  have looked at each account to see what is the chance of it

2  not leading or leaving in this case.  She didn't do that, and

3  that's not appropriate methodology.

4        THE COURT:  All right.  Thank you.  I'm going to deny

5  the motion to strike Ms. Gunnersen and allow her to testify

6  about both of her methodologies, and you all can explore that

7  on cross-examination, your concerns about her models.  And,

8  similarly, I'm going to allow Mr. Sheets to testify about what

9  he thinks she should have done, what the industry standards

10  are.  And I guess he gets into how an expert should calculate

11  EBITDA.

12        I still feel like maybe it's just me, that I'm a

13  little unclear about the future stuff, and I keep bringing

14  that up because I think just as a regular person we all know

15  life changed in 2020, especially in the aviation industry.  So

16  what I was struggling with was the relevance of that given

17  that her date that she was looking at was apparently

18  December 2019 -- and it's still not clear to me, and it might

19  just be because I'm not as enmeshed in the facts as you all

20  are -- how much that affects her analysis.

21        That is something that was concerning me and I

22  think -- I mean, I guess we'll just have to see how it plays

23  out with her testimony, but I would imagine jurors would be

24  thinking if we get into things that happened post 2019, it

25  seems logical to me that someone would have to consider how

1   Covid affected the aviation industry.  So maybe that's just

2   something that comes out on cross-examination, but that's

3   where I was particularly concerned with.  And I'm just going

4   to let you all let your experts in and let the jury figure it

5   out.  Maybe they'll get it better than me.

6         So we're done on the motions to strike, and I hope

7   that will help us with the motions in limine.  I'm going to

8   turn to USI's motions in limine, which I believe there were

9   nine separate motions, so I'm going to -- the first one

10  related to hypothetical lay witness testimony.  I'm going to

11  deny that one without prejudice because I do think the

12  customers who left should be able to explain why they left.  I

13  don't think that is speculative, but I'll be listening for any

14  sort of speculative questions and expect that you all will

15  make the objection at the time it's asked.  But I don't think

16  it would be fair at this point to just say that that testimony

17  cannot come in at all.

18        MS. BAUGHAN:  Your Honor, may I ask for one point of

19  clarification on that ruling?

20        THE COURT:  Yes.

21        MS. BAUGHAN:  So I understand if a customer says, you

22  know, I didn't like USI, they have bad customer service,

23  they're testifying in their personal knowledge.  That's

24  different than if a customer says if they hadn't breached

25  their contracts, I would have gone anyway, and that's the

1   speculative part.  So I don't know if you've ruled on that

2   now, and so that was question one, is that the clarification.

3   And if not, we will certainly be objecting at trial to the

4   extent anybody wants to say if they hadn't done those things,

5   we would have gone anyway.

6          THE COURT:  All right.  And let me hear from you all.

7   Are you planning to ask the customers if they hadn't -- I

8   assume you wouldn't say they hadn't breached, but, you know,

9   ask a question such as that?

10         MR. BANKS:  We're going to be focusing on what was in

11  their heads at the time, you know, what their actual

12  motivations were, what their actual options were, and that's

13  the kind of questions we intend to ask.  But I would also

14  emphasize, you know, kind of what's good for the goose is good

15  for the gander here.  But we would expect the same rulings,

16  the same rules would apply if they have one of their witnesses

17  testify about what would you have done if these people had

18  stayed for 60 days, things like that, because that would be

19  hypothetical.

20         THE COURT:  Right.  So --

21         MS. BAUGHAN:  That's a little different.  May I be

22  heard?

23         THE COURT:  It is a little different.  I feel like

24  we're going to get to that one.  That was a separate motion I

25  feel like.

1          MS. BAUGHAN:  Thank you, your Honor.

2          THE COURT:  All right.  We'll take it step by step.

3   I think you all are on the same page in terms of not asking

4   that general question if they had not left, but asking the

5   customers why they decided to leave is fair.  And I know we'll

6   just have to see how it comes out, but I think you all are on

7   the same page in terms of what is okay.  But I do not expect

8   the overreaching if -- I don't think any client could actually

9   answer that question fairly, if they had not done it, would

10  you have done Y because it's speculative.  So I will grant it

11  insofar as you're asking me to say you cannot ask that

12  question, but I will allow the customers to explain why they

13  did do what they did, why they did leave.

14         MS. BAUGHAN:  Thank you, your Honor.

15         THE COURT:  All right.  No. 2 was testimony as to the

16  occurrence or non-occurrence of solicitation, and I'm going to

17  deny that one without prejudice as well because I think it's

18  hard for me to rule on that without the context of the

19  testimony.  It seems to me that both sides don't -- are

20  sensitive to the word "solicit."  I just don't think I can

21  make a broad ruling on that.  But go ahead.

22         MR. MILLER:  I understand that, your Honor.  There is

23  one point I'd like to make.  I think the parties are largely

24  in agreement on one aspect of this motion, and that is that

25  there should not be testimony on the ultimate issue, you know,

1   did you solicit, were you solicited.  Lockton in its response

2   agrees fact witnesses should not be able to opine on ultimate

3   legal questions, and I think the former employees actually

4   filed a motion in limine on that as well.  And so I understand

5   the Court's ruling, but it appears the parties are in

6   agreement on that.

7          I think what Lockton is asking for is for their

8   witnesses to be able to testify essentially as to what

9   happened, you know, what were you asked, what were the

10  conversations, did they ask you to leave.  And I think those

11  are fair and appropriate questions, but I do think there is

12  agreement on not asking the ultimate issue question, were you

13  solicited.

14         THE COURT:  Right.  Is that right?

15         MR. HALL:  And, your Honor, I think we agree on that

16  specific question; right?  That's the question that's going to

17  go to the jury, and we think that a USI witness shouldn't come

18  up and say, yes, that email was a solicitation.  And, you

19  know, we don't think -- you know, none of the clients are

20  going to testify on that specific question of was it a

21  solicitation.  Solicitation is a defined term, and there's a

22  lot of components that go into it.  And those are fair game in

23  terms of asking whether a request happened or whether there

24  was a plea or something like that.  Obviously, that's fair

25  game because that really is what informs the question.

```
 1            It sort of does raise an issue, your Honor, that we
 2     can -- this may be a premature time to ask it, but I want to
 3     go ahead and plant the seed because really there's only one
 4     liability question, breach question, still left for this jury
 5     to decide, and that is whether there was solicitation.  And,
 6     you know, solicitation has been defined in Georgia cases.
 7            There's about four cases in this court just in the
 8     last couple of years where Judge Thrash, Judge Boulee, Judge
 9     Grimberg, Judge May, they've all come out with essentially the
10     same definition of what solicitation is, and so we think that
11     that charge on that issue is going to be important and
12     something that the jury is going to need to answer this
13     question.  And we'd like for your Honor to consider the
14     possibility of an early charge, a precharge before the
15     evidence comes in.
16            Since this is the one liability issue that the jury
17     is going to have to decide, as they're hearing the evidence
18     about this, we'd like for the jury to have some sense as to
19     what they're listening for.  And because it's a well-defined
20     term and it's at the heart of the case, we'd like for you to
21     consider perhaps giving an early charge on that prior to
22     evidence.
23            But in terms of the actual motion in limine, on the
24     specific question we are in agreement for both sides, but
25     these surrounding things are different.
```

 1          The only other caveat I would make is this:  There is

 2     this bad faith attorney's fees claim under 13-6-11 that has

 3     been asserted.  Okay.  And so that's their claim for

 4     attorney's fees for the breach of contract, and basically the

 5     question on that is, you know, was there bad faith by my

 6     clients if they were found to have done something.  My clients

 7     do need to express what their intent was in making a

 8     communication to try to -- to establish that there was no bad

 9     faith or intent to violate.

10          So we do think that the bad faith question under

11     13-6-11 is going to need a little bit more leeway on the

12     question of my clients' state of mind and intent on the issue

13     of solicitation.  Is that clear?  Am I making sense?

14          THE COURT:  Yes.  Well, just let me ask a follow-up

15     with respect to your request for maybe an early instruction on

16     the definition of solicitation.  What is your position with

17     respect to USI's request that I tell the jury from the start

18     that certain decisions or rulings have been made with respect

19     to liability of Lockton and the former employees?  Is that

20     something that you all are agreeing that I should do at the

21     very beginning?

22          MR. HALL:  Yeah, I mean, I think -- I don't know that

23     I have seen a specific -- is there a specific --

24          THE COURT:  It was in their pretrial order where they

25     ask that, and so it seemed to me that if I'm going to do

1   instructions on law, those to me all kind of are in the same

2   vein.  Let me see if I can find where it was.  So at Doc 317-1

3   at pages 15 through 16 USI asked for a jury instruction at the

4   beginning as to the Court's rulings in its favor as to

5   liability.

6           MR. BANKS:  I think, your Honor -- this is Mr. Banks.

7   I think you'd have to do that.  I think we'd have to give some

8   instruction as to what the findings were on summary judgment.

9   I have, unfortunately, been in that situation a couple of

10  times, and that's what we've always done, is you give the jury

11  a relatively neutral statement of what the findings were, but

12  it has to include what was found.

13          THE COURT:  All right.

14          MR. BANKS:  And we can work together to, I think,

15  come up with that phrasing.

16          THE COURT:  So then what's your position, USI's

17  position, on this early instruction on what solicitation is?

18          MR. MILLER:  Well, it's the first time it's come up,

19  so I'd need to give it some thought, your Honor.  What we were

20  envisioning with the instruction about what's been found and

21  what's not been found is not a detailed recitation of law but

22  basically here are the issues, and we will work with them to

23  try to see if we can reach an agreement on language.  And if

24  not, we will present it to you.

25          On the early charge as to solicitation, it seems a

1   bit unorthodox to do that, here's one instruction on one

2   issue.  But, ultimately, you know, our position on that might

3   depend on what the charge is, and there are a lot of cases

4   recently on that issue, as the other side has pointed out.

5          One thing that's going to be very important to look

6   at is what was the non-solicitation contractual term at issue

7   because there are different definitions under Georgia law, and

8   this Court has found a particular definition applies to the

9   type of restrictive covenant in this case that includes an

10  indirect prohibition on just both direct and indirect

11  solicitation.  So if it's a fulsome charge that explains, I

12  think, what this jury needs to find based on what this Court

13  has already determined solicitation means in this case, we

14  need to look at what that charge is.

15         So I'm not prepared to give the Court a position

16  without seeing what the charge is.  Potentially we could

17  confer about that.

18         THE COURT:  All right.  So, yes, it seems that you

19  all should talk about both things, which is what is the

20  summary that I would be reading to the jury with respect to

21  liability and, also, just the case in general as that's

22  something I would normally explain before we get into voir

23  dire.

24         And then in terms of the solicitation instruction, my

25  inclination when I saw this in your trial brief, was to just

1  say that's an issue for the charge conference for instructions
2  after all the evidence is in, and that's still kind of where
3  I'm leaning.  But it might be that once you come up with the
4  summary and explain the liability, then there is a sentence
5  that states maybe generally, like this is the issue that you
6  need to decide, the solicitation issue, and maybe even some
7  general statement that that has a specific definition that the
8  judge will give to you later.
9         That might be a way to do it, but it seems like I'll
10 let you all talk about it and maybe -- today is Tuesday so
11 maybe by Friday, end of day Friday, let me know what you all
12 have agreed upon, and then we have Monday to figure it out.
13        MR. MILLER:  We'll do that, your Honor.  And as for
14 the motion in limine, our motion really was directed at
15 exactly what the parties have agreed will not come in.
16        THE COURT:  Right.  It seems like you want me to
17 change it to a grant unopposed.  So since you all have argued
18 and agreed, I will change it from a deny to a grant unopposed
19 on the main question.
20        MR. BANKS:  Yeah, I just want to emphasize what
21 Mr. Hall had said about the clients may be asked, meaning
22 Taylor, Dean, Roger may be asked, you know, did you believe
23 that this was a breach of your contract.  And right or wrong
24 they should be able to say what they thought the contract
25 meant.  This is, I know, another motion, but it does relate to

1  this.  And in doing so they may have to use the word

2  "solicitation."  We understand they're not saying it was or

3  wasn't but just in their minds what they were trying to do to

4  try to comply on the good faith bad faith question.

5          THE COURT:  Right.  And what is your position on

6  that?

7          MR. MILLER:  Well, on that point, you know, I think

8  they can explain what they intended.  The concern I have about

9  that -- and we'll need to see how it plays out at trial -- is

10  in depositions the former employees essentially testified with

11  respect to a lot of these issues.  They relied on advice of

12  counsel, and then we couldn't ask follow-up questions to

13  determine really what their thinking was because it was based

14  on advice of counsel.  So if there's a specific question at

15  trial where they're answering differently and potentially

16  waiving a privilege, that could open a whole host of issues.

17  And so I think we're just going to have to see how it plays

18  out.

19          Subject to that concern about the advice of counsel

20  issue and whether they've previously claimed the privilege,

21  other than that, I think it's a fair question, what were you

22  thinking, what did you intend.  And similarly on that, the

23  word "solicitation" is obviously going to come up in our case

24  as well.  There are documents where the former employees said,

25  you know, we can't solicit you, but go see Mr. Sharma.  And

1  that type of stuff will come up at trial.

2        So I think it's appropriate to grant the motion in

3  limine without objection on that particular motion, and then

4  we'll need to deal with the other issues as they come up, your

5  Honor.

6        THE COURT:  All right.  That makes sense to me, and I

7  do agree with both of you that the employees can provide some

8  testimony about what they thought, their intent, those things,

9  but, right, you all are going to have to deal with privilege

10  issues.  We'll just see how it comes up, but we're all on the

11  same page for now.

12        MR. MILLER:  Thank you, your Honor.

13        THE COURT:  No. 3 was the evidence relating to

14  alleged damages and attorneys' fees invoices in connection

15  with Lockton's dismissed counterclaims.  Sorry my notes are

16  not clear.  But I ruled that Mr. Robbins can testify, so I

17  feel like I've dealt with this.  Is that right?

18        MR. PERNINI:  Your Honor, there's a slightly

19  different issue.  And, again, David Pernini on behalf of

20  Lockton.

21        THE COURT:  You can stop saying it.  I've got you

22  now.

23        MR. PERNINI:  So Lockton's counterclaim involves

24  after certain clients left, USI sent a lot of information to

25  these now Lockton clients, including letters from counsel

1  saying govern yourself accordingly, that kind of thing, sent

2  them to all the clients that left that went over to Lockton.

3  One particular one was Tenax that also got the letters, and in

4  addition to that, Mr. Marchisotto, vice president at USI, sent

5  their owner an email that was false, just it was a lie.  And

6  so that fits in the definition of wrongful conduct for

7  tortious interference.

8         Now, what they've asked here is to say, well, then we

9  did -- Lockton made the decision to indemnify Tenax because it

10  made the relationship with Tenax more risky and more

11  problematic.  So client comes and says why am I having to deal

12  with all this?  Lockton says we'll indemnify you for it.  And

13  that's the essence of it.

14         Now, what they're trying to argue is, well, that

15  should only be for whatever fees they incur, whatever fees

16  Tenax incurred, because Marchisotto lied, but that

17  misunderstands the nature of the claim.  They lied to Tenax.

18  Tenax was concerned not just about the Marchisotto email but

19  the entire expense, so Lockton agreed to pay their fees for

20  whatever involvement came from this litigation.  And so that

21  was, the interference was -- with the relationship to fix the

22  interference, we agreed to pay for all their fees.  And so

23  that's the damages we're seeking, and the jury is allowed to

24  hear that.

25         They can argue if you want, well, maybe they should

1  have offered less money to Tenax or maybe, you know, that

2  wasn't -- it wasn't fully required, but that's what we agreed

3  to pay.  That's what Tenax agreed to accept.  That's what we

4  paid was $26,000, not a huge amount, but it's an important

5  aspect of this case.  So we believe that all the fees that we

6  actually paid to Tenax was a result of the interference and

7  should be before the jury.

8            THE COURT:  All right.  Thank you.

9            MS. BAUGHAN:  Your Honor, Nancy Baughan on behalf of

10  USI.  So Mr. Pernini, I don't think, adequately set out the

11  context.  So there was a USI employee, Mr. Marchisotto, who

12  sent an email to a high school buddy at a private equity fund

13  that had an ownership interest in one of the clients who left

14  and went over to Lockton.  That client still had business at

15  USI at the time.  He wanted to try to help them get a meeting

16  or a phone call.  He did say something that wasn't completely

17  accurate in his email.  He wasn't involved in this case.  He

18  wasn't involved with these clients.  He made a mistake.  He

19  made some assumptions.  So the meeting with Tenax never

20  happened.  Tenax stayed at Lockton.  That was all in sort of

21  January.

22            Then later in the year subpoenas, discovery to

23  subpoenas were served, and when the preliminary injunction was

24  issued, I sent letters to some of the clients, not all of

25  them, who were represented by counsel notifying them of the

1  injunction.

2          So the original counterclaim was rife with statements

3  that I had misrepresented things to clients, and it was very

4  wrongful, and that was the basis of their counterclaim and the

5  Marchisotto piece that had happened months earlier.  Judge

6  Jones has already ruled that the letters I sent to the

7  attorneys, to some of the clients was not wrongful and

8  dismissed all claims based on anything that -- any of the

9  attorney communication.

10          So in this case now they seek all the fees relating

11  to responding to subpoenas, to getting the letters that I sent

12  to the attorneys.  So that evidence shouldn't come in, number

13  one, and they've addressed that when they responded in

14  writing.  The other piece of this that they didn't address is

15  not only should that stuff not come in because it's not

16  relevant, the documents that they want to introduce malign me.

17  They talk about the harassing letter from Ms. Baughan.

18          So they want to introduce this evidence so that the

19  jury maybe won't like me and then will hold it against my

20  client.  They didn't address that in their written motion.  I

21  think that is totally improper.  It is not allowed by the

22  Federal Rules of Evidence or by just, you know, the

23  professional standards that we all govern ourselves by.

24          So request number one is it should be limited only to

25  the evidence, the fees relating to Marchisotto, and if you're

1   not inclined to grant that, at a bear minimum any disparaging

2   remarks about USI's counsel should be removed from anything

3   that might ever be shown to this jury.  Thank you.

4           THE COURT:  All right.  Thank you.

5           MR. PERNINI:  Your Honor, the fee entries have to do

6   with their Tenax.  I mean, they're not Lockton fee entries.

7   They're Tenax entries.  So that is the bills we got from

8   Tenax, from their counsel at his opinion, and it's in there,

9   in the letter.  So it's just the bill that was provided to

10  Lockton, and Lockton paid it.  We didn't analyze the bill.  We

11  just paid it, and so that's the evidence before the Court on

12  it.  That is how much we provided to it.

13          Now, she can certainly say that, you know, Mr. -- I

14  think it was Mr. Snow.  I guess that was his firm.  He was the

15  counsel for Tenax.  She can address his opinion on it if she

16  wants, but that was his reaction to it.  And I will say, your

17  Honor, that comes to part of the reason why Lockton had to pay

18  the claim to Tenax, is it wasn't -- you know, there were

19  various concerns being made.  The client thought this was

20  threatening.  The client thought it was harassing, and they

21  were concerned that, you know what, I can go someplace else.

22  I don't have to stay with Lockton.  I don't have to go back to

23  USI.  I can go anywhere I want.

24          So the fact that their state of mind was that it was

25  harassing is certainly something that's relevant because

1   they're certainly going to argue that we didn't have to

2   indemnify Tenax, we could have just let it go.  So the fact

3   that their counsel thought that it was -- this was something I

4   was having to deal with, it's not run of the mill.  It's not

5   business as usual.  It's something that's relevant in this

6   case, your Honor.

7        MS. BAUGHAN:  Your Honor, may I be heard?  What

8   Mr. Pernini said is wrong.  It's not the counsel for Tenax's

9   invoices.  It's Mr. Pernini's firm's invoices.  It's

10  Mr. Pernini's time entry for their attorney fee claim.  He is

11  the one who characterized it as the harassing letter from

12  Ms. Baughan.  It will not be difficult to redact anything that

13  might impugn the conduct of USI's counsel, and it would be

14  unfairly prejudicial to USI under Federal Rule of Evidence 403

15  to have that kind of evidence come in.  It is not fair -- what

16  the parties did in this case is absolutely fair game.  It is

17  not fair game to attack the attorneys to try to win the jury

18  over.  Thank you.

19       MR. PERNINI:  Your Honor, in fairness that was not

20  clear from their motion they were talking about my bills, so I

21  don't have a huge problem in taking out the language from my

22  bills.  That was how we described it internally, so that part

23  I don't mind.

24       THE COURT:  Your bills say harassing -- what do your

25  bills say?

1          MR. PERNINI:  Honestly, she didn't give an example,

2   but I'm taking her word that I wrote down that she wrote a

3   harassing letter, which that was my belief of it and certainly

4   how I presented it to my client.  My client certainly knew

5   which letter I was talking about.  I don't mind -- those bills

6   are not being provided as part of the Tenax claim, which is

7   why I didn't understand it was part of this particular motion,

8   because it has nothing to do with that.  If it's for our fees,

9   I don't mind redacting that language so the jury doesn't see

10  that, and if she can tell me which entry she's talking about

11  in my fees, I'm happy to cut it out.

12         THE COURT:  All right.  Yeah, I definitely think

13  those need to be redacted.  I am a little confused on the --

14  you say his name so nicely, Marchisotto --

15         MR. PERNINI:  Marchisotto.

16         THE COURT:  -- that issue versus the larger issue of

17  the communications because if Judge Jones has made a finding

18  that those were not harassing or improper in any way, then why

19  is any of that coming in now?

20         MR. PERNINI:  It's because of -- your Honor, first of

21  all, the letters went to everyone, and all the people that got

22  the letters, they're no longer part of our counterclaim.  It's

23  just down to Tenax.  And the timing of this starts -- it's a

24  whole process.  It's not just one letter that then became the

25  thing.  The client as soon as these -- before and even the

1   injunction was entered the client sent an email to all the
2   clients saying -- the client.  I'm sorry.  Let me be more
3   clear.  USI, Clark Johnson, in December sent emails to all the
4   clients saying we're getting an injunction, beware, sent a
5   follow-up email in January saying we have an injunction, you
6   need to get an attorney to deal with this.
7           Marchisotto then comes along and says a lie, that
8   you're not allowed to do business with this.  Then they get a
9   letter from counsel saying here's the order, govern yourself
10  accordingly.  All of these together our client comes to us and
11  says this is a lot of hassle for a company that's supposed to
12  be providing me service, and we said, well, then we'll take
13  care of it for you.  And so it's a pattern and --
14          THE COURT:  A chain of events.
15          MR. PERNINI:  It's a chain of events.  The
16  Marchisotto email is the wrongful act, but they're all a chain
17  of events.  You can't just look at it in and of itself because
18  it doesn't fit with actually what happened.
19          MS. BAUGHAN:  Your Honor, there's already been a
20  ruling that, you know, part of that chain of events isn't
21  actionable.  It's not part of the claim.  In the deposition of
22  Tenax two representatives were deposed, and they said the
23  Marchisotto email was a non-issue.  It didn't cause any
24  damages, any harm at all, didn't harm the relationship at all.
25  So what I think that Lockton is trying to do is bring back

1   into this case things that Judge Jones has already ruled upon.

2   The counterclaim that is left in this case is very narrow.  It

3   is just that Marchisotto email.  It is not a whole series of

4   events.  Judge Jones has already ruled on the rest of the

5   series of events, so the claim should be limited to what this

6   Court has already found.

7        MR. PERNINI:  And, your Honor, I couldn't disagree

8   more on that point.  I mean, tortious interference requires a

9   number of elements.  One of them is a wrongful act.  It's

10  not -- you don't just look at was there one wrongful act and

11  what happened.  You have to have a full story of what

12  happened.  So if there was no wrongful act, then we wouldn't

13  have a claim, but if we have a wrongful act, that doesn't mean

14  we can't talk about the other acts around it.

15       It also goes to motive because one of the questions

16  they have to show is when he sent this wrongful email, was

17  that just, as she said, some guy going off on the side or was

18  that part of the scheme and plan of USI.  And the evidence is

19  clear to me that it was part of a scheme and plan of USI to

20  get these customers that left to come back to USI or at a

21  minimum to get them to leave Lockton as punishment.  So we

22  need to show the full picture of that, everything that

23  happened within it.

24       Of course, the question is what was wrongful, and,

25  yes, the only wrongful thing at this point is the Marchisotto

1    email.  But you can't tell the story and you can't show the

2    other elements without showing exactly what happened.  And

3    we're not talking about everyone else.  We're talking just

4    about the Tenax case.

5          THE COURT:  All right.

6          MR. MILLER:  And if I may, your Honor, the issue is

7    the Tenax deponent said it's not part of the story.  I'd refer

8    the Court to pages 89 and 90 of Tim Cantrell's deposition of

9    Tenax that's been filed in both cases.  And he was asked, did

10   the email from Mr. Marchisotto that was forwarded to you cause

11   any concern for you at all?  Answer, it did not.  And he was

12   asked again, do you recall doing anything in response to

13   receiving the email other than having one single discussion

14   with the person who forwarded the email?  Answer, did not.  No

15   other course of action was taken.

16         The issue is the evidence in this case shows that

17   email was not part of some chain of events, and so it really

18   is about resurrecting and bringing back the other claims.

19   Factually it wasn't part of the chain of events given the

20   deposition testimony from Tenax, your Honor.

21         THE COURT:  All right.

22         MR. PERNINI:  And, your Honor, first of all, now

23   they're trying to readdress the summary judgment ruling of

24   Judge Jones because they made these very arguments to knock

25   the claim out, and he rejected them.

1          THE COURT:  Right.  So let me stop you both because

2     that's what I'm thinking.  I just need to go back and look at

3     Judge Jones's order on this issue, and then I will issue a

4     ruling on this.  But, in any event, I do agree that any

5     references to any counsel in this case should be redacted if

6     they are --

7          MR. PERNINI:  We will do it, your Honor.

8          THE COURT:  Would make the jury not like them.

9          MS. BAUGHAN:  Thank you, your Honor.

10          THE COURT:  All right.  I'll get you a ruling on that

11     after I look at Judge Jones's order.

12          All right.  No. 4 was the enforceability, exclude

13     arguments that are inconsistent with the Court's rulings on

14     the enforceability of certain restrictive covenants and --

15          MR. MILLER:  I don't really think there's a dispute

16     on this one, your Honor.

17          THE COURT:  Was there not one?  Okay.  That's great.

18     So --

19          MR. MILLER:  Lockton responded that defendants do not

20     intend to present evidence or argument that the restrictive

21     covenants in this trial are unenforceable.  So we think it

22     should be granted without opposition.

23          THE COURT:  I thought there was some little caveat

24     but let me --

25          MR. BANKS:  It's the issue we talked about on Motion

1    In Limine No. 2, your Honor, that the witnesses, specifically

2    the former employee defendants, should be permitted to talk

3    about their understanding.

4            THE COURT:  Right.  Thank you.  All right.  So then

5    this one is resolved.  This is granted as unopposed.

6            MR. MILLER:  Thank you, your Honor.

7            THE COURT:  All right.  No. 5, this is relating to

8    the nature of Dean Anderson's leave of absence.  Were you all

9    able to reach a stipulation about that?

10           MR. HALL:  We did propose one, your Honor, but we

11   haven't heard back on that yet.  We don't see why there

12   shouldn't be.

13           MR. MILLER:  We need to continue talking about the

14   stipulation, your Honor.  The concern is the stipulation they

15   proposed was broader than just the nature of his medical

16   leave.  They also tried to tie into the stipulation the

17   statement that he was not violating the restrictive covenants

18   during the time period of his leave and --

19           THE COURT:  Which is what Judge Jones found; right?

20   I mean, didn't he say there was like no issue during --

21           MR. HALL:  Oh, right.  Yeah, exactly.  I thought you

22   were saying the opposite.  Yeah, he said that he wasn't

23   working during that time period.  And what our point is, is

24   that if they're going to contend he was doing something wrong

25   while he was on this medical leave, then we've got to talk

1    about our evidence that he wasn't because he was on medical

2    leave and was, you know, unable, amongst other things, to do

3    anything.

4         So if they're going to try to push that he was doing

5    something wrong during his medical leave, we feel like

6    fairness says we've got to be able to defend that allegation.

7    We don't think that that allegation is valid or appropriate,

8    but if they're unwilling to agree to that in our stipulation,

9    then I don't see what choice we have.

10        MR. MILLER:  This may be a solution, your Honor.  I

11   don't know that we're going to affirmatively offer evidence

12   that Dean Anderson was violating the restrictive covenant

13   during his leave, but we don't know what he was doing during

14   leave.  And I would have a concern about stipulating to

15   something as true that I don't know if it's true and giving

16   potentially a false impression about our agreement on the

17   issue to the jury.

18        I don't fundamentally have a problem with the

19   position they're offering, but if we start presenting evidence

20   about what Mr. Anderson was doing on leave, then they might

21   need to present counter evidence.  That would open the door to

22   explaining what he was doing on the leave, but I don't think

23   the trial is going to go down that road.  And if it doesn't,

24   then our view would be that any evidence -- any statement

25   given to the jury or evidence would just need to be, you know,

1  he was out on personal leave or maybe medical leave but

2  nothing beyond that, if that's the fact pattern, the way it

3  plays out at trial.

4          MR. HALL:  I think the language that we had in our

5  proposed stipulation is that he was out on medical leave

6  during this period of time and that his actions during that

7  time period are not an issue in this case.  That seems like a

8  neutral fair way to maybe not say that -- you know, maybe not

9  cloak him in some sort of halo that he didn't do anything but

10 just it's not an issue in this case what happened during that

11 period.  And I think that's a fair and neutral way to say it,

12 and I think that's what we proposed.  Maybe we had another

13 sentence that went slightly beyond that, and maybe we can talk

14 about striking that one.  But I think it's not an issue in the

15 case is maybe the right way to go.

16         THE COURT:  It seems like it's not an issue right

17 now, and we'll just have to see how it comes up.  I understand

18 both of your concerns.  You don't want me to -- when I say

19 you, USI does not want me to say something more -- that the

20 evidence does not necessarily bear out maybe he was doing

21 something.  You don't know yet.  So a stipulation could come

22 at any point.  Let's just see where it goes.  But it seems

23 like everyone is in agreement that we don't need to get into

24 the details of what his leave of absence was for.

25         MR. MILLER:  We're in agreement on that point, your

1   Honor.

2         MR. HALL:  I think just a -- it was a medical leave

3   of absence, so we'd like to just say just that --

4         THE COURT:  Yes.  All right.  Everyone is nodding

5   their heads on that.

6         MR. BANKS:  Your Honor, I'm sorry.  I need to clarify

7   something.  My concern from what I've heard, is that they're

8   saying, you know, unless we try and put on evidence that he

9   was breaching while he was on leave, then we shouldn't put on

10  evidence that he wasn't, which leaves it an open question for

11  the jury, and that's my concern, is that -- I mean, the jury

12  should know.  There's no claim for once Dean went on leave,

13  and if there is a claim, then we need to be able to put on

14  evidence that he wasn't working.  We can't leave it like, you

15  know, open, as an open question for the jury where they don't

16  know one way or the other what was going on at that point.

17  They need to have some sort of finality, and if it's at the

18  end there's an instruction that there's no claim after that

19  point because there's never been any evidence that he

20  infringed or that he breached, that might be sufficient.  But

21  there's got to be some clarity for the jury rather than just

22  this open question about what do they do with the fact that he

23  was on leave.

24        THE COURT:  All right.  So it seems to me like you

25  all could maybe talk about this and maybe in the context of

```
 1   the summary that you all are going to be preparing about what
 2   the jury is supposed to be finding because I think Judge Jones
 3   was clear that the time when he was on leave is not at issue.
 4   So to me that's another finding Judge Jones made.  It might be
 5   that you want to put it in the summary, but it is something we
 6   can talk about later in terms of let's see how the evidence
 7   comes out in terms of what he was doing, although it's not
 8   that he was -- Judge Jones has found he was not doing anything
 9   that violated his contract.  So I think we're just arguing
10   over something that we don't need to argue about right now.
11        MR. MILLER:  We'll confer about it, your Honor, and I
12   think we'll be able to work it out.
13        THE COURT:  All right.  Okay.  So Number -- is that
14   all right?  All right.  No. 6, the Court should exclude
15   evidence and arguments that customers should have the freedom
16   to choose their insurance broker.  I am going to -- my thought
17   was that I'm going to deny it.  I understand the concern, but
18   I think it's sort of clear that people have the freedom to
19   choose their insurance broker.  So I don't want to say at this
20   point that statement can't be made, but at the same time it
21   should not be a huge part of the former employees and
22   Lockton's case.  So I'll deny it without prejudice to bring it
23   up if a question is asked that's objectionable.
24        MS. BAUGHAN:  Thank you, your Honor.
25        THE COURT:  All right.  No. 7, the Court should
```

1  exclude evidence and arguments premised on the "Golden Rule."

2  I'm going to grant that one as unopposed.

3          MR. MILLER:  Thank you, your Honor.

4          THE COURT:  No. 8, the Court should exclude evidence

5  and argument regarding the relative size and/or financial

6  condition of USI relative to the former employees.  I'm going

7  to grant in part as unopposed as to that David and Goliath

8  kind of argument, which I don't expect anyone would actually

9  make but deny it without prejudice at this point as to the

10  specific size and resources of USI.  I think that could be

11  relevant, so it's too early for me to make that call.

12          MR. MILLER:  Thank you, your Honor.

13          THE COURT:  No. 9 is the argument as to Lockton's

14  claim under 13-6-11, that I have allowed Mr. Robbins to

15  testify; right?  So that is denied.

16          MR. PERNINI:  That's moot, your Honor.

17          THE COURT:  Yeah, denied as moot.

18          MR. MILLER:  Correct, your Honor.

19          THE COURT:  All right.  I'm going to turn to

20  Lockton's motions in limine, and just give me a second while I

21  organize myself.  I think at least on No. 1 I feel like we're

22  working that out with the summary, and I think it's too early

23  for me to just say across the board certain things can't come

24  in.  I'm not sure what specifically you all want me to do at

25  this point.

```
 1              MR. BANKS:  I think that's appropriate, your Honor.
 2              THE COURT:  All right.  Great.  Thank you.  Denied
 3    without prejudice.
 4              USI cannot present evidence and argument that clients
 5    moved from USI to Lockton because of work performed after
 6    clients moved their business.  I think, again, that one -- I
 7    understand the concern, but it seems to me a little too early
 8    not knowing what the clients are going to testify to.  I mean,
 9    obviously, I don't think a client can talk about specific
10    incidents that occurred after the move, but the client could
11    be saying general statements about USI or Dean Anderson and
12    not necessarily knowing when those things happened.
13              So, for example, Dean Anderson always returned my
14    calls within 24 hours.  I mean, I don't know when those
15    statements -- when those events would have occurred so --
16              MR. BANKS:  They didn't.  I mean, the thing is we
17    know what the clients generally are going to say because
18    they've been deposed.  There are a couple of clients coming
19    who weren't, but those were Taylor Anderson clients.  These
20    are clients who moved over before Dean Anderson provided any
21    services in violation of his agreements.  That all happened
22    after the fact.  That happened after the clients moved over,
23    and it happened in only very, very limited circumstances.  But
24    I don't think that USI can identify a single client who
25    testified in their deposition that they left because of Dean
```

1 | Anderson providing them service.  There's not a single client
2 | who said that, anything even remotely like that.
3 |         So that's the purpose of the motion, and this goes
4 | back to what I said at the very beginning, that there are
5 | claims in this case and then there are damages models.  And
6 | they don't really match.  And there is no damage model that is
7 | presented in this case based on Dean Anderson's breach of his
8 | non-competition agreements.  There's nothing.  So that is the
9 | reason for the motion.  This has really nothing to do with any
10 | remedy they are seeking in this case.  That claim doesn't.
11 | The claim has no remedy -- has no damages model that they are
12 | seeking a relief for on that claim.
13 |         MR. MILLER:  I certainly don't agree with that, your
14 | Honor, but I think we're getting a lot further than the motion
15 | in limine, which is sounding like the Court was inclined to
16 | deny.  And so I don't necessarily need -- I'll only present
17 | whatever argument the Court wants, but I don't think I need to
18 | address all of that at this point.
19 |         THE COURT:  Right.  I'm just going to deny it without
20 | prejudice at this point.  We'll see how things come in.
21 |         MR. MILLER:  Thank you, your Honor.
22 |         THE COURT:  All right.  No. 3 is about the
23 | attorney-client privilege, and my inclination was to deny that
24 | without prejudice as well because I just don't know how it's
25 | coming in.  I think the fact of consulting a lawyer seems to

1   be something that is going to come out but not the substance,

2   maybe not unless you are relying on advice of counsel, so

3   we'll just have to see what happens.

4          MR. PERNINI:  Your Honor, with regard to that one, I

5   understood that the response from USI was that they did not

6   have intent to ask for a negative inference on that, and I

7   would like to address that aspect of it --

8          THE COURT:  Okay.

9          MR. PERNINI:  -- because that is a concern that there

10  would be an argument made that somehow getting an attorney is

11  a sign that you've done something wrong or nefarious, and that

12  would be inappropriate.  They indicated they're not intending

13  to do that, so it may be moot.  But I do want to bring that up

14  as a specific issue, you know, that might be more clear than

15  the other ones.

16         THE COURT:  It's a fine line, right, because USI

17  wants to argue that this was a whole scheme and that

18  consulting a lawyer was part of this scheme, but to me that's

19  a little different than the negative inference that you're

20  discussing.

21         MR. MILLER:  I think the negative inference issue,

22  your Honor, is if we were to try to ask -- to try to sort of

23  pierce the privilege and ask what was it you talked about, the

24  lawyer.  They claim a privilege.  I think that's where the

25  negative inference comes into play, that you can't ask the

1  jury to draw a negative inference from the fact they won't

2  reveal privileged information.  That's not at issue in this

3  trial.

4       What is at issue is these meetings that occurred with

5  counsel that have already been, you know, provided in

6  discovery and relied on by Judge Jones, and we do need to

7  present that evidence to the jury.  So we expect the jury will

8  draw a negative inference from the entire scheme, which

9  includes the meetings with counsel.  That's part of the case.

10 But we're certainly not going to argue there's something

11 inherently wrongful with not telling us what was discussed in

12 a meeting if there's a valid privilege claim.

13      THE COURT:  It's a tough one because you're saying

14 inherently you don't want the jury to get the impression that

15 it's inherently wrong to consult a lawyer irrespective of what

16 was actually discussed.

17      MR. PERNINI:  That is correct, your Honor, or that

18 you can say because he talked to a lawyer, you can assume that

19 what they talked about was nefarious.  That would be the

20 negative inference.

21      THE COURT:  Oh, well, he's not going to do that.

22      MR. PERNINI:  Well, that's why I'm making clear that

23 point.

24      MR. MILLER:  I'm not going to do that, your Honor,

25 but there is testimony that was provided for which no

1  privilege was claimed as to certain topics, that you met with

2  a lawyer to obtain advice about your departures from USI.

3  That's relevant evidence, and we should be able to make

4  argument on that.  We're not going to argue that the fact that

5  you met with a lawyer is itself somehow nefarious, but there

6  is evidence in this case that's come out -- no privilege was

7  claimed, it wasn't objected to -- as to how the meetings with

8  the lawyers fit into the scheme.  And we think that is not

9  only fair game for arguments, it's essential to our

10 presentation of the case.

11         MR. PERNINI:  An answer might be, your Honor, we'll

12 need to see how this goes to the trial, but I wanted to raise

13 the concern now because that is a real concern.  You can see

14 it's a fine line, and it's a slippery slope that's going on

15 here.  And so we wanted to raise that to the Court.  If the

16 Court would rather see that as the evidence comes in,

17 obviously we're fine with that, but we didn't want to have

18 this brought to the Court's attention for the first time.  It

19 is an ongoing concern that we have.

20         THE COURT:  Right.  I appreciate that.  So it does

21 seem like I will deny this without prejudice in terms of the

22 evidence, and I think the argument might be something we deal

23 with before closings if you all feel the sense that it's going

24 to be a big part of closing because that's when it would come

25 up.

1          MR. PERNINI:  Thank you, your Honor.

2          MR. MILLER:  Thank you, your Honor.

3          THE COURT:  Okay.

4          MS. BAUGHAN:  And, your Honor, I think it's going to

5    come up in opening.  I mean, this was all part of the scheme,

6    as Judge Jones has already found, that a jury could include --

7    I'm sorry -- a jury could conclude based on the whole scheme

8    you can't use attorneys as both a sword and a shield.  In

9    their depositions they testified you didn't give 60 day's

10   notice.  Why is that advice of counsel?  You know, so it is

11   going to be -- you will see this on opening, and it is an

12   essential part of the presentation because it's an essential

13   part of the scheme.

14         THE COURT:  Right.  I understand that.  But opening

15   won't be argument, and it seems that the concern is

16   really the -- that you all telling the jury that they should

17   draw negative inference.  That's not going to come up in

18   opening.

19         MS. BAUGHAN:  Exactly, and shouldn't come up at all.

20         THE COURT:  All right.

21         MR. PERNINI:  I mean, your Honor, the fact that there

22   were meetings will come into evidence.  We certainly

23   understand that.

24         THE COURT:  Right.

25         MS. BAUGHAN:  Okay.

```
 1              THE COURT:  So everyone is on the same page.
 2              MS. BAUGHAN:  I should have stayed seated.  Sorry.
 3              THE COURT:  All right.  Number -- this is kind of
 4   related, the evidence or argument that the former -- providing
 5   the former employees an attorney and indemnifying them are
 6   "wrongful" under Georgia law.  This seems like again another
 7   one that I just need to see how the evidence comes in.  Is
 8   that right?  Because you all -- that's coming in that you all
 9   provided.
10              MR. PERNINI:  It is, your Honor, and we're fine if
11   the Court -- again, this is one of those we wanted to raise
12   issues to the Court now.  Sometimes in the midst of trial to
13   bring up more complicated issues can be -- it can take a lot
14   of time away from the jury, so we're fine with the Court
15   addressing it as it goes along.
16              THE COURT:  All right.  So I'll deny that one without
17   prejudice as well.
18              And then No. 5 is the argument or evidence implying
19   that taking, use, or misappropriation of confidential
20   information.  And again I think -- I'm going to deny it
21   without prejudice because again I just don't know how the
22   evidence is going to come in.
23              MR. PERNINI:  Well, your Honor, this one is a little
24   bit different than the previous ones because this is one where
25   there isn't -- there's never been a claim for stealing of
```

1    confidential information.  We took USI's 30(b)(6) deposition,

2    so they had their representative.  And I asked him, are you

3    aware of any facts showing that Lockton misused confidential

4    information in order to encourage the former employees to

5    leave?  And he said, no.  So we're entitled to rely upon that.

6    There was nothing brought up in summary judgment on this.

7    There's nothing in the pleadings.  There's nothing there at --

8            COURT REPORTER:  Could you please slow down.

9            MR. PERNINI:  I'm sorry.  And please tell me to slow

10   down because I have a terrible habit of doing that, so I don't

11   mind being interrupted.

12           There has never been any evidence of confidential

13   information stolen as part of this case, and so for us to have

14   to be on alert for that during the trial would be problematic.

15   As just a single example, they said, well, there was

16   confidential information used because this departure email

17   went to our confidential customer list.  Well, we have no

18   evidence that that customer list was confidential because we

19   have not sought any evidence to determine whether they put the

20   proper protections in because it's never been part of this

21   case.

22           And so I understand that certain facts may come in,

23   but this is an entirely separate claim that's not part of this

24   case.  And so that's why this one is particularly different

25   and should be excluded.

```
 1           THE COURT:  All right.  So I was inclined to deny it
 2  because I thought it might go into the breach of the duty of
 3  loyalty.  Maybe some of that evidence could be relevant, but
 4  if you all are saying that there's actually no evidence that
 5  any confidential information was disclosed, then I'm feeling a
 6  little different.
 7           MR. MILLER:  So I think the right solution on this
 8  motion relates to arguing that there's a violation of the
 9  nondisclosure provision in the agreement, the confidentiality
10  portion, which we're not going to argue that.  That's not a
11  claim in the case.  I get their concern on that.  We're not
12  going to do that.  But there is evidence in this case that
13  confidential information of USI was misused, and that goes to
14  both breach of the duty of loyalty, the breach of fiduciary
15  duty claim, and the tortious interference claim.  And we laid
16  out that evidence in our brief.
17           Specifically, Taylor Anderson testified he used his
18  USI client list while sitting in USI's office the morning of
19  that resignation to draft that departure email that was
20  unauthorized that blanketed all of the clients.  He used USI's
21  client list to do that.  Roger Maldonado similarly testified
22  he did that off of his USI laptop while he was sitting there
23  in the office, and we think that is relevant to the breach of
24  duty of loyalty claim, the breach of fiduciary duty claim, and
25  the tortious interference claim.
```

1          We believe the Court is going to charge the jury on

2     the tortious interference claim consistent with Georgia law,

3     that one of the things that can support a tortious

4     interference claim is use of confidential information.  And so

5     we think it comes into the case to support those claims that

6     are part of this case, but we don't intend to argue that that

7     is a separate cause of action or that the employees violated

8     the contractual provision in their agreement on nondisclosure

9     and confidentiality.

10          MR. PERNINI:  Well, your Honor, I think we heard

11    exactly the concern that we have here.  They're now saying

12    that Taylor Anderson and the other former employees used this

13    customer list, which they're now claiming is confidential.

14    You know, there's a whole analysis to determine whether or not

15    that's accurate or not.  Is it a trade secret?  Had they put

16    protections in?  We have not taken any discovery on that.

17          We're entitled to take discovery if they're going to

18    try and say that that was improper in any way, which is why

19    when we took their deposition and I asked them for the

20    tortious interference claim if confidential information was

21    part of it, they said no.  So that has not been part of this

22    case.  They're saying I don't have a claim for it.  Well, then

23    it shouldn't come in because it would easily confuse the jury.

24          He's right that under Georgia law -- I'm sure the

25    jury instruction we have will say stealing of confidential

1    information is something you can do wrong.  There's no

2    evidence that we did that.  There's no allegations that we did

3    that.  In the discovery they confirmed that it didn't occur.

4    So to have that thrown into the case is going to confuse the

5    jury.  It's going to require us to then challenge them on

6    whether or not, in fact, this is a truly confidential piece of

7    information, which is not something that's been part of this

8    case.

9            If they don't think it's relevant to their claims,

10   then it shouldn't come in because it would confuse the jury,

11   and there's no evidence -- they can't point to anything other

12   than this one comment which has not been made prior in this

13   case.

14           MR. MILLER:  The evidence has been part of this case

15   since those depositions were taken in the fall of 2020.  It's

16   been out there.  I don't have the 30(b)(6) testimony in front

17   of me, but that has been out there.

18           I think maybe the distinction may be, you know, we're

19   not arguing that they took confidential information, left the

20   office with batches of confidential information.  The argument

21   is that as part of this scheme sending the departure email,

22   which was discussed in advance we believe with Lockton, it is

23   part of the scheme of inducing them to leave, which involved

24   the use of confidential information.  So we think it's been

25   part of the case for years.  It's been out there for years.

 1  Their own clients admitted it in deposition in response to our

 2  direct questions, and they were on fair notice of that.

 3      THE COURT:  It seems to me that the concern is using

 4  the term "confidential" which has, as you've said, a separate

 5  analysis, but there would be nothing wrong with asking the

 6  questions of -- is it Dean Anderson -- that he was sitting in

 7  USI's office with USI's client list without saying it's

 8  confidential in the way that triggers this analysis in a claim

 9  that you're discussing.  Could you ask the question in a way

10  that does not involve using the term "confidential?"  Because

11  I think a jury would understand that if he's using a USI

12  client list to talk -- as he's preparing to leave, could be

13  relevant evidence for the jury.  I agree with that.

14      It's the confidential part which I think Lockton and

15  the former employees take issue with, which I understand.  We

16  don't want to be getting into, well, is it technically

17  confidential, is it a trade secret.  You all don't want to get

18  into that.  Neither side wants to get into that.  So can you

19  ask the question without using the confidential language?

20      MR. MILLER:  We can ask the question without using

21  the confidential language.  We certainly don't want to have a

22  mini litigation, a mini trial on whether that was

23  confidential.  I do think we should be allowed to ask the

24  question did you use your USI client list to do that, and is

25  that something that was made publicly available or is that

1  something that was part of the company's business information.

2  And then we should be able to present an argument in closing

3  based on the answers to those questions and the jury charge

4  based on Georgia law, but we can avoid asking the witness the

5  question was that confidential information to USI.  And we do

6  not intend to have a mini trial on that issue.

7          MR. BANKS:  Your Honor, this would be -- this is

8  Mr. Banks.  We talked and thought I should raise this.  This

9  would be extremely prejudicial to allow something like this to

10 happen where there is essentially no legal standard

11 whatsoever, but they get to insinuate that there is something

12 wrong with the behavior.

13         When the Uniform Trade Secret Act was adopted, it

14 includes trade secret preemption, and the reason for it is so

15 that you don't end up with these sort of stealth quasi trade

16 secret claims out there that have none of the protections that

17 a defendant in a trade secret case has.

18         We've had no notice in the pleadings that this was a

19 basis of their claim.  The 30(b)(6) deposition made clear this

20 was not a basis of their claims.  The fiduciary duty and duty

21 of loyalty claims have been decided.  They do not get to add

22 new theories of liability now.  They asked for summary

23 judgment.  They wanted to do that.  They got summary judgment

24 on the question of breach on those.  They don't get to pile on

25 and add new things that were never pleaded at this point.

1          It would be extremely prejudicial to the defendants

2     only five days, or whatever it is, six days before trial to

3     learn they are facing a claim for misappropriation of

4     something that we don't even have a standard for as to whether

5     it's protectable or not.  This is exactly the sort of surprise

6     tactic that should not be allowed, and it would be extremely

7     prejudicial to allow it in front of the jury.

8          MR. MILLER:  Your Honor, I'll just say on that, you

9     know, this is something that is appropriately defined under

10    Georgia law, not the Trade Secret Act.  The tortious

11    interference case law talks about use of confidential

12    information as one of the factors.  Breach of fiduciary duty

13    and duty of loyalty liability has been decided.  Tortious

14    interference liability has not been decided.

15         In our complaint against Lockton in June of 2020 we

16    talked about all the confidential information these employees

17    had access to as part of their jobs at USI.  Rob Meyers, who

18    is a critical witness from USI, testified the client lists are

19    confidential.  Taylor Anderson and Roger Maldonado talked

20    about the fact that it came from their USI business

21    information.  So we think this is not an ambush.  They've had

22    fair notice.  It's been in the case for years.

23         MR. PERNINI:  Your Honor, on the issue of tortious

24    interference, that is specifically the question that I asked

25    their 30(b)(6) witness of, and this is on page 185 of Rob

1    Allen, 185 to 186.  I'm trying at this point to find out what

2    are the improper acts -- they go through a whole line of

3    questions -- that you're claiming that Lockton did?  And I

4    say, are you aware of any facts showing that Lockton misused

5    confidential information in order to encourage the former

6    employees to breach their contracts?  That's their tortious

7    interference claim.  His answer, I'm going say no.  And that

8    was it.

9              THE COURT:  What was the witness's name?

10             MR. PERNINI:  Robert Allen.  He was their 30(b)(6)

11   witness.  He was a representative of the company.  I'm

12   entitled to rely upon that, and we did.  If he had said, oh,

13   no, there's evidence, then that would have led to a whole line

14   of discussions and a potential claim that there would be

15   preemption under the Trade Secrets Act.  None of that occurred

16   because there is no evidence of it, and they haven't really

17   said there's evidence of it.  They're just trying to squeeze

18   in this additional claim at the last minute.

19             MR. MILLER:  And two responses on that, your Honor.

20   The first one, Rob Allen was a lay witness, not an expert

21   witness, someone schooled on that legal term, but perhaps,

22   more importantly, your Honor, the question asked is not what

23   this evidence relates to.  The question asked was are you

24   aware of Lockton using confidential information to induce the

25   former employees to leave.  This evidence goes to Lockton

1   inducing the former employees to use confidential information

2   as part of the tort -- the conduct that constituted the

3   tortious interference.  So Mr. Alan's response to those

4   questions does not foreclose this evidence.  The question on

5   point was not asked at the deposition in what was just read.

6         MR. PERNINI:  But, your Honor, it's a breach of

7   contract, so tortious interference.  They're claiming we

8   tortiously interfered to cause the employees to breach their

9   contract, but they never claimed that the employees breached

10  their contract by taking confidential information.  In fact,

11  if they had, as Mr. Banks pointed out, that would be a

12  potential preempted trade secret claim that we would have

13  addressed.  His whole argument is he agrees there's no trade

14  secret claim here, that can't be a problem.  The only way this

15  fits in is under the tortious interference claim for

16  Walgreens -- not for Walgreens.  Excuse me.  For Lockton.

17        And if Lockton -- that claim requires that Lockton

18  misused confidential information in order to tortiously

19  interfere.  What he just argued is the only relevance, and

20  that is the specific question that I asked their 30(b)(6)

21  witness.  This is not a layperson.  I said give me a

22  representative of the company that's going to tell me all the

23  evidence you have, and he said we have none.  So you can't now

24  allow that to come into the case because if he had said, oh,

25  we have some, there would have been a whole lot more

1    discovery, and we would not be where we are today.

2           MR. MILLER:  It just wasn't the question asked in the

3    deposition, your Honor.

4           THE COURT:  Well, is there some evidence that -- if

5    it's just related to this client list, is there some evidence

6    that Lockton instructed Dean Anderson to get it or that they

7    used it, something that would tie into that claim?  Because

8    it's only against Lockton.

9           MR. MILLER:  We think there is evidence of that, your

10   Honor.  That's been in the case since our initial complaint

11   against Lockton in June 2020, paragraph 59 where we said that

12   these nearly identical emails to clients that were

13   unauthorized was an example of coordination of the former

14   employees by Lockton.  These were emails that were sent by the

15   three former employees within minutes of each other, which is

16   clear evidence that Lockton coordinated it.

17          They testified they didn't talk to each other, they

18   didn't know what's happened.  The evidence shows Lockton

19   coordinated.  That's the only way it could have happened, and

20   that is evidence of Lockton directing them to send this email.

21   And the only way they could have sent the email was with USI's

22   confidential information.  We pled that in paragraph 59 of our

23   original claim against Lockton in this case, so it's been part

24   of this case since the inception, your Honor.

25          MR. PERNINI:  Well, then their 30(b)(6) witness

```
 1   should have said so because that's not what he said.  That was

 2   the specific question that was asked, and we're allowed to

 3   rely on what a 30(b)(6) witness says.  That binds the company.

 4           THE COURT:  All right.

 5           MR. MILLER:  It just wasn't the question asked.

 6           THE COURT:  All right.  Well, I'm going to leave us

 7   with a cliff hanger.  If there's one thing, I want to look at

 8   this over the lunch break.

 9           MR. BANKS:  Your Honor, if I could, paragraph 59 does

10   not say that they misused confidential information.  It says

11   that they -- it talks about the timing of the sending of the

12   emails.  It is not an allegation that they violated some duty

13   to keep information confidential, which would be very, very

14   different.  It would have led, again, to briefing on whether

15   such a claim was preempted by the Trade Secrets Act and needed

16   to be brought as a misappropriation claim.  It would have led

17   to all sorts of discovery as to the validity of such a claim,

18   which never happened here because it was not pleaded and it

19   was not answered that way in the 30(b)(6).

20           THE COURT:  All right.  I'm going to look at it over

21   lunch.  It's 11:57 now.  Let's just be back at 1:00 o'clock.

22           COURTROOM SECURITY OFFICER:  All rise.  Court stands

23   in recess.

24           (Whereupon, a recess was taken from 11:57 a.m. until

25   1:10 p.m.)
```

1          COURTROOM SECURITY OFFICER:  All rise.  This

2   honorable court is again in session.

3          THE COURT:  Y'all can be seated.  So I looked over

4   the issue we were discussing prior to the lunch break, and I

5   am going to grant Lockton's motion regarding the

6   confidentiality or the confidentiality claim.  Excuse me.

7          I looked back at Judge Jones's order, and this issue

8   was briefed by Lockton but was not addressed by Judge Jones.

9   And he listed several things that were at issue in terms of

10  recruitment of the USI employees, and so I don't think it

11  would be fair at this point to kind of inject confidentiality

12  when it was not an issue for Judge Jones in his order.  And it

13  doesn't appear that USI really raised that confidentiality

14  issue, so I will grant Lockton's motion.

15         And then I went back on the attorney's fee issue that

16  was No. 3 in USI's motion in limine, the Marchisotto emails

17  and what the parties can get into regarding the legal fees for

18  Tenax, and it seems to me that Judge Jones, he did not go into

19  that in detail but he left it -- I think it's open as to

20  whether the legal fees were based on the Marchisotto email or

21  just the chain of events related to the email plus the letter

22  that it received.  So I am going to allow all of the fee stuff

23  to come in, and then I guess on cross-examination you all can

24  deal with any limitations to it or whether you think that the

25  Marchisotto email really did not cause any expense or extra

1  expense.

2          And then on Robbins, Mr. Robbins and his testimony, I

3  am going to stick with my initial preliminary ruling, which is

4  that you all can ask, you all meaning USI, can ask on

5  cross-examination about what his fees may or may not have

6  included with respect to the former employees, but I'm not

7  going to order that the former employees provide any

8  additional information about that.  To me that's just a

9  limitation on his analysis that you can just get out in cross.

10          MR. MILLER:  Thank you, your Honor.

11          MR. HALL:  Thank you, your Honor.

12          THE COURT:  All right.  You're welcome.  So back to

13  Lockton's motion in limine, and I think we are at the last

14  issue, No. 6, relating to the testimony of Ms. Moore and

15  Mr. Hanig.  So I would like to hear some more information

16  about who these people are and why this information is needed

17  and maybe why they weren't listed earlier.

18          MS. BAUGHAN:  Your Honor, Nancy Baughan.  We actually

19  may work this one out.  We had a little talk during the break.

20  But Tracy Moore, as we said in our response, was disclosed.

21  She's the CFO for the region, and she's just going to be

22  talking about the revenue information, the group of clients

23  that left, what was the revenue at USI.  That's part of the

24  basis of the expert's report.

25          Mr. Banks has let me know that they would stipulate

1   to those records coming in if we want to do it that way, and

2   they wouldn't object to her testifying if her testimony is

3   just limited to the revenue issue.  And then I've let

4   Mr. Banks know that we're not intending to call Paul Hanig.

5   So I think we're going to work that one out, but happy to hear

6   from my friend across the aisle.

7           MR. BANKS:  Maybe we've worked it out.  Okay.  So

8   here's my understanding.  So, first of all, Ms. Moore was

9   really not disclosed.  The interrogatory response that she

10  verified was one in 2022, way after the close of discovery,

11  and it had to do with records that related to the cross

12  complaints and punitive damages that was brought by Lockton.

13  It had nothing to do with these issues that apparently she

14  would be testifying to at trial.

15          I appreciate that they don't intend into call

16  Mr. Hanig, so that should not be an issue.

17          Then with Ms. Moore, my understanding was that she

18  would be used to authenticate the financial records, and we

19  said if that's the issue, you don't need to bring her down

20  here for that.  We'll stipulate.  We don't have any reason to

21  think that those are fabricated or anything like that.  We

22  would agree that they're authentic and they can be admitted,

23  and so the expert could rely on them.

24          And then Ms. Baughan asked, well, what if she just

25  came and authenticated the records in person?  I said, well, I

```
 1   don't see any reason to do that.  You know, we've got two
 2   weeks, and there's a lot of stuff we've got to do in this
 3   case.  It seems like a waste of time.  But I did not agree
 4   that she could get up and explain things about the clients at
 5   issue or revenues, et cetera.  I think it is -- again, if it's
 6   vanilla, these are the records, I guess they could do that,
 7   but, again, it kind of seems like a waste when we're going to
 8   stipulate that the documents are authentic.
 9        So I think that would be fine, but beyond that it
10   would not be because we haven't had a chance to depose her.
11   We didn't know that she would be a witness in the case.
12        THE COURT:  All right.  Thank you.
13        MS. BAUGHAN:  I was just consulting with client and
14   co-counsel.  Again, I think we're going to work this one out.
15   We're not planning to offer her for anything other than, you
16   know, yes, these are the documents, and she might explain how
17   USI keeps track of the revenue just so that there's some
18   context for the documents.  But she's not testifying on any
19   other subject, and she was disclosed.  She was talked about in
20   the expert's deposition.  Everybody knew that this was what
21   Ms. Gunnersen was relying upon.
22        So we may very well take them up on their offer of a
23   stipulation, but I'd like to just talk to my client before
24   agreeing to that.  So we'd like to leave open the possibility
25   that she comes live to testify.
```

1              THE COURT:  All right.  Well, it sounds like

2      something we can deal with on Tuesday when we come back for

3      the actual trial, what you all want to use her for.  But I

4      feel like I'm inclined to say it would just be for

5      authenticity absent some showing that there's a really -- a

6      great need for her.

7              MS. BAUGHAN:  Okay.  Thank you for that guidance,

8      your Honor, and we'll talk with the other side and let the

9      Court know if there's anything that needs to be ruled upon.

10             THE COURT:  All right.  Thank you.  So turning now to

11     the former employees' motions in limine.  So the first issue

12     relates to the recruitment, evidence and argument that the

13     former employees violated covenants prohibiting the

14     recruitment of co-workers at USI.

15             Seems to me that this is relevant to the tortious

16     interference claim.  So why shouldn't it come in?

17             MR. HALL:  So, your Honor, certainly our position is

18     that there is a non-recruitment clause in the agreement.

19     There's been no claim made under that clause, so it's

20     certainly not something that can or should come in with

21     respect to my clients, the former employees.  I'm going to let

22     Mr. Pernini speak to how it pertains to the Lockton claim.

23             THE COURT:  All right.

24             MR. PERNINI:  And, your Honor, I think the issue

25     comes to exactly what he's saying, is that there is a

1  provision in their contract.  The jury can be easily be

2  confused by that, vis-a-vis the tortious interference claim.

3  There's really no dispute that Lockton reached out to these

4  individuals directly and brought them over, so to the degree

5  they're trying to prove a claim to bring over people, they

6  have the evidence that, you know, definitely we reached out to

7  Mr. Anderson and Mr. Dean Anderson and Mr. Maldonado and a few

8  others.  They already have that in there.

9         They don't need to add on top of this the evidence of

10 any sort of recruitment amongst the employees, and obviously

11 that would be prejudicial to the employee.  So it really comes

12 almost to a 403 test, which is it is of very little relevance

13 to the tortious interference claim, and it's definitely

14 prejudicial to the former employees, one of the challenges of

15 having both of these claims in the case at the same time.

16        THE COURT:  I understand.  All right.

17        MR. MILLER:  Your Honor, we think this evidence is

18 very relevant to both tortious interference and to the breach

19 of duty of loyalty and breach of fiduciary duty claims.

20        As to tortious interference, it's relevant to the

21 raiding claim, that employees were solicited.

22        As to breach of fiduciary duty and breach of duty of

23 loyalty, it's relevant that the former employees were talking

24 to other USI aviation group employees while they were still

25 employed by USI, and this is outlined in Judge Jones's summary

1   judgment order on pages 39 and 43.  I think it's in the

2   tortious interference piece in the 2020 case, and he's

3   outlying some of the evidence.  And that same evidence that's

4   outlined in the summary judgment order is evidence we want to

5   be able to present to the jury.

6          In particular, there's evidence that one of the USI

7   aviation employees, Amira Couch, was contacted by a Lockton

8   recruiter.  She talked to Dean Anderson, one of the

9   defendants, about that, and Mr. Anderson essentially advised

10  her to call that recruiter back.  And so that's while he's a

11  USI employee.  We think that's relevant to breach of fiduciary

12  duty, duty of loyalty.  There's other evidence like that in

13  that category, so we think it's relevant to multiple claims in

14  the case.

15         THE COURT:  Hasn't a finding been made as to the

16  breach of loyalty, breach of fiduciary duty by Judge Jones's

17  order?  Hasn't that been established?

18         MR. MILLER:  It has, your Honor, but we need to put

19  in evidence of this whole scheme to this jury, principally to

20  show, you know, the overall damages.  But, also, this jury

21  needs to make a decision as to 13-6-11 liability and punitive

22  damages liability.  And we're not going to have a mini trial

23  on liability issues that have been established, but the

24  evidence needs to come in so the jury can evaluate the intent,

25  the brazenness, the egregiousness of the violations.  The jury

1   has to be able to consider that or it won't have a fair

2   picture of evidence as to 13-6-11 and punitive damages.

3          The tortious interference claim has not been decided

4   as to liability yet.  That still needs to be tried, and we

5   think the evidence is relevant to that claim as well.  It's

6   all part of the overall scheme.  The scheme was Lockton

7   working with the former employees as part of a coordinated

8   scheme to bring over as much of the aviation group and the

9   clients as they could.  That's the claim we're trying in the

10  tortious interference case, and liability on that still needs

11  to be established.

12         THE COURT:  My understanding, though, of the motion

13  is that it's more about the evidence that the former employees

14  violated the non-recruitment covenants in their agreements,

15  and to me that does not bear on your -- does not preclude you

16  from arguing the facts that you were just referring to to get

17  employees to leave USI and discussion and working together to

18  move people.  Why do you need to talk about their contracts?

19         MR. MILLER:  If the motion in limine is as narrow as

20  not arguing a violation of that provision of the contract, I

21  do think that's a different issue.  We need to be able to put

22  in the evidence as to the conduct and what occurred, but in

23  terms of arguing a violation of that contractual provision,

24  that is not nearly a significant issue.

25         MR. HALL:  Your Honor, I mean, as you said, the

1  liability has already been established on these claims, and so

2  really this is just piling on evidence.  And it's making

3  allegations about alleged prior bad acts to try to convince

4  the jury of something that's already been decided, an issue

5  that's not before them.  So we don't think that these alleged

6  prior bad acts on a claim that's already been decided -- it's

7  not before the jury -- should come in with respect to my

8  clients.

9          It's extremely prejudicial and exactly what they're

10  going to do, exactly what Mr. Miller just said, which is try

11  to show, you know, violation of some duty of loyalty or

12  fiduciary duty.  They didn't have to move for summary judgment

13  on that, and if they hadn't, they could throw in all the

14  evidence they want to possibly support that.  But they did,

15  and that evidence isn't before the jury and that evidence

16  shouldn't come in.

17          THE COURT:  What about damages, their point that the

18  jury needs to know some information to be able to determine

19  damages?

20          MR. HALL:  I mean, yeah, that's a great question, and

21  look at their damages.  Their damages are about clients who

22  left.  There's no damages.  There's no claim for damages in

23  this case about anything having to do with replacing employees

24  or employees leaving.  This case is about clients and whether

25  clients -- and why clients left.  It doesn't have anything to

1　do with some random comment alleged to Ms. Couch, so it

2　doesn't tie to any of their damages.  There's not a single

3　damages claim here that's tied to anything related to

4　employees leaving or recruitment or anything like that.  There

5　could have been, but there isn't.

6　　　　THE COURT:  But what about damages for the breach of

7　the duty of loyalty or the fiduciary duty?

8　　　　MR. HALL:  I mean, if it's not part of the liability

9　for the case, it can't be used to support damages.  But their

10　damages theories are in the pretrial order, and there's no

11　damages tied to anything like that.  So there's no basis for

12　it to come in on liability because liability is already

13　established.  And there's no basis for it to come in on

14　damages because they've already laid out what their damages

15　theories are, and none of them had anything to do with

16　employees leaving or moving, much less employees -- I mean,

17　let's talk about the evidence that -- no damages related to

18　Ms. Couch being allegedly told to call a recruiter.  That

19　doesn't tie to any damages.  It's hard to see how it could.

20　She still works there.  I mean, she never left.  So this is

21　clearly just -- you know, this is piling on prior bad acts

22　allegations that aren't relevant to any issue, and we think

23　it's very prejudicial and just there's no reason for it to

24　come in.

25　　　　THE COURT:  Well, it's tricky because I think it is

1  relevant to the tortious interference claim.

2         MR. BANKS:  Your Honor, if I might, it's not relevant

3  to the tortious interference claim because there's no claim

4  for interfering with those provisions.  The tortious

5  interference claim is for interfering with the same provisions

6  that are at issue in the case against the former employees.

7  The complaint does not allege interference with the

8  non-solicitation --

9         THE COURT:  No, I hear you, but you all seem to be

10  making two separate arguments.  It seems like you all agree

11  that no one is going to make the argument or elicit evidence

12  that the three employees violated these provisions, but USI

13  wants to get into the chain of events of what happened.  And

14  you all are saying doesn't matter because Judge Jones found

15  liability already.  That issue has been decided.  But there is

16  still a question of damages.  You all are saying it has

17  nothing to do with their damages model.

18         MR. BANKS:  Yeah, they could come in and say, you

19  know, Taylor also ran his car into the front door, and that

20  caused damages.  That doesn't have anything to do with the

21  claim in this case or the damages in this case, so it's not

22  relevant.  And that's the same thing here.  They want to bring

23  in other alleged bad acts to make the employees look bad, but

24  they don't have a claim for that.  It can't be considered on

25  damages because there's nothing -- they're not alleging

1   anything wrongful happened there.  They might want to say it

2   now, but that's not part of the claims in the case.  And it's

3   not -- it can't be considered part of damages, but it also

4   isn't part of what the damages model is that they have put

5   forward.

6          MR. HOLLEY:  Your Honor, this is Bill Holley, and I

7   have not spoken yet in the case.  I'm the newest lawyer here.

8   But we sat here this morning, and we heard opposing counsel

9   talk about why it was important for their clients to be able

10  to say what their state of mind was, that they were not

11  meaning to do anything wrong, that they were not intending to

12  break any contracts.  Well, if they can do that, their actions

13  speak louder than their words, so if at the same time that

14  they're saying they're not doing anything wrong they're acting

15  as agents for Lockton to raid the employees at USI, that's

16  critical.  So it's critical both to cross-examine the evidence

17  that you've already said they can put in, but it's also

18  critical on the question of punitive damages, which Judge

19  Jones obviously didn't reach and on bad faith.  Thank you,

20  your Honor.

21         MR. MILLER:  And also on the tortious interference

22  claim Judge Jones specifically found the evidence I've

23  mentioned as very relevant on the tortious interference rating

24  claim.  He cited in his order as a reason why they could not

25  get summary judgment on that claim basically saying it creates

1    a fact dispute that needs to go to the jury.

2                THE COURT:  All right.  Well, it seems to me that the

3    motion itself was just based on an argument or evidence that

4    the former employees violated the non-recruitment covenants in

5    their agreements.  That is what the motion is based on to try

6    to exclude that, and it seems like everybody agrees that that

7    is improper.  And I think I'm just going to have to deal with

8    other evidence as it comes in but it's -- I don't know how to

9    draw the line right now because it is a little odd where a

10   liability has been established but damages have not, and I'm

11   trying to be fair to both sides.

12               So for right now I will grant the motion related to

13   the specific request in the motion, which was the covenants

14   prohibiting the recruitment of co-workers, grant it on that

15   and leave you all -- you all can raise anything else as it

16   comes up once we see where the trial is headed.

17               All right.  No. 2 relates to evidence and argument

18   that USI is entitled to restitution or disgorgement, and it

19   seemed to me that that could be a remedy for the breach of the

20   fiduciary duty and breach of loyalty.  Am I wrong on that?

21               MR. HALL:  Well, your Honor, I mean, disgorgement has

22   been found to be a remedy for a tort claim for fiduciary

23   breach when an employee has been disloyal during their

24   employment and received compensation during that employment.

25   And if during employment that is proved, then there is case

1  law that would support disgorgement of the money paid by USI

2  to the employee.  That's not what's at issue here.  I mean,

3  that's what they say in their discovery responses, but that's

4  not an issue in this case.

5       What they're trying to seek here, according to what

6  the pretrial order says, surprising to us, is that they want

7  to seek disgorgement as to amounts that Lockton paid as

8  compensation to my clients.  And there's not any case law that

9  says that's disgorgement or that monies paid after you leave

10  and go somewhere else that are paid to you by your new

11  employer, that that can somehow be disgorged.  There's not

12  case law that talks about that.

13       Now, there is a case that says if you steal a

14  business opportunity and later earn money from that, then that

15  opportunity could possibly because those funds were stolen

16  from the prior -- that opportunity was taken from the prior

17  employer.  That's not the case here.  There's no case that

18  says your future earnings can somehow be disgorged back to

19  your prior employer.  That's really an unjust enrichment claim

20  which is not asserted here at all.  It's not disgorgement.

21       So we would certainly say that that's really the way

22  this is looked at.  This is really an unjust enrichment that

23  was never pleaded.  It's not part of their theory of the case.

24  And then just one other point I have to make on that, your

25  Honor, is it's clear from what they say in the pretrial order

1  that they're seeking to recover -- probably the biggest thing

2  they're seeking in terms of disgorgement is this signing bonus

3  that was paid to Mr. Anderson.  Certainly a signing bonus

4  doesn't comport with anything in their discovery disclosures;

5  right?

6        They said in their discovery disclosures that they

7  want to be able to obtain compensation received by the

8  plaintiffs arising from or related to their breaches.  There's

9  no way to tie a signing bonus that was agreed to back in

10  October of 2019 to some breaches that occurred much later and

11  that a signing bonus was paid much later.  So we don't think

12  it fits from that standpoint in terms of it never being

13  disclosed in discovery.

14        Here's the other thing about how this claim pertains

15  to Taylor Anderson, and that is there was a real ambiguity in

16  the summary judgment order.  And it's on page 46 of the

17  summary judgment order where we're arguing about whether

18  Taylor Anderson owed a fiduciary duty to USI, and Judge Jones

19  in the order, you know, a late March order, a long order, done

20  right as the list is about to come out -- I used to work down

21  here -- we get a statement that says even though Taylor

22  Anderson doesn't have a fiduciary duty, that doesn't do

23  anything about the duty of loyalty claim for breach of

24  contract.

25        So you've really -- in essence, Judge Jones is

1 saying, yeah, there's not a fiduciary duty, but you've got

2 this contract claim so we're just going to let them both go.

3 And that really wasn't the right approach on that, and,

4 frankly, it's ambiguous as to what he intended.

5        Clearly based on that comment in the order Judge

6 Jones recognized that Taylor Anderson didn't have any of the

7 prerequisites for owing a fiduciary duty to USI and says as

8 much in the order, but then he just says that doesn't do

9 anything about the duty of -- contractual duty of loyalty.  So

10 he let's them both go, and I think that was just, frankly, a

11 mistake.  And this particular issue shows exactly why that's a

12 mistake, because a disgorgement remedy like this is not a

13 remedy for the breach of contract on the duty of loyalty.

14 It's only a potential remedy if it had been disclosed in the

15 pleadings in discovery, which it wasn't, for a fiduciary

16 claim, which really doesn't exist.

17        So I know I'm throwing a lot at you on that, but, you

18 know, it's not really a proper remedy for the claims that

19 really exist against Taylor Anderson, and it almost seems like

20 just a Scrivener's error that the fiduciary claim against

21 Taylor Anderson survived because it's just right there in the

22 judge's order.

23        THE COURT:  Tell me what page again.

24        MR. HALL:  46 and I will -- it's in the middle of

25 page 46 sort of the last sentence of that top paragraph, and

1   he says, of course, it is true that USI might not recover

2   duplicative damages for the same breaching conduct, but the

3   fact that Taylor Anderson did not have sufficient authority at

4   USI to be a fiduciary does not obviate his contractual duty of

5   loyalty.

6           So, you know, we're asking, your Honor -- I mean,

7   there's sort of multiple grounds for this motion.  On the one

8   hand we're saying this theory of recovery wasn't pleaded, it

9   wasn't properly disclosed during discovery, but we're also

10  saying that it's not a valid recovery against Taylor Anderson

11  because the Court admitted in the summary judgment order that

12  that -- there was no predicate, there is no basis for a

13  fiduciary claim against Taylor Anderson.

14          And, by the way, I mean, if your Honor wants to go

15  back and look at the briefing on that, it was not even really

16  a disputed issue in the briefing, and that's why the Court

17  says the fact that Taylor Anderson didn't owe that duty.

18          So we think there's multiple grounds for saying that

19  this relief isn't proper at all against either Taylor or Dean

20  but certainly not against Taylor because of this finding in

21  the summary judgment order.

22          THE COURT:  All right.  Go ahead.

23          MS. BAUGHAN:  Your Honor, I'm going to start with the

24  last argument that Mr. Hall was making.  He's absolutely wrong

25  that there was some kind of scrivener's error.  Judge Jones

1  issued two very thoughtful 50-page orders in this case.  I get

2  that they don't like some of the results, but this is not the

3  time for a motion for reconsideration.  We're not here to

4  relitigate the issues Judge Jones already decided.  We're here

5  to try the issues that he said needed to go to trial.

6          So if you looked at his summary judgment order, on

7  page -- top of page 46, they're making this same argument.

8  It's already been ruled upon.  This argument ignores Section

9  2.4 of the TA agreement regarding Taylor Anderson's breach of

10  loyalty.  And then he goes on to say, the Georgia Supreme

11  Court has recognized that a duty of loyalty is a fiduciary

12  duty.

13          So he found, based on a Georgia Supreme Court case,

14  that Taylor Anderson breached his fiduciary duty, the tort

15  claim, and he granted summary judgment in favor of USI.  This

16  is at the bottom of 46 on both Counts Five and Six.  So you

17  should reject out of hand the back door attempt at a motion

18  for reconsideration.  This issue has already been decided.

19          So given that there are adjudicated tort breaches of

20  fiduciary duty against both claims, as Mr. Hall admitted,

21  disgorgement is an available remedy for breach of fiduciary

22  duty.  And the whole focus of their motion in limine was that

23  this wasn't disclosed, and we actually thought, well, maybe

24  they just didn't -- you know, there are a lot of pleadings in

25  this case.  Maybe they just didn't really know.

1         So we laid out here in our written response all of
2  the ways in which it was disclosed, and we made clear that we
3  were seeking the value of all benefits and advantages
4  wrongfully obtained by plaintiffs as a result of their
5  breaches, including all compensation received by plaintiffs
6  arising from or relating to those breaches.  So it's been
7  disclosed.

8         In this case -- and, you know, we keep going back to
9  this was a whole scheme.  Lockton paid Taylor Anderson a lot
10  of money to bring USI's clients over to Lockton.  It is all
11  part of that scheme.  And as Judge Jones found in his order,
12  Taylor Anderson was breaching his duties to USI even before he
13  gave notice, so put aside the 60-day period that there are
14  breaches.  He says even before he's out there telling clients
15  what he's doing, where he's going.  So this absolutely ties to
16  USI's damages in the loss of those clients.  So we should be
17  allowed to seek a disgorgement remedy as one of the available
18  options for the jury in this case.

19         THE COURT:  What about their argument that you are
20  seeking money that Lockton paid to Mr. Anderson?  Don't know
21  which one.  Dean Anderson?

22         MR. HALL:  Well, Taylor and Dean.

23         THE COURT:  All right.  We'll leave it at
24  Mr. Anderson.

25         MS. BAUGHAN:  Taylor was paid the most.  Dean was

1    also paid a bonus.  But, you know, I regret that we haven't

2    briefed that because they didn't raise it in their motion in

3    limine.  It wasn't the focus of their motion in limine.  We

4    would be happy to come back to the Court with case law on that

5    issue, but that isn't the basis on which they are asking the

6    Court in their motion to exclude the evidence.  So we've

7    addressed the basis that they've made.  We'd certainly be

8    happy to provide further briefing, but they haven't provided

9    the Court with any case law that says that can't be recovered.

10            THE COURT:  All right.  Thank you.

11            MS. BAUGHAN:  Thank you, your Honor.

12            MR. HALL:  Your Honor, just the idea that this sort

13   of fiduciary duty can spring from the contract, the law in

14   Georgia is clear that a contractual breach cannot support this

15   kind of restitution disgorgement type of remedy, and so we

16   think that any idea that somehow there's a contract that has a

17   duty of loyalty that they allege was breached, that can't

18   support this remedy.  It's only got to be supported by the

19   tort if it was disclosed.

20            THE COURT:  All right.

21            MS. BAUGHAN:  I'm sorry.  I'm not going to address,

22   unless you would like, what Mr. Hall just said because I think

23   I already addressed that.  We're not here on a motion for

24   reconsideration but we did actually address -- the cases that

25   we have cited in our response to the motion in limine speak in

1    terms of what can be disgorged.  We cited to your Honor the

2    *Jennette v. National Community Development*.  This is on pages

3    3 and 4 of our motion in limine response.  In that case

4    sustaining an award of the gross revenues that the agent

5    earned as a result of his breach of fiduciary duty, and the

6    *Vinson* case, approving a jury charge that an unfaithful agent

7    is not entitled to retain the profits of an enterprise

8    operated in competition with the principal's business.  So we

9    would argue that those cases would support the remedy of

10   disgorgement in this case.

11        MR. HALL:  Your Honor, I believe those cases -- you

12   know, I believe those cases dealt with situations where

13   someone had usurped a business opportunity so, for instance,

14   someone, you know, has a real estate deal, they leave their

15   real estate company and go and do the deal.  Those funds from

16   the actual deal that was usurped, I think that's what the

17   courts talk about.  This is not that situation.  This is in

18   the context of employees breaching fiduciary duties based upon

19   their conduct during employment.

20        The only law out there in Georgia says that the

21   recovery is based on the compensation that USI paid during

22   their employment, and you can see that in their discovery

23   responses.  That's what they say.  They're trying to recover

24   compensation paid by USI to plaintiffs during their alleged

25   time of disloyal employment.

1          So that's the remedy that Georgia courts say exists

2    for alleged disloyal employees.  It's when you steal a deal or

3    some sort of transaction that you then turn into money.  Sure

4    that money is a different kind of fiduciary breach, and if

5    it's proven that that was stolen, then sure that money can

6    come.  But that's not what we're talking about here, and

7    that's not what the cases in Georgia have held is appropriate

8    for this employment context.

9          THE COURT:  Did you all disclose it prior to the

10   pretrial order?  The disgorgement?

11         MS. BAUGHAN:  Yes, your Honor, in our response.  We

12   have cited all of the places in our discovery responses.  This

13   is on page 5 of our response to the motion in limine, the

14   supplemental responses to plaintiff's first interrogatories,

15   supplemental responses to Dean Anderson's second

16   interrogatories, the responses to Taylor Anderson's second

17   interrogatories, the second supplemental responses to

18   plaintiff's first interrogatories, and there is a reference to

19   discovery being sought about the ill-gained profits in the

20   initial disclosures.

21         MR. HALL:  Your Honor, those are all just sort of cut

22   and pastes of the exact same words in each of those discovery

23   responses.  None of them say the word "disgorgement."  None of

24   them say the word "restitution."  It says compensation

25   received arising from or related to their breaches.  Okay.

1   And so that's -- that means it's got to be tied to proximately
2   caused.  If you look at Judge Duffey's *Wynn Logistics* case,
3   it's got to be proximately caused by the breach.  Okay.
4          What we're talking about here is a signing bonus that
5   was agreed to months earlier.  There's no way to tie the
6   signing bonus to any breach, so this disgorgement theory
7   related to the signing bonus absolutely was not disclosed.
8   It's not consistent with their disclosures.
9          And, look, they very clearly make it in their
10  pretrial order.  They know how to do it.  They knew how to do
11  it, and they even have this recoupment of the amounts paid by
12  USI in their discovery responses.  So they know how to do it.
13  They didn't do it.  And it's not in these discovery responses,
14  and it doesn't appear until it's very plainly and clearly
15  stated in the pretrial order.  And that's just not the way
16  it -- it should have been pleaded in the complaint, and it
17  wasn't.
18         There's no request for restitution or disgorgement in
19  any of the pleadings.  That's where it should have been, and
20  then it's not in these discovery responses, even though they
21  say otherwise, but yet it's very clearly spelled out
22  explicitly in great detail in the pretrial order.  And that's
23  not the way you try a case, your Honor.  It's got to be
24  disclosed early so that we can have discovery on it.  So thank
25  you.

1          THE COURT:  All right.  Thank you.  My inclination at

2    this point is to give you a ruling later and would like to go

3    back and look in more detail at this, but I'll just say for

4    the record that a motion to reconsider on Judge Jones's orders

5    was not filed.  And so I'm going to stick with what he found

6    in his orders in terms of liability and just have our trial

7    based on that.

8          All right.  The next one was evidence and argument

9    related to the December 9, 2019 departure email and later

10   referral of clients to Manoj Sharma and that being

11   solicitation.  I feel like we've talked about solicitation

12   before, so this might be something that I just have to rule on

13   as it comes in but I think the facts can come out.  It's just

14   whether someone is allowed to testify like this is

15   solicitation.  Is that the concern?

16         MR. HALL:  Not exactly on this particular one, your

17   Honor.  So the issue here is, you know, Judge Jones in the

18   summary judgment order didn't rule, said it's an open question

19   on this question of whether these communications were

20   solicitation.  And what we're asking now is for your Honor as

21   just sort of a way of controlling the evidence in your case,

22   you know, not necessarily changing Judge Jones's order on this

23   particular issue but to say this departure email, which is

24   what this motion is primarily about, there's no question as to

25   what it says.

1              You know, all three of these emails say only two

2    things.  I'm leaving USI, and if you have any questions

3    regarding your insurance, call this person at USI.  And that's

4    all these emails say.  And so what we're asking, your Honor,

5    is for you to look at what the other Courts in this district

6    have said on this question time and time again, even as

7    recently as last month, Judge Thrash in the *Lifebrite* case and

8    Judge Boulee in the *Mercer Global* case and Judge Grimberg in

9    the *Gallagher* case and Judge May in the *Capital Investment*

10   cases -- case.

11             Solicitation requires a request.  It requires an ask.

12   It requires salesmanship.  It requires a petition to do

13   something.  And, you know, you can -- some of these verbal

14   comments that were between Taylor Anderson and some of his

15   clients, we're not asking for a ruling on that.  But these

16   emails, your Honor, there's just no question as to what they

17   say, and they say call USI with any questions about your

18   insurance.

19             So applying the standard that is really now the

20   settled standard in this district -- and it's settled under

21   Georgia law, it's all based -- all these cases by your

22   colleagues are citing Georgia case law, and they're all

23   granting summary judgment on communications like this or, to

24   be honest, there's a couple denying summary judgment but it's

25   because the conduct went way beyond anything like what is in

1   this email.

2        For instance, in *Gallagher* Judge Grimberg says I'm

3   not going to grant summary judgment because the employee went

4   on a pitch meeting to clients trying to sell them business.

5   Well, of course.  That makes sense.  That's not what this

6   email is.  And Judge May in the *Capital Investment* case denied

7   summary judgment because she said that the individual

8   introduced her new company and asked the client for business,

9   so there's that asking component.  But, Judge, even Judge

10  Grimberg and Judge May in those cases cited the same standard

11  that we're talking about here, and it's the same standard that

12  Judge Boulee said in the *Mercer* case would be worthy of

13  summary judgment if that's all the evidence was in his case.

14  And it's certainly the standard that Judge Thrash used in the

15  *Lifebrite* case.

16       So all we're saying is that the standard is now

17  established.  We think it's been established, and we think

18  we're entitled to rely on what that standard is.  And there's

19  no possible reading of this email that says I'm leaving and

20  call USI about your insurance can meet that standard.

21       So what we're asking is that there not be this

22  opportunity for USI to just sort of throw things up there and

23  try to use all these other -- all this other evidence to make

24  my clients look bad and just sort of hope the jury glosses

25  over whether this is really a solicitation.  This is one.

1  It's black and white.  There's the four corners of the

2  document, and what's in that document does not and cannot meet

3  the standard of solicitation as has been laid out by numerous

4  of your colleagues very, very recently.

5          So we're just asking you to apply that same standard.

6  It's the standard that we expected.  It's the standard that's

7  been Georgia law for a long time, and we think we're entitled

8  to rely on that being the standard for what gets in front of

9  the jury on this case.  Thank you, your Honor.

10          MS. BAUGHAN:  Your Honor, this, of course, is just

11  another belated motion for reconsideration.  Judge Jones

12  considered and ruled upon those exact same arguments.  We're

13  not here on summary judgment.  We're not here on a motion for

14  reconsideration.  We're here to try the case.

15          Pages 40 and 41 of the judge's order in the 2019

16  case, on page 41 the judge says, no, we're not going to look

17  at these singular acts, and he says there is evidence from

18  which a fact finder could determine that the whole process was

19  carefully orchestrated, a carefully orchestrated scheme to

20  bring business from USI to Lockton.  And that's exactly what

21  it is.  So Mr. Hall made those arguments eloquently on paper

22  just like he makes them eloquently here.  Judge Jones

23  considered them and ruled.  He was not going to have the wool

24  pulled over his eyes.  It's not let's look at the four corners

25  of this document, and let's look at this separate fact over

1  here.  It's the whole scheme, abruptly resigned, email the

2  clients, send them all to somebody at Lockton so he can close

3  the deal.  It is a carefully orchestrated scheme, and you have

4  to look at the whole scheme to understand what happened here.

5  And the jury is entitled to see that.  This is the type of

6  evidence that has to go to the jury for it to do its job.  So

7  we ask that you deny the former employees' motion for

8  reconsideration and that you deny the motion in limine.

9        THE COURT:  I'm wondering is your intention at trial

10  to elicit any testimony or make any argument that this email

11  in and of itself was a solicitation.

12        MS. BAUGHAN:  We will absolutely be arguing that it

13  is part of the solicitation scheme, this email that some

14  clients knew was coming because they told them in advance

15  we're going to be leaving USI, we're going over to Lockton.

16  So this is how they knew the scheme had been activated.  Some

17  clients didn't know that this email was coming, and this email

18  caused shock and chaos.

19        This email -- USI never would have sent an email like

20  this.  USI would have communicated with clients and told them

21  what the transition plan was, what the go-forward plan was.

22  So this email was designed to disrupt those client

23  relationships and absolutely was a piece of the whole scheme,

24  which was this solicitation, which was successful.

25  Twenty-five clients went over to Lockton.

1          So I don't think we're going to be arguing at all

2    about what are the words of, you know, this -- did the words

3    here urge you to move your business but the fact of sending

4    this email.  And some clients received this email multiple

5    times because Dean sent it, and then Roger sent it.  So this

6    caused a lot of concern amongst clients, which loosens that

7    client relationship and allows Lockton's scheme to succeed.

8    So this is a critical part of the plan, and Judge Jones

9    considered this, and this is exactly the type of evidence that

10   should go to the jury.

11         THE COURT:  All right.  So I'm just -- I can see we

12   could do this for another hour.

13         MS. BAUGHAN:  And might I say one more thing, your

14   Honor?

15         THE COURT:  No, no, because I need to rule on this

16   and move on to a bunch of other things.  I think I have to --

17   I'm going to follow Judge Jones's order, and I agree that this

18   information that the departure email can be introduced.  But I

19   don't think it would be fair or correct for anyone to say that

20   it is in and of itself solicitation.  I think it's a jury who

21   has to decide that, and so in terms of framing your questions

22   and argument, there should be no emphasis on this email.

23         In terms of whether or not you all have met your

24   burden, that can come up later, but the evidence can come in.

25   I just don't want questions where is this the solicitation or

1  did you consider this to be a solicitation.  I think that's

2  for the jury to decide on each kind of piece of evidence that

3  you all are bringing up, going to introduce as part of this

4  scheme.  I think that's all I can do at this point on that.

5        MS. BAUGHAN:  Thank you, your Honor.

6        MR. HALL:  I think it's the next one, No. 4, is the

7  one you were thinking was probably covered by our earlier

8  discussion so just jumping ahead to No. 4.

9        THE COURT:  I hope something was covered by our

10  earlier discussion.

11        MR. HALL:  I thought I would throw that out to you.

12        THE COURT:  All right.  Okay.  I've ruled on this, so

13  we can move on in terms of the solicitation.  And I think

14  everyone agrees and understands that I don't want anyone

15  besides the former employees themselves kind of opining on

16  what solicitation is, but the employees are allowed to talk

17  about their intent.

18        MR. HALL:  Thank you, your Honor.

19        THE COURT:  Is that consistent with USI's

20  understanding?

21        MR. MILLER:  Subject to the concern we raised about

22  the advice of counsel issue.

23        THE COURT:  Right.  Of course, yes.

24        MR. MILLER:  Thank you, your Honor.

25        THE COURT:  All right.  And No. 5 is this evidence

1  and argument about transition assistance.  I need to hear some

2  more about this.  How important is this going to be to USI's

3  case?

4          MS. BAUGHAN:  This will also be important.  Again

5  it's the whole scheme.  So when the former employees -- when

6  Dean Anderson and Taylor Anderson gave their notice of

7  resignation, they were contractually required to give 60 day's

8  notice.  It's already been determined that they breached that,

9  and they breached their fiduciary duties.

10          So why is that 60-day notice period important?  Well,

11 in that 60-day notice period USI would have put a transition

12 plan in place.  They would have been able to tell clients

13 Taylor is leaving, but Mr. Smith is going to handle your

14 account and here's what his qualifications are.  And when a

15 brokerage firm has the opportunity to put that kind of

16 transition plan in place, clients stay.  They don't go.  So

17 this is further proof of causation.  What they did here with

18 the abrupt resignations was part of the cause of those clients

19 transferring their business over to Lockton.

20          So what we would be asking USI employees is, you

21 know, what do you expect employees to do when they give

22 60-day -- when they give their notice?  What do you expect to

23 happen during that period so it can be explained that these

24 are the steps that are normally taken, these are the steps

25 that we were prevented from taking because these guys gave

1  their notices of immediate resignation and walked out the door

2  and down the street.

3      THE COURT:  And how are you drawing the line so that

4  it's not speculative in terms of USI saying what they would

5  have done because that didn't happen?  So where's the line?

6      MS. BAUGHAN:  I think USI can say when an employee

7  leaves, what's the process, what do you do, why do you do

8  those things.  I think the jury has to understand why it's

9  important that giving no notice caused damages to USI.

10      THE COURT:  Okay.  All right.  Let me hear from --

11      MR. BANKS:  Okay.  So, your Honor, a couple of things

12  here.  First, there was no contractual requirement for Dean or

13  Taylor Anderson to have assisted in the transitioning of their

14  clients to someone else at USI during the 60-day notice

15  period.  They had a contractual provision that said they were

16  supposed to give 60 day's notice, that's it.  So there was no

17  obligation for them to do anything else, and the USI

18  witnesses, as we cited in our motion, agreed.  They couldn't

19  force them to do anything.  They would ask them maybe, but

20  that was it.

21      Second, as your Honor said, it is very speculative to

22  say what would have happened in that situation, for USI to say

23  it.  And I will also, as a big overview point, I want to note

24  25 clients left.  Taylor Anderson had 88 clients when he was

25  at USI, and there were a total of 440 clients in the aviation

1   practice group.  This is not some mass raid and scheme to
2   steal all of the business.  A small number of clients left,
3   clients that at trial you'll hear had really longstanding
4   relationships with Taylor.  Twenty-four of them were ones that
5   he had built up himself.  One came over later, months later,
6   for different reasons, and that was National Air Cargo.  That
7   was not his client, but they left because they were
8   dissatisfied with USI.

9          So the question is what damages could have flowed
10  from that failure to give 60 day's notice; right?  And they
11  want to be able to say it's the loss of all of these clients
12  because if you had given us the 60 day's notice, then we would
13  have done all these other things that would have kept these
14  clients for however many years, and that is what is
15  speculative.  But it's not only speculative, it is also
16  contrary to Georgia law on damages, and it's contrary to the
17  summary judgment order.

18         As I noted earlier, the summary judgment order said
19  that the damages that could flow from the failure to give 60
20  day's notice is that perhaps USI could prove that some of
21  those clients would have stayed through the 60-day period, and
22  perhaps damages flowed from losing clients during that 60
23  days.  That's it.  It is not that the clients would have left
24  forever because after the 60 days, according to summary
25  judgment ruling, of course Taylor and Dean were free to be

1    doing whatever they wanted as long as they complied with other

2    contractual provisions.

3         So what are the damages that were solely caused by

4    this breach of the 60-day notice?  It's got to be limited to

5    that under Georgia law, and it can't be what are the damages

6    that flowed from you not providing transition assistance.  And

7    that is our -- what the motion is seeking to exclude because

8    there was no obligation for them to do it, and it would be way

9    too remote and too speculative to assess damages for years and

10   years of client losses based on simply the failure to give 60

11   day's notice.

12        I would note actually that their own expert agrees

13   that 60 days was totally insufficient for USI to have saved

14   any of these clients.  And the USI witnesses have recognized

15   in their depositions that if we get the 60 day's notice, we

16   still lose clients; right?  It doesn't mean you don't lose any

17   clients, but they would be hopeful they may have lost less.

18   So that's why here, though, I think that any idea that they

19   lost clients for more than 60 days is too speculative and too

20   remote to tie to the client.

21        THE COURT:  I feel like you all are saying two

22   different things.  Lockton and the former employees are kind

23   of making it a narrow issue of what were they required to do,

24   those three in those 60 days.  And you, I thought, were saying

25   that USI wanted to get into what they, USI, would have done in

1  terms of maybe providing emails to clients, doing a better

2  transition.  So are you trying to argue about what the

3  employees themselves should have done, the former employees?

4        MS. BAUGHAN:  I mean, we'll certainly be arguing

5  about that.  Under the contracts their duty of loyalty was to

6  use their best efforts to faithfully, diligently, and

7  completely perform all of their duties and responsibilities in

8  furtherance of the business of USI.  So that's what they were

9  supposed to do.

10        In the summary judgment order there's a recognition

11  that under Georgia law a contract provision requiring a

12  specified prior notice of termination is reasonable to allow

13  the employer to prepare for an orderly transition and

14  enforceable through special damages resulting from the sudden

15  quitting, and in the absence of special damages nominal

16  damages are recoverable.

17        So here we have a case where they want to trot

18  clients in to say, you know, oh, here's why we left, and they

19  want to say, U.S., I can't prove causation.  Well, one of the

20  ways we're going to be able to prove cause -- argue causation

21  to the jury is based on the evidence that this is what should

22  happen during the 60-day period, and when this does happen,

23  clients typically stay.  Yes, we might lose some clients, but

24  we lose far less.  So they want to tie one hand behind our

25  back to keep us from giving information to the jury that they

1  might assess whether or not those damages were caused by what
2  Dean and Taylor Anderson did.
3          As to Mr. Banks' other argument, which I'm not sure
4  it's a part of this motion, but he raised it, that we would be
5  limited somehow to damages that just accrued during that
6  60-day period.  They stole the clients in the 60 days.  They
7  didn't give them back, so we absolutely are entitled to all of
8  the damages that flow from stealing the clients in the 60
9  days, not just whatever accrued during that 60-day period.
10          And, you know, we do have expert testimony.  She
11  doesn't say that this covenant was too short.  She talks about
12  the function of covenants.  A notice covenant is to allow an
13  orderly transition to take place.  This was all part of the
14  scheme.  By doing the abrupt resignations, it was more likely
15  to cause the clients to go across the street to Lockton, and
16  so we do need to be able to talk about what was expected under
17  the contracts and when that happens, that clients typically
18  stay.
19          MR. BANKS:  Your Honor, I think what Ms. Baughan said
20  is kind of our point, that this is very, very speculative.
21  There's a whole chain of things that they're saying would have
22  happened that would have allowed us to keep more clients.
23  They probably can't tell you which ones they would have kept
24  and which ones they would have lost.
25          Again I go back to the fact this is a case where a

1   relatively small number of clients changed.  They're not --

2   these aren't things that people collect.  They aren't things

3   that, you know, you took from me and you have to give back.

4   These are clients who make their own decisions.  They made a

5   decision to go to Lockton.  Again, it was only 25 out of 440

6   total clients that moved business here.  It is not a large

7   amount.

8          And whether USI could have kept these, if only they

9   had had a chance to do a bunch of things in 60 days, is a

10  very, very speculative thing that they want to introduce, and

11  the case law is clear that to obtain damages for a breach of

12  contract in this type of situation, they have to prove sole

13  causation as well as to achieve lost profits, they have to

14  prove with reasonable certainty that they would have enjoyed

15  these profits but for the wrongful acts.

16         And this is just -- I mean, I guess it's very

17  speculative, but beyond all of that this goes back to the

18  simple point that the employees were not required to do

19  whatever USI wanted during that period.  They were -- they had

20  to give 60 day's notice.  That was it.  And so we don't think

21  that them putting on this speculative evidence of what

22  transition assistance could have been provided should have

23  been provided and what it would have done should be presented

24  to the jury.

25         MS. BAUGHAN:  Your Honor, it all goes to causation,

1  and Mr. Banks keeps saying this was a very small number of

2  clients.  This was a very big amount of clients.  Taylor

3  Anderson had a grouping of clients with revenues of around two

4  and a half, 2.7 million, and he took the clients with 1.5

5  million in revenue.  So it was a lot of clients.  I don't know

6  where he -- the numbers that he's talking about, but it was a

7  very significant amount of clients.  And this is all part of

8  the scheme.  It was all factored into the model.  How much

9  revenue are you going to be able to bring to Lockton?  Okay.

10 Here's what we think.  We'll pay you 1.5 million to do that.

11 So the jury does need to be able to decide causation, and

12 Mr. Banks is wrong that they weren't required to provide

13 transition assistance.  I just read from the contract.  I

14 mean, yes, as a practical matter USI can't force them to do

15 that, but they were legally required to do that.  And they

16 breached that obligation, and we're entitled to show what

17 happens when those contracts are followed as part of the

18 causation analysis.

19         THE COURT:  Who is your witness on the causation,

20 what happens when the contracts are not followed, that last

21 part you said.

22         MS. BAUGHAN:  What happens when they are followed?

23         THE COURT:  Right or why they are important.  You

24 started with these notice provisions are important because

25 they allow the company to do XYZ.  Who is going to be

1  testifying as to that?

2        MS. BAUGHAN:  So we have had several fact witnesses

3  who have been deposed and whose evidence will be presented

4  here.  Rob Meyers testified to the importance of the 60-day

5  notice provision.  Clark Johnson testified the same.  And then

6  our expert witness, one of the areas in which he is opining is

7  on the value of the covenants and the contractual protections.

8  And so she talks about how the contractual protections, you

9  know, that the purpose is to allow for an orderly transition.

10       MR. BANKS:  Your Honor, I'd submit that the expert is

11  not an appropriate person to testify on such things.  This

12  should be based on personal knowledge as to what these

13  covenants were for, not some expert's opinion about what a

14  covenant can do.

15       MS. BAUGHAN:  Oh, and one more.  Rob Allen did

16  testify in his deposition that when producers provide the

17  contractually required notice, USI usually keeps all of the

18  business, so he'll be here at trial too to testify in that

19  regard, a fact witness.

20       MR. BANKS:  That would appear to be expert testimony

21  that is not based on any sort of statistical analysis or

22  anything that would be testable and would be subject to a

23  challenge.

24       THE COURT:  I'm going to -- again it's -- let me

25  restart.  It's one of those things where I feel like the

1   motion asks for one thing, and then when I hear argument, it

2   kind of becomes something bigger.

3         I read the motion to just say that I should exclude

4   evidence and argument that former employees were required to

5   provide transition assistance during that 60-day period, and

6   it sounds to me like USI might elicit some of that just under

7   the duty of loyalty.  But that was not the main focus of the

8   arguments I'm hearing.  Instead, the arguments more so relate

9   to how their leaving affected USI and why USI needed that

10  notice.  And so I think it's appropriate for USI to provide

11  evidence about the reason for the notice period and why it's

12  important.

13        I feel less comfortable about more speculative

14  testimony, about what would have happened if that notice had

15  been given in this case because I don't think anyone knows

16  that for sure.  And so I think with that instruction or that

17  guidance in mind, I'm going to deny the motion without

18  prejudice and just sort of be on the lookout for speculative

19  things that come up in terms of what would have happened.

20        I have the same concern with respect to the expert's

21  testimony.  I think it's one thing for fact witnesses to

22  explain based on their experience working at USI, what

23  happened or why it's important, what their experience shows,

24  but for an expert to opine on what would have happened in this

25  case seems very speculative to me.

 1          MS. BAUGHAN:  And, your Honor, just to clarify, she

 2   didn't opine what would have happened in this case.  Her

 3   testimony is about the importance, the value of the covenants,

 4   and that hasn't been challenged, of course, on the *Daubert*

 5   motion.  So I feel like if we get somewhere in trouble at

 6   trial, your Honor can rule then, but I understand your point.

 7   Thank you.

 8          THE COURT:  All right.  Okay.

 9          MR. BANKS:  Your Honor, to that end I think what

10   Ms. Gunnersen testified to was on the value to a bunch of

11   covenants that are different from the ones that are going to

12   be at issue at trial, so she talked about non-competes of

13   different lengths and some things like that.  So we'll deal

14   with it at trial, but we would expect her opinions not to

15   change from what she offered previously, which I think largely

16   are not relevant to this case.

17          THE COURT:  All right.  Okay.  We'll deal with it at

18   trial.

19          All right.  No. 6 was the Court should exclude

20   evidence and argument that USI "owned" the clients and/or

21   accounts at issue.  I don't love the term "owned," so I just

22   need to hear how USI was planning to make that argument.  I

23   mean, I understand the point that these were USI's clients.  I

24   just don't know how much of an issue this is going to be.

25          MR. MILLER:  Well, at trial, your Honor, we certainly

1   are going to talk about the fact that USI had a recognized

2   property right in the client relationships, the client good

3   will.  That's the exact thing that was taken from USI, and

4   importantly that's recognized both under the contracts in this

5   case and under Georgia law as USI's property right.

6         The contracts in this case, it's in all three of the

7   individual employees' contracts.  Section 10.7, the employees

8   expressly acknowledge that the client accounts are owned by

9   USI and are not property of the individuals.  That's in each

10  of the contracts that they signed acknowledging the client

11  accounts are USI's property rights.

12        On top of that under Georgia law, it's well

13  recognized both in the common law and in the statutory

14  Restrictive Covenants Act that client relationships are

15  property rights of the employer.  We have case law in our

16  brief on that, and, in addition, the Restrictive Covenants Act

17  defines a legitimate business interest to include business

18  relationships with clients.  That's O.C.G.A. 13-8-51.

19        So we think this is a well-established right.  It's

20  critical to our case.  It's the exact thing that was stolen,

21  and so we ask that your Honor deny the motion in limine both

22  due to the language of the contract and the recognized Georgia

23  law on this topic.

24        MR. BANKS:  Your Honor, it's true they have a legal

25  interest in the good will.  We understand that.  Our concern

1   is that various witnesses have -- including last week Rob

2   Meyers in a preservation deposition testified that USI owned

3   the clients, and that's not true.  They didn't own the

4   clients.  The clients get to make up their own minds and do

5   what they're going to do.  The individuals have obligations on

6   how they're supposed to do things, but the clients are not

7   owned by anyone.  And anybody in sales knows that, that you

8   don't treat your clients -- take them for granted.

9           And that's our problem, is that if there is testimony

10  coming from witnesses that USI owned these clients, that they

11  were USI's property, that the clients were stolen, things like

12  that, that that is inaccurate and would be prejudicial to

13  suggest that there is some legal interest that USI had

14  directly in the clients and in the decisions that those

15  clients made.

16          They have an interest in the revenues, the accounts

17  that are generated while they are served by USI.  They have a

18  legal interest in the good will, but Taylor Anderson has his

19  own interest in his personal relationship with some of these

20  clients.  And, again, the clients get to choose who they're

21  going to do business with in the end.  And this is a narrow

22  motion.  It is simply to exclude claims that USI owned these

23  clients.

24          MR. MILLER:  And to be clear, USI doesn't take the

25  position that USI owned the clients.  USI doesn't own any

1   person or any client, of course.  USI's ownership interest is

2   in the client account, the client relationship, and everyone

3   agreed on that.  That's in the contracts the former employees

4   signed, that the client account is owned by USI.  It's not

5   ownership of the client.  Of course, clients can make their

6   own decisions.  It's the client account.  And since it's in

7   the contract in the case, it's going to come into evidence.

8   We don't think it's an appropriate motion in limine.  It's in

9   the very contract.

10          THE COURT:  All right.  Well, I'm going to deny the

11  motion and just see how things come in.  I'm just letting you

12  all know that to my ears and maybe to some jurors', owned -- I

13  just don't like how it sounds.  I understand what you all are

14  saying it means.  It might mean that -- it might be that it

15  may be best to follow up with your witnesses on what that

16  means or on cross-examination to explain what that means, but

17  I'll deny the motion for now without prejudice.  You can bring

18  it up again.  I'm thinking it's not going to be a big deal.

19          MR. BANKS:  Thank you, your Honor.

20          MR. MILLER:  Thank you, your Honor.

21          MS. BAUGHAN:  Thank you, your Honor.

22          THE COURT:  All right.  No. 7.  So this one is kind

23  of odd to me because I understand that they did not give the

24  notice, but they also were not technically still employees.

25  And so I'm struggling.  I'd like to hear just a little bit

1  about how important this is and how it's going to come up

2  because I don't think they were still employees even though

3  they might not have followed that provision of their contract.

4         MR. HALL:  Well, your Honor, you feel that way and so

5  does the Georgia Court of Appeals and so does the Georgia

6  Supreme Court because they've both ruled that exact same way.

7  In the *Botterbusch* case, which is directly on point, an

8  employment agreement or notice was required.  Contractually it

9  wasn't given, and the Court said the failure to give notice is

10  a procedural violation of the contract.  It doesn't invalidate

11  the termination or the resignation.

12         So that's just -- it could not be more on point, and

13  it's entirely consistent with what you just said.  That case

14  is based upon the Savannah College of Art and Design, SCAD,

15  the *SCAD v. Nulph*, N-u-l-p-h, that *Nulph* case, which is a

16  Georgia Supreme Court case that also dealt with not a notice

17  clause but a procedural requirement for a termination that was

18  not followed, and the Georgia Supreme Court said the

19  termination is still valid.  You can sue for damages for the

20  breach of the procedure.  And that's what we're here about, is

21  USI here trying to allege damages for breach of the procedural

22  requirement of giving notice.  But it doesn't undo the notice,

23  doesn't undo the resignation, rather.

24         So that's exactly what you said.  It's exactly what

25  the Georgia Supreme Court and the Georgia Court of Appeals

1   have said, and, again, it's the law of Georgia.  We think we

2   ought to be able to rely on it.  And they weren't still

3   employees, and I think it's got a lot of ramifications for,

4   you know, parts of their claims.  And part of their claims is

5   based upon allegations that they were still employed for this

6   60-day period.  And that's just not the law, and so we think

7   this is an important evidentiary ruling for purposes of trial,

8   that they shouldn't be able to make that argument to the jury

9   because it's contrary to Georgia law.

10           MR. MILLER:  Your Honor, before I get into the merits

11   of the argument I'd like to point out an important point.

12   This argument has been made in its exact form repeatedly to

13   Judge Jones citing the exact same cases, and it's already been

14   decided.  It was made in the preliminary injunction hearing

15   and rejected.  It was made at summary judgment citing the

16   *Botterbusch* case and rejected.  No motion to reconsider was

17   filed and yet here we are the week before trial, and they're

18   seeking to relitigate an issue that was decided years ago in

19   this case.

20           As to the merits of the argument, your Honor, we've

21   addressed it extensively in prior briefing, again in the

22   motion in limine here.  Well, first let me take a step back

23   and tell your Honor how it really comes into the case.  It's

24   particularly important, your Honor, to show that after giving

25   notice of resignation, they remained employees of USI for the

1  next 60 days, and why that's important is their obligations

2  flowed with that.  They had a duty of loyalty to USI for 60

3  days -- dean and Taylor did, Mr. Maldonado didn't have the

4  notice provision -- for 60 days after they provided notice,

5  and I think that's the February 7th of 2020.  And so it's

6  relevant as to what they did during the time period.

7        That was one of the bases of Judge Jones' summary

8  judgment ruling on the breach of duty of loyalty and fiduciary

9  duty that during that 60-day period they remained employees.

10  USI continued to send them paychecks.  They remained employees

11  of USI, and their competitive conduct while they were USI

12  employees breached their legal duties owed to USI.  It's also

13  relevant for determining, you know, the restrictive covenants

14  and when they switched from interim covenant to a post term

15  covenant.  That's an issue that's already been decided by

16  Judge Jones, but he decided it multiple times in this case.

17        The *Botterbusch* case has been extensively briefed.

18  Judge Jones found it was not on point.  It's distinguishable.

19  It really has nothing to do with the facts here, and,

20  actually, in that case the Court found a notice provision

21  enforceable and held that an employee who was suing for breach

22  was entitled to continuing pay during his notice period.  So

23  that case is not inconsistent with our position, but, more

24  importantly, it's already been adjudicated in this case, your

25  Honor.

1          MR. HALL:  Your Honor, as the moving party I'll just

2     close out the argument on this.  I mean, just saying

3     *Botterbusch* is off point doesn't do it.  Read *Botterbusch*,

4     your Honor.  Just read it.  It's directly on point.  It's a

5     failure to give notice, and the termination was still valid.

6     And sure the notice clause was upheld just like the notice

7     clause has been upheld in this case, and they can seek damages

8     for the breach.  But the question in *Botterbusch* and the

9     question for your Honor in this motion is, does it invalidate

10    the resignation or the termination?  And the answer is no.

11    That's exactly what the Georgia Supreme Court has said.  It's

12    exactly what your Honor just said.

13          And, frankly, you know, when you talk about prior

14    adjudications, I mean, we were two floors down on the TRO

15    hearing and USI asked Judge Jones to -- you know, we were

16    still within the 60-day notice period, and USI asked Judge

17    Jones, tell them they can't work for Lockton, make them go

18    back to USI.  And Judge Jones says, no, I'm not doing that.

19          So, you know, there's been multiple different rulings

20    on this issue.  I'm not saying that they've all been in our

21    favor, your Honor, but read the *Botterbusch*.  Read the *Nulph*

22    case.  The terminations are still valid.  And my clients were

23    not employees of USI for that 60-day period, and they

24    shouldn't be able to argue something contrary to law to the

25    jury in this case.  Thank you.

1          MR. MILLER:  Very briefly, your Honor.  It's not just

2   me saying *Botterbusch* is not on point.  This is from Judge

3   Jones's summary judgment order, direct quote:  Neither of

4   these cases, including *Botterbusch*, is on point, and neither

5   goes to the critical question of whether Dean and Taylor

6   Anderson remained within the term of their employment

7   agreements during the 60 days after they provided notice to

8   USI they were departing.  So Judge Jones has found it's not on

9   point.

10          I've read Botterbusch.  *Botterbusch* actually enforced

11   the notice provision.  In *Botterbusch* the employee -- it was

12   undisputed -- had received payment and still remained an

13   employee during the 270-day notice period after his

14   termination.  It's not at all inconsistent with our case.

15   It's just on a different fact pattern, but there the notice

16   provision was enforceable.  And, also, I would point out

17   *Botterbusch* recognizes the right to damages, your Honor, in

18   this context.  It's in the opinion.

19          THE COURT:  All right.  That's it.

20          MR. MILLER:  Thank you, your Honor.

21          THE COURT:  So as I said before, I'm going to follow

22   what Judge Jones ordered, what his rulings were.  I was more

23   so concerned about the oddity, I think, of having fact

24   witnesses testify that they were still employees, i.e.,

25   they're still supposed to come in every day and do their work.

1  It just seemed odd to me.  It's not so much the legal

2  determination.  I was more so thinking on a very basic what is

3  a jury going to be thinking when they're hearing that.

4       I'm bound by Judge Jones's ruling, and I'm not even

5  saying that I disagree with his finding, which is that the

6  notice provisions were violated.  It's just weird to me.  So I

7  will deny the motion.

8       MR. MILLER:  Thank you, your Honor.

9       THE COURT:  It seems like No. 8 is -- also I'm going

10 to deny that one.  I think those are issues for

11 cross-examination with the expert in terms of her analysis on

12 the damages.

13      MR. HALL:  Your Honor, on No. 8 you said you were

14 going to deny -- I believe Judge Jones in his order, you know,

15 explicitly referenced that USI could try to serve damages

16 during the 60 days so --

17      THE COURT:  Okay.  Hold on.

18      MR. HALL:  -- if we're sticking with Judge Jones's

19 order.

20      THE COURT:  I think what I'm saying is I don't know

21 how you can quantify that when, as Ms. Baughan pointed out,

22 they didn't come back.  So it seems to me I don't know how you

23 would just look at damages only within those 60 days.

24      MR. BANKS:  They could do it, your Honor, by saying

25 that during these 60 days the clients would have paid us X, Y

```
 1   and Z in revenues, right, if there were -- just to back up,
 2   the way this business works is that clients contract right
 3   with their broker, and they either pay on an annual fee for
 4   the services or they pay when they purchase insurance or renew
 5   insurance.  So arguably if a client renewed or purchased
 6   insurance during those 60 days, that could be their damages or
 7   if they entered into a fee agreement that covered two months
 8   out of that year, perhaps two months of that fee might be
 9   their damages.  That's how they could measure it if they
10   wanted to measure the 60 days.
11            MS. BAUGHAN:  Do you want me to -- I respect your
12   ruling, and if you're sticking with it, I'll sit down and be
13   quiet.  But if you would like to hear anything from me, I'm
14   happy to address.
15            THE COURT:  I just think I'm sort of locked into
16   where we are now and so I'm going to -- well, did you find the
17   part of where do you think Judge Jones --
18            MR. HALL:  Your Honor, I mean, Judge Jones says -- on
19   page 25 of the summary judgment order, he says, thus,
20   construing the evidence in favor of USI -- as required in
21   adjudicating plaintiffs' motion for summary judgment -- there
22   is evidence from which a fact finder could determine that if
23   Taylor Anderson had not breached the notice provision, those
24   clients would have remained with USI at least through his
25   60-day notice period.  And then he says, furthermore, they
```

1  could possibly show nominal damages.

2          So sort of the fact that there couldn't be damages,

3  you know, is not dispositive of the claim.  You can still get

4  nominal damages, but as Mr. Banks explained, there

5  absolutely -- you know, there absolutely is a way to prove

6  damages during those 60 days.  And that's exactly what Judge

7  Jones based his -- I mean, he says that in the summary

8  judgment order.  It's again exactly what is said in the

9  *Botterbusch* case where it says damages are limited to the

10  notice period.

11          So if we're going to be bound by what Judge Jones

12  said, I think we ought to be bound by what Judge Jones says

13  especially when it's consistent with what the Georgia Court of

14  Appeals said in *Botterbusch*.

15          MS. BAUGHAN:  Yeah, I was going to cite the same

16  provision to your Honor because that in no way says that we

17  are limited to damages that actually accrued in the 60-day

18  notice period.  Any of these clients who left as a result of

19  what happened during the 60-day notice period, as we talked

20  about, those revenues continue into the future.  You'll hear

21  testimony in this case from both sides that in the insurance

22  brokerage industry there's a 90 percent client retention rate.

23  Clients usually stay.

24          So, you know, if there's no renewal in the 60 days,

25  that's not the point.  The point is you now have the client

1   relationship.  You've taken it from USI and not given it back.

2   So there's nothing in Judge Jones' order that limits the

3   damages to just what accrued during that 60 days.

4          These are arguments they can make as the trial

5   unfolds, but we would certainly ask you to stick with your

6   ruling denying Motion In Limine No. 8.

7          THE COURT:  All right.

8          MR. HALL:  Your Honor, just as the movant I've been

9   trying to get the last word unsuccessfully most of the time,

10  but I'll try again.

11         All we've heard is that Judge Jones didn't like

12  *Botterbusch*.  Well, here's an instance where Judge Jones said

13  exactly what *Botterbusch* says, which is the damages are

14  limited to the notice period, the 60 days.  And that's what

15  *Botterbusch* says, which is Georgia Court of Appeals decision.

16  It's entirely, at the very least, entirely consistent with

17  what Judge Jones says, and so we think we ought to be able to

18  rely on what Georgia law is on this issue.  And it's that for

19  a notice provision breach the damages are limited to the

20  notice period.  That's what the case says.  That's what's very

21  strongly suggested, if not stated, by Judge Jones in his

22  order, so we don't think that this is a stretch at all.

23         By the way, this applies to just Count One, the

24  60-day notice period.  It doesn't apply to their other claims.

25  So we're saying Count One, 60-day notice, the damages under

1  Georgia case law have to be during the notice period, and they

2  can certainly have calculated that.  But maybe they haven't.

3  Maybe they have.  We'll see.  But that's what the law is so,

4  your Honor, we respectfully urge that that motion be granted.

5         THE COURT:  All right.  I'm going to stick with my

6  ruling and deny the motion, and you all can renew it later on

7  just depending on how things come out.

8         I don't read Judge Jones's, that section that you

9  pointed to on page 25, as requiring the limitation, kind of

10 the 60-day limitation, so I'll leave things as I've said with

11 me denying that motion.  And I think similarly with No. 9 I

12 just think it's too early for me to rule on that -- oh, I'm

13 sorry.  The last one, I denied it without prejudice for you

14 all to bring it up later.

15        MR. HALL:  Thank you, your Honor.

16        THE COURT:  And then No. 9 I think same thing.  I

17 think that the causation, we've talked about that a lot, and

18 that's going to just be a fight between the experts.  I'll

19 deny that one without prejudice.

20        MR. HALL:  Well, yeah, just to be clear, causation is

21 actually not part of expert testimony.  I mean, Ms. Gunnersen

22 didn't offer --

23        THE COURT:  Right, exactly.

24        MR. HALL:  Yeah.  So causation is really going to be

25 the battle of the fact witnesses.

```
 1              THE COURT:  All right.  That's true.
 2              MR. HALL:  And, obviously, you know, we know what the
 3    clients are going to say about that.
 4              THE COURT:  Right.  All right.  Understood.
 5              Then No. 10 is -- sorry.  Let me look at the response
 6    to this, and then after this, we'll take a short break.  I
 7    apologize.  I just wanted to get through these motions.
 8              (Brief Pause.)
 9              THE COURT:  I think this relates to what we've
10    already discussed.  I'm going to deny No. 10.
11              MR. HALL:  Yeah, I could see that coming, your Honor.
12    I think it's tied pretty closely to the continued employment
13    issue, so we understand that's denied without prejudice.
14              THE COURT:  All right.  Great.  I think we're done
15    with the motions in limine; is that right?
16              MR. MILLER:  That's right.  Thank you, your Honor.
17              MS. BAUGHAN:  Yes, your Honor.
18              MR. HALL:  Yes, your Honor.
19              THE COURT:  Okay.  We'll take a short break, and then
20    when we come back, just for planning purposes, we will deal
21    with the -- there are some objections to the amended pretrial
22    order, and then we need to talk about bifurcation.  And then,
23    finally, I hope to get to general trial procedure.
24              COURTROOM SECURITY OFFICER:  All rise.
25              THE COURT:  15 minutes.
```

1          MR. MILLER:  Thank you, your Honor.

2          MR. HALL:  Thank you, your Honor.

3          (Brief recess.)

4          COURTROOM SECURITY OFFICER:  All rise.  This

5   honorable court is again in session.

6          THE COURT:  Y'all can be seated.  All right.  So

7   there were a couple of documents or there were some objections

8   to the amended order that I cannot find, but I recall what

9   they are about.

10          MR. HALL:  Your Honor, can I just be heard on just

11   one minor point while we're in a little gap here between --

12          THE COURT:  Are we in a gap?

13          MR. HALL:  Can we be in a gap for just literally one

14   minute?

15          THE COURT:  All right.  One minute.

16          MR. HALL:  Just out of an abundance of caution I want

17   to make this point:  Your Honor mentioned something during our

18   last session about being bound by Judge Jones's order, and I

19   just did want you to understand under Rule 54 you are not

20   bound by a prior ruling in this case and have every authority

21   to make a different ruling, especially with respect to the

22   trial of the case or the evidentiary matters.  So I just

23   wanted to make that point.  I know you've reserved judgment on

24   most of the rulings, so I just want to make that point for the

25   record.  Thank you.

```
1          THE COURT:  Thank you.  And I should make clear that
2     I am not indicating that I necessarily disagree with anything
3     Judge Jones did.  It's just that I'm trying to stay consistent
4     with what he did for the benefit of the parties, just here we
5     are the week before trial.
6          MR. HALL:  Oh, that's not to the benefit of the
7     parties.
8          THE COURT:  All right.  Well, that gave me time to
9     find my papers.  So there was an objection to the former
10    employees and Lockton's amendment.  First is Document 359
11    which relates to some exhibits and stipulations and
12    bifurcation.  It might be helpful if I should just say that on
13    bifurcation I am inclined to have the attorney's fees and
14    punitive damages be in the second phase of the trial, and it
15    seems like you all have gone back and forth on that.
16         MR. PERNINI:  We have, your Honor, if I can just be
17    heard on it briefly?  I understand your inclination.
18         THE COURT:  Yes.
19         MR. PERNINI:  Your Honor, we both have taken
20    different sides on this early or not.  Your Honor, after
21    having looked at all the evidence that we have and sort of
22    getting into preparing for trial, that's why we decided we
23    think it would be more efficient to go otherwise.  Obviously,
24    bifurcation is not the rule.  Bifurcation is the exception.
25    Punitive damages do have to be bifurcated by law, so we're
```

1   going to have that aspect of it.  There's so much trial going

2   on and there's so much evidence that has to come in.  Our

3   concern was if we're going to put all this to a second phase

4   of the trial, that's going to make it even more burdensome on

5   the jury.  We think it's more efficient to bring it all in in

6   the main case in chief.

7          They said this will create a, quote, mini trial.

8   It's not a mini trial.  It's the trial.  It's the trial on

9   their claim.  So we're only talking about a couple of

10  witnesses added in, and then the jury can come out and

11  hopefully give a result that is complete without having to go

12  back again for more time on it.

13         There's also the possibility, your Honor, jurors get

14  tired, and, you know, if you let them know they have to come

15  back, that can affect them in a way.  I know we give all the

16  directions we want, but that can have a negative effect on it.

17  So our concern was let's put it all in the main case except

18  for the part that can't be which is really the standard way we

19  should proceed.

20         THE COURT:  All right.  Thank you.

21         MR. MILLER:  And we think there's both an efficiency

22  and prejudice issue at play here, your Honor.  First, in terms

23  of efficiency, it is very likely if we try the amount of

24  attorney's fees issue in the first phase, we're trying an

25  issue with experts on one side or the other that ultimately

1   does not need to be tried to this jury.  Both claims have

2   13-6-11 attorney's fees claims in the case.  Both sides have

3   experts, and we suggest that the only thing that should be

4   tried on the amount of attorney's fees and reasonableness is

5   an issue that actually needs to be decided by this jury.  So

6   reserving that presentation until that portion of the case

7   when the jury has determined who is entitled to attorney's

8   fees as to liability is definitely the more efficient

9   approach.

10           I also don't think a phase two trial on that is going

11   to be particularly long or cumbersome.  Yes, there are

12   experts, but it's going to be a relatively cabined and

13   discreet presentation, and there's likely to be a need to be a

14   phase two on punitive damages anyway.

15           In terms of prejudice, your Honor, the issue is the

16   way this has played out.  As we've talked about, we received

17   an expert report from their expert, Richard Robbins, in

18   February which was after the initial pretrial order, and in

19   that report he's taking direct attack at USI's litigation

20   tactics and at USI's counsel and the way we've litigated this

21   matter.  And we think it's prejudicial for that type of

22   evidence and essentially a mini trial on the way we've

23   litigated this case to come into phase one when the jury is

24   deciding liability and damages on the substantive claims.

25   It's a necessary part of a phase two trial on that particular

1 issue, but it's prejudicial in phase one.

2          And so we agree with what -- the position Lockton and
3 the former employees took in the initial pretrial order that
4 it's more efficient to reserve that until phase two.  At the
5 time of the initial pretrial order, we thought the attorney's
6 fees portion of the case was going to be pretty
7 straightforward.  It now turns out it's going to be a little
8 more involved with multiple experts.  It should be reserved
9 until phase two, your Honor.

10          MR. PERNINI:  And, your Honor, if I may briefly
11 respond, perhaps we have a different disagreement of the word
12 "prejudice."  This is the evidence that's going to come into
13 the case.  Mr. Robbins' opinion is the most unextraordinary
14 opinion you've ever seen regarding attorney's fees.  Their
15 expert says we were reasonable.  Our expert, guess what, says
16 they weren't reasonable.  Perfectly predictable that that's
17 exactly what Mr. Robbins would have said.  It's not
18 extraordinary.  It's not an out-of-the-ordinary opinion.  It's
19 something that happens all the time in these cases, and
20 there's no reason to call that prejudicial.  It is just a
21 difference of opinion of the experts.

22          And, again, normally it's all tried in one case so
23 you don't have the jury coming in and out.  The only exception
24 is punitive damages because it has to.  We would just ask not
25 to go from the normal rule of having it tried in one case.

1  It's not prejudicial for the jury to hear the evidence that

2  they're going to produce regarding their fees.

3      THE COURT: So if I go with where I'm leaning with

4  the attorney's fees and the punitive damages, of course, have

5  to be in the second phase, how long do you all anticipate it

6  would last, that second phase would last?

7      MS. BAUGHAN: Maybe a day. It's not going to be --

8  it's not going to be long. But the reason why it needs to go

9  into phase two is if -- to get to phase two the jury has to

10 check the box that somebody is entitled to attorney's fees or

11 somebody is entitled to punitive damages. If they say no, we

12 never even have a phase two, so we have witnesses that never

13 have to be heard in the trial. So it doesn't make sense as

14 currently postured to do it in phase one.

15     MR. PERNINI: Your Honor, if the only thing in phase

16 two is punitive damages, it's not even a day. It's just

17 here's the records for the value of the companies and

18 argument. So where it would have to have expert testimony in

19 phase two, it makes phase two a good deal longer to have the

20 attorney's fees provision in that as well.

21     THE COURT: Okay. Thank you. Unless you wanted to

22 say something, but I didn't need anything else.

23     All right. I am just going to stick with my initial

24 inclination, which is to have the attorney's fees and the

25 punitive damages in the second phase. And with that said, we

1   can turn back to the proposed pretrial order and USI's

2   objections to the amendment.  What do you all want me to do on

3   this?

4         MR. MILLER:  I can walk you briefly through our

5   objections, your Honor.  First, we object to the designation

6   of 46 new exhibits essentially on the eve of trial.  The

7   former employees in Lockton submitted their portion of the

8   pretrial order back when it was due in January and designated

9   543 exhibits, very comprehensive.  And then last Thursday,

10   April 20th, they filed additional designations of an

11   additional 46 exhibits pretty close to the eve of trial, three

12   months late.  And so it's a pretty straightforward timeliness

13   objection, your Honor, and they've offered no justification in

14   their submission as to the tardiness.

15         THE COURT:  All right.  What's the justification?

16         MR. BANKS:  Just one moment, your Honor?

17         THE COURT:  Sure.

18         (Brief Pause.)

19         MR. BANKS:  Your Honor, I would just say that there's

20   really no prejudice to this.  These are documents produced in

21   the litigation.  These relate to some of the clients at issue

22   here and they just -- they go to the causation issue that's

23   going to be the main issue tried in this case.  The jury

24   should be entitled to receive the additional evidence.

25   They've had these documents for a long period of time.

1          It's a relatively small addition of exhibits.  The

2    plaintiff designated -- I mean, how many exhibits did they

3    mark?  A thousand exhibits in the first instance?  We've added

4    a few.  It's kind of a drop in the, you know, pond compared to

5    everything that's been marked in this case so far.  I don't

6    even know that we're going to be offering all of them into

7    evidence, but this way at least they're marked and they know

8    they might be used as exhibits in evidence.

9          THE COURT:  All right.  I'm just going to let them

10   in.  You all may know that I have a criminal background and so

11   some of this stuff is -- at least you got it at this point, so

12   I'll let it in.  What's next?

13         MR. MILLER:  Next, your Honor, and I think this is

14   one that can probably be reserved to trial.  We out of concern

15   about authenticity as to documents produced by nonparties in

16   the case -- and normally as part of the pretrial order

17   process, you look through their exhibits, figure out if

18   there's an agreement as to authenticity or if you object, and

19   you have to put that in the pretrial order.

20         Here with these documents produced on the eve of

21   trial, you know, we haven't had time to go through, and

22   they're from nonparties.  And so we would just -- you know,

23   we've indicated as to the documents in our objection we don't

24   consent or stipulate to authenticity, so I think they would

25   need to put on evidence as to authenticity to get them into

1  evidence at trial.

2         THE COURT:  All right.  Well, we'll deal with that

3  when it comes up.

4         MR. MILLER:  Thank you, your Honor.  And then the

5  third and last portion, since your Honor has already dealt

6  with bifurcation, was an objection to additional deposition

7  designations by Lockton and the former employees that they

8  submitted last Thursday.  And, again, that's just a timeliness

9  issue since we've been dealing with the prior deposition

10 designations for a period of two, three months preparing for

11 trial.

12        MR. BANKS:  Your Honor, most of the testimony that we

13 added -- first, I mean, it's a very -- it's four depositions,

14 a couple of pages each.  Most of it is in plaintiffs'

15 designations already, and if you compare it to what they had

16 designated and what we had designated, you know, we're adding

17 a few lines in each case just to give some additional context

18 and foundation.

19        THE COURT:  All right.  I'll allow those supplemental

20 deposition designations.

21        MR. MILLER:  That's it on the objection.  Thank you,

22 your Honor.

23        THE COURT:  All right.  Wasn't there another one,

24 this issue of the employee of Wargo, French & Singer?

25        MR. PERNINI:  Your Honor, I think that has been

1  resolved by the ruling on Richard Robbins.

2          MR. MILLER:  I think it has too, your Honor.  My

3  understanding was they were designating counsel of record to

4  potentially give expert testimony, but your Honor, I think,

5  has mooted that issue.

6          THE COURT:  All right.  Great.  So now I think we can

7  go to just general trial stuff -- no.

8          MR. BANKS:  Before we do, your Honor, there's one

9  other thing that came up last week.  This was in a deposition

10 that took place of Robert Meyers.  I think it was last

11 Thursday.  It's hard to keep the days straight.  And during

12 his deposition he was asked questions by USI's counsel about

13 the USI code of conduct and whether the individual defendants

14 had violated that code and whether he thought they had acted

15 ethically.

16          I would just submit that that would not be proper

17 questioning at trial nor does the USI code of conduct have

18 anything to do with this case.  It suggests contractual or

19 legal obligations that are not at issue here.  There is no

20 claim for breach of code of conduct.  There is no tort for

21 such a thing, and that would be very confusing and misleading

22 to the jury to admit some code of conduct at USI that is not a

23 contract, is not sued on, and does not inform what legal

24 standards the defendants had to comply with on the tort

25 claims.

1        MS. BAUGHAN:  Your Honor, the code of conduct was

2   attached to our very first pleading in this case.  It's been

3   in this case since the beginning.  We have employees here who

4   have adjudicated breaches of loyalty to USI, so there's

5   nothing new about the code of conduct.  It's on our exhibit

6   list, has been.  It's been in the case.  So, yeah, absolutely

7   it's one of their obligations to USI.

8        When Taylor Anderson was telling clients I'm going to

9   be moving to Lockton in a couple of weeks, when he was flying

10  to Canada to visit with clients on USI's nickel telling them

11  I'm going to be moving to Lockton, absolutely he was violating

12  his fiduciary duties and duties of loyalty to USI.  This is

13  just one element of -- one document that sets forth those

14  duties that's been in the case from the beginning.

15       THE COURT:  Well, why is it relevant given where we

16  are with their liability already being established on those

17  duties?

18       MS. BAUGHAN:  I think it's particularly relevant if

19  they're going to get on the stand and say we acted ethically,

20  we didn't think we were doing anything wrong, this was our

21  intent.  I think it would be, you know, absolutely fair

22  cross-examination for them on that point.

23       THE COURT:  Is that the only -- I mean, I'm willing

24  to leave it, reserve it to see how they testify.  I think if

25  they say ethically, then, yes, it could come up.  But I don't

1  think it comes up unless they do mention the word "ethics."

2  But I think we could leave it to deal with them and see how it

3  goes.  I just don't know how much of this you need to get into

4  given liability has already been established.

5      MS. BAUGHAN:  Well, I do think it goes to their bad

6  faith, potentially goes to -- if they have those obligations

7  to USI and Lockton is inducing them to breach those

8  obligations to USI, it could go to tortious interference,

9  which has not yet been resolved.  So I think it could come in

10 in any number of ways.

11     THE COURT:  All right.  I think I'll just see how it

12 goes.

13     MS. BAUGHAN:  Thank you, your Honor.

14     THE COURT:  I'm just worried about doing more than we

15 need to and putting more in front of the jury given where we

16 stand in terms of Judge Jones's orders and what's already been

17 established and trying to find the right balance.

18     MR. BANKS:  And I'm worried about opening statement

19 and things like that, obviously, as well because if this is

20 going to be used then, and we know it's going to be in the

21 deposition designations that they'll want to offer from

22 Mr. Meyers.

23     And, again, I think what Ms. Baughan said is exactly

24 the sort of terribly unduly prejudicial uses that we're

25 worried about here, that it would suggest that if there's a

1  breach of the code of conduct, that that could be wrongful

2  conduct that gives the basis for the tort of interference with

3  contract by Lockton, and that's not the basis of a tort, this

4  code of conduct that exists at USI, or that this informs what

5  a fiduciary duty is or what duty that Taylor Anderson owed.

6  It doesn't.  This is just the USI code of conduct.  It's not

7  the law, and that's why it would be prejudicial to admit.

8  It's not a contract either.

9          MS. BAUGHAN:  I, of course, don't agree with what he

10 said.  If this is even in the summary judgment briefing, this

11 is one of the bases that we argued for duty of loyalty.  This

12 goes to their understanding of what their obligations were as

13 employees, which is relevant to the damages in this case.

14         As Judge Jones found in his order, Taylor was

15 breaching his duties to USI even before he gave his

16 resignation notice.  This is just one source of the duties to

17 USI in addition to the contract.  So when they say

18 prejudicial, that means it's bad for their case.  It may very

19 well be bad for their case.  That doesn't make it unfairly

20 prejudicial.  It's relevant evidence that the jury should hear

21 and weigh if it's appropriate.

22         MR. BANKS:  Your Honor, it is unfairly prejudicial

23 because there is no claim in this case for breach of code of

24 conduct.  There are claims for breach of specific provisions

25 of the contract, none of which is the code of conduct, and

1  there are claims for breach of duty of loyalty and breach of

2  fiduciary duty which have already been adjudicated on breach.

3      This code of conduct cannot inform the legal duty

4  that existed there for a fiduciary, et cetera.  If they had a

5  claim for breach of code of conduct, they could have asserted

6  that, and just because the document has existed for a long

7  time doesn't make it relevant.  It has to be relevant to an

8  actual claim to be tried here, and it's not.  It would be

9  misleading.

10      THE COURT:  Did this code of conduct come up in the

11  employees' deposition, the former employees' depositions?

12      MR. BANKS:  Yeah, it probably did, looks like it did.

13  But, again, the fact that it was questioned about doesn't make

14  it relevant to anything to actually be decided here and

15  doesn't mean that it wouldn't be misleading and confusing to

16  the jury because it is not the legal standard, and it is not

17  the contractual standard that is at issue.

18      MS. BAUGHAN:  It is directly relevant to bad faith

19  and punitive damages, and we started down this road because

20  Mr. Banks made it appear like this was a brand new document

21  that no one had ever heard of before.  And given that they

22  were questioned in their depositions about the code of

23  conduct, I think that falls flat.  So we should be allowed to

24  put it into evidence, make our arguments.  They can make their

25  arguments.  We're not bringing a separate legal claim for

1  breach of the code of conduct, but it does inform what their

2  duties were as employees of USI and how USI was damaged as a

3  result of those breaches of duty.

4       THE COURT:  All right.  Well, if we're down to just a

5  balancing test, then, as Ms. Baughan has stated, it can be

6  prejudicial, just is it more probative than prejudicial.  And

7  at this point I can't say for sure.  I think -- I just don't

8  think it needs to be a huge thing.  If you want to bring it up

9  in terms of damages, that's fine, but I hope not to hear a lot

10 of questions about the code of conduct.  And I'll be listening

11 carefully for that and ready to rule on an objection if one is

12 made if it's just too much.

13      Okay.  All right.  So we are going to have 25 jurors

14 brought in, and you all have agreed to select eight.  And the

15 typical process is they come in, and I would give them the

16 questions.  I believe that my law clerk, Mr. Jester, gave you

17 all the background questions with their number, and they sit

18 in that order.  You all turn around so you can see them.  And

19 I give them an introduction and read the summary of the case

20 that you all are going to be working on, and then I'll ask my

21 qualifying questions, which I believe you all have.

22      Then once that is done, they'll go one by one and

23 answer the general questions, and you all can follow up.  If

24 someone forgets to mention an employer or what their spouse

25 does or their adult child, you can go ahead and ask them those

1  questions as they're still standing there, and once that is

2  done, we will then turn to your questions.  How much time do

3  you all want for voir dire?

4          MR. BANKS:  I think 20 minutes a side.

5          MS. BAUGHAN:  My guess is it would take 40 minutes a

6  side.  I highly doubt we could get through it in 20 per side.

7          THE COURT:  All right.  And when you say per side,

8  are you all, Lockton and former employees, working together on

9  this?  You wanted 20 minutes.

10         MR. PERNINI:  I think we can work together on that.

11 I don't know if you're going to get to the peremptory

12 challenges.  We do have a discussion point on that, but as far

13 as working together on the voir dire, I think we can do that

14 in the time period.

15         THE COURT:  All right.  Well, I'll give you all 40

16 minutes each.

17         Now, there were a lot of witnesses, and I believe

18 someone, one side, had a question about the witness list.

19 Normally I would read it, but when I saw how many witnesses

20 you had, I didn't want to read it.  So do you all -- have you

21 narrowed your witness list down?  I think it was about 60.

22         MS. BAUGHAN:  I think we have narrowed it somewhat.

23 I think maybe what makes the most sense is for us to confer

24 with opposing counsel and give you a shorter list on Monday.

25         THE COURT:  Right.  If it's a shorter list, I don't

1 mind reading it as part of my qualifying questions, and that
2 won't take up your time, your 40 minutes each.  If it's long,
3 though, part of your time.
4           MR. BANKS:  That's fair, your Honor.  Thank you.
5           THE COURT:  All right.  So after you go through your
6 questions, I'll give you all a break to look at your list and
7 your notes, and then we can do the strikes.  I apologize.  I
8 kind of know it as it happens, but when I'm thinking about
9 telling you all, it's eluding me.  First I'll give you a break
10 to look at notes.  You'll make any -- see if anyone should be
11 excused for cause, and then after that, we will do the
12 strikes.  Ms. Shanks will pass the sheet between you all.
13           In terms of the dispute, I was inclined to give the
14 former employees and Lockton four strikes and USI three.
15           MR. PERNINI:  And that's acceptable, your Honor.
16           THE COURT:  Huh?
17           MR. PERNINI:  That's acceptable, your Honor.
18           THE COURT:  All right.  Great.
19           MR. PERNINI:  You said inclined.  I didn't know --
20           THE COURT:  Right, yeah, as a way of me trying to
21 speed things along but not making you all feel that you can't
22 get up if you're really bothered by something.
23           MR. MILLER:  To clarify your Honor's ruling, you're
24 saying --
25           THE COURT:  Four total, four total.

1          MR. MILLER:  Okay.  We understand what the Court is

2   saying.  Our position for the record is still given their

3   unity of interest, they should have the same number of strikes

4   as us.  They're represented by the same counsel.  They're

5   indemnified.  It's literally the same interest, and we've

6   cited case law on that, including a First Circuit case holding

7   that under almost identical circumstances where there's

8   essentially indemnification, same counsel of record, that the

9   strikes should be even.  So that's our position for the

10  record, your Honor.

11          THE COURT:  All right.  Thank you.

12          MR. MILLER:  Thank you.

13          THE COURT:  I'll stick with the three and the four.

14          All right.  Is there anything else on jury selection?

15  I feel like I'm forgetting something.

16          MS. BAUGHAN:  I do have one question, and then I also

17  had just a couple of objections to their questions, not many,

18  but I didn't know if you were going to take those up.  As

19  Ms. Shanks passes the sheet between, I know sometimes in jury

20  selection I've had it done where if you don't strike a juror,

21  then that juror is on and you can't strike them.  Is it just

22  we can strike anyone we want who's in the pool as long as

23  we're within our three?  So if on the first pass I don't

24  strike Juror No. 1, I can use Juror No. 1 for my last strike

25  if I wanted to do so?

```
 1                    THE COURT:  Right, yes.  I don't care how you do it.
 2                    MS. BAUGHAN:  Okay.  All right.  And then I don't
 3       know if you want to hear about the specific voir dire
 4       questions or not.
 5                    THE COURT:  Sure.
 6                    MS. BAUGHAN:  It's not much.
 7                    THE COURT:  Is there anything else from you all?
 8                    MR. BANKS:  Actually, Ms. Baughan's question made me
 9       think of another one.  I've also had -- usually if a party
10       passes, they're done.  I have had it occasionally where
11       someone said now you can pass, and then the other side, they
12       exercise a challenge, you can still exercise one after that,
13       if you had any left.  I don't have a preference.  I just want
14       to know what we're doing.
15                    THE COURT:  Oh, that's new to me.  She just goes
16       between you, and people don't pass.
17                    MR. BANKS:  Yeah, that's generally -- I mean, I don't
18       think I've ever done that, but I've seen it happen.
19                    THE COURT:  Okay.
20                    MR. BANKS:  Yeah.
21                    THE COURT:  I guess it's a gamesmanship kind of
22       thing?
23                    MR. HOLLEY:  Yeah.
24                    MR. BANKS:  Yeah, I guess.  It's like who ends up
25       sliding in so that if someone then moves into the box that you
```

1    didn't like, but you were okay with the first whatever seven,

2    that then you can strike the new number eight.

3         MR. HOLLEY:  It seems like everybody in the courtroom

4    agrees that that's not a good --

5         THE COURT:  No, that's not happening.  All right.  So

6    can we move to the specific questions, voir dire questions.

7    All right.

8         MS. BAUGHAN:  So on the Lockton and the former

9    employees questions, on Question 16 they ask, has anyone ever

10   been negatively affected by a co-worker or employee that

11   resigned without providing proper advance notice?  That part

12   seems fine.  But then they say such as a 2-week notice or a

13   60-day notice, and to me that feels a little bit like it could

14   be unfairly prejudicial because I think until jurors have

15   heard why it's a 60-day notice provision -- you know, if that

16   may seem unusual, that may have people thinking 60 days, that

17   seems like a long time.  So I'd just prefer to strike that

18   clause.  I think it's fine to ask if anybody has ever been

19   negatively impacted about resigning without providing proper

20   notice.

21        THE COURT:  All right.

22        MR. BANKS:  That's fine, your Honor.

23        THE COURT:  Okay.  So you're just going to strike or

24   60 day's notice or is it the --

25        MS. BAUGHAN:  I'd strike both, the including -- I'm

```
 1    sorry.  Such as a two-week notice or a 60-day notice.
 2             THE COURT:  Okay.
 3             MS. BAUGHAN:  And then on 22 --
 4             THE COURT:  Hold on one second.  Let's just make sure
 5    everyone is up to speed.
 6             MR. BANKS:  Sorry.  What question was that again?
 7             MS. BAUGHAN:  16.
 8             MR. BANKS:  16.  Thank you.
 9             MS. BAUGHAN:  22 was the next one, and it asks if
10    you've ever had a -- have you ever had a business relationship
11    with someone who changed jobs?  Did you keep your relationship
12    with the person or did you stay with the company?  That part
13    seems fine to me, but then even though the person left, I
14    think that's suggestive, so I just would like to strike that
15    last clause there, even though the person left.
16             MR. BANKS:  We're fine with that, your Honor.
17             THE COURT:  I lost track.  What number was that?
18             MS. BAUGHAN:  That was 22.
19             THE COURT:  All right.  So we're striking or did you
20    stay with the company even though the person left.
21             MS. BAUGHAN:  We're striking even though the person
22    left.
23             THE COURT:  Oh, right.  All right.
24             MS. BAUGHAN:  Only have one more.  For No. 29 they
25    propose to ask in a lawsuit involving former employee --
```

1   involving employees and their former employer, would anyone

2   here start off favoring the former employee?  And I think if

3   we're going to ask that one, we need to ask the reciprocal --

4   I'm sorry.  Would anyone start off favoring the former

5   employer?  I think if we're going to ask that, we need to ask

6   the reciprocal of that, would anyone start off favoring the

7   former employee.

8           MR. PERNINI:  Which number was that?  I'm sorry.

9           MS. BAUGHAN:  29.

10          MR. PERNINI:  And you're suggesting that you would do

11  a voir dire question that's similar to that?

12          MS. BAUGHAN:  I mean, we could do it that way or --

13  sure.  That would be fine.  We can add that to ours, but if

14  you're going to ask would you start off favoring the former

15  employer, it just seems like they should be asked at the same

16  time.

17          MR. PERNINI:  Your Honor, I don't feel that strong

18  but it's the question -- I don't have an objection if they

19  wanted to add it to their voir dire.  I mean, normally it's

20  done separately.  It wouldn't be unusual for us to ask

21  questions slanted one way and them to ask questions slanted

22  their way.  That's the way it works.

23          THE COURT:  All right.  You can add it.

24          MS. BAUGHAN:  Okay.  We'll add it.  That was all that

25  I had.  Thank you.

```
 1              THE COURT:  Can we go back to No. 22.  The question
 2   is just going to be did you keep your relationship with the
 3   person or did you stay with the company?
 4              MS. BAUGHAN:  Correct.
 5              THE COURT:  Doesn't make sense to me.  To me it makes
 6   it sound like you can't be friends with someone who left a
 7   company that you worked at.
 8              MR. PERNINI:  Yeah, maybe to keep your business
 9   relationship?
10              THE COURT:  It's really the or did you stay with the
11   company.  What does that mean did you stay with the company?
12              MR. PERNINI:  I think it's intended to mean --
13   correct, it should be business relationship.  So if I had a
14   business relationship with someone and they left, did I keep
15   my business relationship with the company that I worked for or
16   did I keep the business relationship with the person that
17   left?  So I think if we add the word "business," that might
18   address the Court's concern.
19              THE COURT:  It would.  I was thinking it was almost
20   like a loyalty thing, did you stay with the company.  All
21   right.  I understand.  Okay.
22              Any concerns with USI's questions?
23              MR. PERNINI:  Just one moment, your Honor.
24              THE COURT:  Sure.
25              (Brief Pause.)
```

1          MR. BANKS:  I think we are fine, your Honor.

2          THE COURT:  Okay.  You all don't have a whole lot of

3     time so maybe you won't get to those, but it struck me as --

4     No. 24, what was the reason you left your last job?  If you

5     were going to go through everyone, that might take a while,

6     and you may want to ask more of a yes or no question and then

7     get some follow up.

8          On 29 through 31 I thought violate might be a little

9     strong, maybe breach.  But I guess you can try it and see if

10    anyone kind of balks at it.  But my main concern is with 41,

11    which talks about a civil case versus a criminal case.  I

12    think it would be better to just stick to what the civil

13    standard is.  My last -- sorry.  Do you need to catch up?

14         MS. BAUGHAN:  So sorry.  I'm having trouble finding

15    where --

16         THE COURT:  Go ahead.  Take your time.

17         MS. BAUGHAN:  I'm sorry.  Was that on our questions?

18         THE COURT:  I thought it was, yes.  Yes, No. 41.

19         MS. BAUGHAN:  I beg your pardon, your Honor.  I was

20    looking at the wrong questions.  Would you please repeat.

21         THE COURT:  I was saying that on 41 I would prefer

22    you just talk about the civil case and not mention a criminal

23    case.  I just had a trial last month, a criminal trial, and

24    even talking about that standard was news to some people.  I

25    think it might lead to some unnecessary confusion.

1          MS. BAUGHAN:  Okay.  We'll do that.

2          MR. PERNINI:  And, your Honor, we did have one, I

3    think, that's come up really today, and that is No. 32 of

4    their voir dire.  What are your thoughts about the ethical

5    standards of large companies?  I think what they were trying

6    to go for is do you think large companies are generally

7    unethical.  But given the discussion we just had about the

8    code of conduct and the ethical standards, I wonder if there's

9    a way we can reword this that doesn't bring that issue up, if

10   that makes sense, because right now they're saying the ethical

11   standards.

12          I understood what they meant was do you think big

13   companies are ethical to see if there are people that have a

14   big company bias, but right now it seems to be it could easily

15   be transferred to code of conduct of that company.  So I'm

16   wondering if there's a way to revise that that gets to what I

17   think is the intent.

18          THE COURT:  Right.

19          MS. BAUGHAN:  Yeah.  And what we were getting at is

20   we want to see if people, you know, think big companies don't

21   treat people fairly.  So we could change it to --

22          THE COURT:  Well, that's what you have at No. 33

23   except for it's most businesses or -- well, sorry.  Compete.

24   Seems like you could kind of use 33 as a model but say large

25   companies treat people fairly or employees.  I'm not sure

1  which one you want.

2         MS. BAUGHAN:  Okay.  I think we could say fairly.

3         MR. PERNINI:  Fairly sounds fine.

4         MS. BAUGHAN:  Okay.

5         THE COURT:  Anything else?

6         MR. PERNINI:  No, your Honor.

7         THE COURT:  How long do you all want for opening

8  statements?

9         MS. BAUGHAN:  So we did request an hour per side in

10 the pretrial order, which I think the sides would be like what

11 we're talking about here of USI as a side, and they are a

12 side.  So that's what we agreed to in the pretrial order, and

13 our position hasn't changed.  I don't know about our friends

14 across the way.

15        MR. BANKS:  That's what we agreed to, and we have

16 been operating under that assumption so that makes sense to

17 us.

18        THE COURT:  And so are you all going to split the

19 hour?

20        MR. PERNINI:  Yes, your Honor.  The former employees

21 will probably take 40 minutes, and we'd take whatever time was

22 left for Lockton.

23        THE COURT:  Okay.  All right.  That's fine.  And I

24 assume if you all are going to be talking about exhibits,

25 they'll be ones that you all are fine with, there are no

```
 1  issues.  I don't like objections during opening, find them to
 2  be jarring.
 3         MR. BANKS:  Your Honor, I suggested to opposing
 4  counsel this morning that we disclose to each other in
 5  advance, you know, our demonstratives and any exhibits and
 6  testimony we intend to use during the opening so that we can
 7  confer on it and then if we have to, raise it with your Honor
 8  in the morning.  I think, yeah, we're in agreement on doing
 9  that.  I don't know that we've picked an exact time but
10  sometime the day before.
11         THE COURT:  All right.  That's fine.  I was thinking
12  that it might not be that we get to openings until Wednesday,
13  but given the limited voir dire, it's possible we will.  So we
14  can still deal with it in the morning on Tuesday.
15         Is there anything else?
16         MS. BAUGHAN:  Your Honor, I did have something else I
17  wanted to raise.  In this case we do have a stipulated
18  protective order that was entered into three plus years ago
19  when we started exchanging documents.  It has two tiers of
20  confidentiality, confidential, and then it has outside
21  counsel's eyes only.  You know, we're now three years down the
22  road.  I don't think there's any basis for outside counsel's
23  eyes only, which might require your Honor to clear the
24  courtroom and, you know, really be disruptive to the trial.
25         So I think I would propose that if anybody,
```

1 consistent with what's in the order, if anybody feels like

2 there's a document that shouldn't be filed in the public

3 record, that could be confidential and it could be sealed as

4 it is introduced.  But I'd like to get some guidance on that

5 issue.  We would propose that folks can maintain

6 confidentiality if they need to for a particular document but

7 that there's no need for outside counsel's eyes only, which

8 would make running the trial very difficult.

9           We do intend to have in-house counsel with us at the

10 trial and certainly wouldn't want a situation where he has to

11 leave the room during the opening statements because something

12 is outside counsel's eyes only.  So I raise that for the

13 Court's consideration.

14           THE COURT:  All right.  What's the response to that?

15           MR. BANKS:  I think generally that's probably the

16 right procedure, is that if a party has an objection to

17 something and believes it should be confidential or treated in

18 some way, that they have to raise it.

19           THE COURT:  All right.  That sounds fine with me.

20           All right.  So in terms of the schedule, on Tuesday

21 we start at 9:30, and I'll go until 4:30.  And after that,

22 we'll start at 9:00 a.m., but I'll still go to 4:30 and I'll

23 give you a morning break and an afternoon break and a lunch.

24           MR. PERNINI:  Your Honor, we do have a couple other,

25 again, practical things we'd like to --

```
1              THE COURT:  Fire away.
2              MR. BANKS:  Yeah, I've got a few listed here.  One of
3    them is related to Dean Anderson's health.  We talked about it
4    a little bit earlier today.  He is in a situation where he's
5    on an organ donor -- he's on an organ transplant list.  He is
6    going to need to have his phone on in court -- we apologize
7    for that -- because he in theory could get the call at any
8    time that the organs are available, and he has to call back, I
9    think, within 20 minutes or he loses it.  Then he has to
10   leave.
11             That conceivably might even happen while he's on the
12   stand.  Our thought would be to have someone here hold his
13   phone while he's testifying but that if that does come up,
14   that we, you know, will let opposing counsel know -- they know
15   about this already -- so that we can then raise it with the
16   Court, and without making a big scene we can deal with the
17   situation and take a break or something like that to allow him
18   to deal with that, if that is okay.
19             THE COURT:  That's fine.
20             MR. BANKS:  And along with that he may need breaks a
21   little more frequently, not during the general trial but when
22   he's testifying.  We would ask that he have a break about
23   every 45 minutes and he will have -- I think he's going to
24   have to have oxygen with him too.  So anyway that's -- is
25   there anything else on --
```

1    MR. HALL:  Well, no, I think he's going to have his

2    phone on, but it won't necessarily have to ring out loud.  We

3    can put it on vibrate.  We'll do everything we can to minimize

4    the disruption.

5    MR. HOLLEY:  And, your Honor, I've had this occur

6    before in a trial, and one thing that we should probably do to

7    make sure the record is good is to have a stipulation that if

8    Dean Anderson leaves, that the trial can continue, and no one

9    will make the objection, particularly him, that it proceeds in

10   his absence.  So we would have no objection to that

11   stipulation, but that's probably a good idea for the record.

12   THE COURT:  Yeah.  I agree with that.

13   MR. BANKS:  Yes.  We are agreeable with that as well.

14   THE COURT:  All right.  So is he going to be able

15   to -- in terms of the order, with downstairs is he just going

16   to hand his phone to one of the attorneys?

17   MR. HALL:  I think the order that we submitted said

18   that he could bring his phone in so --

19   THE COURT:  He can bring it personally?

20   MR. HALL:  Yes.  I think the order that your Honor

21   granted a couple days ago contemplated Dean Anderson's -- just

22   his phone and also his oxygen equipment.  I think that's

23   already covered.  We'll certainly let you know if there's any

24   trouble.

25   THE COURT:  All right.  Okay.

```
 1            MS. BAUGHAN:  And we do want to make sure that
 2   nothing is said to the jury that could invoke sympathy for
 3   Mr. Anderson.  We obviously will, you know, honor his need for
 4   breaks and if he needs to leave for an organ, absolutely, but
 5   we don't want the jury hearing about what his current health
 6   situation is.
 7            MR. HOLLEY:  And as I understand it, your Honor, the
 8   way that this would work is if he needs to leave, he leaves.
 9   We don't have to stop the trial.  We would go forward.  They
10   would not need to say, your Honor, we all need to take a
11   break, but he would step out and take his break; is that
12   right?
13            MR. BANKS:  If he's not testifying, he will just
14   leave.  If he is testifying and we get a call, then we'll have
15   to stand up and say, your Honor, if we could have a break.
16            THE COURT:  Right.  Well, just like any witness who
17   would -- if they say they need something, we give it to them,
18   you know, water, a break.  It wouldn't be any different for
19   him.  Anything else?
20            MS. BAUGHAN:  So I did have one more issue and
21   we've -- oh, did you --
22            MR. BANKS:  I had a few other issues, but you can go
23   ahead.  We can take turns.
24            MS. BAUGHAN:  All right.  I thought you were
25   finished.  I didn't mean to -- so we do have a number of
```

1  videotaped depositions in this case.  I think some of them

2  will end up getting played.  We've designated portions in the

3  pretrial order.  I don't believe objections are due.  They're

4  either due the day before trial or the day of trial, and given

5  the amount of videotaped testimony, it could be a fair amount

6  of objections to consider.  So I wanted to raise that with the

7  Court so that we can figure out a way to handle that and not

8  interrupt the flow of the trial or lay a bunch of objections

9  on your Honor at 9:30 a.m. on Tuesday morning.

10        THE COURT:  All right.  So give me the volume in

11  terms of witnesses that you think there are going to be issues

12  with.

13        MS. BAUGHAN:  I think there are at least like 10

14  videotaped depositions.  I don't know, you know, what the

15  other side plans to put in, but there are 10 potential

16  videotaped depositions, 10 or 11.

17        MR. BANKS:  That sounds roughly correct.  I think the

18  plaintiffs' designations are ECF No. 317-9, and they filed 93

19  pages of depositions -- not 93 pages of testimony but 93 pages

20  of designations.  So each page has lots of designations.  And

21  then ours are -- well, there's some for Lockton, and there's

22  some for the individual defendants.  And they're shorter, but

23  it's still more pages.  And how many witnesses?  It's probably

24  around a dozen total.  I think they're mostly the same

25  witnesses between us.  There might be one or two that are on

1   one party's list but not on the other, but, yeah, that's

2   right.

3            THE COURT:  Well, is it something I can deal with on

4   breaks or maybe before we start trial, not all at once but

5   maybe as the witnesses are coming?

6            MR. HOLLEY:  Your Honor, I didn't talk with the other

7   side about this, but one way to do it is to have the party

8   presenting the case at the time the day before make sure that

9   it has alerted the Court and given the Court the designations.

10  And so these are the deposition or depositions that we would

11  intend to play the next day so that the Court would have the

12  day before to be able to resolve those issues at breaks or

13  whatever time so that there wouldn't -- all of this is to

14  avoid a delay in the trial when the deposition is proposed.

15           THE COURT:  Okay.  All right.  Well, I think that's

16  how we'll just have to deal with it.  Just the day before if

17  you all will let me know, then I'll have to rule on them.

18           MR. HOLLEY:  That would also help the parties because

19  when they start doing that, they realize that shorter playing

20  is better than longer playing.

21           THE COURT:  Yes.  I agree.

22           MR. BANKS:  But, your Honor, from what I've raised

23  with opposing counsel there, I'm all in favor of shortening

24  these.  These are too long.  On the other hand, we need to

25  know what they're going to do in advance because it may be

1  that what they want to eliminate is something that we think is

2  important for context or, you know, just that we think is

3  important that should be in there.  So we would need the

4  opportunity to review those and have an opportunity to make

5  our objections to whatever they're doing to change these

6  designations because if they remove important context, that

7  can be a problem.

8          MR. HOLLEY:  Exactly.  That's why the whole idea is

9  we talk the day before.  We say this is what we're really

10  going to show, and you say, okay, this is what we really need

11  to add.  We ease the burden on the Court.  The Court has a

12  chance to see what's really going to go in, what the real

13  objections are, and that would be the idea for both sides.

14          MR. BANKS:  I think that's a wonderful idea.  In

15  fact, if you can shorten them before our objections are due on

16  Tuesday, that would be even better.

17          MR. HOLLEY:  On both sides.

18          MR. BANKS:  On both sides.

19          THE COURT:  All right.  You don't need me for this.

20  That's good.  What else is on your list?

21          MR. BANKS:  A related issue and we've talked about

22  this, but both sides would like the Court's guidance.  There

23  may be a witness or two that the plaintiff puts on by playing

24  video who is here in court, for example, Dean Anderson or

25  someone like that.  Since it was a discovery deposition, we

1    didn't re-examine our witnesses at the time, and so since

2    they'd be putting that on in lieu of their direct exam of that

3    witness, our thought would be to be able to cross-examine the

4    witness live in response.  And we wanted to get the Court's

5    understanding of how that would proceed.  Obviously, we'd have

6    to remain within the scope and things like that.

7            MR. HOLLEY:  Your Honor, may I be -- 38 years of

8    experience isn't enough, but I've never seen a Court that

9    allows a party -- a party has a choice to either use the

10   deposition testimony or call live testimony.  You can't do one

11   or the other in the same part of the case.  So if the

12   deposition testimony is put on by tape, they have the option

13   to designate a counter tape.  They don't have the option to

14   then bring in the live witness now that we can use depositions

15   for anything.  If they want to put the live witness up in

16   their case, they can do that, but I've never seen a Court mix

17   and match deposition testimony by tape with live testimony.

18           MR. BANKS:  I have heard of such things.  I haven't

19   seen it in my cases, but I know of cases where it's been done.

20   I know of cases where a live witness has testified, and then

21   the cross was done by video.  And I don't have 38 years of

22   experience.  I've got 22, something, and I do know of it

23   happening.  So that's why I asked.

24           THE COURT:  All right.  Well, I don't like this

25   mismatch thing, and I have not seen it so I'm not going to do

1   it.

2          MR. BANKS:  Understood.  That's why we wanted to find

3   out in advance.

4          THE COURT:  All right.  Thanks for asking.

5          MR. BANKS:  Sequestration of witnesses.  I don't know

6   if we need an order on that but --

7          THE COURT:  Normally I just say is anyone invoking

8   the rule.

9          MR. BANKS:  We'd invoke the rule.

10         MR. HOLLEY:  We'd invoke the rule, and when the rule

11  is invoked, yeah, it's up to all counsel to make sure that

12  it's enforced.

13         THE COURT:  Right.  So I'll do it again on the first

14  day of trial.

15         MR. PERNINI:  And, your Honor, on that point we've

16  told them who our corporate representative is going to be for

17  Lockton.  I haven't heard from them who their corporate

18  representative will be.  We'd like to know that.  It sort of

19  helps in the planning process.  If they're not available to

20  tell us today, that's fine, but we would like to know that.

21         MR. HOLLEY:  And I'm going to go back to the

22  invocation rule because the only time -- I've not seen it

23  apply as to experts so because an expert -- so especially with

24  regard in our view of the -- if we get to attorney's fees, it

25  may be that we would want our attorney's fees expert to watch

1   your attorney's fee expert testify and vice versa.  So that

2   would be the exception to the invocation rule.

3          MR. BANKS:  And, yeah, the same with the damages and

4   parties, of course, too.

5          MR. HOLLEY:  Of course.

6          MR. BANKS:  That's why we want to know who the party

7   representative is.

8          THE COURT:  Right.  So party representative and

9   experts can be in here.

10          MR. HOLLEY:  Right.  Sorry.

11          MS. BAUGHAN:  Yeah, so we will have the general

12   counsel of USI sitting with us at counsel table.  He's not a

13   testifying witness.

14          THE COURT:  All right.

15          MR. PERNINI:  So that will be your corporate rep?

16          MS. BAUGHAN:  Yeah.

17          MR. PERNINI:  I'm trying to find out what witness is

18   going to be sitting and watching the whole trial, if a witness

19   is.  If it's your corporate counsel that's not testifying,

20   that's fine.  We just wanted to know.

21          MS. BAUGHAN:  That is our plan, yes.

22          MR. PERNINI:  Okay.

23          MR. HOLLEY:  And Lockton's will be?

24          MR. PERNINI:  Manoj Sharma.

25          THE COURT:  Anything else?

```
 1          MR. BANKS:  Yes.  Let's see.  Just checking the
 2   things off that we've discussed.  In opening statement our
 3   counsel to stay at the lecturn or -- yes?  Okay?
 4          THE COURT:  Yes.
 5          MR. BANKS:  Do we need a key to use the witness room
 6   if there are witness rooms available?
 7          COURTROOM DEPUTY:  I will have it open.
 8          MR. BANKS:  Okay.  Thank you.  That's been handled.
 9   That's been handled.
10          MR. HOLLEY:  And are there -- I'm sorry.  It's been a
11   while since I've been in this courthouse.  Are there two
12   witness rooms or just one?
13          COURTROOM DEPUTY:  I think there's one witness room.
14   However, there might be an additional room that can be used.
15          MR. HOLLEY:  Okay.  And whatever is good for the
16   goose is good -- so if one side gets a room, we just would ask
17   if we would get a room too or neither side.
18          THE COURT:  We'll work that out.
19          MR. HOLLEY:  Thank you.
20          MR. BANKS:  And then, lastly, is -- well, actually,
21   second to last would be we have two weeks reserved for this
22   case.  There's a lot of witnesses on these lists, as your
23   Honor knows.  We think that it would be prudent to consider a
24   time clock in this case to ensure this case is done on time,
25   and it would just be distributed evenly between the
```

1  plaintiff -- between USI and then the defendants.

2  THE COURT:  Do you have a suggestion as to what that

3  clock should be set at?

4  MR. BANKS:  Well, so if we have approximately --

5  since we go 9:00 to 4:30 each day and have about an hour and a

6  half of lunch and breaks; is that right?

7  THE COURT:  Yes.

8  MR. BANKS:  So that would give us six hours a day.

9  And we're going five days a week?

10  THE COURT:  Yes.

11  MR. BANKS:  Okay.  So that would be a total of 60

12  hours of court time in two weeks; right?  So 28 hours each?

13  MR. HOLLEY:  Well, your Honor, that's inherently

14  unfair because we have a number of more witnesses than they

15  have.  So when he said a clock, I was picturing in federal

16  court down in Newnan, there was a judge who we all knew who

17  had an hour glass, and he would say when the hour glass is

18  done, you're done questioning that witness.  Now, that might

19  work per witness, but it's inherently unfair when one side

20  knows that the other side has more witnesses and has a burden

21  to carry and they don't.

22  MR. BANKS:  Well, we'll be cross-examining those

23  witnesses, and I don't know that they actually have more

24  witnesses in the end.  There's a lot of clients who are going

25  to be testifying.

```
 1            MR. HOLLEY:  How does that work?  So our 28 hours
 2    means if I put a witness up for an hour and he crosses for 7,
 3    that 8 hours is used up?  That's why it doesn't work.  We
 4    trust the discretion of the judge.  None of us wants to waste
 5    time.  You're going to move us along if we're not, and if it
 6    becomes necessary to set those limits during the course of the
 7    trial, your Honor will know that.
 8            THE COURT:  All right.  Let me just think about it
 9    and confer with my colleagues on that.
10            MR. BANKS:  And to be clear, your Honor, in the
11    proposal I was not saying if it's their witness, they get
12    charged with the cross time.  I mean, if they call Manoj
13    Sharma and they examine him for an hour and we examine him for
14    an hour, it's an hour each.  That would be the way it would
15    work.
16            And then I guess the other question would be what to
17    do with argument.  And I have seen judges where they charge
18    the party who loses the argument at the time.  I don't know if
19    you want to be that draconian, but that is a way of
20    potentially handling it or we just don't count the argument
21    time unless it becomes excessive.
22            MR. HOLLEY:  I submit that we're all professionals,
23    that the counsel have talked to each other.  If your Honor
24    needs to set those rules, that's going to become pretty
25    obvious.  I believe it will not be.
```

1          THE COURT:  All right.  Thank you.  I'll let you

2   speak.

3          MR. PERNINI:  This is about a different issue.

4          THE COURT:  Oh.  Well, on that issue I'll think about

5   it.  One of my colleagues is big on the time limit, so I'll

6   think about it and confer with my colleagues and see.

7          Who was the judge in Newnan with the hour glass?

8   Well, it couldn't be Judge Batten.

9          MR. HOLLEY:  I forget.  He was a judge who was no

10  longer a judge after he had a bit of an issue.

11         THE COURT:  Oh, I've got you.

12         MR. HOLLEY:  Judge Camp.

13         THE COURT:  Judge Camp.

14         MR. HOLLEY:  Yes.  I apologize.

15         THE COURT:  All right.  Thank you.

16         MR. HOLLEY:  But he did have an hour glass, and he

17  would turn it.

18         MR. PERNINI:  That has nothing to do with why he's

19  not a judge anymore.

20         Your Honor, we have a sort of interesting request by

21  Mr. Sheets.  He's our expert in this case.  He, unfortunately,

22  had long planned a family vacation, what would be the second

23  week of trial, so not the first week.  So we had asked whether

24  we could just have his testimony taken out of order in this

25  case to accommodate this issue.  The challenge, of course, is

1  that he's a rebuttal expert, so they would have to put their

2  expert on first.

3          Our proposal was to say we're happy to have, if you

4  want, to plan for the Friday the first week of trial.  That

5  way most of the evidence we've got in.  We can have a damages

6  testimony at that point with Gunnersen testifying and then

7  Sheets testifying afterwards.  It has the benefit of allowing

8  the jury to hear that in time together rather than a delay

9  with Sheets being the last thing they heard.

10          We've raised that.  I don't know that we've gotten a

11 response from USI on it, and I don't know what the Court's

12 view is of taking witnesses out of order so I wanted to bring

13 it up to the Court.

14          MS. BAUGHAN:  So, your Honor, we are talking about

15 their paid expert witness in a trial that was scheduled by

16 agreement.  We don't have an objection if they want to bring

17 him here on Friday because that's the last day before his

18 vacation to testify out of order.  He can do that as long as

19 nothing, you know, counts against us at directed verdict, but

20 our expert won't be testifying until week two.  So it would

21 just be before she testifies.

22          THE COURT:  All right.  Well, there was no objection

23 made.

24          MR. PERNINI:  We'll consider it on our end then, your

25 Honor.

 1          THE COURT:  Okay.

 2          MR. PERNINI:  Thank you, your Honor.

 3          THE COURT:  All right.  I need trial notebooks from

 4  you all or something so that I can follow along, although I

 5  hesitate to ask.  I'm scared of the volume.  But are you

 6  planning to provide notebooks the morning of trial?

 7          MS. BAUGHAN:  We are planning to provide notebooks in

 8  accordance with the pretrial order, which I think maybe says

 9  Monday, so we will have those.  Obviously, there are a lot of

10  exhibits that both sides have designated.  We do plan to show

11  the exhibits electronically, so your Honor could follow along

12  electronically if that's easier.  And I did have one question

13  procedurally about that.

14          Obviously, when an exhibit gets cued up, you need to

15  be able to see it.  We need to lay the foundation and see if

16  there's any objection before it gets published to the jury.

17  Is that how the technology works or once it's up on the

18  screen, the jury could see it too?

19          THE COURT:  Ms. Shanks will correct me, but I think

20  there is a way where you could just see it on your screens.

21  But it would require you to be saying something to Ms. Shanks

22  so that it's not being displayed on the jury's screens.

23          COURTROOM DEPUTY:  I didn't think that -- I thought

24  once it's on the screen, everybody sees it.  I'll have to

25  check and see if there's a way to.  Yeah, I don't know.

```
 1              THE COURT:  We'll look at that, but that's another
 2   reason why the paper, unfortunately, is helpful.
 3              MS. BAUGHAN:  And we will do whatever is easiest for
 4   the Court.  We will package it together however you would
 5   like, but we likely won't be going sequentially in the exhibit
 6   order.  So it may be multiple binders, but we want to give you
 7   whatever is easiest for you and your staff.
 8              THE COURT:  And are you going to provide for the
 9   jury?  During deliberations they would get a hard copy of the
10   exhibits; right?
11              MS. BAUGHAN:  Right, everything that's admitted.
12              THE COURT:  Let Ms. Shanks and I look at the
13   technology and see how it works, and then we'll let you know
14   in terms of your question about the exhibits.  Even though
15   it's a lot, sometimes it's just hard to follow along
16   electronically, like I do need to pull the paper.  So I still
17   need paper.
18              MS. BAUGHAN:  Okay.  Be glad to do that.  Also be
19   glad to hand up copies old school and provide a three-ring
20   binder that you could put them in.  Please just tell us what
21   is best for you and we will --
22              THE COURT:  Binders are best rather than old school
23   handing it out piecemeal because I will lose it.
24              MS. BAUGHAN:  Okay.  We will do binders, and I
25   believe your pretrial instructions also ask for two electronic
```

1  copies on a thumb drive?  Which we can do that as well.

2       THE COURT:  Yes, we do, yes.

3       MS. BAUGHAN:  Okay.

4       THE COURT:  And one is for the clerk's office; right,

5  Ms. Shanks?  One will go to the clerk's office as the record

6  so that our clerk's office doesn't have to scan in the paper.

7       MS. BAUGHAN:  So is that after we know which exhibits

8  are admitted?

9       THE COURT:  Yes, yes.

10      MS. BAUGHAN:  Okay.

11      THE COURT:  Right.  So you can wait on that.

12      MR. HALL:  Your Honor, with the volume of documents

13 that we're talking about, will there be a place where your

14 Honor would have us maybe at the end of the day or if there's

15 something else going on in the courtroom, will there be

16 attorney workrooms for each side to have?  Is that a

17 possibility?

18      THE COURT:  So we do have attorney lounges on the

19 floor, and then when I used to try cases here, I would stick

20 my stuff in that little room there.  And then the courtroom is

21 going to be locked.

22      MR. HALL:  So do you think we can count on there

23 being two attorney lounge rooms that each side -- you know,

24 one for each side for the trial?

25      COURTROOM DEPUTY:  Uh-huh.

```
 1           MR. HALL:  Assuming they're available.  Okay.  Thank
 2   you.
 3           THE COURT:  Okay.  All right.  So I don't think we
 4   would start with witnesses until Wednesday?  All right.
 5           MR. HOLLEY:  Your Honor, may I ask probably the
 6   pickiest question?  When boards are used, do you want them
 7   back here or is there a place that the Court wants
 8   demonstrative boards when they're not on the screen to be
 9   shown to the jury?
10           THE COURT:  Fine.
11           MR. HOLLEY:  Great.
12           THE COURT:  Yes, wherever.  Will you all submit your
13   jury instructions.  I think I usually say the first day of
14   trial.  I know you can supplement it, but I guess end of day
15   on Tuesday, and then I imagine you both have differences on a
16   verdict form.  So get those submitted.
17           MR. HOLLEY:  And for both of those I assume you would
18   like us to send Word copies also to the Court?
19           THE COURT:  Yes.  All right.
20           MR. HALL:  I just want to make sure that I've got
21   this straight.  I may be the only person that doesn't.  We've
22   got a lot of, like we said, a lot of video deposition
23   testimony that's coming in, and there are objections that are
24   due.  But then we've also talked about submitting them to the
25   Court the day before use, and I just want to make sure.  Are
```

1  we still -- are we going to do those day before use or is

2  there still a requirement that we submit all the video depo

3  objections -- I think it's a day or two before trial?  I just

4  want to --

5        THE COURT:  Right.  It seems like we agreed on day

6  before use, and I thought it might be better to piecemeal it

7  if it's going to be that much.

8        MR. HALL:  Well, I think that may be right too

9  because I think -- what I'm hoping is that we can condense it

10  down some.

11        MS. BAUGHAN:  Your Honor, our preference would be to

12  go forward with the current procedure.  So objections -- you

13  know, we have told them certain of the witnesses we're not

14  calling by video, so they can take those off but give all

15  objections.  And then the day before thing is let's everybody

16  skinny it down because once they've seen their objections and

17  they've seen mine, you know, this may help us skinny things.

18        I am very afraid if we wait until the day before and

19  we have four witnesses that are going to be called by video

20  the next day, that we are going to create a big mess for the

21  Court.  So I would stick with the original all objections

22  deadline, and then we'll have sort of the what are you really

23  going to show and can we work out any of the objections

24  deadline the day before the witness is going to testify by

25  video.

```
 1              MR. HALL:  Okay.

 2              THE COURT:  All right.

 3              MR. HALL:  We're okay with that then.

 4              THE COURT:  All right.  We'll stick with that, and I

 5  think I was just thinking of part two, which is when it comes

 6  to me.

 7              MR. HOLLEY:  Yeah.  What happens is everybody gets

 8  their objections.  Everybody says, oh, my, gosh, we can't do

 9  that.  Then we talk.  We figure it out.  We hopefully give you

10  a very limited set of issues to address.

11              MR. HALL:  So it may be exchanged?

12              MR. HOLLEY:  Yeah.

13              MR. HALL:  Exchange objections, and then we'll submit

14  them to the Court the day before?  Is that -- I mean, I just

15  want us to know what we're doing.  I don't so much care.

16              THE COURT:  Seems like Monday is the exchange date.

17              MR. HOLLEY:  That's fine.

18              MR. HALL:  Okay.  We'll exchange then.  Okay.  And

19  then we'll still submit to the Court day before use; is that

20  right?

21              MR. BANKS:  Yes, we would.  We would get together.

22  This actually raises a different question that I should have

23  had on my list, and that is, so we do have witnesses that both

24  sides have designated from.  I would suggest that we play the

25  videos once rather than if they -- because a lot of the
```

1  designations overlap.  I mean, a huge percentage of our

2  designations are included in theirs with these clients, and

3  so, for example, first person on the list, Tim Cantrell, that

4  they play everything at that time, including not just rule of

5  completeness but our other designations.  Otherwise, we're

6  going to be wasting a lot of time when Tim Cantrell is played

7  again and we have to replay things because we can't just play

8  the, like, three or four lines extra that we wanted because

9  they have no context and nobody will have any idea what he's

10  talking about.  And so I would suggest we just do each witness

11  once.

12        MS. BAUGHAN:  I don't think that's workable,

13  particularly for the witness that Mr. Banks just mentioned

14  because that witness is relevant to the counterclaim, to

15  Lockton's counterclaim.  I certainly don't want Lockton's

16  counterclaim evidence in my case, so, you know, rule of

17  completeness, yes, if something must be played to make the

18  testimony complete and not misleading.  But just because I

19  want to call a witness on one point should not mean that their

20  evidence gets into my case.

21        MR. BANKS:  Well, I think anything within the scope

22  should certainly be fair game because we would be able to

23  cross-examine the witness within scope if they were live.  I

24  agree on the counterclaim.  That's correct.  That should be in

25  our case in chief.  That would be outside the scope, but

1  anything within the scope of what they've designated, we

2  should be able to play just like we would be able to

3  cross-examine the witness live.  Otherwise, we're not getting

4  an opportunity to cross-examine the witness, and that's not

5  fair.

6        THE COURT:  Well, I thought the suggestion was that

7  you would play it when it's time for your cross-examination.

8  I think -- I understand the logistics are weird, but I also

9  understand the point that USI might not want to elicit

10  testimony for purposes of cross in their presentation of the

11  deposition.  It seems like you all might be able to work this

12  out.  Maybe if it's a range and you just want an extra couple

13  of lines, then, yes, maybe you could just play it all at once.

14        MR. BANKS:  Yeah.  I think practically speaking.

15  Otherwise, again, we'll be wasting a lot of time by replaying

16  the exact same testimony right afterwards.

17        MS. BAUGHAN:  I would recommend that maybe we talk it

18  over.  If we're still having an issue, maybe we could notify

19  the Court end of the week, and we could get it resolved if we

20  need to.  I think a lot of these practical issues we're all

21  wrestling with and we want to -- let's see if we can come to

22  an agreement.

23        MR. BANKS:  I think that's fair.

24        THE COURT:  All right.  Great.  All right.  I think

25  I've said everything on my list.  Anything else?

1        MS. BAUGHAN:  The last thing is just before we leave

2   the courtroom we wanted to make sure our computer

3   appropriately interacted with equipment, and I think

4   Ms. Shanks has to turn it on.  I know we're at the very end of

5   the day.  Would it be all right if we tested that out when

6   your Honor is finished?

7        THE COURT:  All right.

8        MS. BAUGHAN:  Thank you.

9        THE COURT:  Well, that's my cue to leave.  If

10  anything comes up between now and Tuesday, email Ms. Shanks,

11  and I'll be available if you need me.  And there are a couple

12  of things that I need to get back to you on, so we'll do that.

13  Likely be an email or a quick docket entry if it's an order.

14  All right.  We are adjourned.

15       MS. BAUGHAN:  Thank you, your Honor.

16       MR. BANKS:  Thank you, your Honor.

17       (Whereupon, the proceedings were adjourned at 3:15

18  p.m.)

19                        -  -  -

20

21

22

23

24

25

```
1                        REPORTERS CERTIFICATE

2

3

4              I, Wynette C. Blathers, Official Court Reporter for

5    the United States District Court for the Northern District of

6    Georgia, with offices at Atlanta, do hereby certify:

7              That I reported on the Stenograph machine the

8    proceedings held in open court on April 26, 2023, in the

9    matter of JAMESON TAYLOR ANDERSON et al. v. USI INSURANCE

10   SERVICES LLC  |  USI INSURANCE SERVICES LLC v. SOUTHEAST

11   SERIES OF LOCKTON COMPANIES, LLC, Case Nos. 1:19-CV-05582-VMC

12   and 1:20-CV-2490-VMC; that said proceedings in connection with

13   the hearing were reduced to typewritten form by me; and that

14   the foregoing transcript (Pages 1 through 181) is a true and

15   accurate record of the proceedings.

16             This the 30th day of April, 2023.

17

18

19

20                              _____
                           /s/ Wynette C. Blathers, RMR, CRR
21                             Official Court Reporter

22

23

24

25
```